20001663CA - HAULSEE, MICHAEL vs. DEUTSCHE BANK NATIONAL TRUST C...    Page 1 of 2

Case 8:21-cv-00349-SDM-JSS   Document 1-2   Filed 01/12/21   Page 1 of 428 PageID 12

# COMPOSITE EXHIBIT A

## 20001663CA - HAULSEE, MICHAEL vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE

### SUMMARY

| | | | | | |
|---|---|---|---|---|---|
| **Judge:** | SMILEY, ELIJAH | **Court Type:** | Circuit Civil | **Case Type:** | OTHER |
| **Case Number:** | 20001663CA | **Uniform Case Number:** | 032020CA001663CAXXXX | **Status:** | OPEN |
| **Clerk File Date:** | 9/23/2020 | **Status Date:** | 9/23/2020 | **Waive Speedy Trial:** | ☐ |
| **Total Fees Due:** | 0.00 | **Booking Number:** | | **Agency:** | |
| **Agency Report Number:** | | **Custody Location:** | | **Foreclosure:** | ACTIVE - 9/23/2020 |

### PARTIES

| TYPE | PARTY NAME | ATTORNEY |
|---|---|---|
| PLAINTIFF | HAULSEE, MICHAEL | 1 WOLF, MATTHEW DANIEL (Main Attorney)<br>Email: MWOLF@WOLFFELAWFL.COM<br>2 TURNER-HAHN, CARLA<br>Email: carlathahn@gmail.com |
| PLAINTIFF | HAULSEE, MARCIA | |
| DEFENDANT | DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE | |

### EVENTS

| DATE | EVENT | JUDGE | LOCATION | RESULT | |
|---|---|---|---|---|---|
| 11/20/2020 3:00 PM | HEARING - CIVIL | OVERSTREET, MICHAEL C | JUDGES CHAMBERS | Not Assigned | |

### CASE DOCKETS

| IMAGE | DATE | ENTRY |
|---|---|---|
| 📄 20 | 1/11/2021 | EP - MOTION TO QUASH SERVICE OF PROCESS |
| 📄 2 | 1/8/2021 | EP - EXHIBIT DECLARATION OF RONALDO REYES |
| 📄 10 | 1/8/2021 | EP - MOTION TO DISQUALIFY COUNSEL AND FOR SACTIONS FOR FRAUD |
| 📄 4 | 1/7/2021 | EP - NOTICE OF SERVICE OF INTERROGATORIES |
| 📄 3 | 1/7/2021 | EP - REQUEST FOR PRODUCTION |
| | 1/7/2021 | PLAINTIFF'S ATTORNEY: WOLF, MATTHEW DANIEL ASSIGNED |
| 📄 1 | 1/7/2021 | EP - NOTICE OF APPEARANCE FOR PLT |
| 📄 4 | 1/6/2021 | EP - DFTS MOTION TO WITHDRAW WITH INCORPORATED SIGNED CLIENT CONSENT |
| 📄 41 | 12/23/2020 | EP - MOTION TO SET ASIDE/VACATE DEFAULT & OPPOSITION TO MOTION FOR SUMMARY JDMT |
| 📄 119 | 12/23/2020 | EP - REQUEST FOR JUDICIAL NOTICE OF OTHER LEE SEGAL CASES |
| 📄 26 | 12/23/2020 | EP - REQUEST FOR JUDICIAL NOTICE OF PINELLAS COUNTY CASE |
| 📄 10 | 12/23/2020 | EP - NOTICE OF FILING ATTACHED AFFIDAVITS |
| 📄 20 | 12/23/2020 | EP - NOTICE OF FILING DOCUMENTS RELATING TO CORPORATE EXISTENCE |
| 📄 52 | 12/23/2020 | EP - REQUEST FOR JUDICIAL NOTICE OF PINELLLAS COUNTY FORECLOSURE CASE |
| 📄 2 | 12/18/2020 | EP - NOTICE OF UNAVAILABILITY |
| 📄 68 | 12/17/2020 | EP - REQUEST FOR JUDICIAL NOTICE OF US DISTRICT COURT CASE FOR THE MIDDLE DISTRICT OF FL |
| 📄 12 | 12/17/2020 | EP - DFTS NOTICE OF FILING LEGAL AUTHORITY CITED BY PLTS COMPLAINT |
| 📄 2 | 12/17/2020 | EP - NOTICE OF LIMITED APPEARANCE |
| 📄 2 | 12/1/2020 | EP - NOTICE OF HEARING - 1/20/21 AT 11:30 |
| | 11/12/2020 | HEARING - CIVIL SET FOR 11/20/2020 AT 3:00 PM IN JC/ , JDG: OVERSTREET, MICHAEL C |
| 📄 1 | 10/20/2020 | EP - NOTICE OF HEARING- 11/20/20 AT 3 PM |
| 📄 3 | 10/15/2020 | EP - PLTS MOTION FOR SUMMARY JUDGMENT AFTER DEFAULT |
| 📄 3 | 10/15/2020 | EP - AFFIDAVIT IN SUPPORT OF MOTION FOR JUDGMENT |
| 📄 2 | 10/15/2020 | EP - MOTION FOR DEFAULT/ DEFAULT ENTERED ON DEUTSCHE BANK |
| 📄 1 | 10/7/2020 | EP - RETURN OF SERVICE - SERVED - DEUTSCHE BANK - 09/24/20 |
| | 9/30/2020 | JUDGE SMILEY, ELIJAH: ASSIGNED |
| | 9/30/2020 | DIVISION N ASSIGNED |
| 📄 1 | 9/23/2020 | PAYMENT $410.00 RECEIPT #2020037205 |
| 📄 2 | 9/23/2020 | EP - SUMMONS ISSUED - DEUTSCHE BANK NATIONAL TRUST CO |
| 📄 13 | 9/23/2020 | EP - INITIAL COMPLAINT |
| 📄 3 | 9/23/2020 | EP - CIVIL COVER SHEET |
| | 9/23/2020 | JUDGE OVERSTREET, MICHAEL C: ASSIGNED |
| | 9/23/2020 | DIVISION K ASSIGNED |
| | 9/23/2020 | CLERK TF/DOR SUMMONS ASSESSED $10.00 |
| | 9/23/2020 | CASE TYPE : OTHER |
| | 9/23/2020 | CIVIL-OTHER FILING FEES ASSESSED $400.00 |
| | 9/23/2020 | CASE FILED 09/23/2020 CASE NUMBER 20001663CA |

| IMAGE | DATE | ENTRY |
|-------|------|-------|

Case 8:21-cv-00349-SDM-JSS   Document 1-2   Filed 01/12/21   Page 3 of 428 PageID 14

**FORM 1.997.   CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

---

### I.   CASE STYLE

IN THE CIRCUIT COURT OF THE <u>FOURTEENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>BAY</u>   COUNTY, FLORIDA

<u>Michael Haulsee, Marcia Haulsee</u>
Plaintiff

Case # ___20001663CA___

Judge _____

vs.

<u>Deutsche Bank National Trust Company, as Trustee</u>
Defendant

---

### II.   AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐ $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

### III.   TYPE OF CASE   (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
       ☐ Business governance
       ☐ Business torts
       ☐ Environmental/Toxic tort
       ☐ Third party indemnification
       ☐ Construction defect
       ☐ Mass tort
       ☐ Negligent security
       ☐ Nursing home negligence
       ☐ Premises liability—commercial
       ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
       ☐ Commercial foreclosure
       ☐ Homestead residential foreclosure
       ☐ Non-homestead residential foreclosure
       ☐ Other real property actions

☐Professional malpractice
       ☐ Malpractice—business
       ☐ Malpractice—medical
       ☐ Malpractice—other professional
☒ Other
       ☐ Antitrust/Trade regulation
       ☐ Business transactions
       ☐ Constitutional challenge—statute or ordinance
       ☐ Constitutional challenge—proposed amendment
       ☐ Corporate trusts
       ☐ Discrimination—employment or other
       ☐ Insurance claims
       ☐ Intellectual property
       ☐ Libel/Slander
       ☐ Shareholder derivative action
       ☐ Securities litigation
       ☐ Trade secrets
       ☒ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.     REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.      NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

   <u>Two</u>

**VI.     IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.    HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.   IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: <u>s/ Carla Turner-Hahn</u>       Fla. Bar # <u>390658</u>
      Attorney or party             (Bar # if attorney)

<u>Carla Turner-Hahn   </u>       <u>09/23/2020</u>
  (type or print name)         Date

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

    Plaintiffs,

                                   Case No.:  20001663CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

    Defendant.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs, MICHAEL HAULSEE and MARCIA HAULSEE, by and through their undersigned counsel, sue Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee ("Defendant"), and would show:

### BACKGROUND

1.    All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

2.    Venue is proper in Bay County, Florida, as the cause of action accrued here.

3.    On or about November 30, 2006, Plaintiff, MICHAEL HAULSEE, entered a promissory note ("the Note") and mortgage ("the Mortgage") with LoanCity, a California Corporation ("LC") in connection with their purchase of the property located at 2900 Pelham Road North, St. Petersburg, FL 33710 ("the Property").

4.    Instead of operating merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage also read like a contract, requiring the remittance of monetary payments, including payments of property taxes and insurance.

1

5.      Shortly after closing on this loan, LC sold the Note to a third-party depositor ("the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

6.      Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust.  The Depositor then assigned the cash flows from the Loans to the Trust, which in this case was called Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates Series 2007-QS4 ("the Trust").

7.      Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities.  The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments.  Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

8.      Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages").  In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default.  Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral.  This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the

2

purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

9.      Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors -- essentially, that they were all high-quality loans ("the Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

10.     Deutsche Bank Trust Company Americas ("Deutsche") never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

11.     Deutsche's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of

impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

12.     Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference.  As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

13.     By 2012, however, the Depositor was no longer in business.  As Trustee of the Trust, Deutsche was still responsible for collecting cash flows on behalf of the Certificateholders. Yet it was failing to do so.  Plaintiffs, for example, stopped making payments under the Note in June, 2013 – one of many Borrowers who did so.  As a result, a lawsuit was filed against them, Pinellas County Case No. 15-2225-CI ("the Lawsuit"), with Deutsche, as Trustee for the Trust, named as the plaintiff.  The genesis of the Lawsuit was Deutsche's attempt to foreclose the Mortgage and divest Plaintiffs of ownership of the Property.

14.     At all times relevant, Deutsche Bank National Trust Company, as Trustee was the alter ego of Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4.  The corporate veil is hence able to be pierced, and Deutsche Bank National Trust Company, as Trustee is liable for the acts described herein to the same extent as Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed, Pass-Through Certificates, Series 2007-QS4.  As such, while the latter was technically the named plaintiff in the lawsuit, the former, as its alter ego, is treated synonymously with it, as one and the same, for all purposes herein.

4

15.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

16.     First, Defendant was neither the owner nor the holder of the Note by operation of law. In fact, it was illegal for Defendant to own or hold the Notes. Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.     Second, the Lawsuit was brought in the name of the Trust, which was identified in the style of the Lawsuit as the party prosecuting the case ("as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4"). However, the beneficiaries of the Trust, *i.e.* the Certificateholders, did not authorize the Lawsuit, benefit from it, or even know it had been filed. Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff. Defendant undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

18.     Despite the foregoing, the Servicers, including but not limited to Ocwen Loan Servicing, LLC ("Ocwen"), purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Lawsuit to be prosecuted in Defendant's name and represented, under oath, that Defendant was the owner and holder of the Note. As Defendant is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

19.     To support its position in the Lawsuit, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal. (At any one time, only one servicer was assigned to the Loan.  However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein.  As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

20.     First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Trust beneficiaries, *i.e.* the Certificateholders, as they did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome.  Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make the Trust the plaintiff in the Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

21.     Second, the Servicers knew that Defendant was not the owner or holder of the Note by operation of law.  Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit, under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

22.     Third, the Servicer caused to be recorded in the Official Records of Pinellas County, Florida at Instrument 2015110323, an Assignment of Mortgage ("the First Assignment"), which purported to assign the Mortgage from Mortgage Electronic Registration Systems, Inc. ("MERS"), as Nominee for LC, to Residential Funding Corporation ("RFC"), Defendant, and a second Assignment of Mortgage ("the Second Assignment"), at OR Instrument 2015110324, which purported to assign the Mortgage from RFC to Defendant.

23.     In truth, MERS had no ability to convey the First Assignment, either as Nominee for RFC or otherwise.  After all, the Trust was created in 2007 by the sale of the cash flows from the Loans, so by the time of the First Assignment, MERS had no interest in the Mortgage, as it had already been sold to the Depositor.  The Servicer nonetheless prepared and caused to be recorded the First Assignment – a violation of Fla. § 817.535(2)(a) and a criminal infraction, a felony under Florida law.

24.     For these same reasons, RFC has no authority to convey the Second Assignment, as the Loan had already been sold to the Depositor.  In fact, as of the date of the Second Assignment, RFC ceased to exist.  To create the appearance of a conveyance in the official records, the Servicer nonetheless prepared and caused to be recorded the Second Assignment, representing itself to be the attorney in fact for RFC and authorized to sign on its behalf when it was not.  These were additional violations of Fla. Stat. § 817.535(a)(a), felony infractions under Florida law, yet the Servicers committed them anyway to impair Plaintiffs' title to the Property and further their scheme to steal it from him.

25.     Fourth, the Servicer relied on a chain/series of endorsements on the Note, including one by RFC ("the First Endorsement") and another by Deutsche Bank Trust Company Americas, as Trustee ("DB") ("the Second Endorsement"), and used them as a basis to claim standing in the Lawsuit.  In truth, however, the First Endorsement was stamped onto the Note long after RFC ceased to exist in a fraudulent effort to procure standing where none otherwise existed, and the Second Endorsement was not actually executed by DB, but Ocwen Loan Servicing, LLC ("Ocwen"), purportedly as attorney in fact for DB.  Yet Ocwen was not actually attorney in fact for DB and lacked the authority to execute the Second Endorsement.  It fraudulently represented

otherwise in a fraudulent, perjurious, and illegal attempt to convey standing where none otherwise existed.

26.     Fifth, the Servicers repeatedly represented, in the Lawsuit, that Defendant had been damaged as a result of Plaintiffs' non-payment of the installment payments due under the Note. These representations were knowingly false, fraudulent, and perjurious at all times relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trust. Suffice it to say Servicer's repeated representations in the Lawsuit that Defendant was not damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant's name where no basis to do so existed.

27.     Sixth, the Servicer filed in the Lawsuit a Limited Power of Attorney from Deutsche ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuit as an agent of the Trust. These representations, however, were entirely fraudulent – and known to be so by all involved. In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit.

28.     Seventh, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendant and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendant in the Lawsuit. In the process, the

Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendant was the holder of the Note and was damaged by Plaintiffs' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendant, the entity for which they were counsel of record in the Lawsuit.

29.   At all times relevant, Deutsche knew that the actions of the Servicers in the Lawsuit were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, Deutsche has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers like Ocwen on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

30.   For instance, in its capacity as Trustee, Deutsche has executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like Ocwen to go to court and create the impression they were an agent of Ocwen and authorized to prosecute a foreclosure in Ocwen's name and otherwise act on its behalf even if actual authority were lacking.

31.   At the same time, though, Deutsche knew that servicers like Ocwen were using Deutsche's name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts. If this misconduct ever came to light, Deutsche wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent." That is why: (i) Deutsche insisted that all limited powers of

attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) Deutsche insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within Deutsche, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of Deutsche, and conceded that Deutsche never owned or held any promissory notes.

32.    Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like Ocwen – perpetuated in the name of Deutsche, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment with Deutsche, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

33.    Despite its feigned ignorance, Deutsche knew full well what was happening. In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, Deutsche failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name. In fact, Deutsche continues to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

34.    Further proof that Deutsche's "ignorance" of the Servicers' illegality was feigned, and that Deutsche knew full well what the Servicers were doing, is seen in the indemnification agreements between it and the Servicers. After all, when an indemnification agreement exists

between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship. Here, conversely, Deutsche, *i.e.* the principal, wanted Servicers like Ocwen, *i.e.* the agent, to indemnify Deutsche for all actions the servicers took in their name. The obvious reason for such an unusual indemnification is that Deutsche knew that servicers like Ocwen were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and Deutsche wanted someone else to pay in the event the fraud scheme ever came to light.

35.     Deutsche's motive for participating in the foregoing was clear – money. After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to Deutsche for those payments. Facilitating and encouraging the foregoing misconduct hence enabled Deutsche to avoid significant payments out of its own pocket.

36.     Based on the fraudulent and illegal acts of Defendant, Ocwen, and the Servicers, as described here, Defendant succeeded in obtaining a Final Judgment of Foreclosure and, ultimately, divesting Plaintiff of title to the Property. Yet Plaintiff did not discover the fraudulent nature of Defendant's actions until 2020, after extensive investigation, the delay in discovery being attributed largely to Defendant's ongoing scheme to conceal its misconduct from Plaintiff, this Court, its own attorneys, and the public.

## **COUNT ONE**

37.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

38.     Plaintiff realleges and incorporates by reference paragraphs 1-36 above.

11

39.     Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4).   To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

40.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of the Property and the attorney's fees and costs incurred defending the Lawsuit.

41.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

## COUNT TWO

42.     This is an action for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

43.     Plaintiff realleges and incorporates by reference paragraphs 1-35 above.

44.     Through a series of fraudulent misrepresentations, as set forth above, Defendant slandered Plaintiff's title to the Property, then divested (or purported to divest) Plaintiff of ownership.

45.     As a result of Defendant's actions, Plaintiff has been damaged.  Those damages include, but are not limited to, the value of the Property, interest on that money, lost rents for the duration of time that Plaintiff has been dispossessed, and attorney's fees and costs arising from having to defend the Lawsuit.

WHEREFORE Plaintiff demands judgment against Defendant for damages, general and special, interest, attorney's fees, and costs. Plaintiff further demands a trial by jury and such other and further relief that this Court deems proper.

This 23rd day of September, 2020.

<div style="text-align:right">

*/s/ Carla Turner-Hahn, Esquire*
Carla Turner-Hahn, Esquire
Carla Turner-Hahn, P.A.
Attorney for Plaintiff
615 Whisper Woods Drive
Lakeland, Florida 33813
Ph: 727-433-1624
FBN: 0390658
Email: carlathahn@gmail.com

</div>

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

      Plaintiffs,

                                           Case No.:  20001663CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

      Defendant.

_____/

**SUMMONS**

THE STATE OF FLORIDA
To: Each Sheriff of the State

      YOU ARE COMMANDED to serve this summons and a copy of the complaint or petition in this action on Defendant, Deutsche Bank National Trust Company, as Trustee, 60 Wall Street, New York City, New York, 10005.

The Defendant is hereby required to serve written defenses to said Complaint on Plaintiff's attorney, Lee Segal, Esquire, whose address is 18167 US Hwy 19 N, #100, Clearwater, FL 33764, Lee@segalschuh.com.

      Not counting the day of service of this summons, you have twenty (20) calendar days in which to file an Answer and defenses. You must file the original of your Answer and defenses with the Clerk of this Court either before or immediately after you serve the Plaintiff's attorney. If you fail to serve such an Answer within this twenty-day period, then a default and a Judgment may be entered against you without further notice.

WITNESS my hand and the seal of this Court on _____September 23_____, 2020.

                              CLERK OF THE CIRCUIT COURT

                    By: _____Jennifer Estrach_____

                         As Deputy Clerk

<u>IMPORTANT</u>

A lawsuit has been filed against you.  You have twenty (20) days after this summons is served on you to file a written response to the attached Complaint with the Clerk of this Court.  A phone call will not protect you.  Your written responses, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case.  If you do not file your responses on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from this Court.  There are other legal requirements.  You may want to call an attorney right away.  If you do not know an attorney, you may call an attorney referral service or legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the Plaintiff's attorney named above.

Filing # 114614270 E-Filed 10/07/2020 04:57:04 PM

IN THE CIRCUIT FOURTEENTH JUDICIAL CIRCUIT
IN AND FOR BAY COUNTY FLORIDA
Attorney: Segal & Schuh Law Group P.L.  PH: (727) 824-5775
Address: 18167 US Highway 19 North Suite 100 Clearwater , NY 33764

Job #: 200664
Client's File.:

# AFFIDAVIT OF SERVICE

Michael Haulsee and Marcia Haulsee

*Plaintiff*

Deutsche Bank National Trust Company

*Defendant*

Index Number: 200001663CA

Date Filed: 9/23/2020

Date Received  9/23/2020 at 12:22 PM

Court Date:

STATE OF NEW YORK, COUNTY OF SUFFOLK, SS.:
Michael S. Levey , being sworn says: Deponent is not a party herein; is over the age of 18 years and resides in the State of .
On 9/24/2020, at **1:04 PM** at: **CT CORP  28 LIBERTY STREET, NY, NY 10005** Deponent served the within **Summons and Complaint**

upon: DEUTSCHE BANK NATIONAL TRUST COMPANY,  therein named.

☐ **#1 INDIVIDUAL**
By delivering a true copy of each to said recipient personally; Deponent knew the person so served to be the person described in as said recipient therein.

☐ **#2 SUITABLE AGE PERSON**
By delivering thereat a true copy of each to  (Authorized Agent) a person of suitable age and discretion. Said premises is recipient's:[] actual place of business / employment  [] dwelling house (usual place of abode) within the state.

☐ **#3 AFFIXING TO DOOR**
By affixing a true copy of each to the door of said premises which is defendants
[] actual place of business / employment  [] dwelling house (usual place of abode) within the state. Deponent was unable with due diligence to find defendant or person of suitable age and discretion thereat having called there

☒ **#4 Corporation or Partnership or Trust or LLC or Medical Profession**
By delivering thereat a true copy of each to Gabriel Perez Messenger Room o/b/o CT Corp personally. Deponent knew said entity so served to be the entity described in said aforementioned document as said defendant and knew said individual to be an Authorized Agent thereof.

☐ **#5 MAILING**
On , deponent enclosed a copy of same in a postpaid envelope properly addressed to defendant at defendant's last known [] Actual Place of Residence [] Actual Place of Business, and deposited the envelope in an official depository, personally or via agency, under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "personal and confidential" and did not indicate on the outside, thereof by return address or otherwise that the communication was from an attorney or concerned an action against the defendant.

☒ **#6 DESCRIPTION**
Sex: Male          Color of skin: White          Color of hair: Black     Glasses: No
Age: 22 - 35 Yrs.     Height: 5ft 4inches - 5ft 8inches          Weight: 161-200 Lbs. Other Features: Mask

☐ **#7 MILITARY SERVICE**
I asked the person spoken to whether defendant was in active military service of the United States or the State of New York in any capacity whatever and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated.

☐ **#8 WITNESS FEES**  Subpoena Fee Tendered in the amount of

☒ **#9 OTHER**
Per Jacquelin Walton at the security desk,  the respondent Deutsche Bank of 60 Wall Street NY NY has directions to continue to serve process at CT Corp 28 Liberty Street NY NY 10005 as no one currently is present in the building who is authorized to accept legal papers.  As of 9/24/20 she does not know when this method will revert to the original service address.

Sworn to before me on 9/30/2020

_Robert Monteleon_
Robert J. Monteleone
NOTARY PUBLIC STATE OF NEW YORK
No. 02MO6010691
Qualified in Suffolk County
My Commission Expires October 16, 2022

_Michael S. Levey_
Michael S. Levey
1209939

Michael S.Levey 450 Route 25 A East Setauket NY 11733 631 786 8021 received by Attorney (Firm) and or Pro Se Litigant

o/b/o Segal & Schuh Law Group P.L.  (727) 824-5775 18167 US Highway 19 North Suite 100 Clearwater , NY 33764

Case 8:21-cv-00349-SDM-JSS   Document 1-2   Filed 01/12/21   Page 22 of 428 PageID 33

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

      Plaintiffs,

                                                            Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

      Defendant.

_____/

## MOTION FOR CLERK'S DEFAULT

Plaintiffs, MICHAEL HAULSEE and MARCIA HAULSEE, by and through their undersigned counsel, move this Court for a default in their favor and against Defendant, Deutsche Bank National Trust Company, as Trustee ("Defendant"), and would show:

1.      On September 24, 2020, Defendant was personally served with the Summons and Complaint.  An Affidavit of Service so reflecting is contained in the court file.

2.      On October 14, 2020, Defendant's deadline to respond to the Complaint came and went, yet Defendant failed to file/serve any paper or otherwise respond.

3.      The Clerk of this Court should enter a default against Defendant.

                                       */s/ Carla Turner-Hahn, Esquire*
                                       Carla Turner-Hahn, Esquire
                                       Carla Turner-Hahn, P.A.

## DEFAULT

A default is hereby entered against Deutsche Bank National Trust Company, as Trustee, as to all relief sought in the Complaint, for failure to serve any paper as required by law.

                                      *Jennifer Sullivan*    *10/15/2020*

                                   _____
                                    Deputy Clerk

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via regular U.S. Mail to Defendant, Deutsche Bank National Trust Company, as Trustee, 60 Wall Street, New York City, New York 10005 and 28 Liberty Street, New York City, New York 10005 on this 15th day of October, 2020.

<div align="right">

*/s/ Carla Turner-Hahn, Esquire*
Carla Turner-Hahn, Esquire
Carla Turner-Hahn, P.A.
Attorney for Plaintiff
615 Whisper Woods Drive
Lakeland, Florida 33813
Ph: 727-433-1624
FBN: 0390658
Email:  carlathahn@gmail.com

</div>

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

      Plaintiffs,

                                              Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

      Defendant.

_____/

## MOTION FOR FINAL SUMMARY JUDGMENT
## AFTER DEFAULT

Plaintiffs, MICHAEL HAULSEE and MARCIA HAULSEE, by and through their undersigned counsel and pursuant to Fla.R.Civ.P. 1.510, move this Court for entry of final summary judgment in their favor and against Defendant, Deutsche Bank National Trust Company, as Trustee ("Defendant"), and would show:

1.      This is a lawsuit alleging various fraudulent and criminal misconduct, as set forth in Counts One and Two of the Complaint.

2.      Defendant was personally served with process, yet it did not respond to the Complaint, resulting in a clerk's default.

3.      By operation of law, the default acts as an admission of all well-pled allegations in the Complaint.  See Cellular Warehouse, Inc. v. GH Cellular, LLC, 957 So. 2d 662, 665 (Fla. 3d DCA 2007) (a defaulted defendant "admits all well-pleaded allegations in a complaint").  Under Fla.R.Civ.P. 1.500(e), "[f]inal judgments after default may be entered by the court at any time." While additional proof is necessary to establish the amount of unliquidated damages, the default is conclusive on all issues of liability, obviating the need for further notice, hearing, or evidence.

See <u>Pony Express Courier Corp. of Florida v. Zimmer</u>, 475 So. 2d 1316, 1319 (Fla. 2d DCA 1985);

<u>see also</u> <u>Wiseman v. Stocks</u>, 527 So. 2d 904, 905 (Fla. 1st DCA 1988) ("By his default, [defendant]

admitted the truth of this allegation; accordingly, the lower court had no legal right to consider

evidence relating to the issue.").

4.      Contemporaneous with the filing of this motion, Plaintiffs are filing the affidavit of

Michael Haulsee, reflecting the damages owed. <u>See</u> Affidavit in Support of Motion for Summary

Judgment.

5.      Plaintiffs prosecuted Count One under Fla. Stats. §§ 817.535 and 772.103(1)-(4),

part of the Civil Remedies for Criminal Practices Act. As such, Plaintiff is entitled to the treble

damages authorized under the statute, as alleged in the Complaint.[1]

6.      The pleadings, default, and Affidavit in Support of Summary Judgment leave no

genuine issues of material fact. This Court should enter final judgment in Plaintiffs' favor on the

monetary damages sought in Count One for the following amounts:    $5,097,300.00

($1,682,500.00, reflecting the value of the property, multiplied by three), plus $49,800.00 in

attorney's fees as special damages ($16,600.00 in fees incurred, multiplied by three), for a total of

$5,147,100.00. <u>See</u> Affidavit in Support of Summary Judgment.

WHEREFORE Plaintiffs respectfully request relief in accordance with the foregoing.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

via regular U.S. Mail to Defendant, Deutsche Bank National Trust Company, as Trustee, 60 Wall

---

[1]      Count Two of the Complaint alleged a different theory of recovery, but the damages under that claim are the same as those in Count One. To avoid a double recovery, Plaintiffs are not pursuing the damages sought in Count Two, as the granting of this motion would render them moot.

Street, New York City, New York 10005 and 28 Liberty Street, New York City, New York 10005 on this 16th day of October, 2020.

*/s/ Carla Turner-Hahn, Esquire*
Carla Turner-Hahn, Esquire
Carla Turner-Hahn, P.A.
Attorney for Plaintiff
615 Whisper Woods Drive
Lakeland, Florida 33813
Ph: 727-433-1624
FBN: 0390658
Email:  carlathahn@gmail.com

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

       Plaintiffs,

                                                       Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

       Defendant.

_____/

## NOTICE OF FILING

Please take notice of the filing of the Affidavit in Support of Summary Judgment of Plaintiff.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via regular U.S. Mail to Deutsche Bank National Trust Company, as Trustee, 60 Wall Street, New York City, New York 10005 and 28 Liberty Street, New York City, New York 10005 on this 16th day of October, 2020.

                                 */s/ Carla Turner-Hahn, Esquire*
                                 Carla Turner-Hahn, Esquire
                                 Carla Turner-Hahn, P.A.
                                 Attorney for Plaintiff
                                 615 Whisper Woods Drive
                                 Lakeland, Florida 33813
                                 Ph: 727-433-1624
                                 FBN: 0390658
                                 Email: carlathahn@gmail.com

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

       Plaintiffs,

                                 Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

       Defendant.

_____/

### <u>AFFIDAVIT IN SUPPORT OF SUMMARY JUDGMENT</u>

I, Michael Haulsee, testify as follows:

1.     I am over 18 years of age, competent, and state these facts upon my personal knowledge.

2.     I owned the property located at 2900 Pelham Road North in St. Petersburg, Florida ("the Property") for many years.

3.     The value of the Property is $1,682,500.00. That is the value set forth on Realtor.com, a website that I frequently use to help guide my valuations of real estate. In addition, I know this to be the value based on my ownership of the Property for many years and my knowledge of property values in the neighborhood.

4.     Over the course of many years, my wife and I incurred $16,600.00 in attorney's fees in defending foreclosure lawsuits on the Property.

_____     10/15/2020
Michael Haulsee                    Date

STATE OF _Florida_
COUNTY OF _Pinellas_

    Before me, the undersigned authority, on this _15_ day of October 2020, personally appeared Michael Haulsee, who is personally known to me and who, having been duly sworn, deposes and says that the foregoing facts are true and correct.



Notary

Notary Public State of Florida
Jason Sayles
My Commission GG 960047
Expires 01/22/2024

3

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and MARCIA HAULSEE,

     Plaintiffs,

                                        Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

## NOTICE OF TELEPHONIC HEARING

Please take notice of the following hearing:

| | |
|---|---|
| Matter: | Plaintiff's Motion for Final Summary Judgment After Default |
| Judge: | Hon. Michael C. Overstreet |
| Date/Time: | November 20, 2020 at 3:00 pm CST / 4:00 pm EST |
| How to Attend: | Dial (for United States) |
| | +1 253 215 8782 |
| | +1 301 715 8592 |
| | Meeting ID:   935 400 1045 |

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via regular U.S. Mail to Defendant, Deutsche Bank National Trust Company, as Trustee, 60 Wall Street, New York City, New York 10005 and 28 Liberty Street, New York City, New York 10005 on this 20th day of October, 2020.

                                      */s/ Carla Turner-Hahn, Esquire*
                                      Carla Turner-Hahn, Esquire
                                      Carla Turner-Hahn, P.A.
                                      Attorney for Plaintiff
                                        615 Whisper Woods Drive
                                        Lakeland, Florida 33813
                                        Ph: 727-433-1624
                                        FBN: 0390658
                                        Email:  carlathahn@gmail.com

Case 8:21-cv-00349-SDM-JSS   Document 1-2   Filed 01/12/21   Page 31 of 428 PageID 42

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

       Plaintiffs,

                                                Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

       Defendant.

_____/

## NOTICE OF SUMMARY JUDGMENT / FINAL HEARING

Please take notice of the following hearing:

| | |
|---|---|
| Matter: | Plaintiffs' Motion for Final Summary Judgment After Default; Final Hearing on the issue of damages (evidence may be submitted) |
| Date/Time: | January 20, 2021 at 11:30 a.m. Central Time |
| Judge: | Hon. Elijah Smiley |
| Join Zoom Hearing: | https://zoom.us/j/9741764042 |
| Meeting ID: | 974 176 4042 |

One tap mobile
+13126266799,,9741764042# US (Chicago)
+16465588656,,9741764042# US (New York)

Dial by your location
+1 312 626 6799 US (Chicago)
+1 646 558 8656 US (New York)
+1 346 248 7799 US (Houston)
+1 669 900 9128 US (San Jose)
+1 253 215 8782 US
+1 301 715 8592 US

| | |
|---|---|
| Meeting ID: | 974 176 4042 |

Find your local number: https://zoom.us/u/axssBn5G

Join by SIP      9741764042@zoomcrc.com

Join by H.323
162.255.37.11 (US West)
162.255.36.11 (US East)
221.122.88.195 (China)
115.114.131.7 (India Mumbai)
115.114.115.7 (India Hyderabad)
213.19.144.110 (EMEA)
103.122.166.55 (Australia)
209.9.211.110 (Hong Kong)
64.211.144.160 (Brazil)
69.174.57.160 (Canada)
207.226.132.110 (Japan)

Meeting ID: 974 176 4042

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via regular U.S. Mail to Defendant, Deutsche Bank National Trust Company, as Trustee, 60 Wall Street, New York City, New York 10005 and 28 Liberty Street, New York City, New York 10005 on this 1st day of December, 2020.

*/s/ Carla Turner-Hahn, Esquire*
Carla Turner-Hahn, Esquire
Carla Turner-Hahn, P.A.
Attorney for Plaintiff
615 Whisper Woods Drive
Lakeland, Florida 33813
Ph: 727-433-1624
FBN: 0390658
Email: carlathahn@gmail.com

**IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA**

**MICHAEL HAULSEE and
MARCIA HAULSEE,**

      **Plaintiff,**               **CASE NO.: 2020-001663-CA**

**vs.**

**DEUTSCHE BANK NATIONAL TRUST
COMPANY,**

      **Defendant.**

_____/

## DEFENDANT'S NOTICE OF FILING
## <u>LEGAL AUTHORITY CITED BY PLAINTIFF IN COMPLAINT</u>

Defendant, Deutsche Bank Trust Company Americas, As Trustee For Residential Accredit

Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS4, by and through

the undersigned attorneys, hereby gives notice of filing the attached Legal Authorities cited in

Plaintiff's Complaint.

1.      § 772.013, Florida Statutes – ***STATUTE DOES NOT EXIST***;

2.      § 772.014, Florida Statutes – ***STATUTE DOES NOT EXIST***;

3.      § 817.535, Florida Statutes – prohibiting recording in official records, with the intent to defraud another, any false instrument purporting to affect an owner's interest in the property;

5.      *Jacaranda, LLC v. Green Tree Servicing, LLC*, 203 So. 3d 964 (Fla. 2d DCA 2016) (A trial court should vacate an ex parte default when the plaintiff seeking default had actual knowledge that the defendant was represented by counsel and intended to defend the lawsuit, but failed to contact the defendant's counsel prior to seeking default).

Dated: December 17, 2020

Respectfully submitted,

Jason H. Okleshen, Esq.
Florida Bar No. 496170
Okleshenj@gtlaw.com
**GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Ste. 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222

Beth A. Norrow, Esq.
Florida Bar No. 061497
norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Ste. 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: /s/ *Beth A. Norrow*
      Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 17, 2020, a true and correct copy of the foregoing was filed with the Clerk of the Court using the State of Florida e-filing system which will send a notice of electronic service to:

Carla Turner-Hahn, Esq.
615 Whisper Woods Dr.
Lakeland, FL 33813
Email: carlathahn@gmail.com

/s/ Beth A. Norrow
Beth A. Norrow

*ADMIN 37984280*





| West's Florida Statutes Annotated |
| --- |
| Title XLVI. Crimes (Chapters 775-899) |
| Chapter 817. Fraudulent Practices (Refs & Annos) |
| Part I. False Pretenses and Frauds, Generally |

West's F.S.A. § 817.535

# 817.535. Unlawful filing of false documents or records against real or personal property

Effective: October 1, 2013

Currentness

(1) As used in this section, the term:

(a) "File" means to present an instrument for recording in an official record or to cause an instrument to be presented for recording in an official record.

(b) "Filer" means the person who presents an instrument for recording in an official record or causes an instrument to be presented for recording in an official record.

(c) "Instrument" means any judgment, mortgage, assignment, pledge, lien, financing statement, encumbrance, deed, lease, bill of sale, agreement, mortgage, notice of claim of lien, notice of levy, promissory note, mortgage note, release, partial release or satisfaction of any of the foregoing, or any other document that relates to or attempts to restrict the ownership, transfer, or encumbrance of or claim against real or personal property, or any interest in real or personal property.

(d) "Official record" means the series of instruments, regardless of how they are maintained, which a clerk of the circuit court, or any person or entity designated by general law, special law, or county charter, is required or authorized by law to record. The term also includes a series of instruments pertaining to the Uniform Commercial Code filed with the Secretary of State or with any entity under contract with the Secretary of State to maintain Uniform Commercial Code records and a database of judgment liens maintained by the Secretary of State.

(e) "Public officer or employee" means, but is not limited to:

1. A person elected or appointed to a local, state, or federal office, including any person serving on an advisory body, board, commission, committee, council, or authority.

2. An employee of a state, county, municipal, political subdivision, school district, educational institution, or special district agency or entity, including judges, attorneys, law enforcement officers, deputy clerks of court, and marshals.

3. A state or federal executive, legislative, or judicial officer, employee, or volunteer authorized to perform actions or services for any state or federal executive, legislative, or judicial office, or agency.

4. A person who acts as a general or special magistrate, auditor, arbitrator, umpire, referee, hearing officer, or consultant to any state or local governmental entity.

5. A person who is a candidate for public office or judicial position.

(2)(a) A person who files or directs a filer to file, with the intent to defraud or harass another, any instrument containing a materially false, fictitious, or fraudulent statement or representation that purports to affect an owner's interest in the property described in the instrument commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b) A person who violates paragraph (a) a second or subsequent time commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(3) If a person is convicted of violating subsection (2) and the owner of the property subject to the false instrument is a public officer or employee, the offense shall be reclassified as follows:

(a) In the case of a felony of the third degree, to a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b) In the case of a felony of the second degree, to a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(4)(a) If a person is convicted of violating subsection (2) and the person committed the offense while incarcerated in a jail or correctional institution or while participating in a pretrial diversion program under any form of pretrial release or bond, on probation or parole, or under any postrelease supervision, the offense shall be reclassified as follows:

1. In the case of a felony of the third degree, to a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

2. In the case of a felony of the second degree, to a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b) If a person's offense has been reclassified pursuant to this subsection, the sentencing court shall issue a written finding that the offense occurred while incarcerated in a jail or correctional institution and direct that a copy of the written finding and judgment of conviction be forwarded to the appropriate state institution or county facility for consideration of disciplinary action and forfeiture of all gain-time or any early release credits accumulated up to the date of the violation.

(5) If the person is convicted of violating subsection (2) and the owner of the property covered by the false instrument incurs financial loss as a result of the instrument being recorded in the official record, including costs and attorney fees incurred in correcting, sealing, or removing the false instrument from the official record as described herein, the offense shall be reclassified as follows:

(a) In the case of a felony of the third degree, to a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b) In the case of a felony of the second degree, to a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(6) A person who fraudulently records a claim of lien in the official records pursuant to part I of chapter 713 is subject to the fraud provisions of s. 713.31 and not this section.

(7) If a person is convicted of violating this section, the sentencing court shall issue an order declaring the instrument forming the basis of the conviction null and void and may enjoin the person from filing any instrument in an official record absent prior review and approval for filing by a circuit or county court judge. The sentencing court may also order the instrument forming the basis of the conviction sealed from the official record and removed from any applicable electronic database used for recording instruments in the official record.

(8)(a) Any person adversely affected by an instrument filed in the official record which contains a materially false, fictitious, or fraudulent statement or representation has a civil cause of action under this section without regard to whether criminal charges are pursued under subsection (2). A notice of lis pendens in accord with s. 48.23 shall be filed which specifically describes the instrument under challenge and the real or personal property affected by the instrument.

(b) Upon a finding that the instrument contains a materially false, fictitious, or fraudulent statement or representation such

that the instrument does not establish a legitimate property or lien interest in favor of another person:

1. The court shall determine whether the entire instrument or certain parts thereof are null and void ab initio. If the court finds the instrument void in its entirety, it may order the instrument sealed from the official record and removed from any electronic database used for indexing or locating instruments in the official record. The court may also, permanently or for a period of time, enjoin the defendant who filed the instrument or who directed the filer to file the instrument from filing or directing a person to file an instrument in the official records without prior review and approval for filing by a circuit or county court judge, provided that as to third parties who may have given value for an interest described or granted by any instrument filed in violation of the injunction, the instrument shall be deemed validly filed and provides constructive notice, notwithstanding any failure to comply with the terms of the injunction.

2. Upon a finding of intent to defraud or harass, the court or jury shall award actual damages and punitive damages, subject to the criteria in s. 768.72, to the person adversely affected by the instrument. The court may also levy a civil penalty of $2,500 for each instrument determined to be in violation of subsection (2).

3. The court may grant such other relief or remedy that the court determines is just and proper within its sound judicial discretion.

(c) The prevailing party in such a suit is entitled to recover costs and reasonable attorney fees.

(d) The custodian of any official record shall, upon payment of appropriate fees, provide a certified copy of the sealed instrument to the party seeking relief under this section for use in subsequent court proceedings; in addressing or correcting adverse effects upon the person's credit or property rights, or reporting the matter for investigation and prosecution; or in response to a subpoena seeking the instrument for criminal investigative or prosecution purposes.

(e) Upon request, the custodian of any official record shall, upon payment of appropriate fees, provide a certified copy of the sealed instrument to any federal, state, or local law enforcement agency.

(f) If feasible, the custodian of the official record where the instrument is recorded shall record any court order finding that the instrument is null and void in its entirety or in certain parts thereof.

(g) An instrument removed from an electronic database used for recording instruments in the public record pursuant to this section shall be maintained in a manner in which the instrument can be reduced to paper form.

(9) A government agency may provide legal representation to a public officer or employee if the instrument at issue appears to have been filed to defraud or harass the public officer or employee in his or her official capacity. If the public officer or employee is the prevailing party, the award of reasonable attorney fees shall be paid to the government agency that provided the legal representation.

(10) This section does not apply to the procedures for sealing or expunging criminal history records as provided in chapter 943.

**Credits**

Added by Laws 2013, c. 2013-228, § 1, eff. Oct. 1, 2013.

Notes of Decisions (4)

West's F. S. A. § 817.535, FL ST § 817.535
Current through Chapter 184 (End) of the 2020 Second Regular Session of the Twenty-Sixth Legislature

End of Document                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

203 So.3d 964
**District Court of Appeal of Florida,
Second District.**

JACARANDA, LLC, Appellant,
v.
GREEN TREE SERVICING, LLC,
Appellee.

No. 2D15−3561.
|
Nov. 2, 2016.

**Synopsis**
**Background:** Bank brought foreclosure action against purchaser of property at judicial auction. The Circuit Court, Manatee County, John F. Lakin, J., entered final judgment of foreclosure based on entry of clerk's default and denied purchaser's motion to vacate. Purchaser appealed.

[**Holding:**] The District Court of Appeal, Badalamenti, J., held that clerk's default was invalid based on bank's failure to notify purchaser of its intention to seek default.

Reversed and remanded.

West Headnotes (5)

[1]  **Appeal and Error**⬦Relief from default judgment

An order denying a motion to vacate a clerk's default is reviewed under an abuse of discretion standard.

1 Cases that cite this headnote

[2]  **Judgment**⬦Nature of judgment by default
**Judgment**⬦Discretion of court

**Judgment**⬦Presumptions and burden of proof

Default judgments are generally not favored by the courts, and a court's discretion should be liberally exercised and all reasonable doubt resolved in favor of granting applications for relief so as to permit a determination of the controversy upon the merits.

[3]  **Judgment**⬦Want or insufficiency of notice of proceedings

A trial court should vacate an ex parte default when the plaintiff seeking default had actual knowledge that the defendant was represented by counsel and intended to defend the lawsuit, but failed to contact the defendant's counsel prior to seeking default.

[4]  **Judgment**⬦Proceedings in General

A plaintiff has actual knowledge of a defendant's intention to defend a lawsuit and actual knowledge that the defendant is represented by counsel, so as to trigger the plaintiff's duty to contact defendant's counsel prior to seeking default, where the two parties simultaneously participate in another lawsuit which involves the same dispute and where plaintiff knew that defendant is represented by counsel in that other lawsuit.

[5]  **Judgment**⬦Right to Relief in General

Clerk's default was invalid, in bank's foreclosure action against purchaser of property at judicial auction, and thus final judgment of foreclosure premised upon the default was void, where bank had actual knowledge that purchaser

intended to defend the foreclosure action through its active participation in purchaser's quiet title action, and bank had actual knowledge that purchaser was represented by counsel, but bank failed to notify purchaser or purchaser's counsel prior to moving for default.

**\*965** Appeal pursuant to Fla. R. App. P. 9.130 from the Circuit Court for Manatee County; John F. Lakin, Judge.

**Attorneys and Law Firms**

Mark P. Stopa of Stopa Law Firm, Tampa, for Appellant.

David Rosenberg and Daniel S. Stein of Popkin & Rosaler, P.A., Deerfield Beach, for Appellee.

**Opinion**

BADALAMENTI, Judge.

This is an appeal of a denial of a motion to vacate a final judgment of foreclosure premised upon the entry of a clerk's default. Jacaranda, LLC (Jacaranda) filed a quiet title action against Green Tree Servicing, LLC (Green Tree) concerning a property that Jacaranda purchased at a judicial auction. Green Tree subsequently filed a separate foreclosure action against Jacaranda concerning the same property. Although Green Tree initially served Jacaranda with process to notify Jacaranda of this foreclosure action, Green Tree failed to notify Jacaranda or Jacaranda's counsel that Green Tree had moved for and obtained a clerk's default in the foreclosure action. The trial court subsequently entered a final judgment of foreclosure in favor of Green Tree and then denied Jacaranda's motion to vacate that final judgment. We hold that the trial court abused its discretion by denying Jacaranda's motion to vacate. Green Tree had actual knowledge both that Jacaranda **\*966** intended to defend the foreclosure lawsuit and that Jacaranda was represented by counsel. As such, Green Tree's failure to notify Jacaranda or its counsel of its intention to seek the entry of a clerk's default invalidated the clerk's entry of default and rendered the subsequent final judgment it is premised upon void. We thus reverse the denial of Jacaranda's motion to vacate the final judgment and remand for proceedings on the merits.

[1] [2] "An order denying a motion to vacate a clerk's

default is reviewed under an abuse of discretion standard." *Makes & Models Magazine, Inc. v. Web Offset Printing Co.,* 13 So.3d 178, 181 (Fla. 2d DCA 2009) (citing *U.S. Bank Nat'l Ass'n v. Lloyd,* 981 So.2d 633, 639 (Fla. 2d DCA 2008)). "We acknowledge that 'default judgments are generally not favored by the courts, and a court's discretion should be liberally exercised and all reasonable doubt resolved in favor of granting applications for relief so as to permit a determination of the controversy upon the merits.' " *Paul v. Wells Fargo Bank, N.A.,* 68 So.3d 979, 981 (Fla. 2d DCA 2011) (quoting *U.S. Tobacco Co. v. Hartford Accident & Indem. Co.,* 444 So.2d 81, 83 (Fla. 2d DCA 1984)).

[3] [4] "[A] trial court should vacate an ex parte default when the 'plaintiff seeking default had actual knowledge that the defendant was represented by counsel and intended to defend the lawsuit, but failed to contact the defendant's counsel prior to seeking default.' " *Makes & Models Magazine, Inc.,* 13 So.3d at 181 (quoting *Lloyd,* 981 So.2d at 640). A plaintiff has actual knowledge of a defendant's intention to defend a lawsuit and actual knowledge that the defendant is represented by counsel where the two parties simultaneously participate in another lawsuit which involves the same dispute and where plaintiff knew that defendant is represented by counsel in that other lawsuit. *See id.*

[5] Here, the trial court was required to consider a two-part inquiry: (1) whether Green Tree had actual knowledge that Jacaranda intended to defend the foreclosure lawsuit, and (2) whether Green Tree had actual knowledge that Jacaranda was represented by counsel. *See id.* (citing *Lloyd,* 981 So.2d at 639). Jacaranda's active participation in the quiet title action, which involved the same property, gave Green Tree actual knowledge of Jacaranda's intention to defend Green Tree's foreclosure action. *See id.* Moreover, it is both undisputed and abundantly clear that Green Tree had actual knowledge that Jacaranda was represented by counsel in the quiet title action.

Green Tree had an obligation to notify Jacaranda or Jacaranda's counsel prior to moving for default in the foreclosure action. *See id.* Because Green Tree failed to satisfy this obligation, the clerk's default is invalid and the final judgment it is premised upon is therefore void. *See id.* We thus reverse the trial court's denial of Jacaranda's motion to vacate the final judgment of foreclosure.

Reversed; remanded for proceedings consistent with this opinion.

**Jacaranda, LLC v. Green Tree Servicing, LLC, 203 So.3d 964 (2016)**

41 Fla. L. Weekly D2454

SILBERMAN and CRENSHAW, JJ., Concur.

**All Citations**

203 So.3d 964, 41 Fla. L. Weekly D2454

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA

**MICHAEL HAULSEE and**
**MARCIA HAULSEE,**

      **Plaintiff,**                  **CASE NO.: 2020-001663-CA**

**vs.**

**DEUTSCHE BANK NATIONAL TRUST**
**COMPANY,**

      **Defendant.**

_____/

## NOTICE OF LIMITED APPEARANCE
## AND DESIGNATION OF EMAIL ADDRESSES

PLEASE TAKE NOTICE that the undersigned counsel, Jason H. Okleshen and Beth A. Norrow, and the law office of Greenberg Traurig, P.A. hereby serves their Notice of Limited Appearance for Defendant, **DEUTSCHE BANK NATIONAL TRUST COMPANY** ("DBNTC"). Counsel is appearing for the limited purpose of challenging whether service of process was valid, and for vacating Default and Judgment(s) after Default. Counsel hereby gives the following designations for purposes of electronic service and request that all future pleadings, notices, documents or electronic filings be served upon the undersigned attorney and law firm.

| Primary: | norrowb@gtlaw.com | Primary: | Okleshenj@gtlaw.com |
|---|---|---|---|
| Secondary: | dunnla@gtlaw.com | Secondary: | FLService@gtlaw.com |

Dated: December 17, 2020

Respectfully submitted,

Jason H. Okleshen, Esq.
Florida Bar No. 496170
Okleshenj@gtlaw.com
**GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Ste. 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222

Beth A. Norrow, Esq.
Florida Bar No. 061497
norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Ste. 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: */s/ Beth A. Norrow*
       Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 17, 2020, a true and correct copy of the foregoing was filed with the Clerk of the Court using the State of Florida e-filing system which will send a notice of electronic service to:

Carla Turner-Hahn, Esq.
615 Whisper Woods Dr.
Lakeland, FL 33813
Email: carlathahn@gmail.com

/s/ Beth A. Norrow
Beth A. Norrow

2

**IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA**

**MICHAEL HAULSEE and
MARCIA HAULSEE,**

     **Plaintiff,**                **CASE NO.: 2020-001663-CA**

**vs.**

**DEUTSCHE BANK NATIONAL TRUST
COMPANY,**

     **Defendant.**

_____/

### REQUEST FOR JUDICIAL NOTICE OF U.S. DISTRICT COURT CASE FOR THE MIDDLE DISTRICT OF FLORIDA

     Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY ("DBNTC") by and

through its undersigned counsel and pursuant to Fla. Stat. §§ 90.202(11), (12), hereby files this

Request for Judicial Notice in support of Defendant's Motion to Vacate Default and Motion to

Quash Service of Process and for all other purposes applicable in this matter, and states:

     1.     Section 90.202(6) of the Florida Evidence Code specifically provides that a court

may take judicial notice of the "[r]ecords of any court of this state." § 90.202(6), Fla. Stat. (2017);

*see also Hunt v. State*, 613 So. 2d 893, 898 n.5 (Fla. 1992) (recognizing that the Supreme Court

took judicial notice of the record in another case on the basis of section 90.202(6) of the Florida

Statutes); *Martin v. Garrison*, 658 So. 2d 1019, 1021 (Fla. 4th DCA 1995) (taking judicial notice

of court records). In interpreting this provision, Florida appellate courts have also taken judicial

notice of deeds recorded in the Official Records of a Florida County. *See Gonzalez v. Chase Home

Fin. LLC*, 37 So. 3d 955, 958 (Fla. 3d DCA 2010) (taking judicial notice of a deed and mortgage

recorded in Miami-Dade County's official records); *see also Beggi v. Ocean Bank*, 91 So. 3d 193,

195 n. 3 (Fla. 3d DCA 2012) (recognizing quitclaim deeds that were recorded in the official records of Miami-Dade County when the appellee requested taking of judicial notice of same).  Indeed, the Florida Supreme Court has stated that "[c]ourts may take judicial cognizance of all public documents and public records."  *Conyers v. State*, 123 So. 817, 818 (Fla. 1929).

2.      Further, Sections 90.202(11) and 90.202(12) of the Florida Statutes also permit the Court to take judicial notice of "[f]acts that are not subject to dispute because they are generally known within the territorial jurisdiction of the court" and/or "[f]acts that are not subject to dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned."  *See* Fla. Stat. §§ 90.202(11), (12).

3.      Pursuant to this statute, DBNTC requests that the Court take judicial notice of the Court filings in the following case, which fall squarely within the above-referenced sections:

  i.      ***Michael Haulsee and Marcia Haulsee v. Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass Through Certificates, Series 2007-QS4***; U.S. District Court for the Middle District of Florida Case No. 8:20-cv-02410-TPB-SPF, which includes, but is not limited to:

- U.S. District Court for the Middle District of Florida Docket, **Exhibit 1;**
- Complaint filed on August 17, 2020, **Exhibit 2;**
- Defendant's Motion to Dismiss Complaint, **Exhibit 3;**
- Plaintiff's Notice of Pendency of Other Actions, **Exhibit 4**.

4.      Judicial notice of these documents will allow this Court "to arrive at the best decision[] on the merits."  Dorothy F. Easley, *Judicial Notice on Appeal: A History Lesson in Recent Trends*, 84 Fla. B.J. 45, 46 (Dec. 2010) (noting that courts consider additional sources referred to in briefs or conduct their own independent research to arrive at the best decisions on the merits).

**WHEREFORE**, DBTCA respectfully request that the Court take judicial notice of the documents filed in *Michael Haulsee and Marcia Haulsee v. Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass Through Certificates, Series 2007-QS4;* U.S. District Court for the Middle District of Florida Case No. 8:20-cv-02410-TPB-SPF, together with such other relief this Court deems just and necessary.

Dated: December 17, 2020

Patrick G. Broderick (FBN 88568)
brodenickp@gtlaw.com
**GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Suite 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222
Secondary email:
Sandra.Famadas@gtlaw.com;

Respectfully submitted,

Beth A. Norrow (FBN 061497)
norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Suite 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: /s/ *Beth A. Norrow*
        Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 17, 2020, a true and correct copy of the foregoing was filed with the Clerk of the Court using the State of Florida e-filing system which will send a notice of electronic service to:

Carla Turner-Hahn, Esq.
615 Whisper Woods Dr.
Lakeland, FL 33813
Email: carlathahn@gmail.com

/s/ Beth A. Norrow
Beth A. Norrow

**2020 CA 002507 F - HAULSEE, MICHAEL vs. DEUTSCHE BANK NATIONAL TRUST COMPANY AMERICAS AS TRUSTEE FOR RESIDENTIAL ACCREDIT LOANS INC MORTGAGE ASSET-BACKED THROGH CERTIFICATES SERIES 2007-QS4**

## SUMMARY

# EXHIBIT 1

| | | |
|---|---|---|
| **Judge:** | **Court Type:** | **Case Type:** |
| STONE, WILLIAM F | Circuit Civil | OTHER CIRCUIT CIVIL |
| **Case Number:** | **Uniform Case Number:** | **Status:** |
| 2020 CA 002507 F | 462020CA002507FXXXXX | CLOSED |
| **Clerk File Date:** | **Status Date:** | **Waive Speedy Trial:** |
| 8/17/2020 | 9/15/2020 | ☐ |
| **Total Fees Due:** | **Booking Number:** | **Agency:** |
| 0.00 | | |
| **Agency Report Number:** | **Custody Location:** | |

## PARTIES

| TYPE | PARTY NAME | ATTORNEY |
|---|---|---|
| PLAINTIFF | HAULSEE, MICHAEL | |
| PLAINTIFF | HAULSEE, MARCIA | |
| DEFENDANT | DEUTSCHE BANK NATIONAL TRUST COMPANY AMERICAS AS TRUSTEE FOR RESIDENTIAL ACCREDIT LOANS INC MORTGAGE ASSET-BACKED THROGH CERTIFICATES SERIES 2007-QS4 | |

## EVENTS

| DATE | EVENT | JUDGE | LOCATION | RESULT |
|---|---|---|---|---|
| | | No Events on Case | | |

## CASE DOCKETS

| DATE | ENTRY |
|---|---|
| 9/23/2020 | NOTICE OF REMOVAL TO DISTRICT COURT - RECORDED (OR.3493.3893. / 3392979) |
| 9/17/2020 | NOTICE OF APPEARANCE OF COUNSEL: BETHA NORROW ON BEHALF OF DEUTSCHE BANK TRUST COMPANY AMERICAS |
| 9/15/2020 | CASE CLOSED |
| 9/15/2020 | NOTICE OF REMOVAL TO DISTRICT COURT |
| 9/14/2020 | NOTICE OF APPEARANCE AND DESIGNATION OF EMAIL ADDRESSES OF COUNSEL: FOR DEF |
| 9/11/2020 | SUMMONS SERVED: DEUTSCHE BANK NATIONAL TRUST COMPANY 8/26/2020 |
| 9/10/2020 | SUMMONS SERVED: DEUTSCHE BANK NATIONAL TRUST COMPANY 8/26/2020 |
| 9/8/2020 | SUMMONS SERVED: DEUTCHE BANK NATIONAL TRUST COMPANY 8/26/2020 |
| 8/21/2020 | EMAIL SENT- RECIPIENTS: SUBJECT: SERVICE OF COURT DOCUMENT - 2020 CA 002507 F, HAULSEE, MICHAEL VS. DEUTSCHE BANK NATIONAL TRUST COMPANY AMERICAS AS TRUSTEE FOR RESIDENTIAL ACCREDIT LOANS INC MORTGAGE ASSET-BACKED THROGH CERTIFICATES SERIES 2007-QS4 ATTACHMENT COUNT: 1 EMAILDOCKETDESCRIPTIONS: SIT-8/17/2020 |
| 8/21/2020 | PAYMENT $410.00 RECEIPT #2020032777 |
| 8/20/2020 | EMAIL SENT- RECIPIENTS: SEGAL, LEE SUBJECT: SERVICE OF COURT DOCUMENT - 2020 CA 002507 F, HAULSEE, MICHAEL VS. DEUTSCHE BANK NATIONAL TRUST COMPANY AMERICAS AS TRUSTEE FOR RESIDENTIAL ACCREDIT LOANS INC MORTGAGE ASSET-BACKED THROGH CERTIFICATES SERIES 2007-QS4 ATTACHMENT COUNT: 1 EMAILDOCKETDESCRIPTIONS: SIT-8/17/2020 |
| 8/17/2020 | SITUS DESIGNATION FORM FILED |
| 8/17/2020 | SUMMONS ISSUED TO: DEUTCHE BANK NATIONAL TRUST COMPANY |
| 8/17/2020 | COMPLAINT FOR DAMAGES |
| 8/17/2020 | CIVIL COVER SHEET |
| 8/17/2020 | JUDGE STONE, WILLIAM F: ASSIGNED |
| 8/17/2020 | CASE FILED 08/17/2020 CASE NUMBER 2020 CA 002507 F |

Filing # 111916694 E-Filed 08/17/2020 02:36:23 PM

# EXHIBIT 2

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT,
IN AND FOR OKALOOSA COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

        Plaintiffs,

                                            Case No.:    2020 CA 002507 F

v.

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Trustee for Residential Accredit Loans, Inc.
Mortgage Asset-Backed Pass-Through Certificates,
Series 2007-QS4,

        Defendant.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

       Plaintiffs, MICHAEL HAULSEE and MARCIA HAULSEE, by and through their undersigned counsel, sue Defendant, DEUTSCHE BANK TRUST COMPANY AMERICAS, as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4 ("Defendant"), and would show:

## BACKGROUND

       1.    All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

       2.    Venue is proper in Okaloosa County, Florida, as the cause of action accrued here.

       3.    On or about November 30, 2006, Plaintiff, MICHAEL HAULSEE, entered a promissory note ("the Note") and mortgage ("the Mortgage") with LoanCity, a California Corporation ("LC"), which Mortgage was recorded in the Pinellas County Official Records at Instrument 2006457100, connection with their purchase of the following property ("the Property"):

1

AUG 2 7 2020

Parcel 1:

Lot 40, Jungle Shores, Subdivision No. 6, according to the Plat thereof as recorded in Plat Book 12, Page 27 of the Public Records of Pinellas County, Florida

AND

Parcel 2:

Begin at the Southwest Corner of Lot Forty (40) of Jungle Shores, Subdivision No. 6, Run Thence West into the Waters of Boca Ciega Bay, in extension of the South line of Lot Forty (40), 330 feet more or less to the quarter section line of Section 12, Township 31 South, Range 15 East, thence North along the quarter section line to a point of intersection of the South boundary line of Lot Forty one (41) extended to the intersection of the water of Boca Ciega Bay and the upland; thence Southeasterly meandering the shoreline of Boca Ciega Bay to the point of beginning.

More commonly known as 2900 Pelham Road North, St. Petersburg, FL 33710

4.      Instead of operating merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage also read like a contract, requiring the remittance of monetary payments, including payments of property taxes and insurance.

5.      Shortly after closing on this loan, LC sold the Note to a third-party depositor ("the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

6.      Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust. The Depositor then assigned the cash flows from the Loans to the Trust, which in this case was called Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates Series 2007-QS4 ("the Trust").

2

7.      Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities. The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments. Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

8.      Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages"). In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default. Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

9.      Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the

3

Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

10.     Deutsche Bank Trust Company Americas ("Deutsche") never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

11.     Deutsche's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

12.     Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

13. By 2012, however, the Depositor was no longer in business. As Trustee of the Trust, Deutsche was still responsible for collecting cash flows on behalf of the Certificateholders. Yet it was failing to do so. Plaintiffs, for example, stopped making payments under the Note in June, 2013 – one of many Borrowers who did so. As a result, a lawsuit was filed against them, Pinellas County Case No. 15-2225-CI ("the Lawsuit"), with Defendant named as the plaintiff. The genesis of the Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiffs of ownership of the Property.

14. For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

15. First, Defendant was neither the owner nor the holder of the Note by operation of law. In fact, it was illegal for Defendant to own or hold the Notes. Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

16. Second, the Lawsuit was brought in the name of the Trust, which was identified in the style of the Lawsuit as the party prosecuting the case ("as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4"). However, the beneficiaries of the Trust, *i.e.* the Certificateholders, did not authorize the Lawsuit, benefit from it, or even know it had been filed. Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet it purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

Defendant undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.     Despite the foregoing, the Servicers, including but not limited to Ocwen Loan Servicing, LLC ("Ocwen"), purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Lawsuit to be prosecuted in Defendant's name and represented, under oath, that Defendant was the owner and holder of the Note. As Defendant is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

18.     To support its position in the Lawsuit, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal. (At any one time, only one servicer was assigned to the Loan. However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein. As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

19.     First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Trust beneficiaries, *i.e.* the Certificateholders, as they did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome. Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make the Trust the plaintiff in the Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

20.     Second, the Servicers knew that Defendant was not the owner or holder of the Note by operation of law. Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit,

under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

21.     Third, the Servicer caused to be recorded in the Official Records of Pinellas County, Florida at Instrument 2015110323, an Assignment of Mortgage ("the First Assignment"), which purported to assign the Mortgage from Mortgage Electronic Registration Systems, Inc. ("MERS"), as Nominee for LC, to Residential Funding Corporation ("RFC"), Defendant, and a second Assignment of Mortgage ("the Second Assignment"), at OR Instrument 2015110324, which purported to assign the Mortgage from RFC to Defendant.

22.     In truth, MERS had no ability to convey the First Assignment, either as Nominee for RFC or otherwise. After all, the Trust was created in 2007 by the sale of the cash flows from the Loans, so by the time of the First Assignment, MERS had no interest in the Mortgage, as it had already been sold to the Depositor. The Servicer nonetheless prepared and caused to be recorded the First Assignment – a violation of Fla. § 817.535(2)(a) and a criminal infraction, a felony under Florida law.

23.     For these same reasons, RFC has no authority to convey the Second Assignment, as the Loan had already been sold to the Depositor. In fact, as of the date of the Second Assignment, RFC ceased to exist. To create the appearance of a conveyance in the official records, the Servicer nonetheless prepared and caused to be recorded the Second Assignment, representing itself to be the attorney in fact for RFC and authorized to sign on its behalf when it was not. These were additional violations of Fla. Stat. § 817.535(a)(a), felony infractions under Florida law, yet the Servicers committed them anyway to impair Plaintiffs' title to the Property and further their scheme to steal it from him.

24.     Fourth, the Servicer relied on a chain/series of endorsements on the Note, including one by RFC ("the First Endorsement") and another by Deutsche Bank Trust Company Americas, as Trustee ("DB") ("the Second Endorsement"), and used them as a basis to claim standing in the Lawsuit. In truth, however, the First Endorsement was stamped onto the Note long after RFC ceased to exist in a fraudulent effort to procure standing where none otherwise existed, and the Second Endorsement was not actually executed by DB, but Ocwen Loan Servicing, LLC ("Ocwen"), purportedly as attorney in fact for DB. Yet Ocwen was not actually attorney in fact for DB and lacked the authority to execute the Second Endorsement. It fraudulently represented otherwise in a fraudulent, perjurious, and illegal attempt to convey standing where none otherwise existed.

25.     Fifth, the Servicers repeatedly represented, in the Lawsuit, that Defendant had been damaged as a result of Plaintiffs' non-payment of the installment payments due under the Note. These representations were knowingly false, fraudulent, and perjurious at all times relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trust. Suffice it to say Servicer's repeated representations in the Lawsuit that Defendant was not damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant's name where no basis to do so existed.

26.     Sixth, the Servicer filed in the Lawsuit a Limited Power of Attorney from Deutsche ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuit as an agent of the Trust. These representations, however, were entirely fraudulent – and

known to be so by all involved. In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit.

27. Seventh, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendant and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendant in the Lawsuit. In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendant was the holder of the Note and was damaged by Plaintiffs' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendant, the entity for which they were counsel of record in the Lawsuit.

28. At all times relevant, Deutsche knew that the actions of the Servicers in the Lawsuit were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, Deutsche has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers like Ocwen on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

9

29.     For instance, in its capacity as Trustee, Deutsche has executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like Ocwen to go to court and create the impression they were an agent of Ocwen and authorized to prosecute a foreclosure in Ocwen's name and otherwise act on its behalf even if actual authority were lacking.

30.     At the same time, though, Deutsche knew that servicers like Ocwen were using Deutsche's name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts. If this misconduct ever came to light, Deutsche wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent." That is why: (i) Deutsche insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) Deutsche insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within Deutsche, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of Deutsche, and conceded that Deutsche never owned or held any promissory notes.

31.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like Ocwen – perpetuated in the name of Deutsche, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment with Deutsche, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

10

32.     Despite its feigned ignorance, Deutsche knew full well what was happening.  In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, Deutsche failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name.  In fact, Deutsche continues to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

33.     Further proof that Deutsche's "ignorance" of the Servicers' illegality was feigned, and that Deutsche knew full well what the Servicers were doing, is seen in the indemnification agreements between it and the Servicers.  After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship.  Here, conversely, Deutsche, *i.e.* the principal, wanted Servicers like Ocwen, *i.e.* the agent, to indemnify Deutsche for all actions the servicers took in their name.  The obvious reason for such an unusual indemnification is that Deutsche knew that servicers like Ocwen were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and Deutsche wanted someone else to pay in the event the fraud scheme ever came to light.

34.     Deutsche's motive for participating in the foregoing was clear – money.  After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to Deutsche for those payments.  Facilitating and encouraging the foregoing misconduct hence enabled Deutsche to avoid significant payments out of its own pocket.

11

35.     Based on the fraudulent and illegal acts of Defendant, Ocwen, and the Servicers, as described here, Defendant succeeded in obtaining a Final Judgment of Foreclosure and, ultimately, divesting Plaintiff of title to the Property. Yet Plaintiff did not discover the fraudulent nature of Defendant's actions until 2020, after extensive investigation, the delay in discovery being attributed largely to Defendant's ongoing scheme to conceal its misconduct from Plaintiff, this Court, its own attorneys, and the public.

## COUNT ONE

36.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

37.     Plaintiff realleges and incorporates by reference paragraphs 1-35 above.

38.     Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4). To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

39.     As a result of these violations, Plaintiff has been damaged. These damages include, but are not limited to, the value of the Property and the attorney's fees and costs incurred defending the Lawsuit.

40.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper. Plaintiff further demands trial by jury.

12

## COUNT TWO

41.    This is an action for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

42.    Plaintiff realleges and incorporates by reference paragraphs 1-34 above.

43.    Through a series of fraudulent misrepresentations, as set forth above, Defendant slandered Plaintiff's title to the Property, then divested (or purported to divest) Plaintiff of ownership.

44.    As a result of Defendant's actions, Plaintiff has been damaged. Those damages include, but are not limited to, the value of the Property, interest on that money, lost rents for the duration of time that Plaintiff has been dispossessed, and attorney's fees and costs arising from having to defend the Lawsuit.

WHEREFORE Plaintiff demands judgment against Defendant for damages, general and special, interest, attorney's fees, and costs. Plaintiff further demands a trial by jury and such other and further relief that this Court deems proper.

This 14th day of August, 2020.

Respectfully submitted,

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

13

# EXHIBIT 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MICHAEL HAULSEE AND
MARCIA HAULSEE,

     Plaintiff,                  Case No: 3:20-cv-05820-MCR-HTC

vs.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, AS TRUSTEE FOR RESIDENTIAL
ACCREDIT LOANS, INC. MORTGAGE
ASSET-BACKED PASS-THROUGH
CERTIFICATES, SERIES 2007-QS4,

     Defendant.

_____/

## DEFENDANT'S MOTION TO DISMISS COMPLAINT
## AND DEMAND FOR JURY TRIAL

Defendant, Deutsche Bank Trust Company Americas, as Trustee for

Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates,

Series 2007-QS4 ("DBTCA"), by counsel and pursuant to Federal Rule of Civil

Procedure 12(b)(6), moves to dismiss the Complaint and Demand for Jury Trial

("Complaint") [D.E. #1] filed by Plaintiffs, Michael Haulsee and Marcia Haulsee

(collectively "Haulsees" or "Plaintiffs"), with prejudice, and as grounds states as

follows:

1

## I.    INTRODUCTION

This matter began in 2015 as an unremarkable state foreclosure action (the "Foreclosure Action") filed by DBTCA after the Haulsees defaulted on their loan, which was secured by a Mortgage on residential property located in St. Petersburg, Florida (the "Property").  Following pre-trial motion practice and discovery, the matter proceeded to a non-jury trial before the Honorable Jack St. Arnold, who after hearing the parties' testimony and considering the admitted evidence entered a Uniform Final Judgment of Foreclosure ("Final Judgment") in favor of DBTCA and against the Haulsees in the amount of $1,667,704.07.  *See* recorded Final Judgment [D.E. 1-3].

After the trial court denied the Haulsees' request for a rehearing, the Haulsees filed an appeal in Florida's Second District Court of Appeal seeking reversal of the Final Judgment.  The Haulsees were not successful.  *See* Per Curiam Affirmance and Mandate attached as **Composite Exhibit A.**[1]  As a result, the matter was remanded to the trial court to proceed with the sale of the Property.  *See id*.

---

[1] Pursuant to FED. R. EVID. 201, this Court can consider official or public records on a motion to dismiss.  *See Universal Express, Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) (citation omitted) ("[p]ublic records are among the permissible facts that a district court may consider" on a motion to dismiss); *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015) (emphasis added) ("Courts may take judicial notice of publicly filed documents, *such as those in state court litigation*, at the Rule 12(b)(6) stage.").  DBTCA will separately file a formal

The Haulsees, having exhausted their avenues to obtain reversal of the Final Judgment, filed this Complaint on August 17, 2020—just three days after the Second District Court of Appeal issued its decision—making incredible allegations that DBTCA engaged in a pattern of criminal activity related to the Foreclosure Action entitling them to recover significant damages. [D.E. 1-1].

In their two-count Complaint, the Haulsees allege that DBTCA violated Florida's Civil Remedies for Criminal Practices Act (Count I) and is liable under an unspecified claim for its purported "series of fraudulent misrepresentations" that allegedly "slandered Plaintiff's title to the Property, then divested (or purported to divest) Plaintiff of ownership" (Count II). [D.E. 1-1 at ¶ 43]. According to the Haulsees, the purported "fraudulent and illegal acts" allowed DBTCA to succeed "in obtaining a Final Judgment of Foreclosure and, ultimately, divesting Plaintiff[s] of title to the Property." [D.E. 1-1 at ¶ 35]. As a result, the Haulsees claim that they have sustained damages (general and special), including triple damages under the Civil Remedies for Criminal Practices Act, costs, interest, and attorneys' fees. [D.E. 1-1 at ¶¶ 39, 40, 44].

For the reasons below, the Haulsees' Complaint should be dismissed.

---

Request for Judicial Notice once DBTCA has had the opportunity to confer with opposing counsel in compliance with Local Rule 7.1(B).

## ARGUMENT

I.  **DISMISSAL IS REQUIRED BECAUSE THE HAULSEES FAIL TO ALLEGE SUFFICIENT JURISDICTIONAL FACTS UNDER FLORIDA'S LONG ARM STATUTE.**

"A federal court sitting in diversity undertakes a two-step inquiry to determine whether personal jurisdiction exists." *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) (*cert. denied sub nom. Waite v. Union Carbide Corp.*, 139 S. Ct. 1384 (2019)); *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203 (11th Cir. 2015).   Under this two-part test, the exercise of jurisdiction must (1) be appropriate under the forum state's long-arm statute; and (2) comport with the Due Process Clause of the Fourteenth Amendment.  *Waite*, 901 F.3d at 1312; *Carmouche*, 789 F.3d at 1203.  "Only if both prongs of the analysis are satisfied may a federal or state court exercise personal jurisdiction over a nonresident defendant." *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 256 (11th Cir. 1996)).

Florida's long-arm statute—which must be strictly construed—provides that a defendant can be subject to (1) general personal jurisdiction if the defendant engages in "substantial and not isolated activity" in Florida; or (2) specific personal jurisdiction for conduct specifically enumerated in Section 48.193(1)(a) of Florida's long-arm statute.  *Waite*, 901 F.3d at 1312; *Carmouche*, 789 F.3d at 1203-04.

The plaintiff bears the initial burden of alleging sufficient facts in the complaint to make out a prima facie case of jurisdiction over a non-resident

defendant. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). A prima facie case of personal jurisdiction is established if plaintiffs present "enough evidence to withstand a motion for directed verdict." *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000). "Conclusory allegations are insufficient." *3Lions Publ'g, Inc. v. Interactive Media Corp.*, 389 F. Supp. 3d 1031, 1036 (M.D. Fla. 2019).

Here, DBTCA is a validly existing banking corporation organized under the banking laws of the State of New York with its principal place of business in New York, New York. [D.E. 1 at ¶ 3]. The DBTCA is, thus, neither incorporated in nor has its principal of business in Florida. [*See* D.E. 1]. Accordingly, the Haulsees had the burden to allege sufficient jurisdictional facts establishing that this Court has personal jurisdiction over DBTCA under Florida's Long Arm Statute. They failed to do so.

First, there are no allegations in the Complaint establishing DBTCA's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

Second, the Haulsees fail to allege, recite, identify, or rely upon any prong of Florida's long-arm statute. *E.g., In re Takata Airbag Products Liab. Litig.*, 396 F.

Supp. 3d 1101, 1142 (S.D. Fla. 2019) (dismissing complaint where plaintiffs failed to allege "specific facts to fit within" Florida's long-arm statute because generalized allegations did not establish a prima facie case); *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1215-16 & n.6 (S.D. Fla. 2017) (finding general allegations that defendant "conduct[ed] substantial business in this District" insufficient to allege specific jurisdiction under Florida's long-arm statute because the complaint contained "no detail to support this statement," which left the court "unable to infer which of [defendant's] contacts with Florida support[ed] specific personal jurisdiction").

Indeed, while the Haulsees make broad, sweeping allegations of fraud and illegality by DBTCA, the connection to Florida is unclear. Accordingly, because the Haulsees have failed to meet their burden of alleging a prima facie case of personal jurisdiction, this Court should dismiss this Complaint. *See Rexam Airspray, Inc. v. Arminak*, 471 F. Supp. 2d 1292, 1298 (S.D. Fla. 2007) (dismissal is proper if the court determines personal jurisdiction is lacking).

## II.  FLORIDA'S COMPULSORY COUNTERCLAIM RULE BARS THIS ACTION.

The Haulsees' failure to raise the claims alleged in this Complaint as compulsory counterclaims in the Foreclosure Action bars this lawsuit.

State law governs "[w]hether failure to bring a compulsory counterclaim in a prior state court proceeding bars a [subsequent] diversity action on that claim in federal court." *Montgomery Ward Dev. Corp. v. Juster*, 932 F.2d 1378, 1380 (11th

Cir. 1991). In that regard, Florida's compulsory counterclaim rule, which incorporates Federal Rule of Civil Procedure 13(a), provides as follows:

> A pleading must state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, provided it arises out of the ***transaction or occurrence*** that is the subject matter of the opposing party's claim….

*Id.*; Fla. R. Civ P. 1.170(a) (emphasis added).

In other words, under Rule 1.170(a), "a compulsory counterclaim is a defendant's cause of action 'arising out of the ***transaction or occurrence*** that formed the subject matter of the plaintiff's claim.'" *Montgomery*, 932 F.2d at 1381 (emphasis added) (quoting *Yost v. Am. Nat'l Bank*, 570 So. 2d 350, 352 (Fla. 1st DCA 1990)). Crucially, "failure to raise a compulsory counterclaim in the first suit results in a waiver of that claim." *Id.*; *see also Londono v. Turkey Creek, Inc.*, 609 So. 2d 14, 19 (Fla. 1992) (failure to raise compulsory counterclaim waives that claim).

Because the compulsory counterclaim rule's purpose is to "eliminate multiplicity of litigation," courts must interpret Rule 1.170(a) "broad[ly]" and "realistic[ally]." *Montgomery*, 932 F.2d at 1381 (quoting *Stone v. Pembroke Lakes Trailer Park, Inc.*, 268 So. 2d 400, 402 (Fla. 4th DCA 1972)). To this end, the Eleventh Circuit follows Florida's "four-part 'transaction or occurrence' test to determine whether a claim was compulsory." *Id.* This test asks:

> (1)  Are the issues of fact and law raised by the claim and counterclaim largely the same?
>
> (2)  Would res judicata bar the subsequent suit on defendant's claim absent the compulsory counterclaim rule?
>
> (3)  Will substantially the same evidence support or refute the plaintiff's claim as well as defendant's counterclaim?
>
> (4)  Is there any logical relation between the claim and the counterclaim?

*Id.* (quoting *City of Mascotte v. Fla. Mun. Liab. Self Insurers Program*, 444 So. 2d 965, 966 (Fla. 5th DCA 1983)); *Op. Corp. v. Roca Labs, Inc.*, 312 F.R.D. 663, 668 (M.D. Fla. 2015) (*vacated on other grounds on reconsideration*, (Jan. 25, 2016)); *Beepot v. J.P. Morgan Chase Nat'l Corp. Servs.*, 57 F. Supp. 3d 1358, 1370 (M.D. Fla. 2014). "An affirmative answer to *any* of [these] questions would mean that the counterclaim is compulsory." *Montgomery*, 932 F.2d at 1381 (emphasis added).

Here, the Haulsees' claims meet *all* four parts of Florida's transaction or occurrence test. Thus, Florida's compulsory counterclaim rule bars this action.

**A. The Haulsees' Claims Raise The Same Issues Of Fact And Law And Rely On The Same Evidence As DBTCA's Foreclosure Action.**

At their core, the Haulsees' claims allege that, through its agents, DBTCA wrongly obtained a final judgment by fraudulently creating and recording instruments—*i.e.*, the First and Second Assignments of Mortgage[2]—and making

---

[2] The First Assignment and Second Assignment will be collectively referred to as the "Assignments" and are attached as **Composite Exhibit B**. This Court can

fraudulent material misrepresentations in the Foreclosure Action—*e.g.*, that DBTCA had standing.  [D.E. 1-1, ¶¶ 21-35].  In other words, the main thrust of their allegations is that DBTCA harmed the Haulsees by falsely representing that it was entitled to foreclose on the subject Property.  These allegations, like those in DBTCA's Foreclosure Action *all depend exclusively on issues of fact and law bearing on the question whether DBTCA was entitled to foreclose on the property*.  *Compare* [D.E. 1-1, ¶¶ 14, 28] (alleging DBTCA fraudulently filed Foreclosure Action, so the state trial court's rulings are void), *with* Final Judgment, [D.E. 1-3] (ruling DBTCA was the holder of the Note and Mortgage, had standing to foreclose on the Property, complied with foreclosure procedures, and was entitled to a $1,667,704.07 judgment against the Haulsees).  Of course, if the answer to this question is yes—and it is—any statement or representation by DBTCA or its agents that it was legally entitled to a final judgment could not be false, let alone fraudulent.

Accordingly, because the Haulsees' Complaint raises the same issues of fact and law as DBTCA's Foreclosure Action, the first part of the transaction or occurrence test is met.  *Cf. Five Percent Nutrition, LLC v. Get Fit Fast Supplements, LLC*, 391 F. Supp. 3d 1093, 1097-98 (M.D. Fla. 2019) (federal action barred under

---

consider these documents.  *See Brooks*, 116 F.3d at 1369 ("where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal.").

the compulsory counterclaim rule because the claims raised involved the same counterfeit products and trademarks involved in the state action).

Additionally, because these issues of law and fact rely on "substantially the same evidence" that was admitted at the foreclosure trial, such as the Note, Mortgage, and Pooling and Servicing Agreement,[3] the test's third part is also satisfied. *Montgomery*, 932 F.2d at 1381.

### B. Res Judicata Would Bar The Haulsees' Suit Absent The Compulsory Counterclaim Rule.

The second part of the transaction or occurrence test is satisfied because res judicata would bar the Haulsees' lawsuit absent the compulsory counterclaim rule.

"Under Florida law,[4] res judicata applies where there is: '(1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the persons and parties to the action; (4) identity of the quality [or capacity] of the persons for or against whom the claim is made'; and (5) the original claim was disposed on the merits." *Lozman v. City of Riviera Beach, Fla.*, 713 F.3d 1066, 1074 (11th Cir. 2013) (applying Florida law) (citation omitted). The policy underlying this doctrine "is that if a matter has already been decided, the [plaintiff or counterclaimant] has

---

[3] The index to the record on appeal in the appeal from the Final Judgment in the Foreclosure Action, which shows which exhibits were admitted at trial, is attached as **Exhibit C**. *See supra* note 1.

[4] Federal courts apply the preclusion law of the state that rendered the allegedly preclusive judgment. *Lozman*, 713 F.3d at 1074 n.6.

already had his or her day in court, and for purposes of judicial economy, that matter generally will not be reexamined again in *any court* (except, of course, for appeals by right)." *Beepot*, 57 F. Supp. 3d at 1370 (original emphasis) (citation omitted).

### 1.    There Is An Identity Of Thing Sued For.

An "identity of the thing sued for" is established when (1) the state foreclosure action and federal claim for wrongfully obtaining a foreclosure judgment involve "[t]he same loan transaction, mortgage, and residential property"; and (2) the borrower sought or should have sought the same relief in the prior and subsequent actions. *Id.* at 1371 (finding identity of thing sued for in federal lawsuit premised upon servicer's failure to provide borrowers with certain documents after they expressed right to full accounting and to rescind loan because foreclosure action and subsequent federal lawsuit involved same loan, mortgage, and property); *Puff 'N Stuff of Winter Park, Inc. v. Fed. Tr. Bank, F.S.B.*, 945 F. Supp. 1523, 1529 (M.D. Fla. 1996) (plaintiffs' federal RICO claims involved same thing sued for as their counterclaims in prior foreclosure action because in both suits they sought, among other things, damages, attorneys' fees and any other relief the court deemed just and proper). Here, both DBTCA's claim in the Foreclosure Action and the Haulsees' claims in this action involve the same loan transaction, Property, and entitlement to foreclose, and the Haulsees could and should have sought the remedies and relief

they seek in this forum in the Foreclosure Action.  Thus, there is an identity of the "thing sued for." *Lozman*, 713 F.3d at 1074 (citation omitted).

## 2. There Is An Identity Of Cause Of Action.

"Identity of the cause of action is a question of 'whether the facts or evidence necessary to maintain the suit are the same in both actions.'" *Lozman*, 713 F.3d at 1074-75 (quoting *Tyson v. Viacom, Inc.,* 890 So.2d 1205, 1209 (Fla. 4th DCA 2005) (en banc and per curiam).  Importantly, in deciding whether there is an identity of the cause of action, "a court looks not only at the causes of action actually raised in the first suit, but also at every other matter which the parties might have litigated and had determined, within the issues as [framed] by the pleadings or as incident to or essentially connected with the subject matter' of the first litigation." *Zikofsky v. Mktg. 10, Inc.*, 904 So. 2d 520, 523 (Fla. 4th DCA 2005) (citations omitted).  This narrow test "extends to 'essentially connected' claims that a defendant in a former action failed to raise as a defense" or counterclaim. *Beepot*, 57 F. Supp. 3d at 1372 (citations omitted); *id.* at 1374 (in the res judicata context, "claims that 'could have been brought' are claims in existence at the time the original complaint is filed'" (quoting *Pleming v. Universal–Rundle Corp.,* 142 F.3d 1354, 1357 (11th Cir. 1998)); *id.* at 1372 ("while [borrowers] now bring these claims as 'swords' rather than 'shields,' res judicata is still applicable").

Here, the Haulsees' claims are both incident to and essentially connected with the Foreclosure Action's subject matter because both lawsuits involve the same nucleus of operative facts, which all revolve around the enforceability of the Note and Mortgage by DBTCA. Hence, there is an identity of the causes of action. *See Martinez v. Bank of Am. Corp.*, 14-21467-CIV, 2014 WL 2735668, at *4 (S.D. Fla. June 16, 2014) (there was identity of causes of action in plaintiff's fraud-based federal lawsuit challenging validity of note and mortgage in successful state foreclosure action because both actions "concern[ed] the same nucleus of operative facts—the validity and enforceability of the [n]ote and [m]ortgage"); *Taveras v. Ocwen Loan Servicing LLC*, No. 19-cv-23358, 2019 WL 6497367, at *3-4 (S.D. Fla. Dec. 3, 2019) (holding identity of causes of action existed and consent judgment of foreclosure barred borrower's subsequent claim alleging fraudulent assignment of mortgage induced him into consenting to foreclosure judgment); *Puff 'N Stuff*, 945 F. Supp. at 1530 (there was identity of causes of action because "the counterclaims to the state foreclosure action and the [subsequent] RICO action … share[d] an identical nucleus of operative fact"); *Beepot*, 57 F. Supp. 3d at 1372-73 (there was identity of causes of action because borrowers made identical arguments in state foreclosure action and subsequent TILA claim).

**3.  There Is An Identity Of Parties And Their Capacities And A Final Adjudication On The Merits.**

The third and fourth elements of the res judicata test (identities of the parties and their capacities) are unquestionably satisfied here.  The parties in both actions are the Haulsees, as borrowers, and DBTCA as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4. *See Martinez*, 2014 WL 2735668, at *4 (third and fourth "elements of the res judicata analysis [were] satisfied because both lawsuits [were] premised on the parties' relationship as mortgagor and mortgagee"); [D.E. 1; D.E. 1-3].

The fifth and final element of res judicata is also satisfied because the Final Judgment was an adjudication on the merits.  *See, e.g.*, *Symonette v. Aurora Loan Servs., LLC*, 631 F. App'x 776, 778 (11th Cir. 2015) (foreclosure judgment pertaining to condominium was a judgment on the merits for res judicata purposes).

Therefore, because the res judicata doctrine would bar the Haulsees' claims absent the compulsory counterclaim rule, the second part of the transaction or occurrence test is met.

**C.  DBTCA's Foreclosure Claim And The Haulsees' Florida Civil RICO Claim And Unidentified Fraud Claim Are Logically Related.**

The logical relationship between the prior plaintiff's claims and the potential counterclaims "is of special significance." *Montgomery*, 932 F.2d at 1381.  The Eleventh Circuit adheres to the following definition of "logical relationship" under Florida law:

> A claim has a logical relationship to the original claim if it arises out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant.

*Id.* (quoting *Neil v. S. Fla. Auto Painters, Inc.*, 397 So. 2d 1160, 1164 n.7 (Fla. 3d DCA 1981).

Specifically, if a borrower's fraud and RICO claims in a subsequent federal action would have defeated the prior state foreclosure action, then the claims in both actions are logically related. *Zimmerman v. JPMorgan Chase Bank, N.A.*, 11-81106-CIV, 2012 WL 12860983, at *6–7 (S.D. Fla. Apr. 12, 2012) (Florida borrower-plaintiffs' fraud and RICO claims that "center[ed] upon the [allegations] that the mortgage loans on their homes had not been properly assigned, were not properly endorsed, or were illegal" were "inextricably intertwined" with and bore a logical relationship to claims in pending state foreclosure actions and were barred under the compulsory counterclaim rule because plaintiffs' claims could defeat foreclosure actions).

Because the Haulsees' claims, through allegations of fraud and illegality, attack DBTCA's entitlement to foreclose on the Property, rely on the same aggregate of operative facts as the Foreclosure Action, and would have defeated DBTCA's Foreclosure Action had they been raised as counterclaims (if they had any merit, which they do not), these claims bear a logical relationship to DBTCA's claim in the

Foreclosure Action.  *See Puff 'N Stuff*, 945 F. Supp. at 1531 (because bank's "foreclosure action was to collect on the very loans which plaintiffs now claim are the result of [bank's] alleged racketeering activity," and had foreclosure defendants/federal plaintiffs "prevailed in state court, the loans on which [bank] sought foreclosure could have been rendered illegal and unenforceable," the "RICO claim is a compulsory counterclaim that should have been presented to the state trial court and is, therefore, barred"); *see also Ocean Bank v. State Dep't of Fin. Servs.*, 902 So. 2d 833, 835 (Fla. 1st DCA 2005) (counterclaim by department of financial services in receivership action that sought to void mortgages arose out of same transaction or occurrence as claims in foreclosure action, so counterclaim was barred in receivership proceeding under compulsory counterclaim rule); *Martinez,* 2014 WL 2735668, at *3 (citation omitted) (borrower's federal claims for, among other things, fraud were based on "the same aggregate of operative facts" and logically related to prior foreclosure action because success in federal action could undermine state foreclosure judgment).

In sum, although an affirmative answer to ***any*** of the questions in the four-part transaction or occurrence test requires dismissal, the Haulsees' claims compel affirmative answers to ***all*** four questions.  As such, their Complaint must be dismissed with prejudice.

In the unlikely event that this Court finds that the claims are not barred under Florida's compulsory counterclaim rule, the Complaint must nevertheless be dismissed due to the fatal pleading deficiencies discussed below.

## III. THE HAULSEES' COMPLAINT FAILS TO COMPLY WITH THE PLEADING REQUIREMENTS OF RULE 8 AND IS AN IMPERMISSIBLE SHOTGUN PLEADING.

While Rule 8(a)(2), of the Federal Rules of Civil Procedure, only requires "a short and plain statement of the claim showing that the pleader is entitled to relief," "naked assertion[s]" bereft of "further factual enhancement" do not suffice. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007). Instead, a complaint's "factual allegations must be enough to raise a right to relief above the speculative level" and mere legal conclusions are not entitled to the assumption of truth. *Id.* at 555.

Here, the Haulsees allege in a broad, sweeping, conclusory fashion that DBTCA's filing and prosecution of the Foreclosure Action was "fraudulent, illegal and perjurious, rendering the entire proceeding, and any rulings emanating from it, void." [D.E. 1-1, ¶ 14]. On their face, these accusatory allegations arising from a simple state court foreclosure action are incredible and wholly unsupported. Without factual support, the Haulsees' inflammatory allegations fail to rise above the speculative level.

In addition, throughout the Complaint, the Haulsees confusingly conflate the Trust and DBTCA. For instance, the Haulsees claim that the Foreclosure Action

was brought "in the name of the Trust"—which it was not. [D.E. 1-1, ¶ 16]. Instead, foreclosure actions are, and in this case the Foreclosure Action was, brought by DBTCA. [D.E. 1-3]. The Haulsees' misunderstanding (or misstatement) that the Plaintiff in the Foreclosure Action was the Trust, forms the basis for multiple unsupported and unfounded accusations that fraudulent and illegal acts occurred in relation to the Foreclosure Action, including:

- Naming the Trust as the Plaintiff to conceal that the Servicers were the parties who stood to benefit from the lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders;

- Misrepresenting that the Trust was the owner or holder of the Note in a fraudulent attempt to foreclose the Note and Mortgage.

[D.E. 1-1, ¶¶ 19, 20].

Moreover, the Haulsees accuse the servicers of their loan of engaging in fraudulent and criminal acts related to the Foreclosure Action. [D.E. 1-1, ¶¶ 19, 20]. According to the Haulsees, DBTCA knew of the illegal acts being perpetrated by their servicers and allowed the alleged fraudulent and illegal conduct to continue. [D.E. 1-1, ¶¶ 30-34]. These grandiose allegations—as with all their other allegations—are factually unsupported and implausible. *Jacobbi v. Ansbacher Law*, 3:15-cv-953-J-39JBT, 2016 WL 11578457, at *3 (M.D. Fla. July 14, 2016) (*report and recommendation adopted*, 3:15-cv-953-J-39JBT, 2016 WL 11578474 (M.D. Fla. Aug. 15, 2016)) (dismissing complaint without prejudice for violating Rule 8(a)

because in every count, "Plaintiffs ma[de] only vague, conclusory allegations and [did] not provide factual support for their claims").

The Haulsees then incorporate each of their unsupported allegations into their claims for relief pled in Count I and II. [D.E. 1-1, ¶¶ 37, 42]; *Mendez-Arriola v. White Wilson Med. Ctr. PA*, No. 3:09cv495/MCR/EMT, 2010 WL 338005, at *1 (N.D. Fla. Jan. 21, 2010) (dismissing amended complaint as shotgun pleading where each count incorporated by reference all paragraphs of "general allegations, many of which are plainly immaterial to that specific count"). This makes it impossible to discern the precise nature of the claims and which allegations of fact are intended to support which claim(s) for relief—a wholly impermissible manner of pleading. *Anderson v. Dist. Bd. of Tr. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366-67 (11th Cir. 1996) (same).

Given these pleading deficiencies—and shotgun-style pleading—this Court should dismiss the Complaint.

## IV. THE HAULSEES HAVE FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

The Haulsees' Complaint attempts to assert two claims: (1) violation of the Civil Remedies for Criminal Practices Act (Count I), and (2) an unspecified claim alleging fraud intended to divest the Haulsees of their Property (Count II). [D.E. 1-1, ¶¶ 36-44]. For the reasons below, both claims must be dismissed.

19

## A. The Haulsees Have Failed To State A Claim Under The Civil Remedies For Criminal Practices Act.

The Civil Remedies for Criminal Practices Act—often referred to as the Florida RICO Act—is codified in Chapter 772 of the Florida Statutes. § 772.101, Fla. Stat. The first three subsections of the statute list different types of unlawful activities prohibited by the statute, while the fourth subsection states it is a violation to conspire or endeavor to violate any of the first three provisions. § 772.103(1)-(4), Fla. Stat.

At its core, "[t]he Florida RICO Act…establishes civil liability when an enterprise engages in a pattern of criminal activity." *Arthur v. JP Morgan Chase Bank, NA*, 569 F. App'x 669, 679-80 (11th Cir. 2014) (citing § 772.013, Fla. Stat.). More specifically, "[a] civil RICO claim . . . requires a demonstration of the following elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that caused injury to business or property.'" *Drummond v. Zimmerman*, No. 19-81532-CIV-SINGHAL, 2020 WL 1845671, at *3 (S.D. Fla. Apr. 13, 2020) (citation omitted). Moreover, where a Florida Civil RICO claim alleges a RICO conspiracy under § 772.103(4), Fla. Stat., the plaintiff must show "(1) an agreement with the overall objective of the conspiracy; or (2) an agreement to commit two predicate acts." *Id.* (citation omitted).

Notably, a "violation of the Florida RICO statute requires allegations of predicate acts that violated Florida law, rather than Federal law." *Drummond*, 2020

20

WL 1845671, at n.1 (quoting *Asbury v. Slider*, 2020 WL 871097, at *3, n.1 (M.D. Fla. Feb. 21, 2020)).

> **1.    The Haulsees Have Failed To Plead A Claim For Violation Of The Civil Remedies For Criminal Practices Act With The Required Particularity.**

"Civil RICO claims, which are essentially a certain breed of fraud claims, must be pled with an increased level of specificity" consistent with Rule 9(b). *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007).  "Under Rule 9(b), the Plaintiffs must allege (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs ; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997).

Here, the Haulsees have simply claimed in a single paragraph that "through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property."  [D.E. 1-1, ¶ 38].  Nowhere in the claim do the Haulsees identify at all, let alone with the required specificity, (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; or (4) what the defendants gained by the alleged

fraud. *Brooks*, 116 F.3d at 1380-81; *see also Drummond*, 2020 WL 1845671, at *4 (dismissing civil RICO counts because, although "Complaint contain[ed] a litany of alleged wrongdoing it lack[ed] … any specific descriptions of allegedly fraudulent statements, documents, or misrepresentations or the specific defendant(s) responsible for them, as required by Fed. R. Civ. P. 9(b)").

Nor are there any allegations sufficient to raise a RICO conspiracy. Wholly absent from the Complaint are allegations that there was "(1) an agreement with the overall objective of the conspiracy; or (2) an agreement to commit two predicate acts." *Drummond*, 2020 WL 1845671, at *4; *Berber v. Wells Fargo Bank, N.A.*, 16-24918-CIV, 2018 WL 10436236, at *4 (S.D. Fla. May 24, 2018) (dismissing with prejudice Florida civil RICO claim premised "on an alleged pattern of fraud-based criminal activity" because complaint was "fatally deficient for failure to describe the underlying acts of fraud with the specificity required under Rule 9(b)").

Indeed, it is unclear what the precise predicate act is that forms the basis of their Florida RICO claim. At best, the Haulsees have referenced Section 817.535, Florida Statutes—which can qualify as a predicate act. Section 817.535 provides, in pertinent part, as follows:

> A person **who files or directs a filer to file**, with the intent to defraud or harass another, any instrument containing a materially false, fictitious, or fraudulent statement or representation **that purports to affect an owner's interest** in the property described in the instrument commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

22

§ 817.535(2)(a), Fla. Stat. (emphasis added).

Importantly, however, the word "file" is defined under the statute as the presentment of "an instrument for **recording in an official record** or to cause an instrument to be presented for recording in an official record." § 817.535(1)(a), Fla. Stat. (emphasis added). Here, the Haulsees fail to identify a single document that DBTCA presented for filing or directed to be filed. Without such a document, § 817.535 does not apply to DBTCA. *See Arthur*, 569 F. App'x at 685-86 (dismissal of Florida RICO claim alleging fraudulent foreclosure based on predicate acts of Florida theft by fraud and mail fraud because, after multiple amendments to complaint, plaintiffs did not *and could not* "allege[] important facts to satisfy Rule 9 pleading, such as the dates on which specific documents were sent" or "the locations or individuals responsible for mailing [the] document[s]").

At most, the Haulsees allege that **the servicer** caused Assignments of Mortgage to be filed in the public records. [D.E. 1-2, ¶ 21]. However, even accepting this allegation as true, there is no allegation that DBTCA directed these filings, let alone with the "intent to defraud or harass" and that these filings contained "a materially false, fictitious, or fraudulent statement or representation **that purports to affect an owner's interest** in the property." § 817.535(2)(a), Fla. Stat. (emphasis added). Absent such allegations, their claim is woefully deficient.

Accordingly, the Haulsees have failed to plead their Civil Remedies for Criminal Practices Act claim with the required specificity under Rule 9(b).

**2.     Any Attempt To Rely On The Assignments Of Mortgage As A Basis For Their Claim Under The Civil Remedies For Criminal Practices Act Fails As A Matter Of Law.**

Even if the Haulsees' allegations complied with the particularity requirements under Rule 9(b), the claim would nonetheless fail because the Assignments of Mortgage do not affect the Haulsees' interest in the Property.

The "First Assignment" is from MERS, solely as nominee for LoanCity, its successors and assigns, to Residential Funding Corporation, LLC, and is dated April 13, 2015. *See* Exhibit B. According to the Haulsees, MERS had no ability to convey the First Assignment because—at the time it was executed—the loans had already been sold to the Depositor. [D.E. 1-1, ¶ 22]. The Second Assignment—executed on the same date—is from Residential Funding Company, LLC to Deutsche Bank Trust Company Americas, As Trustee For Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4. *See* Exhibit B. According to the Haulsees, "RFC [had] no authority to convey the Second Assignment" because the loan had been sold to the Depositor and RFC was not in existence as of April 13, 2015. [D.E. 1-1, ¶ 23].

Based on these allegations, the Haulsees claim that the servicer violated the law when it prepared and recorded the assignments "to impair Plaintiffs' title to the

Property and further their scheme to steal it from [the Haulsees]." [D.E. 1-1 ¶ 23]. Their contention is absurd and legally untenable.

The execution and recording of an assignment of mortgage is a permissive act under Florida law, which is often done merely to place third-party creditors and subsequent purchasers on notice of the existence of the assignee's interest. *See* §§ 701.01, 701.02, Fla. Stat. (2016). An assignment of mortgage, thus, "simply affects the rights/priority of the assignee mortgagees against other assignees." *Brandenburg v. Residential Credit Sols., Inc.*, 137 So. 3d 604, 605 (Fla. 4th DCA 2014). Stated differently, an assignment of mortgage merely establishes to whom the borrower is obligated under the mortgage. It, thus, has no impact on the borrower's property rights. Whether the mortgage is assigned to multiple entities over the course of the loan, the borrower's interest remains the same—the borrower owns the property subject to the mortgage and once paid in full holds title to the real property free and clear.

In fact, even if a party lacks the authority to assign a mortgage, it has no impact whatsoever on a pending foreclosure action. Under Florida law, the assignment of mortgage is "superfluous" and "unnecessary because . . . the mortgage follows the note." *HSBC Bank USA, Nat'l Ass'n v. Buset*, 241 So. 3d 882, 891 (Fla. 3d DCA 2018). As such, even if there is an "illegality" in the assignment of mortgage, the bank, as holder of the note, would nonetheless have the authority to foreclose on the

mortgage. *Id.* at 892 (reversing dismissal of foreclosure action based on trial court's ruling that bank tried "to fraudulently induce the trial court into believing the 2012 assignment occurred in 2005" and remanding for the trial court to enter a final judgment of foreclosure).

Indeed, in this case, DBTCA did not admit the superfluous Assignments into evidence at the trial. *See* Exhibit C. Therefore, it would be impossible for the Haulsees to establish that (1) the servicer or DBTCA had an intent to defraud the Haulsees with the Assignments; and (2) DBTCA was not entitled to foreclose based on the Assignments—indeed, the Assignments had no bearing at all on the Haulsees' property rights.

Moreover, the theory of illegality being pursued by the Haulsees, *i.e.*, a lack of authority to assign the mortgage, cannot even be raised by them. Courts have repeatedly held that borrowers—who are not parties to the assignment of mortgage—lack standing to challenge the assignment's validity. *See e.g., Altier v. Fed. Nat'l Mortg. Ass'n*, No. 1:13-cv-164-MW/GRJ, 2013 WL 6388521, at *3-4 (N.D. Fla. Dec. 6, 2013) ("Plaintiffs do not have standing to raise a challenge to the validity of an assignment because Plaintiffs are not parties to the Assignment."); *Coursen v. JP Morgan Chase & Co.*, No. 8:12-cv-690-T-26EAJ, 2013 WL 5437341, at *11 (M.D. Fla. Sept. 27, 2013) (*aff'd sub nom. Coursen v. Shapiro & Fishman, GP*, 588 F. App'x 882 (11th Cir. 2014)) (same); *Martin v. EverBank*, 615 F. App'x

531, 533 (11th Cir. 2015) ("The district court correctly found that Martin did not have standing to challenge the validity of the assignment from MERS to EverBank.").

For the foregoing reasons, Count I must be dismissed with prejudice.

## B.  The Haulsees' Unidentified Claim In Count II Must Be Dismissed.

The Haulsees' unspecified claim in Count II containing four paragraphs—one of which simply incorporates all of the factual allegations pled in the first 34 paragraphs—must be dismissed because (1) it was not pled with the required particularity; and (2) to the extent that the Haulsees are attempting to raise a slander of title of claim, they have failed to state a claim upon which relief can be granted. [D.E. 1-1, ¶¶ 41-44].

### 1.    Fraud Must Be Pled With The Particularity Rule 9(b) Requires.

In the Eleventh Circuit, to plead a fraud claim with the required specificity Rule 9(b) requires, the complaint must set forth: (1) precisely what oral or written statements were made, (2) the time and place of each such statement and the person responsible for making the statement, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud. *Brooks*, 116 F.3d at 1370-71.

Here, although the Haulsees make general allegations accusing "various servicers" of taking "a series of actions that can only be described as fraudulent,

void, perjurious, and illegal," [*see* D.E. 1-1 ¶ 18], they fail to describe the precise misrepresentations. *Hearn v. Int'l Bus. Machines*, 588 F. App'x 954, 957 (11th Cir. 2014) (affirming dismissal because, despite plaintiff "repeatedly stat[ing] that employees of IBM 'made materially false representations[,]' … she never stated *with particularity*" the "content" of those statements) (citation omitted) (original emphasis); *In re Palm Beach Fin. Partners, L.P.*, 488 B.R. 758, 776 (Bankr. S.D. Fla. 2013) (dismissing claim because plaintiff did not claim "the existence of a specific misrepresentation made by a defendant").

Moreover, instead of identifying the person who made each allegedly false misrepresentation, the Haulsees refer generally to conduct by "various servicers."[5] [D.E. 1-1 ¶ 18]; *see also In re Palm Beach Fin. Partners, L.P.*, 488 B.R. at 776 (dismissing fraudulent misrepresentation claims because plaintiff's allegations did not "identify who made the statement"); *Band v. Ginn Companies, LLC*, No. 3:09-cv-792-J-25TEM, 2010 WL 11515174, at *8 (M.D. Fla. Sept. 30, 2010) (same). Nor do the Haulsees allege how DBTCA can be liable for the alleged misrepresentations made by others.

The Haulsees have also failed to plead with particularly the "'time' and 'place' that the allegedly false statements were made" to the Haulsees. *Hearn*, 588 F. App'x

---

[5] The only alleged wrongdoers specifically named in the Complaint are Ronaldo Reyes and Thomas Patrick. [D.E. 1-1 ¶¶ 30, 31, 32]. However, the Complaint is devoid of any alleged fraudulent statements by made them.

at 957; *Capital Holdings USA, LLC v. Am. Paramount Fin.*, No. 10:CV-80393, 2011 WL 13136040, at *4 (S.D. Fla. Apr. 28, 2011) (dismissing complaint because "paragraphs d[id] not contain the specific dates on which any misrepresentations were made or where these statements were made); *Band*, 2010 WL 11515174, at *8 (same).

Finally, the Haulsees have not alleged that they relied on the purported misrepresentations and that this reliance caused their injury. *Hearn*, 588 F. App'x at 957 (dismissing fraud claim because plaintiff never stated precisely "how she acted in reliance on" the defendant's alleged false statements). To the contrary, while the Haulsees claim that the "fraudulent misrepresentations" divested them of their property, the Final Judgment provides otherwise. [D.E. 1-1, ¶ 43]. Indeed, by that judgment, the Haulsees were divested of their Property because they defaulted on their loan obligations to DBTCA—not because of any purported fraudulent misrepresentation. [D.E. 1-3].

Accordingly, the Haulsees have not pled fraudulent misrepresentation with the specificity Rule 9(b) requires, so Count II be dismissed on this basis alone.

### 2. To The Extent The Haulsees Are Raising A Slander Of Title Claim, They Have Failed To State A Claim Under Florida Law.

To the extent the Haulsees are attempting to raise a claim for slander of title in Count II, it is wholly deficient under Florida law. To state a claim for slander of title, the pleader must assert:

(1) A falsehood;

(2) has been published, or communicated to a third person;

(3) when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff and;

(4) in fact, the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and

(5) special damages are proximately caused as a result of the published falsehood.

*McAllister v. Breakers Seville Ass'n, Inc.*, 981 So. 2d 566, 573 (Fla. 4th DCA 2008) (quoting *Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. 3d DCA 1984)).

While the Haulsees make broad, sweeping allegations related to statements made by servicers concerning DBTCA's entitlement to foreclose [D.E. 1-1, ¶¶ 30-34], it is impossible to discern the purported "falsehoods" that form the basis of their slander of title claim, let alone how such falsehoods were "published, or communicated to a third person." *McAllister*, 981 So. 2d at 573. Indeed, none of their rambling allegations state that DBTCA published any falsehood to a third party, nor do they explain how DBTCA can be liable for a purported falsehood published

by the servicers. *Tishman-Speyer Equitable S. Fla. Venture v. Knight Invs., Inc.*, 591 So. 2d 213, 214 (Fla. 4th DCA 1991) (stating that for a claim of slander of title, the plaintiff must prove that the "defendant published the alleged defamatory statement to a third party"); *Bonded Inv. & Realty Co. v. Waksman*, 437 So. 2d 162, 164 (Fla. 2d DCA 1983) (publication requirement not met because there was no evidence that letter to subsequent purchasers purporting to exercise option to repurchase the property "was ever sent to any third party who had no interest in the matter").

And even assuming that the Haulsees pled that there was a specific falsehood in the Foreclosure Action, courts have held that "the mere bringing of a foreclosure action does not constitute slander of title." *Meier v. Deutsche Bank Tr. Co. Americas*, 2:09-cv-169-FtM-29SPC, 2012 WL 1288764, at *1, *3 (M.D. Fla. Apr. 16, 2012) (citing *Dennis v. Am. Med. Express Corp.,* 763 So.2d 392, 393 (Fla. 3d DCA 2000), and *Bonded*, 437 So. 2d at 164) (dismissing slander of title claim alleging that foreclosure constituted a slander of title because the bank attempted to use a "null and void" assignment of mortgage "in [the] foreclosure complaint").

Moreover, there is no allegation that (1) DBTCA knew or reasonably should have known that the purported false statements published to third parties would induce others not to deal with the Haulsees; and (2) that the falsehood was a material and substantial part in inducing others not to deal with the Haulsees. Finally, while

the Haulsees have pled damages for value of the Property, lost rents, and attorneys' fees and costs, there is no allegation that such damages were proximately caused by the purported falsehoods published to third parties. Indeed, any damage sustained by the Haulsees related to their Property was directly due to their default under the loan documents, which resulted in the Final Judgment.

For these reasons, the Haulsees' slander of title claim must be dismissed. *Grave v. Wells Fargo Bank, N.A.*, 14-60975-CV, 2014 WL 11776961, at *6 (S.D. Fla. July 11, 2014) (dismissing slander of title claim because "lis pendens truthfully notified third parties that [the] property was the subject of a foreclosure action," and plaintiffs did not allege "facts that the lis pendens was false or filed maliciously").

## V. THE HAULSEES LACK STANDING TO CHALLENGE THE RELATIONSHIP BETWEEN PARTIES TO THE TRUST INSTRUMENTS.

Throughout their Complaint, the Haulsees have raised numerous allegations that relate to the relationship between and duties of the parties to the Trust, including challenges to the creation of the Trust [D.E. 1-1 ¶ 5-9], duties to certificateholders [D.E. 1-1¶¶ 10-12], authorization from certificateholders [D.E. 1-1¶1 6], servicers' authority to act for DBTCA [D.E. 1-1¶¶ 17, 26, 27, 29-33], benefits to certificateholders [D.E. 1-1¶¶ 19, 34], and damages to DBTCA [D.E. 1-1¶ 25].

The Haulsees—who clearly are not parties, beneficiaries, or third-party beneficiaries to the Trust—lack standing as a matter of law to challenge the Trust's

creation or allege that there have been violations of the agreements related to the Trust. *See McGill v. Impac CMB Tr. Series 2007-A*, 6:12-cv-1142-Orl-28TBS, 2013 WL 1912787, at *2-3 (M.D. Fla. Apr. 11, 2013) (*report and recommendation adopted*, 6:12-cv-1142-ORL-28, 2013 WL 1934948 (M.D. Fla. May 9, 2013)) (plaintiffs "who are not parties to or third party beneficiaries of a [Pooling and Servicing Agreement (PSA)], lack standing to challenge the validity of or noncompliance with the terms of a PSA"); *Fontaine v. JP Morgan Chase Bank, N.A.*, 3:16-cv-1301-J-34MCR, 2017 WL 9398637, at *6 (M.D. Fla. July 26, 2017) (*report and recommendation adopted as modified sub nom. Fontaine v. JPMorgan Chase Bank*, N.A., 3:16-cv-1301-J-34MCR, 2017 WL 3725676, at *6 (M.D. Fla. Aug. 30, 2017)) ("[p]laintiffs lack[ed] standing to challenge the validity of the Assignment or any non-compliance with the terms of the Trust agreement, because they are not parties to the Assignment or the Trust agreement and their interests are unaffected by the Assignment"); *Rhodes v. JPMorgan Chase Bank, N.A.*, No. 12-80368-CIV, 2012 WL 5411062, *4 (S.D. Fla. Nov. 6, 2012) ("With respect to a challenge to either the validity of mortgage's assignment or transfer based on Defendant's failure to comply with Pooling and Servicing Agreement, Plaintiff has no standing to raise this argument.... [because standing] requires status as a party to that agreement, a third-party beneficiary or an investor in the pooled mortgages[.]"); *Buset*, 241 So.

3d at 890 (non-beneficiaries of the pooling and servicing agreement cannot raise purported violations of the PSA as a defense to foreclosure).

Because the Haulsees lack standing to challenge the Trust, their claims of purported violations of the Trust cannot form the basis of their claims.

## CONCLUSION

At its core, this action is nothing more than the Haulsees' refusal to accept the Final Judgment and sale of their Property due to their default on their loan obligations. If the Haulsees believed there was any legitimacy to their conclusory and speculative allegations, they should have asserted those claims in the Foreclosure Action. They, however, did not. Now, the findings of the state court cannot be—nor should they be—disturbed by this Court. Regardless, even if the Haulsees' claims were not barred under Florida's compulsory counterclaim rule, they suffer from multiple pleading deficiencies—some of which are fatal—and all of which require dismissal.

For these reasons, DBTCA respectfully requests this Court dismiss the Haulsees' Complaint in its entirety, with prejudice, together with such other relief the Court deems appropriate under the circumstances.

**(Attorney's Signature Appears on the Following Page)**

Respectfully Submitted,

**GREENBERG TRAURIG, P.A.**
450 South Orange Avenue, Suite 650
Orlando, Florida 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909

**GREENBERG TRAURIG, P.A.**
777 S. Flagler Drive, Suite 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222

By:/s/ *Beth A. Norrow*
    Jason H. Okleshen, Esq.
    Florida Bar No. 496170
    Okleshenj@gtlaw.com
    FLService@gtlaw.com
    Beth A. Norrow, Esq.
    Florida Bar No. 061497
    norrowb@gtlaw.com
    castrop@gtlaw.com

## CERTIFICATE OF COMPLIANCE WITH LR 7.1(F), N.D. Fla. Loc. R.

I hereby certify pursuant to LR 7.1(F), N.D. Fla. Loc. R. that the foregoing document contains 7,924 words.

    /s/ *Beth A. Norrow*
    Beth A. Norrow

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 7, 2020, a true and correct copy of the foregoing was filed with the CM/ECF e-filing system which will send a notice of electronic service to:

Lee Segal, Esq.
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100
Clearwater, FL 33764
lee@segalschuh.com
marie@segalschuh.com

<div align="right">

/s/ *Beth A. Norrow*
Beth A. Norrow

</div>

# COMPOSITE EXHIBIT A

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

| | | |
|---|---|---|
| MARCIA S. HAULSEE and MICHAEL S. HAULSEE, | ) ) ) | |
| Appellants, | ) ) | |
| v. | ) ) | Case No. 2D19-137 |
| DEUTSCHE BANK TRUST COMPANY AMERICAS, as Trustee for RESIDENTIAL ACCREDIT LOANS, INC., MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-Q34, | ) ) ) ) ) ) ) ) ) | |
| Appellee. | ) ) ) | |

Opinion filed August 14, 2020.

Appeal from the Circuit Court for
Pinellas County; Jack R. St. Arnold,
Judge.

Robert E. Biasotti of Biasotti Law
Saint Petersburg, for Appellant.

Kimberly S. Mello and Vitaliy
Kats of Greenberg Traurig, P.A.
Orlando and Tampa, for Appellee.


PER CURIAM.

Affirmed.

SILBERMAN, SLEET, and ATKINSON, JJ., Concur.

# M A N D A T E

from

### DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

## SECOND DISTRICT

THIS CAUSE HAVING BEEN BROUGHT TO THIS COURT BY APPEAL, AND AFTER DUE CONSIDERATION THE COURT HAVING ISSUED ITS OPINION;

YOU ARE HEREBY COMMANDED THAT SUCH FURTHER PROCEEDINGS BE HAD IN SAID CAUSE, IF REQUIRED, IN ACCORDANCE WITH THE OPINION OF THIS COURT ATTACHED HERETO AND INCORPORATED AS PART OF THIS ORDER, AND WITH THE RULES OF PROCEDURE AND LAWS OF THE STATE OF FLORIDA.

WITNESS THE HONORABLE NELLY N. KHOUZAM CHIEF JUDGE OF THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA, SECOND DISTRICT, AND THE SEAL OF THE SAID COURT AT LAKELAND, FLORIDA ON THIS DAY.

DATE:  September 01, 2020

SECOND DCA CASE NO.  19-0137

COUNTY OF ORIGIN:    Pinellas

LOWER TRIBUNAL CASE NO.  2015-CA-2225

CASE STYLE:    MARCIA S. HAULSEE AND        v.   DEUTSCHE BANK TRUST
              MICHAEL S. HAULSEE                       COMPANY AMERICAS, AS
                                             TRUSTEE, ET AL.



_Mary Elizabeth Kuenzel_
Mary Elizabeth Kuenzel
Clerk

**CC**: (without attached opinion)
ARDA GOKER, ESQ.                              JONATHAN I. JACOBSON, ESQ.
KIMBERLY S. MELLO, ESQ.                    LEE SEGAL, ESQ.
ROBERT E. BIASOTTI, ESQ.                   VITALIY KATS, ESQ.

I#: 2015110323 BK: 18752  PG: 2361, 04/21/2015 at 05:06 PM, RECORDING 2 PAGES
$18.50 D.C. RECORD VERIFIED KEN BURKE, CLERK OF COURT AND COMPTROLLER PINELLAS COUNTY, D File BY
DEPUTY CLERK: CLKDMC4

Case 8:21-cv-00348-SDM-JSS   Document 1-2   Filed 01/12/21   Page 104 of 428 PageID 115

# COMPOSITE EXHIBIT B

Recording Requested By:
OCWEN LOAN SERVICING, LLC

When Recorded Return To:

OCWEN LOAN SERVICING, LLC
240 TECHNOLOGY DRIVE
IDAHO FALLS, ID_83401

*Record 1ST*

### CORPORATE ASSIGNMENT OF MORTGAGE

Pinellas, Florida
SELLER'S SERVICING #:7442410197 "HAULSEE"
SELLER'S LENDER ID#: DCR24265.2
OLD SERVICING #: 7442410197

MIN #: 100058310019147455  SIS #: 1-888-679-6377

Date of Assignment: April 13th, 2015
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), SOLELY AS NOMINEE FOR
LOANCITY, ITS SUCCESSORS AND ASSIGNS at PO BOX 2026 FLINT MI 48501, 1901 E VOORHEES ST, STE C,
DANVILLE, IL 61834
Assignee: RESIDENTIAL FUNDING CORPORATION at C/O OCWEN LOAN SERVICING, LLC., 1661
WORTHINGTON ROAD, STE 100, WEST PALM BEACH,, FL 33409
Executed By: MICHAEL S. HAULSEE AND MARCIA S. HAULSEE, HUSBAND AND WIFE  To: MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), SOLELY AS NOMINEE FOR LOANCITY ITS
SUCCESSORS AND/OR ASSIGNS
Date of Mortgage: 11/30/2006 Recorded: 12/18/2006  in Book/Reel/Liber: 15535 Page/Folio: 1598 as Instrument
No.: 2006457100  In the County of Pinellas, State of Florida.

Property Address: 2900 PELHAM ROAD N:, SAINT PETERSBURG, FL 33710

Legal: N/A

THE PURPOSE OF THIS CORRECTIVE ASSIGNMENT OF MORTGAGE IS TO CORRECT THE ASSIGNEE ON
THE ASSIGNMENT RECORDED ON SEPTEMBER 09, 2014 IN BOOK 18520 AT PAGE 1467 AS INSTRUMENT
NUMBER 2014252040.

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of
which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said
Mortgage having an original principal sum of $999,999.00 with interest, secured thereby, and the full benefit of all the
powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys
unto the said Assignee, the Assignor's interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the
terms contained in said Mortgage.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), SOLELY AS NOMINEE FOR LOANCITY,
ITS SUCCESSORS AND ASSIGNS
On ___**APR 1 4 2015**

By: _____
**Karen Smith**
Assistant Secretary

"TAS"TASGMAC"04/13/2015 01: 11 35 PM" GMAC40GMACA000000000000004537790" FLPINEL* 74424*0197 FLSTATE_MORT_ASSIGN_ASSN "KS"KS1GMAC"

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

STATE OF **Iowa**
COUNTY OF **Black Hawk**

On **APR 14 2015** before me, **Vicki Pospisil**, a Notary Public in and for **Black Hawk** in the State of **Iowa**, personally appeared **Karen Smith**, Assistant Secretary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

Vicki Pospisil
Notary Expires 6/10/2017

VICKI POSPISIL
COMMISSION NO.784536
MY COMMISSION EXPIRES
JUNE 10, 2017

(This area for notarial seal)

Prepared By:
Karen Smith, OCWEN LOAN SERVICING, LLC 240 TECHNOLOGY DRIVE, IDAHO FALLS, ID 83401 800-746-2936

*TAS*TASGMAC*04/13/2015 01 11 35 PM* GMAC40GMACA00000000000004537790* FLPINEL* 7442410197 FLESTATE_MORT_ASSIGN_ASSN *KS*KS1GMAC*

I#: 2015110324 BK: 18752 PG: 2363, 04/21/2015 at 05:06 PM, RECORDING 2 PAGES
$18.50 RECORDING $18.50 KEN BURKE, CLERK OF COURT AND COMPTROLLER PINELLAS COUNTY, FL BY DEPUTY CLERK: CLKDMC8

Case 8:21-cv-00089-JSS   Document 1-2   Filed 01/12/21   Page 106 of 428 PageID 117

Recording Requested By:
OCWEN LOAN SERVICING, LLC

When Recorded Return To:

OCWEN LOAN SERVICING, LLC
240 TECHNOLOGY DRIVE
IDAHO FALLS, ID 83401

*Record 2nd*

**CORPORATE ASSIGNMENT OF MORTGAGE**

Pinellas, Florida
SELLER'S SERVICING #:7442410197 "HAULSEE"
SELLER'S LENDER ID#: DW 24265.2
OLD SERVICING #: 7442410197

Date of Assignment: April 13th, 2015
Assignor: Residential Funding Company, LLC f/k/a Residential Funding Corporation by it's attorney in fact Ocwen
Loan Servicing, LLC at 1661 WORTHINGTON RD, SUITE 100, WEST PALM BEACH, FL 33409
Assignee: DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE FOR RESIDENTIAL ACCREDIT
LOANS, INC., MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-QS4 at C/O
OCWEN LOAN SERVICING, LLC., 1661 WORTHINGTON ROAD, STE 100, WEST PALM BEACH, FL 33409
Executed By: MICHAEL S. HAULSEE AND MARCIA S. HAULSEE, HUSBAND AND WIFE To: MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), SOLELY AS NOMINEE FOR LOANCITY ITS
SUCCESSORS AND/OR ASSIGNS.
Date of Mortgage: 11/30/2006 Recorded: 12/18/2006 in Book/Reel/Liber: 15535 Page/Folio: 1598 as Instrument
No.: 2006457100 In the County of Pinellas, State of Florida.

Property Address: 2900 PELHAM ROAD N., SAINT PETERSBURG, FL 33710

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of
which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said
Mortgage having an original principal sum of $999,999.00 with interest, secured thereby, and the full benefit of all the
powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys
unto the said Assignee, the Assignor's interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage, and the said property unto the said Assignee forever, subject to the
terms contained in said Mortgage.

Residential Funding Company, LLC f/k/a Residential Funding Corporation by it's attorney in fact Ocwen Loan
Servicing, LLC POA: 06/24/2014 In Book/Reel/Liber: 18442 Page/Folio: 1571 as Instrument No.: 2014179037
On __APR 1 4 2015__

By: *Karen Smith*
 **Karen Smith**
 Authorized Signer

STATE OF _____ **Iowa**
COUNTY OF _____ **Black Hawk**

On __APR 1 4 2015__, before me, **Vicki Pospisil**, a Notary Public in and for **Black Hawk** in
the State of _____**Iowa**, personally appeared _____**Karen Smith**, Authorized Signer, personally
known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

*Vicki Pospisil*
 **Vicki Pospisil**
 Notary Expires 6/10/2017

VICKI POSPISIL
COMMISSION NO.784538
MY COMMISSION EXPIRES
JUNE 10, 2017

(This area for notarial seal)

TAS*TASGMAC*04/13/2015 01 11 39 PM* GMAC40GMACA0000000000X0004537928* FLPINEL* 7442410197 FLSTATE_MORT_ASSIGN_ASSN *KS*KS1GMAC*

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

Prepared By:
Karen Smith, OCWEN LOAN SERVICING, LLC 240 TECHNOLOGY DRIVE, IDAHO FALLS, ID 83401 800-746-2936



*TAS*TASGMAC*04/13/2015 01 11 39 PM* GMAC4GGMACA0000000000000004537926* FLPINEL* 7442410197 FLSTATE_MORT_ASSIGN_ASSN *KS*KS1GMAC*

## IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
## IN AND FOR PINELLAS COUNTY, FLORIDA

**MARCIA S HAULSEE; MICHAEL S HAULSEE**
Appellant(s)

## Vs.

**DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE FOR RESIDENTIAL ACCREDIT LOANS INC., MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-Q34; CITIBANK NA**
Appellee(s)

## Appellate Case Number: 2D19-137

# RECORD ON APPEAL

Original Record in the case of

DEUTSCHE BANK TRUST COMPANY AMERICAS

Vs.

MICHAEL S HAULSEE, et al

UCN 522015CA002225XXCICI / Case Number 15-002225-CI

In the Circuit Court, Pinellas County, Florida
Prepared for use on appeal to the
Second District Court of Appeal of Florida

# IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
## OF THE STATE OF FLORIDA, IN AND FOR PINELLAS COUNTY

## APPEALS MASTER INDEX
## ORIGINAL RECORD ON APPEAL

DEUTSCHE BANK TRUST COMPANY AMERICAS
Vs.
MICHAEL S HAULSEE, et al

## <u>15-002225-CI</u>

| FILE DATE | DOCUMENT DESCRIPTION | PAGE |
|-----------|---------------------|------|
| 02/18/2019 | APPELLATE RECORD COVER SHEET | 1 - 1 |
| 02/19/2019 | INDEX | 2 - 6 |
| 02/19/2019 | CASE SUMMARY DOCUMENT | 7 - 15 |
| 04/06/2015 | VERIFIED COMPLIANT FOR FORECLOSURE OF MORTGAGE | 16 - 19 |
| 04/06/2015 | FORM C - IMPORTANT NOTICE TO HOMEOWNER | 20 - 22 |
| 04/06/2015 | VALUE OF REAL PROPERTY OR MORTGAGE FORECLOSURE CLAIM | 23 - 23 |
| 04/06/2015 | NOTICE OF LIS PENDENS    BK: 18742    PG: 841 | 24 - 24 |
| 04/06/2015 | ATTACHMENT TO COMPLAINT - CERTIFICATION OF POSSESSION PURSUANT TO FLA. STAT. 702.015(4) | 25 - 25 |
| 04/06/2015 | ATTACHMENT TO COMPLAINT - INTERESTFIRST NOTE | 26 - 30 |
| 04/06/2015 | ATTACHMENT TO COMPLAINT - MORTGAGE    BK: 15535 PG: 1598-1610 | 31 - 43 |
| 04/08/2015 | FORM D - PLAINTIFF / LENDER'S CONTACT INFORMATION | 44 - 44 |
| 05/06/2015 | DEFENDANTS, MICHAEL S HAULSEE AND MARCIA HAULSEE'S MOTION FOR EXTENSION TO RESPOND TO COMPLAINT | 45 - 46 |
| 06/02/2015 | NON-MILITARY SERVICE AFFIDAVIT, AS TO DEFENDANTS, MICHAEL S HAULSEE AKA MICHAEL HAULSEE AND MARCIA S HAULSEE | 47 - 51 |
| 06/29/2015 | DEFENDANTS, MICHAEL S HAULSEE AND MARCIA HAULSEE'S MOTION TO DISMISS COMPLAINT | 52 - 54 |
| 10/02/2015 | PLAINTIFF'S MOTION FOR JUDICIAL DEFAULT, ON DEFENDANT, CITIBANK N A, SUCCESSOR BY MERGER TO CITIBANK FEDERAL SAVINGS BANK | 55 - 56 |
| 10/02/2015 | PLAINTIFF'S NOTICE OF DROPPING PARTY DEFENDANT, AS TO DEFENDANTS UNKNOWN TENANTS 1, 2, 3, AND 4 | 57 - 58 |

| | | |
|---|---|---|
| 01/27/2016 | ORDER ON DEFENDANT'S MOTION TO DISMISS | 59 - 59 |
| 02/24/2016 | PLAINTIFF'S MOTION FOR ENLARGEMENT OF TIME TO COMPLY WITH COURT ORDER DATED JANUARY 27, 2016 | 60 - 65 |
| 03/18/2016 | PLAINTIFF'S VERIFIED AMENDED COMPLAINT FOR FORECLOSURE OF MORTGAGE | 66 - 101 |
| 07/01/2016 | DEFENDANTS, MICHAEL S HAULSEE AND MARCIA HAULSEE'S MOTION TO DISMISS AMENDED COMPLAINT | 102 - 103 |
| 09/29/2016 | PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT | 104 - 109 |
| 10/06/2016 | ORDER ON DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT | 110 - 111 |
| 01/11/2017 | PLAINTIFF'S MOTION FOR JUDICIAL DEFAULT, AS TO DEFENDANTS, MICHAEL S HAULSEE AKA MICHAEL HAULSEE AND MARCIA HAULSEE WITH ATTACHED EXHIBITS | 112 - 122 |
| 01/11/2017 | PLAINTIFF'S MOTION FOR CLERK'S DEFAULT, AS TO DEFENDANT CITIBANK N A, SUCCESSOR BY MERGER TO CITIBANK, FEDERAL SAVINGS BANK | 123 - 125 |
| 01/12/2017 | DEFENDANTS, MICHAEL S HAULSEE AND MARCIA HAULSEE'S ANSWER AND AFFIRMATIVE DEFENSES | 126 - 132 |
| 01/18/2017 | DEFAULT ENTERED, AS TO CITIBANK N A, SUCCESSOR BY MERGER TO CITIBANK, FEDERAL SAVINGS BANK, DATE: JANUARY 18, 2017 | 133 - 134 |
| 02/13/2017 | PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S DEMAND FOR JURY TRIAL | 135 - 149 |
| 02/13/2017 | PLAINTIFF'S REPLY TO DEFENDANT'S AFFIRMATIVE DEFENSES | 150 - 151 |
| 03/01/2017 | DEFENDANTS, MICHAEL S HAULSEE AND MARIA HAULSEE'S MOTION TO STRIKE REPLY | 152 - 153 |
| 04/30/2018 | AGREED ORDER ON PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S DEMAND FOR JURY TRIAL | 154 - 155 |
| 05/18/2018 | CERTIFICATE OF COMPLIANCE WITH VERIFYING READINESS FOR FORECLOSURE NON-JURY TRIAL | 156 - 158 |
| 06/26/2018 | ORDER SCHEDULING NON-JURY TRIAL | 159 - 160 |
| 08/16/2018 | PLAINTIFF'S EXHIBIT LIST | 161 - 165 |
| 08/16/2018 | PLAINTIFF'S WITNESS LIST | 166 - 168 |
| 09/14/2018 | DEFENDANTS' MOTION TO CONTINUE TRIAL, AND MOTION FOR MEDIATION | 169 - 170 |
| 09/21/2018 | PLAINTIFF'S SUPPLEMENTAL WITNESS LIST | 171 - 172 |
| 10/05/2018 | PLAINTIFF'S CERTIFICATE OF COMPLIANCE WITH FORECLOSURE PROCEDURES | 173 - 176 |
| 10/05/2018 | PLAINTIFF'S EXHIBIT - NO 1 - IN EVIDENCE - ORIGINAL NOTE AND MORTGAGE, HEARING: OCTOBER 5, 2018 | 177 - 195 |
| 10/05/2018 | PLAINTIFF'S EXHIBIT - NO 3 - IN EVIDENCE - CORRESPONDENCE, DATED DECEMBER 14 2014, FROM OCWEN LOAN SERVICING LLC, TO MICHAEL S HAULSEE, RE: DELIVERED DOCUMENTS, HEARING: OCTOBER 5, 2018 | 196 - 199 |
| 10/05/2018 | PLAINTIFF'S  EXHIBIT - NO 4 - IN EVIDENCE - CORRESPONDENCE, DATED FEBRUARY 22, 2014, FROM OCWEN LOAN SERVICING LLC, TO MICHAEL S HAULSEEE, | 200 - 208 |

RE: NOTICE OF DEFAULT, HEARING: OCTOBER 5, 2018

| 10/05/2018 | PLAINTIFF'S EXHIBIT - NO 6 - IN EVIDENCE - LOAN INFORMATION, HEARING: OCTOBER 5, 2018 | 209 - 212 |
|---|---|---|
| 10/05/2018 | PLAINTIFF'S EXHIBIT - NO 7 - IN EVIDENCE - CORRESPONDENCE, DATED 2/4/13, FROM OCWEN LOAN SERVICING LLC, TO MICHAEL S HAULSEE, RE: TRANSFER OF LOAN, HEARING: OCTOBER 5, 2018 | 213 - 217 |
| 10/05/2018 | PLAINTIFF'S EXHIBIT - NO 8 - IN EVIDENCE - LIMITED POWER OF ATTORNEY, HEARING: OCTOBER 5, 2018 | 218 - 230 |
| 10/05/2018 | PLAINTIFF'S EXHIBIT - NO 9 - IN EVIDENCE - DETAIL TRANSACTION HISTORY, HEARING: OCTOBER 5, 2018 | 231 - 262 |
| 10/05/2018 | PLAINTIFF'S EXHIBIT - NO 10 - IN EVIDENCE - AFFIDAVIT OF DEBT, HEARING: OCTOBER 5, 2018 | 263 - 271 |
| 10/05/2018 | PLAINTIFF'S EXHIBIT - NO 11 - IN EVIDENCE - STANDARD TERMS TO POOLING AND SERVICING AGREEMENT WITH EXHIBITS, HEARING: OCTOBER 5, 2018 | 272 - 639 |
| 10/05/2018 | ATTORNEY, JONATHAN JACOBSON, ESQUIRE'S AFFIDAVIT OF ATTORNEY FEES AND COSTS | 640 - 643 |
| 10/05/2018 | UNIFORM FINAL JUDGMENT OF FORECLOSURE    BK: 20300 PG: 619 | 644 - 650 |
| 10/05/2018 | ORDER GRANTING DEFENDANT'S COUNSEL EMERGENCY MOTION TO WITHDRAW AS COUNSEL, ETC... | 651 - 652 |
| 10/09/2018 | ATTORNEY, JONATHAN JACOBSON, ESQUIRE'S AFFIDAVIT OF ATTORNEY FEES AND COSTS | 653 - 656 |
| 10/09/2018 | ATTORNEY, JODI MICHELLE FOX, ESQUIRE'S SUPPORTING AFFIDAVIT AS TO ATTORNEY'S FEES | 657 - 658 |
| 10/18/2018 | DEFENDANT, MICHAEL S HAULSEE'S NOTICE OF FILING TRIAL TRANSCRIPT | 659 - 660 |
| 10/18/2018 | DEFENDANT. MICHAEL S HAULSEE'S NOTICE OF FILING COPY OF ORDER FROM BANKRUPTCY CASE NUMBER 8:18-BK-08436-RCT GRANTING TEMPORARY EXTENSION OF THE AUTOMATIC STAY, ETC... | 661 - 662 |
| 10/18/2018 | BANKRUPTCY CASE NUMBER 8:18-BK-08436-RCT ORDER GRANTING TEMPORARY EXTENSION OF THE AUTOMATIC STAY, ETC... | 663 - 666 |
| 10/29/2018 | PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR REHEARING AND/OR RECONSIDERATION, ETC... | 667 - 671 |
| 11/01/2018 | PLAINTIFF'S NOTICE OF CONSENT TO EXCEPTION FROM THE STAY EXTENSION | 672 - 674 |
| 01/09/2019 | ORDER ON DEFENDANT'S MOTION FOR RE-HEARING AND/OR RECONSIDERATION OF THIS COURT'S UNIFORM FINAL JUDGMENT OF FORECLOSURE DATED OCTOBER 5, 2018 | 675 - 676 |
| 01/09/2019 | NOTICE OF APPEAL    BK: 20398    PG: 1912 | 677 - 691 |

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
OF THE STATE OF FLORIDA, IN AND FOR PINELLAS COUNTY**


**APPEALS MASTER INDEX
ORIGINAL RECORD ON APPEAL**


DEUTSCHE BANK TRUST COMPANY AMERICAS
Vs.
MICHAEL S HAULSEE, et al


**15-002225-CI**

| FILE DATE | DOCUMENT DESCRIPTION | PAGE |
|---|---|---|
| 10/18/2018 | TRANSCRIPTION OF PROCEEDINGS: NON-JURY TRIAL, DATE: OCTOBER 5, 2018 | 1 - 73 |

# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MICHAEL HAULSEE AND
MARCIA HAULSEE,

      Plaintiff,           Case No: 8:20-cv-2410-T-60SPF

vs.

DEUTSCHE BANK TRUST COMPANY
AMERICAS, AS TRUSTEE FOR RESIDENTIAL
ACCREDIT LOANS, INC. MORTGAGE
ASSET-BACKED PASS-THROUGH
CERTIFICATES, SERIES 2007-QS4,

      Defendant.

_____/

### PLAINTIFF'S NOTICE OF PENDENCY OF OTHER ACTIONS

      In accordance with Local Rule 1.04(d), I certify that the instant action:

_____ IS related to pending or closed civil or criminal case(s) previously filed in this Court, or any other Federal or State court, or administrative agency as indicated below:

_____

__X__ IS NOT related to any pending or closed civil or criminal case filed with this Court, or any other Federal or State court, or administrative agency.

      Dated this 30th day of November, 2020.

                  Respectfully submitted by,

                  /s/ Lior Segal, Esq_____

                  Lior Segal, Esquire (FBN: 37837))
                  Segal & Schuh Law Group, P.L.
                  18167 U.S. Hwy. 19 N., Suite 100
                  Clearwater, Florida 33764
                  Tel: (727) 824-5775 Fax: (888) 672-7347
                  Attorney for Plaintiff

lee@segalschuh.com - Attorney
lisa@segalschuh.com - Paralegal

**CERTIFICATE OF SERVICE**

    **I HEREBY CERTIFY** that on this 30th day of November, 2020, the foregoing was electronically filed using the Florida Courts E-filing Portal, and electronically served upon all counsel of record through the eportal.

/s/ Lior Segal, Esquire

Lior Segal, Esquire (FBN: 37837)
Segal & Schuh Law Group, P.L.
18167 U.S. Hwy. 19 N., Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
Attorney for Plaintiff
lee@segalschuh.com – Attorney
lisa@segalschuh.com – Paralegal

Case 8:21-cv-00349-SDM-JSS   Document 1-3   Filed 01/12/21   Page 115 of 428 PageID 126

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and MARCIA HAULSEE,

      Plaintiffs,

                                         Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,  as
Trustee,

      Defendant.

_____/

## <u>NOTICE OF UNAVAILABILITY</u>

The undersigned law firm hereby gives Notice to this Court and all attorneys and parties of

record that Carla Turner-Hahn, Esq., shall be unavailable as follows:

1.  Carla Turner-Hahn, Esq., is currently the only attorney practicing for Carla Turner-Hahn,

P.A. and shall be unavailable December 18, 2020 through and including January 6, 2021.

2.  The undersigned request that no appointments, mediations, depositions, conferences,

hearings or other legal proceedings be scheduled during these times. Further no fax, email or

correspondence should be sent setting a deadline for response during the time that said attorney is

not available and for three (3) business days after the conclusion of the time of unavailability.

                     Respectfully Submitted,

                     */s/ Carla Turner-Hahn, Esquire*
                     Carla Turner-Hahn, Esquire
                     Carla Turner-Hahn, P.A.
                     Attorney for Plaintiff
                     615 Whisper Woods Drive
                     Lakeland, Florida 33813
                     Ph: 727-433-1624
                     FBN: 0390658
                     Email:  carlathahn@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

 I HEREBY CERTIFY that on December 18, 2020, a true and correct copy of the foregoing was filed with the Clerk of the Court using the State of Florida E-filing system, which will send a notice of electronic service to:

Beth Norrow, Esq.
Florida Bar No. 061497
norrowb@gtlaw.com
Greenberg Taurig, P.A.
450 S. Orange Ave., Ste 650
Orlando, FL 32801

*/s/ Carla Turner-Hahn, Esquire*
Carla Turner-Hahn, Esquire
Carla Turner-Hahn, P.A.

**IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT IN AND FOR BAY COUNTY, FLORIDA**

**MICHAEL HAULSEE and
MARCIA HAULSEE,**

     **Plaintiff,**              **CASE NO.: 2020-001663-CA**

**vs.**

**DEUTSCHE BANK NATIONAL TRUST
COMPANY,**

     **Defendant.**

_____/

## MOTION TO VACATE DEFAULT
## AND OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AFTER DEFAULT

Defendant, **DEUTSCHE BANK NATIONAL TRUST COMPANY** ("DBNTC"), by and through undersigned counsel, moves this Court to vacate entry of Clerk's Default and deny the Motion for Final Summary Judgment After Default filed by MICHAEL AND MARCIA HAULSEE (collectively "Haulsees") on October 15, 2020, and as grounds therefore states:

1.      Haulsees initiated this action on September 23, 2020, after having previously peddled this claim in Okaloosa County Circuit Court. (Req. for Jud. Notice, Ex. 2). The Okaloosa Complaint was removed to U.S.D.C. Middle District of Florida where it remains pending subject to a Motion to Dismiss. (Req. for Jud. Notice, Ex. 2 & 3; *see also* Middle District Docket, attached hereto as **Exhibit "A"**).

2.      Haulsees purportedly served the Summons and Complaint in this matter on CT Corporation System ("CT Corp"), which is not the registered agent for DBNTC. *See* Affidavit of Service filed October 7, 2020; *see also* Rejection Letter, attached hereto as **Exhibit "B"**.

3.      Despite having previously been notified that CT Corp was not the proper entity to serve,[1] Haulsees and their counsel served CT Corp anyway, then falsely represented to this Court that personal service was accomplished on DBNTC when it was not.  *See* Motion for Clerk's Default filed on October 15, 2020.

4.      Now, Haulsees seek entry of judgment by default against DBNTC for more than $5 Million Dollars based upon a Complaint for "unlawful debt" collection contrary to the Uniform Judgment of Foreclosure entered against them in Pinellas County Circuit Court on October 5, 2018, and affirmed per curiam by the Second District Court of Appeals.  (Req. for Jud. Notice, Ex. 20 & 21).

5.      For the reasons set forth below, DBNTC respectfully request the Court vacate the Clerk's Default, deny entry of judgment by default and dismiss this action forthwith.

## BACKGROUND

This case involves egregious conduct that intended to deprive DBNTC of its fundamental, constitutional due process rights.

First, contrary to the misrepresentations made to this Court by Haulsees, DBNTC was <u>never</u> served with process in this action. Haulsees made their misrepresentations to this Court regarding purported service after having been sent written notice by CT Corp that:  (1) the attempted service on DBNTC by the process server's delivery of the Summons and Complaint to CT Corp's office located at 28 Liberty Street, NY, NY ("CT Corp's Address"), was rejected; (2) CT Corp was not DBNTC's registered agent for service of process; and (3) as a result, the Summons and Complaint could not be forwarded by CT Corp to DBNTC.  *See again* CT Corp Rejection Letter, Exhibit "B".

---

[1] See Notice of Filing Affidavit of Alexandre Harlow of CT Corp.

Worse, Haulsees' counsel knew—prior to the filing of the Complaint—that CT Corp was not DBNTC's registered agent for service of process and that the Summons and Complaint could not be forwarded to DBNTC by CT Corp. *See* Notice of Filing Affidavit of CT Corp. Despite this knowledge, Haulsees' counsel continued to use CT Corp's Address as the place for "serving" DBNTC with the Summons, Complaint, and notice of ensuing court proceedings. Only after obtaining the Clerk's Default under false representations of service of process on DBNTC did Haulsees begin adding to the certificates of service on their subsequent notices of court filings that such filings were being served via regular U.S. mail addressed to both CT Corp's Address and 60 Wall Street, NY, NY, which is the address of DBNTC's distant parent corporation, Deutsche Bank AG.

Second, this action is a duplicate Complaint filed by Haulsees that was blatantly concealed from undersigned counsel so that Haulsees could improperly obtain a judgment by default. Indeed, this identical Complaint was filed by Haulsees in Okaloosa County Circuit Court on August 17, 2020. (Req. For Jud. Notice, Ex. 2). The Defendant in that action, Deutsche Bank Trust Company Americas, as Trustee ("DBTCA") is represented by undersigned counsel. DBTCA removed the action to federal court on September 15, 2020, where it is currently pending in the Middle District of Florida subject to a Motion to Dismiss ("Haulsee Federal RICO Action"). Eight (8) days after the Complaint was removed to Federal Court, Haulsees forum shopped their claim to *this Court* and re-filed the exact same causes of action and allegations on September 23, 2020—and never mentioned this case to DBTCA or its counsel. Indeed, the cases are based upon:

- The **same property** (2900 Pelham Rd, N., St. Petersburg) (*Id*., ¶3; Compl., ¶3);
- The **same Note** executed November 30, 2006 by Haulsees (*Id*., ¶3; Compl., ¶3);
- The **same Mortgage** with Loan City (*Id*., ¶3; Compl., ¶3);
- The **same Foreclosure Action** – Pinellas Case #15-2225-CI (*Id*., ¶13; Compl., ¶13);

3

- The **same cause of action Count I** ("§817.535 and §772.013(1)-(4). To wit, through a pattern of criminal activity, the collection of an unlawful debt..." (*Id.*, ¶38; Compl., ¶39);
- The **same cause of action Count II** ("fraudulent misrepresentations") (*Id.*, ¶43; Compl., ¶44).

Indeed, the only difference between the two Complaints is paragraph 14 of the instant Complaint wherein Haulsees blindly allege that DBNTC is "the alter ego of" the named defendant in the Haulsee Federal RICO Action.  (Compl., ¶14).  No specific conduct is alleged on the part of DBNTC in this action (or the Haulsee Federal RICO Action ).  Indeed, this entire Complaint is— if anything—claim splitting and/or forum shopping by Haulsees, neither of which are permitted under Florida law.

Further, in the Haulsee Federal RICO Action, Haulsees were ordered to disclose any pending related matters, but they chose to conceal this action so that DBNTC would remain unaware of this case and Haulsees could improperly obtain judgment by default against DBNTC. On November 30, 2020, Haulsees lied to the federal court and undersigned counsel by filing a Notice in the Haulsee Federal RICO Action that misrepresented their case was "***NOT related to any pending or closed civil or criminal case filed with this Court or any other Federal or State court, or administrative agency***."  (RFJN Middle District, Ex. 4).  Given the fact that the Complaints are virtually identical, the Notice was most certainly made in bad faith and in a concerted effort to conceal this mater from DBNTC and its counsel.

Given these facts, it is obvious that Haulsees made the deliberate decision to deprive DBNTC of its due process rights.  The law, however, prohibits such gamesmanship.  Specifically, Rule 1.540(b)(4) of the Florida Rules of Civil Procedure provides that judgments entered without affording the defendant its due process rights of notice and an opportunity to be heard are void and

of no legal effect.  As such, Haulsees' Motion for Final Summary Judgment After Default must be denied and the improper Clerk's Default against DBNTC must be vacated.

## STATEMENT OF FACTS

### I.    HAULSEES' FORECLOSURE PROCEEDING.

Michael Haulsee executed a Note on November 30, 2006, which was secured by a Mortgage encumbering real property located at 2900 Pelham Rd. North, St. Petersburg, FL 33710 ("Property").  (Compl., ¶ 3).[2]  Haulsees defaulted on their loan in June 2013.  (Compl., ¶ 13).  As a result of Haulsees' defaults, foreclosure was initiated in 2015 by DBTCA[3].  (Req. for Jud. Notice, Exs. 16 & 17).  On October 5, 2018, a Uniform Judgment of Foreclosure ("Final Judgment") was entered *against Haulsees* conclusively adjudicating their indebtedness to DBTCA and DBTCA's standing and entitlement to foreclose against Haulsees.  (Req. for Jud. Notice, Ex 19).  Haulsees unsuccessfully appealed the Final Judgment to the Second District Court of Appeals ("Second District").  On August 14, 2020, the Second District entered a per curiam opinion, affirming the Final Judgment.  (Req. for Jud. Notice, Exs. 20 & 21).  Upon affirmance of the Final Judgment, the Haulsees began filing their civil conspiracy claims across the state of Florida aimed at collaterally attacking the Final Judgment.  (*See again* Compl. and Req. for Jud. Notice, Ex. 2).

### II.    HAULSEES' COUNSEL, CARLA TURNER-HAHN, KNEW SERVICE OF PROCESS FAILED, YET FALSELY REPRESENTED OTHERWISE TO THIS COURT.

Haulsees' counsel, Carla Turner-Hahn, is no stranger to DBNTC and she was previously made aware that service upon DBNTC could not be accomplished through CT Corp as CT Corp

---

[2] DBTCA is contemporaneously filing a Request for Judicial Notice of the court records and public records referenced in this Motion.

[3] The Plaintiff in the foreclosure action, "Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4," is the same entity described in paragraph 16 of the instant Complaint and the same entity named by Haulsees in the Haulsee Federal RICO Action. DBTCA and DBNTC are separate and distinct corporate entities.  *See* Notice of Filing DBNTC Corporate filings.

was not the registered agent for DBNTC.  *See* Notice of Filing Affidavit of Alexandre Halow of CT Corp filed December 23, 2020.  Yet she served CT Corp anyway and falsely represented to this Court that personal service was made upon DBNTC.

In 2015, DBNTC filed a foreclosure lawsuit against Carla Turner-Hahn and her husband, Jeffrey M. Hahn (collectively, the "Hahns"), in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida, under Case No. 2015-005650-CI ("Hahn Foreclosure").  (Req. for Jud. Notice, Ex. 16).  On April 10, 2020, DBNTC moved for Summary Judgment, requesting a judgment of foreclosure, with the property to be sold at auction to satisfy the Hahns' personal indebtedness to DBNTC in the amount of $506,041.08.  Instead, filing an opposition to summary judgment, Hahn, without notifying DBNTC or its counsel, filed a separate declaratory judgment[4] action on June 30, 2020, in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida, Case No. 2020-3116-CI ("Hahn Declaratory Action") (Req. for Jud. Notice, Ex. 22 & 23).

Like this instant case, the Hahns attempted to serve the Summons and Complaint in the Hahn Declaratory Action ("Hahn Summons and Complaint") on DBNTC through CT Corp, at CT Corp's Address on July 13, 2020.  (Req. For Jud. Notice, Ex. 24; *see also* Notice of Filing Affidavit of Alexandre Halow of CT Corp).  On July 15, 2020—***months before the instant Complaint was improperly served—CT Corp sent a letter to Hahn's counsel, Lee Segal[5], advising him that CT Corp was "not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL***

---

[4] Note: Paragraphs 2-32 of Hahn Declaratory Action is virtually identical to paragraphs 4-35 of the instant Complaint and paragraphs 4-34 of Haulsee Federal RICO Action.

[5] Mr. Segal is counsel for Haulsees in the Haulsee Federal RICO Action which is—as previously stated—identical to the instant action.

**TRUST COMPANY" ("Hahn Rejection Letter").**  (*Id.*).  CT Corp further advised the Hahns'

counsel that it did not forward the Hahn Summons and Complaint to DBNTC.  (*Id.*).

Ultimately, Ms. Hahn knew full well that the attempted service of the Haulsee Complaint

in this matter on DBNTC *via CT Corp*. would be unsuccessful.  Yet, she did it anyway.  As

expected, Ms. Hahn received a rejection letter from CT Corp in this matter dated September 25,

2020.  *See again* Exhibit B.  Then, despite knowing service was not accomplished on CT Corp,

Ms. Hahn falsely represented to this Court that personal service was made on DBNTC.  *See* Motion

for Clerk's Default; *see also* Motion for Summary Judgment After Default.  Ms. Hahn's actions

herein are tantamount to fraud upon the Court and should not be permitted.

<u>**MEMORANDUM OF LAW**</u>

**I.     General Legal Standard Governing Vacating or Setting Aside Defaults**

Florida has a long-standing policy that strongly favors adjudication of lawsuits on the

merits.  Defaults are not favored by the courts, and all reasonable doubts should be resolved in

favor of granting relief there from.  *See North Shore Hosp. Inc. v. Barber*, 143 So. 2d 849 (Fla.

1962); *Johnson v. Johnson*, 845 So. 2d 217, 220 (Fla. 2d DCA 2003) (citations omitted); *County

Sanitation, Inc. v. Jean*, 559 So. 2d 1269, 1270 (Fla. 4th DCA 1990); *B/G Amusements, Inc. v.

Mystery Funhouse, Inc.*, 381 So. 2d 318, 319 (Fla. 5th DCA 1980); *McAlice v. Kirsch*, 368 So. 2d

401, 404 (Fla. 3d DCA 1979).  To that end, Florida's long-standing policy provides for great

liberality in setting aside defaults.  *County Nat'l Bank of N. Miami Beach v. Sheridan, Inc.*, 403

So. 2d 502, 504 (Fla. 4th DCA 1981) (specifically reaffirming the policy of Florida's courts to set

aside defaults under the standards applied in *North Shore Hosp. Inc. v. Barber); Kindle Trucking

Co. v. Marmar Corp.*, 468 So. 2d 502 (Fla. 5th DCA 1985).

A default may be set aside when the defaulting party demonstrates excusable neglect, a meritorious defense, and due diligence in seeking relief.  *See Johnson*, 845 So.2d at 220; *Rice v. James*, 740 So. 2d 7, 8 (Fla. 1st DCA 1999); *Brandt v. Doleman*, 421 So. 2d 689, 690 (Fla. 4th DCA 1982); *B/G Amusements*, 381 So. 2d at 319.  In fact, when a defaulted party demonstrates that his inaction resulted from error, misunderstanding or other human foible, and he has meritorious defenses to the claim, it is a gross abuse of discretion for the Court *not* to set aside the default.  *Somero v. Hendry Gen. Hosp.*, 467 So. 2d 1103 (Fla. 4th DCA 1985).

### A.    Defendant's Neglect Is Excusable

As explained above, DBNTC was never properly served with the Summons or Complaint in this matter.  As a result, DBNT was unable to follow its normal procedures of review and assignment to counsel for preparation and handling of a timely response.

### B.    Defendant Has a Meritorious Defense

A meritorious defense may be shown by an unverified pleading or an affidavit.  *Merrill Lynch Mortg. Capital, Inc. v. Hallmark Indus., Inc.*, 627 So. 2d 12, 13 (Fla. 2d DCA 1993) (citations omitted).  Defendant has set forth a meritorious defense.  *See* proposed Motion to Dismiss, attached hereto as **Exhibit "C"** and fully incorporated as though set forth herein.  Specifically, there are no allegations in the Complaint that connect the parties, property, or conduct to Bay County.  Second, the Complaint continues to be inextricably intertwined with the Pinellas Foreclosure Action.  Third, the Complaint is a collateral attack on the Uniform Final Judgment of Foreclosure entered on October 5, 2020.  And finally, the Complaint fails to state a valid cause of action under Florida's Civil Remedies for Criminal Practices Act.  Specifically, this action is barred by Florida's Compulsory Counterclaim Rule and has been otherwise waived.

The remainder of DBNT's arguments and defenses are more thoroughly set forth in the attached pleadings and affidavit.  Accordingly, DBNT has a meritorious defense in that Haulsees' Complaint—in its entirety—is an improper and dismissible action.

### C.   Defendant Exercised Due Diligence in Moving to Set Aside Entry of Default and Default Final Judgment

The Clerk's Default in this matter was entered on October 15, 2020.  DBNTC first became aware of the entry of the Clerk's Default in December 2020, when DBNTC's counsel was searching Florida Court records for similar cases and defaults due to Ms. Hahn's (and other foreclosure defense attorneys) campaign to obtain default judgments against foreclosing lenders such as DBNTC.  *See generally*, Request For Judicial Notice Of Other Lee Segal Cases ("RFJN Segal") Exs. 5-15.  DBNTC immediately took the necessary steps to seek an agreement to vacate default but Ms. Hahn refused to address the request.  *See* Emails between Ms. Hahn and Ms. Norrow, attached hereto as **Exhibit "D"**.  Thereafter, Ms. Hahn filed a Notice of Unavailability and ceased communication with Ms. Norrow.  *See* Notice of Unavailability attached hereto as **Exhibit "E"**.  Mr. Norrow reached out to Ms. Hahn a third and final time on December 18, 2020 and provided copies of the pleadings so that Ms. Hahn could timely address the default and duplicate claims.  *See* Email attached hereto as **Exhibit "F"**.  Ms. Hahn failed and/or refused to respond.

Given the minimal passage of time and under these circumstances, it is unquestionable that DBNTC was diligent in seeking to vacate the Clerk's Default.  Furthermore, in light of Florida's long-standing policy strongly favoring adjudication of lawsuits on the merits this Court should vacate the entry of Clerk's Default.

Based on the foregoing, DBNTC requests this Court enter an Order vacating the entry of Clerk's Default, denying Haulsees' Motion for Summary Judgment by Default, and for such other and further relief this Court deems just and appropriate.

WHEREFORE, the Defendant, DBNTC, requests this Court to enter and Order:

(a)  Vacating the Clerk's Default dated October 15, 2020;

(b)  Awarding DBNTC is attorney fees incurred in this matter under §57.105 and/or §772.104; and

(c)  for such other and further relief this Court deems just and appropriate.

Dated: December 23, 2020

Jason H. Okleshen, Esq.
Florida Bar No. 496170
Okleshenj@gtlaw.com
**GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Ste. 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222

Respectfully submitted,

Beth A. Norrow, Esq.
Florida Bar No. 061497
norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Ste. 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: /s/ *Beth A. Norrow*
        Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company*

10

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 23, 2020, a true and correct copy of the foregoing

was filed with the Clerk of the Court using the State of Florida e-filing system which will send a

notice of electronic service to:

Carla Turner-Hahn, Esq.
615 Whisper Woods Dr.
Lakeland, FL 33813
Email: carlathahn@gmail.com

/s/ Beth A. Norrow
Beth A. Norrow

# EXHIBIT "A"

# U.S. District Court
## Middle District of Florida (Tampa)
## CIVIL DOCKET FOR CASE #: 8:20-cv-02410-TPB-SPF

Haulsee et al v. Deutsche Bank Trust Company Americas
Assigned to: Judge Thomas P. Barber
Referred to: Magistrate Judge Sean P. Flynn
Demand: $1,000,000
Case in other court:  Florida Northern, 3:20-cv-05820
Cause: 28:1441 Notice of Removal-Foreclosure

Date Filed: 10/15/2020
Jury Demand: Both
Nature of Suit: 220 Real Property:
Foreclosure
Jurisdiction: Federal Question

**Plaintiff**

**Michael Haulsee**

represented by **Lee Segal**
Segal & Schuh Law Group, PL
18167 US Hwy 19 N Ste 100
Clearwater, FL 33764
727-824-5775
Fax: 888-672-7347
Email: lee@segalschuh.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marcia Haulsee**

represented by **Lee Segal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Deutsche Bank Trust Company
America's**
*as Trustee for Residential Accredit Loans
Inc. Mortgage Asset-Backed Passthrough
Certificate Series 2007-QSA*

represented by **Jason H. Okleshen**
Greenberg Traurig, LLP
777 S Flagler Dr Ste 300E
West Palm Beach, FL 33401-6167
561/650-7900
Fax: 561/655-6222
Email: okleshenj@gtlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Beth Ann Norrow**
Greenberg Traurig, LLP
450 S Orange Ave, Suite 650
Orlando, FL 32801
248/670-0353
Email: norrowb@gtlaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|

| 09/15/2020 | 1 | NOTICE OF REMOVAL by Deutsche Bank Trust Company Americas from Okaloosa Circuit Court, case number 2020-CA-002507-F. ( Filing fee $ 400 receipt number AFLNDC-5650987.), filed by Deutsche Bank Trust Company Americas. (Attachments: # 1 Exhibit State Court Complaint, # 2 Exhibit State Court Notice of Removal, # 3 Exhibit Uniform Final Judgment, # 4 Exhibit Docket, # 5 Civil Cover Sheet) (NORROW, BETH) [Transferred from flnd on 10/15/2020.] (Entered: 09/15/2020) |
| 09/16/2020 | 2 | DOCKET ANNOTATION BY COURT: Re 1 Notice of Removal, filed by DEUTSCHE BANK TRUST COMPANY AMERICAS. A reminder that party names are to be added using all caps and no punctuation. (See "Style Guide for Electronic Case Filing" available on Clerk's website). The party names will be corrected by the clerk. (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 09/16/2020) |
| 09/16/2020 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 1 Notice of Removal. (See proposed ISO). (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 09/16/2020) |
| 09/22/2020 | 3 | MOTION for Extension of Time to File Answer *to Complaint* by DEUTSCHE BANK TRUST COMPANY AMERICAS. (NORROW, BETH) [Transferred from flnd on 10/15/2020.] (Entered: 09/22/2020) |
| 09/23/2020 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 3 MOTION for Extension of Time to File Answer *to Complaint* (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 09/23/2020) |
| 09/24/2020 | 4 | REFERRAL AND ORDER granting 3 Motion for Extension of Time to Answer. For good cause shown, the motion is GRANTED, as requested. (Answer due 9/30/2020.) Signed by JUDGE M CASEY RODGERS on 9/24/2020. (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 09/24/2020) |
| 09/29/2020 | 5 | ORDER - Accordingly, within ten (10) days (**10/9/2020**) of this Order, the parties are directed to file a response indicating whether they have any objection to transferring this case to the Middle District of Florida, and if so, stating the reasons underlying that objection. Signed by JUDGE M CASEY RODGERS on 9/29/2020. (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 09/30/2020) |
| 09/30/2020 | 6 | Second MOTION for Extension of Time to File Answer */Response to Complaint* by DEUTSCHE BANK TRUST COMPANY AMERICAS. (NORROW, BETH) [Transferred from flnd on 10/15/2020.] (Entered: 09/30/2020) |
| 09/30/2020 | 7 | REFERRAL AND ORDER granting 6 Motion for Extension of Time to Answer. (DEUTSCHE BANK TRUST COMPANY AMERICAS answer due 10/7/2020.) Signed by JUDGE M CASEY RODGERS on 9/30/2020. (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 09/30/2020) |
| 10/07/2020 | 8 | MOTION to Dismiss by DEUTSCHE BANK TRUST COMPANY AMERICAS. (Internal deadline for referral to judge if response not filed earlier: **10/21/2020**). (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (NORROW, BETH) [Transferred from flnd on 10/15/2020.] (Entered: 10/07/2020) |
| 10/09/2020 | 9 | RESPONSE by DEUTSCHE BANK TRUST COMPANY AMERICAS re 5 Order to Show Cause, . (NORROW, BETH) [Transferred from flnd on 10/15/2020.] (Entered: 10/09/2020) |
| 10/09/2020 | 10 | DEFENDANT DEUTSCHE BANKS REQUEST FOR JUDICIAL NOTICE OF RELATED APPEAL AND PUBLIC RECORDS re 8 MOTION to Dismiss by DEUTSCHE BANK TRUST COMPANY AMERICAS. (Attachments: # 1 Exhibit A-C) |

| | | |
|---|---|---|
| | | (NORROW, BETH) Modified on 10/13/2020 to correct title (jcw). [Transferred from flnd on 10/15/2020.] (Entered: 10/09/2020) |
| 10/13/2020 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of JUDGE M CASEY RODGERS notified that action is needed Re: 9 Response to Order to Show Cause, 5 Order to Show Cause - No response filed by Plaintiffs, 10 Request for Judicial Notice. (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 10/13/2020) |
| 10/15/2020 | 11 | ORDER - Accordingly, because venue is proper in the Middle District of Florida and no party has objected to transfer there, the Clerk is directed to transfer this case to the Middle District of Florida and close the file. Signed by JUDGE M CASEY RODGERS on 10/15/2020. (jcw) [Transferred from flnd on 10/15/2020.] (Entered: 10/15/2020) |
| 10/15/2020 | 12 | Case transferred in from District of Florida Northern; Case Number 3:20-cv-05820. File received electronically (Entered: 10/15/2020) |
| 10/15/2020 | 13 | TRANSFER IN from the Nothern District of Florida (Pensacola Division). Case assigned to District Judge Thomas P. Barber and Magistrate Judge Sean P. Flynn. New Case Number: 8:20-cv-2410-T-60SPF. (AG) (Entered: 10/15/2020) |
| 10/20/2020 | 14 | **RELATED CASE ORDER AND NOTICE of designation under Local Rule 3.05 - track 2. Signed by Judge Thomas P. Barber on 10/20/2020. (SRC)** (Entered: 10/20/2020) |
| 11/04/2020 | 15 | NOTICE of pendency of related cases re 14 Related case order and track 2 notice per Local Rule 1.04(d) by Deutsche Bank Trust Company America's. Related case(s): yes (Norrow, Beth) (Entered: 11/04/2020) |
| 11/04/2020 | 16 | CERTIFICATE of interested persons and corporate disclosure statement re 14 Related case order and track 2 notice by Deutsche Bank Trust Company America's. (Norrow, Beth) (Entered: 11/04/2020) |
| 11/30/2020 | 17 | CASE MANAGEMENT REPORT. (Norrow, Beth) (Entered: 11/30/2020) |
| 11/30/2020 | 18 | NOTICE of pendency of related cases per Local Rule 1.04(d) by Michael Haulsee. Related case(s): No (Segal, Lee) (Entered: 11/30/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/17/2020 12:26:58 | | |
| **PACER Login:** | norrowblane:3662846:0 | **Client Code:** | 023223.245400 |
| **Description:** | Docket Report | **Search Criteria:** | 8:20-cv-02410-TPB-SPF |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT "B"



September 25, 2020

Carla Turner-Hahn
Carla Turner-Hahn, P.A.
615 Whisper Woods Drive,
Lakeland, FL  33813

Re:  MICHAEL HAULSEE AND MARCIA HAULSEE, PLTFS. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, ETC., DFT.

Case No.  20001663CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538305571

Sent By Regular Mail

 cc:  --



**(Returned To)**

Carla Turner-Hahn
Carla Turner-Hahn, P.A.
615 Whisper Woods Drive,
Lakeland, FL  33813

# EXHIBIT "C"

**IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT IN AND FOR BAY COUNTY, FLORIDA**

MICHAEL HAULSEE and
MARCIA HAULSEE,

     **Plaintiff,**               **Case No. 20-001663-CA**

vs.

DEUTSCHE BANK NATIONAL TRUST
COMPANY,

     **Defendant.**

_____/

## <u>MOTION TO DISMISS COMPLAINT AND JURY DEMAND</u>

     Defendant, **DEUTSCHE BANK NATIONAL TRUST COMPANY,** ("DBNTC"), by and through undersigned counsel, moves this court to dismiss the Complaint and Demand for Jury Trial ("Complaint") filed by Plaintiffs MICHAEL and MARCIA HAULSEE ("Haulsees"), and in support thereof states as follows:

     1.    This matter allegedly arises out of purported collection of an "unlawful debt" in Pinellas County, Florida. (Complaint, ¶13).[1]

     2.    The Complaint seeks damages against DBNTC for purportedly "acquir[ing] and maintain[ing] an interest in the Property" (Complaint, ¶39) but the complaint fails to describe any interest – or claim to interest – in the Property nu DBNTC.

     3.    The Complaint further seeks damages against DBNTC because the Haulsees had to defend a foreclosure lawsuit against them (Complaint, ¶45). However, the Complaint fails to allege any foreclosure action initiated by DBNTC against Haulsees.

---

[1] This identical cause of action is pending in U.S.D.C. for the Middle District of Florida and was filed on August 17, 2020 – prior to the initiation of this action. (*see also* Req. for Jud. Notice, Ex. 2).

4.      For these reasons (and for the reasons set forth below) the Complaint against DBNTC must be dismissed.

## FORECLOSURE ACTION AGAINST HAULSEES

5.      Pursuant to the Complaint, in 2013 Haulsees ceased paying on their Note and Mortgage (Complaint, ¶13) and their lender initiated a foreclosure action against them. (Complaint, ¶13). The Foreclosure Action, entitled **Deutsche Bank Trust Company Americas, As Trustee For Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4 v Michael and Marcia Haulsee,** was filed in Pinellas County Florida in 2015.  (Req. for Jud. Notice, Ex. 17).

6.      On October 5, 2018, Haulsee's lender was awarded Uniform Judgment of Foreclosure ("Foreclosure Judgment") in the amount of $1,667,704.07 against Haulsees (Req. for Jud. Notice, Ex. 19).

7.      The Foreclosure Judgment was Per Curiam Affirmed by the Second District Court of Appeals on August 14, 2020. (*Id.,* Ex. 20).

8.      Thereafter, Haulsees initiated this cause of action in multiple courts concluding the foreclosure was a result of a conspiracy rather than their failure to pay thein mortgage. (Req. for Jud. Notice, Ex. 2).

9.      The only reference to DBNTC in the Complaint is in paragraph 14 wherein Haulsees nakedly conclude that DBNTC – a national banking association with its main office in and principal place of business in California – is the "alter ego" of **Deutsche Bank Trust Company Americas, As Trustee For Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4**.  (Complaint, ¶14).

10.     There are no facts or explanation provided for Haulsees "alter ego" conclusion.

2

11.     As more fully set forth below, the Complaint must be dismissed for incurable pleading defects.

## ARGUMENT

### I.     Legal Standard On Motion To Dismiss.

The purpose of a motion to dismiss is to test the legal sufficiency of the complaint, not to determine issues in dispute. *The Fla. Bar v. Greene*, 926 So. 2d 1195, 1199 (Fla. 2006); *see Elmore v. Fla. Power & Light Co.*, 760 So. 2d 968, 971 (Fla. 4th DCA 2000).  The "defense" of failure to state a cause of action is a challenge to the legal sufficiency of the affirmative pleading on its face, that is, the entitlement of the plaintiff to obtain the relief sought if that party is ultimately able to prove the facts alleged.  *Lowery v. Lowery*, 654 So. 2d 1218, 1219 (Fla. 2d DCA 1995) (Rule 1.140(b)(6) motion tests legal sufficiency).  Whether a complaint is sufficient to state a cause of action is an issue of law.  *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 300 (Fla. 1st DCA 1999).  A court must dismiss the pleading if the allegations do not entitle the claimant to the relief sought.  *See Jackson Grain Co. v. Kemp*, 177 So. 2d 513, 516 (Fla. 2d DCA 1965). Moreover, a party may raise traditional affirmative defenses – such as defenses based on res judicata and collateral estoppel – in a motion to dismiss where, as here, "the defense's existence can be judged on the face of the complaint."  *Ramos v. Mast*, 789 So. 2d 1226, 1227 (Fla. 4th DCA 2001); *Wildflower, LLC v. St. Johns River Water Mgmt. Dist.*, 179 So. 3d 369, 373 (Fla. 5th DCA 2015).

### II.     Haulsees' Complaint is Barred for Failure to Comply with Rule 1.130 Fla. R. Civ. P.

Pursuant to Rule 1.130(a), Florida Rules of Civil Procedure, a copy of the instrument upon which a claim is based, must be attached to the pleadings. Haulsees challenges the foreclosure of their Note and Mortgage which resulted in Final Judgment in favor of a non-party to this action in

3

the Pinellas County. Complaint, ¶¶ 3, 14, 36. But, Haulsees failed to attach any documents to the Complaint such as the Note, Mortgage or the Final Judgment. For failure to comply with Rule 1.130(a) this Complaint must be dismissed.

### III.   Complaint Must be Dismissed for Lack of Specificity.

To state a cause of action, a complaint must allege sufficient ultimate facts to show that the pleader is entitled to relief. *Perry v. Cosgrove*, 464 So. 2d 664, 665 (Fla. 2nd DCA 1985); and Fla. R. Civ. P 1.110(b). In fact, "[d]espite the elemental proposition that on a motion to dismiss for failure to state a cause of action all allegations are taken as true, [a] court will not 'by inference on inference or speculation, supply essential averments that are lacking. *Alvarez v E. & A Produce Corp*, 708 So. 2d 997, 1000 (Fla. 3d DCA 1998); *see also Conley v. Shutts & Bowen, P.A.*, 616 So. 2d 523, 524-25 (Fla. 3d DCA 1993) (affirming dismissal of complaint for failure to allege sufficient ultimate facts; refusing to permit inferences from mere speculation).

In this matter, Count I, states that it is an action "arising under the Civil Remedies for Criminal Practices Act," yet it is entirely unclear what provision in the Act has been violated. Indeed, the Complaint concludes the conduct amounts to violation of "§772.013" but there is no such statute in Florida. And, to further confuse the issue Haulsees randomly reference § 817.535, Florida Statutes - which only governs recorded instruments – but Haulsees fail to identify any instrument recorded by DBNTC (or any other entity) in Public Records. Indeed, there are no allegations that DBNTC recorded any instruments affecting Haulsees interests in the Property nor are there any allegations that DBNTC had any relationship to Haulsees, their debt or the Property. Clearly, DBNTC should not be left to guess which instruments are at issue or what theory of liability Haulsees are proceeding under, particularly given their claims of illegal and fraudulent

activity. Given the pleading deficiencies – and shotgun style pleading – this Court should dismiss the Complaint or, at a minimum, require the filing of more definite statement.

## IV.     Complaint Fails To State A Claim Under the Civil Remedies for Criminal Practices Act.

Haulsees seek damages for purported violation of §772.013, Florida Statutes. (Complaint, ¶39). However, *no such statute exists*. (See Notice of Filing Legal Authority). As previously stated, the Court cannot "by inference on inference or speculation, supply essential averments that are lacking." *Alvarez*, 708 So. 2d at 100); *see also Conley*, 616 So. 2d at 524-25 (affirming dismissal of complaint for failure to allege sufficient ultimate facts; refusing to permit inferences from mere speculation). Certainly, identification of the law under which the entire claim purports to travel – is an essential term. And, that term is lacking in Haulsees' Complaint.

Even if Haulsees had alleged the correct statute – which they did not – their claim would still fail to satisfy the requirements of a valid civil remedy cause of action. The Civil Remedies for Criminal Practices Act is actually codified in §772.103, et. seq. of the Florida Statutes ("RICO Act"). Haulsees fails to allege an actual RICO Act violation by DBNTC and has no chance on the merits because a civil RICO claim requires far more than bare – and completely unfounded – accusations of criminal conduct.

### a.   RICO Claim fails as to Haulsees because it is not the Debtor.

First, Haulsees cannot maintain a RICO Act violation against DBNTC for purportedly wrongful collection of debt – because DBNTC took no action to collect on any debt. Indeed, the only conduct described in the Complaint was by **Deutsche Bank Trust Company Americas, As Trustee For Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4** and/or its servicers. No factual explanation is provided to connect DBNTC to Haulsees, the Note, the Mortgage or the Property. As such, this claim fails.

5

### b. RICO Claim Fails under §772.102(2) as the Debt has been adjudicated as Valid

Further, a RICO Action for 'unlawful debt' collection cannot lie when the underlying debt itself *is lawful*. Pursuant to §772.102(2), "unlawful debt" is defined as "any money or other thing of value constituting principal or interest of a debt that is *legally unenforceable* in this state in whole or in part because the debt was incurred or contracted." (emphasis added). Aside from the fact that Haulsees fails to describe any debt to which it is a party, Haulsees further fails to describe or identify how their debt is unlawful. And, pursuant to the Final Judgment of Foreclosure granted in the Pinellas Foreclosure Action on October 5, 2020, a court of competent jurisdiction has already adjudicated the enforceability of the debt. (Req. for Jud. Notice, Ex. 19). Final Judgement was affirmed on appeal and cannot be disturbed through this action. (Req. for Jud. Notice, Exs. 20 & 21).

### c. Claim For Violation of §772.103 of the Florida Statutes Fails As A Matter Of Law.

The prohibited activities under the Act which the Complaint apparently *attempts* to travel are set forth in §772.103 which provides as follows:

**772.103   Prohibited activities.**—It is unlawful for any person:
(1)   Who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of criminal activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

(2)   Through a pattern of criminal activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property.

(3)   Employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity or the collection of an unlawful debt.

(4)   To conspire or endeavor to violate any of the provisions of subsection (1), subsection (2), or subsection (3).

The first three subsections of the Florida Civil RICO Act list different types of unlawful activities prohibited by the statute, while the fourth subsection states it is a RICO violation to conspire or endeavor to violate any of the first three provisions.  §772.103(4).

At its core, "[t]he Florida RICO Act…establishes civil liability when an enterprise engages in a pattern of criminal activity." *Arthur v. JP Morgan Chase Bank, NA*, 569 Fed. Appx. 669, 680 (11th Cir. 2014) (citing § 702.013, Fla. Stat.).  "In order to establish a pattern of criminal activity, the plaintiff must allege two or more criminal acts 'that have the same or similar intents, results, accomplices, victims, or methods of commission' that occurred within a five-year time span." *Id.*  (quoting § 772.102(4), Fla. Stat.); *see also Drummond v. Zimmerman*, 19-81532-CIV, 2020 WL 1845671, at *3 (S.D. Fla. Apr. 13, 2020).  More specifically, "[a] civil RICO claim … requires a demonstration of the following elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) that caused injury to business or property.'").  Moreover, where a Florida Civil RICO claim alleges a RICO conspiracy under § 702.103(4), Fla. Stat., the plaintiff must show "(1) an agreement with the overall objective of the conspiracy; or (2) an agreement to commit two predicate acts." *Id.* (citation omitted))

Because of the similarities between Florida and federal RICO Acts, Florida looks to federal authority regarding the interpretation and application of its act. *Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co*., 881 So. 2d 565 (Fla. 3DCA 2004)

Notably, while "[t]he Florida RICO statute requires the same elements as a federal RICO claim, the 'violation of the Florida RICO statute requires allegations of predicate acts that violated Florida law, rather than Federal law.'" *Id.* (quoting *Asbury v. Slider*, 2020 WL 871097, at *3., n.1 (M.D. Fla. Feb. 21, 2020)).

7

Importantly, "'[c]ivil RICO claims, which are essentially a certain breed of fraud claims, must be pled with an increased level of specificity' consistent with" Federal Rule of Civil Procedure 9.  *Id.* (quoting *Ambrosia Coal & Constr. Co. v. Pages Morales,* 482 F.3d 1309, 1316 (11th Cir. 2007)). And "[u]nder this pleading standard, a well-pleaded complaint must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud.'" *Id.* (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1380–81 (11th Cir.1997)).

Here, Haulsees simply claim in a single paragraph that "through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property." (Complaint, ¶39. However, Haulsees fails to allege any event that resulted in DBNTC gaining title to or interest in the property. And, the Final Judgment of Foreclosure awarded in the Pinellas Foreclosure Action does not convey an interest in the property but rather, orders the sale of the property to satisfy a legitimate debt. (Req. for Jud. Notice, Ex. 19). There is simply no explanation for Haulsees' conclusion that DBNTC acquired or maintained an interest in the Property…at any time.

Further, the crime of unlawful filing of false documents or records against real or personal property in violation of §817.535, Fla. Stat., qualifies as Florida RICO predicates.  *See* § 772.102(1)(a)5, 22. However, Haulsees fail to allege facts to support a violation of §817.535, Fla. Stat. or that it relied on any action by DBNTC to its detriment. *See Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co*., 881 So. 2d 565, 573 (Fla. 3DCA 2004) citing *Allocco v. City of Coral Gables,* 221 F.Supp.2d 1317, 1363 (S.D.Fla.2002)("a plaintiff cannot base a RICO claim for fraud

on misrepresentations made to third parties")(applying Florida RICO); *see Palmas* at 573, citing *Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Capital Co.,* L.L.C., 202 F.Supp.2d 1339, 1349 (S.D.Fla.2002)(a plaintiff cannot base a RICO claim for fraud on misrepresentations made to third parties because the injury is not "direct").

### d.  Claim For Violation of §817.535 of the Florida Statutes Fails As A Matter Of Law.

Section 817.535, Florida Statutes, provides, in pertinent part, as follows:

> A person **who files or directs a filer to file**, with the intent to defraud or harass another, any instrument containing a materially false, fictitious, or fraudulent statement or representation **that purports to affect an owner's interest** in the property described in the instrument commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. (emphasis added)

Further, the word "file" is defined under the statute as the presentment of "an instrument for **recording in an official record** or to cause an instrument to be presented for recording in an official record."  §817.535(1)(a), Fla. Stats.  In this matter—throughout the entire Complaint—Haulsees fail to identify a single document that DBNTC presented for recording.  For this reason alone, the entirety of the claim fails.

Because DBNTC did not "file or direct a filer to file" any instruments, §817.535, Fla. Stats. does not apply to DBNTC.  Second, to the extent Haulsees attempt to rely on the Assignments of Mortgage as asserted in Paragraphs 22-23 to support this claim, that claims likewise fails as to DBNTC.  The referenced Assignments fail to form the basis of § 817.535, Florida Statutes because (1) DBNTC did not file or direct anyone to file the Assignments, and (2) because an Assignment of Mortgage does not affect *Haulsees* interest in the property.  The purpose of an Assignment of Mortgage is to provide notice to other creditors.  *See generally* § 701.02, Florida Statutes.  An Assignment of Mortgage "simply affects the rights/priority of the assignee mortgagees against other assignees." *Brandenburg v. Residential Credit Sols., Inc.*, 137 So. 3d 604, 605 (Fla. 4th

DCA 2014).  Because the Assignments only affect assignee mortgages against other assignees, it cannot form the basis for violation of § 817.535, Fla. Stats. as the Assignments do not purport to affect the interest of Haulsees.

      With that aside, Haulsees are otherwise not permitted to challenge the Assignments because Haulsees are not parties to the Assignments.   Indeed, even if said instruments were faulty—which they are not—Haulsees does not have any standing to bring suit because it is neither a party to the Assignment nor intended third-party beneficiaries thereof.  *See e.g., Harvey v. Deutsche Bank Nat. Tr. Co.,* 69 So. 3d 300, 304 (Fla. 4DCA 2011) (disputes as to validity of assignment are between the assignee and assignor); *Altier v. Fed. Nat'l Mortg. Ass'n*, 2013 WL 6388521, at *3-4 (N.D. Fla. Dec. 6, 2013) ("Plaintiffs do not have standing to raise a challenge to the validity of an assignment because Plaintiffs are not parties to the Assignment."); *Coursen v. JP Morgan Chase & Co.*, 2013 WL 5437341, at *11 (M.D. Fla. Sept. 27, 2013) ("[U]nder Florida law [the plaintiff] as a non-party to the assignment lacks standing to contest it."), *aff'd sub nom. Coursen v. Shapiro & Fishman, GP*, 588 F. App'x 882 (11th Cir. 2014); *Rhodes v. JP Morgan Chase Bank, N.A.*, 2012 WL 5411062 *4 (S.D. Fla. Nov. 6, 2012); *In re Canellas,* 2012 WL 868772, at *3 (M.D. Fla. Mar. 14, 2012); *Correia v. Deutsche Bank Nat'l Tr. Co.*, 452 B.R. 319, 324 (B.A.P. 1st Cir. 2011) (if "[t]he Debtors cannot show they were a party to the contract," they lack standing to challenge the assignment of their mortgage); *Martin v. EverBank,* 615 F. App'x 531, 533 (11th Cir. 2015) ("The district court correctly found that Martin did not have standing to challenge the validity of the assignment from MERS to EverBank."); *Stevens v. Deutsche Bank Nat'l Tr. Co.*, 2013 WL 12098770, at *7 (W.D. Tex. June 25, 2013) ("Defendants argue plaintiffs lack standing to challenge the Assignment, and the Court agrees."), *aff'd sub nom. Stevens v. Deutsche Bank Nat'l Tr. Co.,* 570 F. App'x 402 (5th Cir. 2014); *Bridge v. Aames Capital Corp.,* 2010 WL 3834059, *5 (N.D. Ohio Sept. 29, 2010); *Rowe v. U.S. Bancorp*, 569 F. App'x. 701, 704

(11th Cir. 2014); *Davis v. Mortg. Elec. Registration Sys., Inc.*, 2015 WL 4561547, at *8 (N.D. Ga. July 28, 2015); *Howell v. PHH Mortg. Corp.*, 2015 WL 5829673, at *3 (M.D. Fla. Oct. 1, 2015) ("Plaintiffs do not have standing to raise a challenge to the validity of the assignments because Plaintiffs were not parties to those transfers."), *reconsideration denied,* 2015 WL 6750809 (M.D. Fla. Nov. 5, 2015).

## V.       Complaint is Barred by the Compulsory Counterclaim Rule.

Under Florida's Compulsory Counterclaim Rule, Haulsees may not bring claims for relief in this Court where such claims should have been brought (if at all) as a counterclaim in the Pinellas Foreclosure Action.  Haulsees' claims here concern the same issues of fact and law that were also at issue in the Foreclosure Action.  Indeed, the Complaint in this matter seeks determination that the debt is unlawful and that DBNTC should never have been permitted to foreclose and/or take title to the Property through foreclosure.  Florida's compulsory counterclaim rule requires that Haulsees' claims must have been brought in response to the complaint in the Foreclosure Action, or be forever barred.  *Montgomery Ward Dev. Corp. v. Juster*, 932 F.2d 1378, 1380-82 (11th Cir. 1991).

In applying the compulsory counterclaim rule, both the Eleventh Circuit and the Florida Supreme Court have held a counterclaim to be compulsory where there is any logical relation between the claim and the counterclaim.  According to the Eleventh Circuit:

> A claim has a logical relationship to the original claim if it arises out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis for both claims; or (2) that the aggregate core facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant.

*Id*. at 1381; *see also Londono v. Turkey Creek, Inc.*, 609 So. 2d 14, 20 (Fla. 1992).

Here, Haulsees' claims arise out of the "same aggregate facts" – standing, validity of the debt, and jurisdiction for foreclosure.  Those claims asserted by Haulsees are compulsory

counterclaims because they arise out of the same set of operative facts and necessarily call into question the validity of the judgment in the Foreclosure Action. *See Puff'N Stuff of Winter Park, Inc. v. Federal Trust Bank, F.S.B*., 945 F. Supp. 1523, 1531 (M.D. Fla. 1996) (barring RICO claim based on Florida's compulsory Complaint rule where the RICO claim sprang from common nucleus of operative fact and bore a substantial relationship to the state foreclosure action).

## VI.    Haulsees Challenges to Defendant Trust are Barred as a Matter of Law.

Any claims asserted by Haulsees that are predicated on actions or inactions of the foreclosing plaintiff, *Deutsche Bank Trust Company Americas, As Trustee For Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4* are barred as a matter of law because Haulsees are not a party to nor are they intended beneficiaries of the Trust and thus lack standing to challenge the roles and responsibilities of any parties to the Trust. *See HSBC Bank USA,Nat'l Ass'n v. Buset*, 241 So. 3d 882 (Fla. 3d DCA 2018) (non-beneficiaries of the pooling and servicing agreement cannot raise purported violations of the PSA as a defense to foreclosure); *Citibank, N.A. v. Olsak*, 208 So. 3d 227, 230 (Fla. 3d DCA 2016) (non-beneficiaries of the trust cannot defeat a foreclosure by relying upon trust documents to which they are not a party); *Castillo v. Deutsche Bank Nat. Tr. Co*., 89 So. 3d 1069 (Fla. 3rd DCA 2012) (a non-party to or non-beneficiary of the trust lacks standing to raise issue with the final judgment of foreclosure in favor of the lender).

## CONCLUSION

For the reasons above, DBNTC has not and cannot assert a cause of action for violation of Florida's RICO Act. This, coupled with its blatant forum shopping and intentional improper service of process that have plagued this case, Haulsees' Complaint must be dismissed with prejudice and an award of fees and costs to DBNTC. Accordingly, DBNTC respectfully requests that this Court enter an order dismissing the Complaint in its entirety and granting DBNTC

attorney fees under Fla. Sta. §57.105 and/or §772.104, together with such other relief the Court

deems just and appropriate under the circumstances.

Dated: December 23, 2020                    Respectfully submitted,

Patrick G. Broderick (FBN 88568)            Beth A. Norrow (FBN 061497)
broderickp@gtlaw.com                        norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**                     **GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Suite 300 East          450 S. Orange Ave., Suite 650
West Palm Beach, FL 33401                   Orlando, FL 32801
Telephone: (561) 650-7915                   Telephone: (407) 420-1000
Facsimile: (561) 655-6222                   Facsimile: (407) 420-5909
Secondary email:                            Secondary email: dunnla@gtlaw.com;
Sandra.Famadas@gtlaw.com;                   FLService@gtlaw.com

                                            By: /s/ *Beth A. Norrow*_____
                                                   Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company*

### CERTIFICATE OF SERVICE

I CERTIFY that on December 23, 2020, I electronically filed the foregoing with the Clerk of Court via the Florida E-Filing Portal, which shall cause a copy to be served via email to the following:

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 N., Ste. 100
Clearwater, FL 33764
lee@segalschuh.com
marie@segalschuh.com

                                            /s/ Beth A. Norrow_____
                                            Beth A. Norrow

13

# EXHIBIT "D"

| | |
|---|---|
| **From:** | Norrow, Beth A. (Assoc-Orl-LT) |
| **To:** | Carla Turner-Hahn |
| **Cc:** | Jones, Laura (Para-ORL-LT); Dunn, Linda A. (Secy-TPA-LT) |
| **Subject:** | 3rd Request - RE: Haulsee v DBNTC - Bay County Case #20-01663-CA |
| **Date:** | Friday, December 18, 2020 2:01:46 PM |
| **Attachments:** | image001.png |
| | Haulsee v DBNTC - Bay County Case #20-01663-CA.msg |
| | RE Haulsee v DBNTC - Bay County Case #20-01663-CA - 2nd Request.msg |

Hello Mr. Turner-Hahn,

I am in receipt of your sudden "out of office" auto reply. Unfortunately, our duties as lawyers extends worldwide 24/7 so you actually have to address this matter. To assist you, I have attached my prior emails hereto to be sure that you can conveniently review these issues as required. If you are asking me to table this discussion until after January 7, 2020 when you return from your extended holiday break, then I will rely on same and conclude you have waived any claim that my client 'failed to act with due diligence' as to the Complaint and default and that I will not need to consider filing any Motions directed toward your defective filings until after January 7, 2020.

This is my 3rd request to vacate default and 3rd request to dismiss your duplicate Complaint.

Thank you,

**Beth A. Norrow**
Associate

Greenberg Traurig, P.A.
450 So. Orange Avenue, Suite 650 | Orlando, FL 32801
T +1 407.418.2345
norrowb@gtlaw.com  |  www.gtlaw.com  |  View GT Biography



**From:** Carla Turner-Hahn <carlathahn@gmail.com>
**Sent:** Friday, December 18, 2020 1:22 PM
**To:** prvs=5621ded6d3=norrowb@gtlaw.com
**Subject:** Auto Reply - out of office RE: Haulsee v DBNTC - Bay County Case #20-01663-CA - 2nd Request

**\*EXTERNAL TO GT\***

My office is closed for the Holidays and will reopen on January 7th.  If you are an established client and have my mobile number and your matter is urgent, please contact me on my mobile.
Thank you & Happy Holidays.

--
Very Truly Yours,

Carla Turner-Hahn, Esquire
Attorney at Law
Master of Business Administration

**PLEASE NOTE MY NEW Office Location & Mailing Address:**
**Rochelle Advisory & Management, LLC**
**Carla Turner-Hahn, P.A.**
**615 Whisper Woods Drive**
**Lakeland, FL 33813**
Telephone: 727-433-1624
FAX: 1-877-711-4021
Email: CarlaTHahn@gmail.com
********************************************************************************

**THE INFORMATION CONTAINED IN THIS ELECTRONIC COMMUNICATION IS SUBJECT TO THE**
**ATTORNEY-CLIENT, WORK PRODUCT, OR OTHER APPLICABLE PRIVILEGE, IS CONFIDENTIAL, AND**
**IS INTENDED ONLY FOR USE BY THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF**
**THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR**
**DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, PLEASE BE ADVISED THAT ANY**
**DISSEMINATION, DISTRIBUTION, COPYING OR USE OF THIS COMMUNICATION IS STRICTLY**
**PROHIBITED.**

Note: (Please show your email savvy by respecting & protecting the privacy of me & others. Use Bcc:
for more than one recipient. IF YOU ARE FORWARDING—"Forward and Send" ONLY after you have
deleted all email addresses from this email. It's the smart way to share)

# EXHIBIT "E"

Case 8:21-cv-00349-SDM-JSS   Document 1-3   Filed 01/12/21   Page 152 of 428 PageID 163

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and MARCIA HAULSEE,

      Plaintiffs,

                                         Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,  as
Trustee,

      Defendant.

_____/

## <u>NOTICE OF UNAVAILABILITY</u>

    The undersigned law firm hereby gives Notice to this Court and all attorneys and parties of record that Carla Turner-Hahn, Esq., shall be unavailable as follows:

    1.  Carla Turner-Hahn, Esq., is currently the only attorney practicing for Carla Turner-Hahn, P.A. and shall be unavailable December 18, 2020 through and including January 6, 2021.

    2.  The undersigned request that no appointments, mediations, depositions, conferences, hearings or other legal proceedings be scheduled during these times. Further no fax, email or correspondence should be sent setting a deadline for response during the time that said attorney is not available and for three (3) business days after the conclusion of the time of unavailability.

                      Respectfully Submitted,

                      */s/ Carla Turner-Hahn, Esquire*
                      Carla Turner-Hahn, Esquire
                      Carla Turner-Hahn, P.A.
                      Attorney for Plaintiff
                      615 Whisper Woods Drive
                      Lakeland, Florida 33813
                      Ph: 727-433-1624
                      FBN: 0390658
                      Email:  carlathahn@gmail.com

<u>**CERTIFICATE OF SERVICE**</u>

 I HEREBY CERTIFY that on December 18, 2020, a true and correct copy of the foregoing was filed with the Clerk of the Court using the State of Florida E-filing system, which will send a notice of electronic service to:

Beth Norrow, Esq.
Florida Bar No. 061497
norrowb@gtlaw.com
Greenberg Taurig, P.A.
450 S. Orange Ave., Ste 650
Orlando, FL 32801

<div style="margin-left: 40%;">

*/s/ Carla Turner-Hahn, Esquire*
Carla Turner-Hahn, Esquire
Carla Turner-Hahn, P.A.

</div>

# EXHIBIT "F"

| | |
|---|---|
| **From:** | Carla Turner-Hahn |
| **To:** | Norrow, Beth A. (Assoc-Orl-LT) |
| **Subject:** | Re: Haulsee v DBNTC - Bay County Case #20-01663-CA |
| **Date:** | Friday, December 18, 2020 12:27:16 PM |
| **Attachments:** | image001.png |

**\*EXTERNAL TO GT\***

Dear Ms. Norrow:

In response to your demand:

Clarification number one: my last name is Turner-Hahn.
Clarification number two: I know only that you claim to represent DBNTC, a material fact that remains in dispute.

With regard to your unreasonable demand of a substantive response from me on behalf of my client by "high noon" today, do what you will. I have filed & e-served my Notice of Unavailability and activated my auto-reply email response
because I have had long standing plans to close my office for the Holidays. Further, I have represented the Haulsees for nearly 20 years and know that they are also traveling and otherwise committed over the Holidays.

As the hearing for the Motion for Summary Judgment after Default in this matter is not set until January 20, 2021, there is no prejudice to the Defendant, your purported client.

Happy Holidays.

Very Truly Yours,

Carla Turner-Hahn, Esquire
Attorney at Law
Master of Business Administration

**PLEASE NOTE MY NEW Office Location & Mailing Address:**
**Rochelle Advisory & Management, LLC**
**Carla Turner-Hahn, P.A.**
**615 Whisper Woods Drive**
**Lakeland, FL 33813**
Telephone: 727-433-1624
FAX: 1-877-711-4021
Email: CarlaTHahn@gmail.com
**************************************************************************
**THE INFORMATION CONTAINED IN THIS ELECTRONIC COMMUNICATION IS SUBJECT TO THE ATTORNEY-CLIENT, WORK PRODUCT, OR OTHER APPLICABLE PRIVILEGE, IS CONFIDENTIAL, AND IS INTENDED ONLY FOR USE BY THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, PLEASE BE ADVISED THAT ANY DISSEMINATION, DISTRIBUTION, COPYING OR USE OF THIS COMMUNICATION IS STRICTLY PROHIBITED.**

Note: (Please show your email savvy by respecting & protecting the privacy of me & others. Use Bcc: for more than one recipient. IF YOU ARE FORWARDING—"Forward and Send" ONLY after you have deleted all email addresses from this email. It's the smart way to share)

On Thu, Dec 17, 2020 at 6:38 PM <norrowb@gtlaw.com> wrote:

> Ms. Hahn,
>
> As you know, I represent DBNTC. I recently learned of the attached Complaint you purportedly filed in Bay County Circuit Court on September 23, 2020.
>
>
> First, please be advised that this Bay County Complaint is a duplicate cause of action by Haulsees for the same purported conduct set forth in the Haulsee Complaint pending in the Middle District of Florida. Naming DBNTC merely as an 'alter ego' does not avoid improper claim splitting. As such, the Bay County Complaint must be dismissed. Second, for the reasons set forth in the attached Motion to Dismiss pending in the Middle District Haulsee matter, the Complaint fails to state a valid cause of action against DBTCA – and thus certainly no cause of action can be asserted against DBNTC under your purported 'alter ego' theory. Indeed, half the statutes cited in the Bay County Complaint do not even exist. On this basis, the Complaint needs to be dismissed.
>
> Finally, pursuant to the Affidavit of Service, the Summons and Complaint were delivered to CT Corp, which you know is not the registered agent for DBNTC. *See* attached letter to your counsel in your personal case that was recently dismissed. Accordingly, service of process was never accomplished. And, given that this letter was sent in your *personal* case, it appears you knew full well that delivering the documents to CT Corp meant the pleadings would never reach DBNTC. Accordingly, I am asking you to do what is right in this matter and (1) vacate the improper default against DBNTC and (2) dismiss the duplicate Bay County Complaint.
>
>
> Please let me know your client's position by noon tomorrow or I will proceed accordingly.
>
>
> **Beth A. Norrow**
> Associate
>
> Greenberg Traurig, P.A.
> 450 So. Orange Avenue, Suite 650 | Orlando, FL 32801
> T +1 407.418.2345
> norrowb@gtlaw.com   |   www.gtlaw.com   |   View GT Biography

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate the information.

Case 8:21-cv-00349-SDM-JSS Document 1-3 Filed 01/12/21 Page 158 of 428 PageID 169

**IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA**

**MICHAEL HAULSEE and
MARCIA HAULSEE,**

      **Plaintiff,**                   **CASE NO.: 2020-001663-CA**

**vs.**

**DEUTSCHE BANK NATIONAL TRUST
COMPANY,**

      **Defendant.**

_____/

### DEFENDANT'S NOTICE OF FILING
### DOCUMENTS RELATING TO CORPORATE EXISTENCE

Defendant, Deutsche Bank National Trust Company, by and through the undersigned

attorneys, hereby gives notice of filing the attached corporate documents:

1. Office of the Comptroller of the Currency's Certificate of Corporate Existence of Deutsche Bank National Trust Company, Los Angeles, California, Charter No. 18608, executed on February 21, 2018;
2. Office of the Comptroller of the Currency's Certification of Fiduciary Powers relating to Deutsche Bank National Trust Company, Los Angeles, California Charter No. 18608, executed on March 22, 2018;
3. Correspondence dated April 4, 2002 from Comptroller of the Currency Administrator of National Banks reflecting that as of April 15, 2002, the "title of Bankers Trust Company of California, National Association, Charter Number 18608 will change to Deutsche Bank National Trust Company";

Dated: December 23, 2020          Respectfully submitted,

Jason H. Okleshen, Esq.            Beth A. Norrow, Esq.
Florida Bar No. 496170              Florida Bar No. 061497
Okleshenj@gtlaw.com             norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**     **GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Ste. 300 East     450 S. Orange Ave., Ste. 650
West Palm Beach, FL 33401        Orlando, FL 32801
Telephone: (561) 650-7915        Telephone: (407) 420-1000
Facsimile: (561) 655-6222         Facsimile: (407) 420-5909

Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: /s/ *Beth A. Norrow*
    Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 23, 2020, a true and correct copy of the foregoing

was filed with the Clerk of the Court using the State of Florida e-filing system which will send a

notice of electronic service to:

Carla Turner-Hahn, Esq.
615 Whisper Woods Dr.
Lakeland, FL 33813
Email: carlathahn@gmail.com

/s/ Beth A. Norrow
Beth A. Norrow

1

 Office of the Comptroller of the Currency

Washington, DC 20219

## CERTIFICATE OF CORPORATE EXISTENCE

I, Joseph Otting, Comptroller of the Currency, do hereby certify that:

1. The Comptroller of the Currency, pursuant to Revised Statutes 324, et seq, as amended, and 12 USC 1, et seq, as amended, has possession, custody, and control of all records pertaining to the chartering, regulation, and supervision of all national banking associations.

2. "Deutsche Bank National Trust Company," Los Angeles CA (Charter No. 18608), is a national banking association formed under the laws of the United States and is authorized thereunder to transact the business of banking on the date of this certificate.

IN TESTIMONY WHEREOF, today,

February 21, 2018, I have hereunto

subscribed my name and caused my seal

of office to be affixed to these presents at

the U.S. Department of the Treasury, in

the City of Washington, District of

Columbia



_____
Comptroller of the Currency

**2**

Office of the Comptroller of the Currency

Washington, DC 20219

## CERTIFICATION OF FIDUCIARY POWERS

I, Joseph Otting, Comptroller of the Currency, do hereby certify that:

1. The Office of the Comptroller of the Currency, pursuant to Revised Statutes 324, et seq, as amended, and 12 USC 1, et seq, as amended, has possession, custody, and control of all records pertaining to the chartering, regulation, and supervision of all national banking associations.

2. "Deutsche Bank National Trust Company," Los Angeles, California (Charter No. 18608), was granted, under the hand and seal of the Comptroller, the right to act in all fiduciary capacities authorized under the provisions of the Act of Congress approved September 28, 1962, 76 Stat. 668, 12 USC 92a, and that the authority so granted remains in full force and effect on the date of this certificate.

IN TESTIMONY WHEREOF, today,

March 22, 2018, I have hereunto subscribed

my name and caused my seal of office to be

affixed to these presents at the U.S.

Department of the Treasury, in the City of

Washington, District of Columbia.



Joseph Otting

Comptroller of the Currency

**3**



Comptroller of the Currency
Administrator of National Banks

Attn: Licensing Unit
50 Fremont Street, Suite 3900
San Francisco, CA 94105
(415) 545-5930, FAX (415) 442-5315

April 4, 2002

Sandra L. West
Assistant Secretary
C/o Deutsche Bank
31 West 52nd Street-M/S NYC09-0810
New York, NY 10019

Re:     **Title Change**
        **Bankers Trust Company of California, N.A.**
        **Los Angeles, California**
        **Charter No. 18608**

Dear Ms. West:

The Office of the Comptroller of the Currency (OCC) has received your letter concerning the title change, appropriate amendment to the First Article of Association of Bankers Trust Company of California, National Association. The OCC will update their records to reflect that as of *April 15, 2002,* the title of Bankers Trust Company of California, National Association, Charter Number 18608 *will change to Deutsche Bank National Trust Company.*

The original of the bank's respective Article has been forwarded to the bank's official file with our Office and an original is hereby returned for your records.

As a result of the Garn-St Germain Depository Institutions Act of 1982, the OCC is no longer responsible for the approval of national bank name changes nor does it maintain official records on the use of alternate titles. The use of other titles or the retention of the rights to any previously used title is the responsibility of the bank's board of directors. Legal counsel should be consulted to determine whether or not the new title, or any previously used title, could be challenged by competing institutions under the provisions of federal or state law.

Very truly yours,

*James A. Bundy*

James A. Bundy
Licensing Manager

Enclosure

## BANKERS TRUST COMPANY OF CALIFORNIA, NATIONAL ASSOCIATION

I, DAVID ABRAMSON, certify that:

1.     I am the duly elected and acting Secretary of Bankers Trust Company of California, National Association (formerly, BT Trust Company of California), and as such officer, I am the official custodian of its records; that the following is a true and correct copy of resolutions adopted by the Association's shareholders; and that such resolutions are now lawfully in force and effect:

**RESOLVED**, that the Association is hereby authorized to amend the First Article of Association to read as follows:

FIRST:     The title of this Association shall be "Deutsche Bank National Trust Company."

**FURTHER RESOLVED**, that the effective date of the amendment of the First Article of Association shall be April 15, 2002.

2.     The following is a true and correct copy of a resolution of the Association's Board of Directors, and such resolution is now lawfully in force and effect:

**RESOLVED**, that the amendment of the First Article of Association to change the title of the Association to "Deutsche Bank National Trust Company" is hereby approved, effective April 15, 2002.

3.     The foregoing amendment to the Articles of Association has been duly approved by the Board of Directors of Bankers Trust Company of California, National Association on March 21, 2002.

4.     The Resolution and Amendment set forth above has not been modified or rescinded and is in full force and effect.

**IN WITNESS WHEREOF**, I have set my hand and the seal of this Association this 27th day of March 2002.

David Abramson
Secretary

(S E A L)

State of New York    )
                       ) ss.:
County of New York  )

On the 27th day of March in the year 2002 before me, the undersigned, a Notary Public in and for said state, personally appeared David Abramson, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

**SANDRA L. WEST**
Notary Public, State Of New York
No.01WE4942401
Qualified in New York County
Commission Expires September 18, 20__

## Office of the Comptroller of the Currency

Accepted by: _____
                James A. Bundy, Licensing Manager

Date: _____4/4/02_____



Comptroller of the Currency
Administrator of National Banks

Washington, D.C. 20219

## CERTIFICATE

I, John D. Hawke, Jr., Comptroller of the Currency, do hereby certify that the document hereto attached is a true copy, as recorded in this Office, of the currently effective Articles of Association for "Bankers Trust Company of California, National Association," Los Angeles, California, (Charter No. 18608)

IN TESTIMONY WHEREOF, I have hereunto

subscribed my name and caused my seal of office

to be affixed to these presents at the Treasury

Department in the City of Washington and District

of Columbia, this Monday, February 04, 2002

*John D. Hawke, Jr.*



***Comptroller of the Currency***

CERTIFICATE OF AMENDMENT
OF
ARTICLES OF ASSOCIATION
OF
BANKERS TRUST COMPANY OF CALIFORNIA, N.A.

I, David Abramson, certify that:

1.    I am the duly elected Secretary of Bankers Trust Company of California, N.A.

2.    On January 17, 1992, at a special meeting of the Shareholders of Bankers Trust Company of California, N.A., the following resolution and amendment to Article FIFTH of the Articles of Association of Bankers Trust Company of California, N.A. was adopted:

> RESOLVED, that Bankers Trust Holdings, Inc., the sole shareholder of Bankers Trust Company of California, N.A. ("BTCal"), hereby approves of the amendment to the first paragraph of Article FIFTH of the Articles of Association of BTCal, to read as follows:
>
> > The authorized amount of capital stock of this Association shall be 500,000 shares of common stock of the par value of One Hundred Dollars and no cents ($100.00) each; but said capital stock may be increased or decreased from time to time, in accordance with the provisions of the laws of the United States.

Article FIFTH of the Articles of Association of Bankers Trust Company of California, N.A. is restated in entirety, as follows:

> The authorized amount of capital stock of this Association shall be 500,000 shares of common stock of the par value of One Hundred Dollars and no cents ($100.00) each; but said capital stock may be increased or decreased from time to time, in accordance with the provisions of the laws of the United States.

No holder of shares of the capital stock of any class of the Association shall have any pre-emptive or preferential right of subscription to any shares of any class of stock of the Association, whether now or hereafter authorized, or to any obligations convertible into stock of the Association, issued, or sold, nor any right of subscription thereto other than such, if any, as the Board of Directors, in its discretion may from time to time determine and at such price as the Board of Directors may from time to time fix.

If the capital stock is increased by a stock dividend, each shareholder shall be entitled to his/her proportionate amount of such increase in accordance with the number of shares of capital stock owned by him/her at the time the increase is authorized by the shareholders, unless another time subsequent to the date of the shareholders' meeting is specified in a resolution adopted by the shareholders at the time the increase is authorized.

The Association, at any time and from time to time, may authorize and issue debt obligations, whether or not subordinated, without the approval of the shareholders.

3.    The foregoing amendment of the Articles of Association has been duly approved by the Board of Directors of Bankers Trust Company of California, N.A. on January 7, 1992.

4.    The Resolution and Amendment set forth above has not been modified or rescinded and is in full force and effect.

IN WITNESS WHEREOF, I have set my hand and the seal of this Association this 22nd day of January, 1992.

David Abramson
Secretary

DATE ACCEPTED:                    FEBRUARY 10, 1992

2                    BY:
                    JOHN C. BEERS
                    Acting Director for Analysis
                    Western District

### BT TRUST COMPANY OF CALIFORNIA, NATIONAL ASSOCIATION

I, DAVID ABRAMSON, certify that:

I am the duly constituted Secretary of BT Trust Company of California, National Association, and as such officer I am the official custodian of its records; and that the following is a true and correct copy of a resolution of the Association's Shareholders, and such resolution is now lawfully in force and effect:

>    RESOLVED, that the amendment of the First Article of Association is hereby approved, shall be effective immediately, and shall read as follows:

>    FIRST:    The title of this Association shall be "Bankers Trust Company of California, National Association".

And that the following is a true and correct copy of a resolution of the Association's Board of Directors, and such resolution is now lawfully in force and effect:

>    RESOLVED, that the amendment of the title of the Association's By-Laws to read "Bankers Trust Company of California, National Association", is hereby approved.

Dated: _March 30, 1987_

_____
                                        Secretary

Filed
Comptroller of The Currency
Northeastern District

Date FEB 1 3 1986

BT TRUST COMPANY OF CALIFORNIA, NATIONAL ASSOCIATION

ARTICLES OF ASSOCIATION


For the purpose of organizing an association to carry on the business of a limited purpose trust company under the laws of the United States, the undersigned do enter into the following articles of association:

FIRST:   The title of this Association shall be "BT Trust Company of California, National Association".

SECOND:   The main office of the Association shall be in the City of Los Angeles, County of Los Angeles, State of California.   The general business of the Association shall be conducted at its main office and its branches.

THIRD:   The Board of Directors of this Association shall consist of not less than five nor more than twenty-five shareholders, the exact number of Directors within such minimum and maximum limits to be fixed and determined from time to time by resolution of a majority of the full Board of Directors or by resolution of the shareholders at any annual or special meeting thereof.   Each director, during the full term of his or her directorship, shall own a minimum of $1,000 aggregate par value of stock of this association or a minimum par market value or equity interest of $1,000 of stock in the bank holding company controlling this association.   Unless otherwise provided by the laws of the United States, any vacancy in the Board of Directors for any reason, including an increase in the number thereof, may be filled by action of the Board of Directors.

FOURTH:   The annual meeting of the shareholders for the election of Directors and the transaction of whatever other business may be brought before said meeting shall be held at the main office or such other place as the Board of Directors may designate, on the day of each year specified therefor in the By-laws, but if no election is held on that day, it may be held on any subsequent day according to the provisions of law; and all elections shall be held according to such lawful regulations as may be prescribed by the Board of Directors.

Nominations for election to the Board of Directors may be made by the Board of Directors or by any shareholder of any outstanding class of capital stock of the Association entitled to vote for election of directors.   Nominations other than those made by or on behalf of the existing management of the Associa-tion, shall be made in writing and shall be delivered or mailed to the President of the Association and to the Comptroller of the Currency, Washington, D.C., not less than 14 days nor more than

-2-

50 days prior to any meeting of shareholders called for the
election of directors;, provided, however, that if less than 21
days' notice of the meeting is given to shareholders, such
nomination shall be mailed or delivered to the President of the
Association and to the Comptroller of the Currency not later than
the close of business on the seventh day following the day on
which the notice of meeting was mailed.  Such notification shall
contain the following information to the extent known to the
notifying shareholder:  (a) the name and address of each proposed
nominee; (b) the principal occupation of each proposed nominee;
(c) the total number of shares of capital stock of the Associa-
tion that will be voted for each proposed nominee; (d) the name
and residence address of the notifying shareholder; and (e) the
number of shares of capital stock of the Association owned by the
notifying shareholder.  Nominations not made in accordance
herewith may, in his/her discretion, be disregarded by the
chairperson of the meeting, and upon his/her instructions, the
vote tellers may disregard all votes cast for each such nominee.

FIFTH:  The authorized amount of capital stock of this
Association shall be 5,000 shares of common stock of the par
value of One Hundred Dollars and no cents ($100.00) each; but
said capital stock may be increased or decreased from time to
time, in accordance with the provisions of the laws of the United
States.

No holder of shares of the capital stock of any class
of the Association shall have any pre-emptive or preferential
right of subscription to any shares of any class of stock of the
Association, whether now or hereafter authorized, or to any
obligations convertible into stock of the Association, issued, or
sold, nor any right of subscription thereto other than such, if
any, as the Board of Directors, in its discretion may from time
to time determine and at such price as the Board of Directors may
from time to time fix.

If the capital stock is increased by a stock dividend,
each shareholder shall be entitled to his/her proportionate
amount of such increase in accordance with the number of shares
of capital stock owned by him/her at the time the increase is
authorized by the shareholders, unless another time subsequent to
the date of the shareholders' meeting is specified in a
resolution adopted by the shareholders at the time the increase
is authorized.

The Association, at any time and from time to time, may
authorize and issue debt obligations, whether of not subordi-
nated, without the approval of the shareholders.

-3-

SIXTH:  The Board of Directors (a majority of whom shall be a quorum to do business) shall appoint one of its members to be President of the Association who shall hold office (unless he shall become disqualified or be sooner removed by a two-thirds vote of the members of the Board) for the term for which he was elected a Directors.  The Board of Directors may appoint one of its members to be Chairperson of the Board, who shall perform such duties as may be designated by it.  The Board of Directors shall have power to appoint one or more Vice-Presidents; and to appoint a Cashier and such other officers and employees as may be required to transact the business of the Association.

The Board of Directors shall have the power to define the duties of the officers and employees of the Association; to fix the salaries to be paid to them; to dismiss them; to require bonds from them and to fix the penalty thereof; to regulate the manner in which any increase of the capital of the Association shall be made; to manage and administer the business and affairs of the Association; to make all by-laws that it may be lawful for them to make and generally do and perform all acts that it may be legal for a board of directors to do and perform.

SEVENTH:  The Board of Directors shall have the power to change the location of the main office of the Association to any other place within the limit of the City of Los Angeles, without the approval of the shareholders but subject to the approval of the Comptroller of the Currency; and shall have the power to establish or change the location of any branch or branches of the Association to any other location, without the approval of the shareholders but subject to the approval of the Comptroller of the Currency.

EIGHTH:  The corporate existence of this Association shall continue until terminated in accordance with the laws of the United States.

NINTH:  The Board of Directors of this Association, or any three or more shareholders owning, in the aggregate, not less than 25 percent of the stock of this Association, may call a special meeting of shareholders at any time.  Unless otherwise provided by the laws of the United States, a notice of the time, place, and purpose of every annual and special meeting of the shareholders shall be given by first-class mail, postage prepaid, mailed at least ten days prior to the date of such meeting to each shareholder of record at his/her address as shown upon the books of this Association.

-4-

TENTH:  Any person, his/her heirs, executors or administrators, may be indemnified or reimbursed by the Association for liability and reasonable expenses (including amounts paid in settlement or in satisfaction of judgments or as fines or penalties) actually incurred in connection with any claim, action, suit, or proceeding, civil or criminal, whether or not by or in the right of the Association, in which he/she or they shall be involved or threatened to be involved by reason of his/her being or having been a director, officer, or employee of the Association or of any firm, corporation, or organization which he/she serves or has served in any such capacity at the request of the Association (provided he/she so served at the specific request of the Association in writing signed by the Chairperson of the Board or the President and specifically referring to this Article Tenth); provided, however, that no person shall be so indemnified or reimbursed (1) in relation to any matter in an action, suit or proceeding as to which he/she shall finally be adjudged to have been guilty of, or liable for, willful misconduct, gross neglect of duty or criminal acts in the performance of his/her duties to the Association or such firm, corporation or organization; or (2) in relation to any matter in a claim, action, suit or proceeding which has been made the subject of a settlement except with the approval of (a) a court of competent jurisdiction, (b) the Board of Directors, acting by vote of Directors not parties to the same or substantially the same action, suit or proceeding, constituting a majority of the whole number of the Directors, or (c) the shareholders, acting by vote of a majority of the outstanding shares of capital stock; and provided further that, in the case of persons serving another firm, corporation or organization at the request of the Association, the indemnity provided in this Article Tenth shall apply only if and to the extent that, after making such efforts as the Board of Directors or shareholders shall deem adequate under the circumstances, such person shall be unable to obtain indemnification from such firm, corporation or organization.  The foregoing provisions for indemnification or reimbursement shall not be exclusive of other rights to which such person, his/her heirs, executors or administrators, may be entitled by contract or otherwise.  Unless the context clearly requires otherwise, the term "the Association" as used in this Article shall include any predecessor corporation.

The Association may, upon the affirmative vote of a majority of its Board of Directors, purchase insurance for the purpose of indemnifying its directors, officers and other employees to the extent that such indemnification is allowed in the preceding paragraph.  Such insurance may, but need not, be for the benefit of all directors, officers, or employees.

-5-

ELEVENTH:  The powers of the Association shall be limited to conducting the business of a trust company under a national bank charter, and no amendment to such powers may be made without the prior approval of the Comptroller of the Currency.

TWELFTH:  These Articles of Association may be amended at any regular or special meeting of the shareholders by the affirmative vote of the holders of a majority of the stock of this Association, voting in person or by proxy, unless the vote of the holders of a greater amount of stock is required by law, and in that case by the vote of the holders of such greater amount.

IN WITNESS WHEREOF, we have hereunto set our hands this on the date appearing opposite our names.

_____         _____10/7/85_____
Peter E. Lengyel                                                      date

_____         _____10/7/85_____
Harold K. Atkins                                                      date

_____         _____10/7/85_____
John L. Murphy                                                        date

_____         _____10/7/85_____
Allan C. Martin                                                       date

_____         _____10/7/85_____
Rein Lumi                                                             date

_____         _____10/7/85_____
Gerard P. Hourihan                                                    date

State of New York

County of New York

      Before the undersigned, a Notary Public of the State of New York personally appeared Peter E. Lengyel, to me known, who acknowledged that he executed the foregoing certificate for the purposes therein mentioned.

Witness my hand and seal of office this _7_ day of _October_, 1985.

<u>David Abramson</u>
Notary Public

DAVID ABRAMSON
Notary Public, State of New York
No. 60-0007765
Qualified in Westchester County
Certificate filed in New York County
Commission Expires March 30, 1987

State of New York

County of New York

      Before the undersigned, a Notary Public of the State of New York personally appeared John L. Murphy, to me known, who acknowledged that he executed the foregoing certificate for the purposes therein mentioned.

Witness my hand and seal of office this _7_ day of _October_, 1985.

<u>David Abramson</u>
Notary Public

DAVID ABRAMSON
Notary Public, State of New York
No. 60-0007765
Qualified in Westchester County
Certificate filed in New York County
Commission Expires March 30, 1987

State of New York

County of New York

      Before the undersigned, a Notary Public of the State of New York personally appeared Harold K. Atkins, to me known, who acknowledged that he executed the foregoing certificate for the purposes therein mentioned.

Witness my hand and seal of office this _7_ day of _October_, 1985.

<u>David Abramson</u>
Notary Public

DAVID ABRAMSON
Notary Public, State of New York
No. 60-0007765
Qualified in Westchester County
Certificate filed in New York County
Commission Expires March 30, 1987

Case 8:21-cv-00349-SDM-JSS   Document 1-3   Filed 01/12/21   Page 178 of 428 PageID 189

IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

      **Plaintiff,**                  **CASE NO.: 2020-001663-CA**

vs.

DEUTSCHE BANK NATIONAL TRUST
COMPANY,

      **Defendant.**

_____/

## DEFENDANT'S NOTICE OF FILING

Defendant, **DEUTSCHE BANK TRUST COMPANY AMERICAS, As Trustee For**

**Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series**

**2004-QS4**, by and through the undersigned attorneys, hereby gives notice of filing the attached:

1. Affidavit of Alexandre C. Halow for CT Corporation System dated November 25, 2020.
2. Affidavit of Alexandre C. Halow for CT Corporation System dated December 8, 2020.

Dated: December 23, 2020          Respectfully submitted,

Jason H. Okleshen, Esq.         Beth A. Norrow, Esq.
Florida Bar No. 496170          Florida Bar No. 061497
Okleshenj@gtlaw.com          norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**     **GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Ste. 300 East    450 S. Orange Ave., Ste. 650
West Palm Beach, FL 33401      Orlando, FL 32801
Telephone: (561) 650-7915      Telephone: (407) 420-1000
Facsimile: (561) 655-6222       Facsimile: (407) 420-5909
                         Secondary email: dunnla@gtlaw.com;
                         FLService@gtlaw.com

                         By: /s/ *Beth A. Norrow*_____
                           Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 23, 2020, a true and correct copy of the foregoing

was filed with the Clerk of the Court using the State of Florida e-filing system which will send a

notice of electronic service to:

Carla Turner-Hahn, Esq.
615 Whisper Woods Dr.
Lakeland, FL 33813
Email: carlathahn@gmail.com

/s/ Beth A. Norrow
Beth A. Norrow

*ADMIN 37983530*

2

# EXHIBIT 1

## AFFIDAVIT OF ALEXANDRE C. HALOW

STATE OF GEORGIA       )
                           )
COUNTY OF CLARKE      )

Alexandre C. Halow, being first duly sworn and on oath, deposes and states as follows:

1.     I am over the age of 18 and competent to testify as to the matters contained herein.

2.     C T Corporation System ("CT") is a commercial registered agent, and in that capacity exists to receive and forward service of process on behalf of its customers.

3.     I am a Representation Services Advisor for CT. As such, I am familiar with the records maintained by CT in the ordinary course of business for the purpose of handling and processing the service of process CT receives on behalf of its customers. All statements made in this affidavit regarding service of process received by CT are made based on my review of those records.

4.     Based on my review of CT's records, CT is not the designated registered agent for an entity named "Deutsche Bank National Trust Company" in the state of New York.

5.     On July 24, 2020, CT received a Summons and Complaint in the matter entitled: *Jacaranda, LLC, as Trustee for the Certificateholders of the Brev 1144 Land Trust v. Deutsche Bank National Trust Company, as Trustee for Soundview Home Loan Trust 2004-1, Asset-Backed Certificates, Series 2004-1*, Brevard County Circuit Court Case # 05-2020-CA-035223 (the "Matter"). Based on CT's records, the Matter was served on CT in New York.

6.     By letter dated July 27, 2020 (the "Rejection Letter) to Lee Segal, Esquire of Segal and Schuh Law Group, P.L., 18167 US Highway 19 North, Suite 100, Clearwater, FL

33764, CT Corporation rejected service of the Summons and Complaint received in the Matter on July 24, 2020. A true and correct copy of the Rejection Letter is attached as **Exhibit A**.

7.      CT did not forward a copy of the Summons and Complaint received in the Matter to Deutsche Bank National Trust Company.

8.      CT's records do not reflect receipt of any other service related to the Matter.

**FURTHER AFFIANT SAYETH NAUGHT**.

DATED: November 25, 2020

Alexandre C. Halow
Representation Services Advisor for CT
Personally Known _____ OR
Produced Identification ✓

Subscribed and sworn to before me
this 25st day of November, 2020, by
Alexandre C. Hallow .
_____, Notary Public

Type of Identification Produced: GA Driver's License

State of Georgia
My Commission expires: 05/26/2024

Page 2 of 2

Exhibit A



July 27, 2020

Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL 33764

Re: Jacaranda, LLC, etc., Pltf. vs. Deutsche Bank National Trust Company, etc., Dft.

Case No. 052020CA035223XXXXXX

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 537994646

Sent By Regular Mail

cc: --

**(Returned To)**

Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL 33764

# EXHIBIT 2

## AFFIDAVIT OF ALEXANDRE C. HALOW FOR CT CORPORATION SYSTEM

STATE OF GEORGIA        )
                                 )

COUNTY OF CLARKE     )

Alexandre C. Halow, being first duly sworn on oath, deposes and states as follows:

1.      I am over the age of 18 and competent to testify as to the matters contained herein.

2.      C T Corporation System ("CT") is a commercial registered agent, and in that capacity exists to receive and forward service of process on behalf of its customers.

3.      I am a Representation Services Advisor for CT. As such, I am familiar with the records maintained by CT in the ordinary course of business for the purpose of handling and processing the service of process CT receives on behalf of its customers. All statements made in this affidavit regarding service of process received by CT are made based on my review of those records.

4.      Based on my review of CT's records, CT is not the designated registered agent for an entity named "Deutsche Bank National Trust Company" in the state of New York.

5.      On July 13, 2020, CT Corporation received a Summons and Complaint in the matter entitled: *Carla Turner-Hahn and Jeffrey M. Hahn vs. Deutsche Bank National Trust Company, As Trustee For GSAA Home Equity Trust 2006-10, Asset-Backed Certificates, Series 2006-10*, Pinellas County Circuit Court Case # 2020-3116-CI (the "Matter"). Based on CT's records, the Matter was served on CT in New York.

6.      By letter dated July 15, 2020 (the "Rejection Letter") to Lee Segal, Esquire of Segal and Schuh Law Group, P.L., 18167 US Highway 19 North, Suite 100, Clearwater, FL

33764, CT Corporation rejected service of the Summons and Complaint received in the matter on July 13, 2020. A true and correct copy of the Rejection Letter is attached as **Exhibit A**.

7.    CT did not forward the Summons and Complaint received in the Matter to Deutsche Bank National Trust Company.

8.    CT's records do not reflect receipt of any other service related to the Matter.

**FURTHER AFFIANT SAYETH NAUGHT.**

DATED: December _8_, 2020

_Alexandre C. Halow_
Alexandre C. Halow
Representation Services Advisor for CT
Personally Known _____ OR
Produced Identification _X_

Type of Identification Produced: GA Driver's License

Subscribed and sworn to before me
this _8th_ day of December, 2020, by
Alexandre C. Halow.

_Traci E Burns_ Notary Public

State of Georgia
My Commission expires: 08/26/2024





July 15, 2020

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 N., Ste 100,
Clearwater, FL  33764

Re:  JEFFREY M. HAHN and CARLA TURNER HAHN, Pltfs. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, etc., Dft.

Case No.  20003116CI

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation
System is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST
COMPANY.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 537939543

Sent By Regular Mail

cc:  --
**(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 N., Ste 100,
Clearwater, FL  33764

# Exhibit A

Case 8:21-cv-00349-SDM-JSS   Document 1-3   Filed 01/12/21   Page 188 of 428 PageID 199

IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA

**MICHAEL HAULSEE and
MARCIA HAULSEE,**                                    **Case No. 20-001663-CA**

      **Plaintiff,**

**vs.**

**DEUTSCHE BANK NATIONAL TRUST
COMPANY,**

      **Defendant.**

_____/

## REQUEST FOR JUDICIAL NOTICE
## OF PINELLAS COUNTY CASE HAHN V. DEUTSCHE BANK

Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY ("DBNTC") by and

through its undersigned counsel and pursuant to Fla. Stat. §§ 90.202(11), (12), hereby files this

Request for Judicial Notice in support of Defendant's Motion to Vacate Default and Motion to

Quash Service of Process and for all other purposes applicable in this matter, and states:

      1.      Section 90.202(6) of the Florida Evidence Code specifically provides that a court

may take judicial notice of the "[r]ecords of any court of this state." § 90.202(6), Fla. Stat. (2017);

*see also Hunt v. State*, 613 So. 2d 893, 898 n.5 (Fla. 1992) (recognizing that the Supreme Court

took judicial notice of the record in another case on the basis of section 90.202(6) of the Florida

Statutes); *Martin v. Garrison*, 658 So. 2d 1019, 1021 (Fla. 4th DCA 1995) (taking judicial notice

of court records).  In interpreting this provision, Florida appellate courts have also taken judicial

notice of deeds recorded in the Official Records of a Florida County.  *See Gonzalez v. Chase Home*

*Fin. LLC*, 37 So. 3d 955, 958 (Fla. 3d DCA 2010) (taking judicial notice of a deed and mortgage

recorded in Miami-Dade County's official records); *see also Beggi v. Ocean Bank*, 91 So. 3d 193,

195 n. 3 (Fla. 3d DCA 2012) (recognizing quitclaim deeds that were recorded in the official records

of Miami-Dade County when the appellee requested taking of judicial notice of same).  Indeed, the Florida Supreme Court has stated that "[c]ourts may take judicial cognizance of all public documents and public records." *Conyers v. State*, 123 So. 817, 818 (Fla. 1929).

2.    Further, Sections 90.202(11) and 90.202(12) of the Florida Statutes also permit the Court to take judicial notice of "[f]acts that are not subject to dispute because they are generally known within the territorial jurisdiction of the court" and/or "[f]acts that are not subject to dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." *See* Fla. Stat. §§ 90.202(11), (12).

3.    Pursuant to this statute, DBNTC requests that the Court take judicial notice of the court filings in the following case, which fall squarely within the above-referenced sections:

i.    *Jeffrey M. Hahn and Carla Turner-Hahn v. Deutsche Bank National Trust Company, as Trustee, et al.*; Pinellas County Circuit Court Case No. 2020-3116-CI, which includes, but is not limited to:

- Pinellas County Court Docket; **Exhibit 22;**
- Complaint filed on June 30, 2020; **Exhibit 23;**
- Affidavit of Service on Deutsche Bank filed on July 31, 2020, **Exhibit 24;**
- Motion for Clerk's Default & Default filed August 3, 2020 **Exhibit 25;**

4.    Judicial notice of these documents will allow this Court "to arrive at the best decision[] on the merits."  Dorothy F. Easley, *Judicial Notice on Appeal: A History Lesson in Recent Trends*, 84 Fla. B.J. 45, 46 (Dec. 2010) (noting that courts consider additional sources referred to in briefs or conduct their own independent research to arrive at the best decisions on the merits).

**WHEREFORE**, DBNTC respectfully request that the Court take judicial notice of the documents filed in the above-referenced foreclosure case, together with such other relief this Court deems just and necessary.

Dated: December 23, 2020

Respectfully submitted,

Patrick G. Broderick (FBN 88568)
broderickp@gtlaw.com
**GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Suite 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222
Secondary email:
Sandra.Famadas@gtlaw.com;

Beth A. Norrow (FBN 061497)
norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Suite 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: /s/ *Beth A. Norrow*
Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company*

## CERTIFICATE OF SERVICE

I CERTIFY that on December 23, 2020, I electronically filed the foregoing with the Clerk of Court via the Florida E-Filing Portal, which shall cause a copy to be served via email to the following:

Carla Turner-Hahn, Esq.
615 Whisper Wood Dr.
Lakeland, FL 33813
carlahahn@gmail.com

/s/ Beth A. Norrow
Beth A. Norrow

3

# EXHIBIT 22

12/23/2020       https://ccmspa.pinellascounty.org/PublicAccess/CaseDetail.aspx?CaseID=18556569

Skip to Main Content   Logout   My Account   Search Menu   New Civil Search   Refine Search   Back

Location : Pinellas County   Help

# REGISTER OF ACTIONS
## CASE NO. 20-003116-CI



Order Documents!   Click Here!
Request Now!   Including Certified!

| | |
|---|---|
| **JEFFREY M HAHN, et al Vs. DEUTSCHE BANK NATIONAL TRUST COMPANY** | |

§
§
§
§
§
§
§
§
§

| | |
|---|---|
| Case Type: | **OTHER CIVIL - CIRCUIT** |
| Date Filed: | **06/30/2020** |
| Location: | **Section 20** |
| Judicial Officer: | **MEYER, KEITH** |
| UNIFORM CASE NUMBER: | **522020CA003116XXCICI** |

## PARTY INFORMATION

**Attorneys**

| | | |
|---|---|---|
| DEFENDANT | DEUTSCHE BANK NATIONAL TRUST COMPANY *AS TRUSTEE FOR* GSAA HOME EQUITY TRUST 2006-10 ASSET BACKED CERTIFICATES SERIES 2006-10 | ~~BETH A NORROW, ESQ~~<br><br>~~GREENBERG TRAURIG P A~~<br>~~450 S ORANGE AVE STE 650~~<br>~~ORLANDO, FL 32801~~<br><br>~~407-420-1000(W)~~ |
| | 60 WALL STREET<br>NEW YORK, NY 10005 | ~~JASON H OKLESHEN, ESQ~~<br><br>~~450 SOUTH ORANGE AVENUE~~<br>~~SUITE 650~~<br>~~ORLANDO, FL 32801~~<br><br>~~561-650-7900(W)~~ |
| PLAINTIFF | HAHN, CARLA TURNER | ~~LEE SEGAL, ESQ~~ |
| | 18167 US HIGHWAY 19 N STE 100<br>CLEARWATER, FL 33764 | ~~FL FORECLOSURE & CREDIT DEFENSE FIRM PL~~<br>~~18167 US HWY 19 N STE 100~~<br>~~CLEARWATER, FL 33764~~<br><br>~~813-920-5775(W)~~ |
| PLAINTIFF | HAHN, JEFFREY M | ~~LEE SEGAL, ESQ~~ |
| | 18167 US HIGHWAY 19 N SUITE 100<br>CLEARWATER, FL 33764 | ~~FL FORECLOSURE & CREDIT DEFENSE FIRM PL~~<br>~~18167 US HWY 19 N STE 100~~<br>~~CLEARWATER, FL 33764~~<br><br>~~813-920-5775(W)~~ |

## EVENTS & ORDERS OF THE COURT

**OTHER EVENTS AND HEARINGS**

| | | |
|---|---|---|
| 12/02/2020 | NOTICE OF VOLUNTARY DISMISSAL | Doc # 34 |
| | *(AMENDED) WITH PREJUDICE* | |
| 10/23/2020 | CASE DISMISSED - BEFORE HEARING (SRS DISPOSITION) | Doc # 32 |
| 10/23/2020 | NOTICE OF VOLUNTARY DISMISSAL | Doc # 33 |
| 10/19/2020 | PLAINTIFF'S MOTION TO CANCEL FORECLOSURE SALE | Doc # 31 |
| 10/02/2020 | PLTF-PET'S MOTION TO COMPEL | Doc # 30 |
| | *DISCOVERY AND COMPLIANCE WITH SUBPOENA* | |
| 09/18/2020 | CORRESPONDENCE TO COURT RE | Doc # 28 |
| | *HEARING - RECEIVED BY COURT 09182020* | |
| 09/18/2020 | SUBPOENA | Doc # 29 |
| | *NOTICE TO APPEAR (SIGNED)* | |
| 09/17/2020 | RESPONSE | Doc # 23 |

| | | |
|---|---|---|
| | | *IN OPPOSITION TO MOTN TO STRIKE NOTICE OF APPEARANCE/TO DISQUALIFY COUNSEL/AND FOR SANCTIONS FOR FRAUD W/ATTACHED EXHIBITS* |
| 09/17/2020 | **REQUEST**   Doc # 24 | |
| | | *FOR JUDICIAL NOTICE W/ATTACHED EXHIBIT* |
| 09/17/2020 | **PLTF-PET'S MOTION TO STRIKE**   Doc # 25 | |
| | | *HEARSAY AFFIDAVIT* |
| 09/17/2020 | **PLTF-PET'S MOTION TO COMPEL**   Doc # 26 | |
| | | *DEPOSITIONS AND CONTINUE HEARING* |
| 09/17/2020 | **NOTICE OF FILING**   Doc # 27 | |
| | | *ATTACHED SUPPLEMENTAL AUTHORITIES IN SUPPORT OF MOTION TO VACATE DEFAULT, QUASH SERVICE OF PROCESS AND FOR SANCTIONS* |
| 08/26/2020 | **NOTICE OF HEARING**   Doc # 21 | |
| | | *09232020 1:30 (TELEPHONIC)* |
| 08/26/2020 | **NOTICE OF HEARING**   Doc # 22 | |
| | | *09232020 1:30 ZOOM* |
| 08/13/2020 | **CORRESPONDENCE**   Doc # 12 | |
| | | *STATING C T CORPORATION SYSTEM IS NOT A REGISTERED AGENT FOR DEUTSCHE BANK NATIONAL TRUST COMPANY* |
| | | Party:  DEUTSCHE BANK NATIONAL TRUST COMPANY |
| 08/13/2020 | **DEF-RESP'S MOTION**   Doc # 13 | |
| | | *TO VACATE DEFAULT, QUASH SERVICE OF PROCESS AND FOR SANCTIONS* |
| 08/13/2020 | **EXHIBIT**   Doc # 14 | |
| | | *A - AFFIDAVIT OF SERVICE* |
| 08/13/2020 | **EXHIBIT**   Doc # 15 | |
| | | *B - LETTER DATED 07152020* |
| 08/13/2020 | **EXHIBIT**   Doc # 16 | |
| | | *C - MOTION FOR CLERK'S DEFAULT* |
| 08/13/2020 | **EXHIBIT**   Doc # 17 | |
| | | *D - EMAIL DATED 08112020* |
| 08/13/2020 | **EXHIBIT**   Doc # 18 | |
| | | *E - EMAIL DATED 08132020* |
| 08/13/2020 | **EXHIBIT**   Doc # 19 | |
| | | *F - VERIFIED COMPLAINT FOR FORECLOSURE OF MORTGAGE* |
| 08/13/2020 | **EXHIBIT**   Doc # 20 | |
| | | *G - NOTICE OF APPEARANCE AS CO-COUNSEL FOR PLAINTIFF AND DESIGNATION OF EMAIL ADDRESSES* |
| 08/12/2020 | **PLTF-PET'S MOTION TO STRIKE**   Doc # 10 | |
| | | *NOTICE OF APPEARANCE, TO DISQUALIFY COUNSEL, AND FOR SANCTIONS FOR FRAUD ON THE COURT* |
| 08/12/2020 | **EXHIBIT**   Doc # 11 | |
| | | *A - DECLARATION OF RONALDO REYES* |
| 08/11/2020 | **NOTICE OF APPEARANCE**   Doc # 8 | |
| | | Party:  DEUTSCHE BANK NATIONAL TRUST COMPANY |
| 08/11/2020 | **NOTICE**   Doc # 9 | |
| | | *OF RELATED ACTION* |
| 08/04/2020 | **PLTF-PET'S MOTION FOR FINAL JUDGMENT**   Doc # 7 | |
| | | *AFTER DEFAULT* |
| 08/03/2020 | **CLERK DEFAULT**   Doc # 6 | |
| | | Party:  DEUTSCHE BANK NATIONAL TRUST COMPANY |
| 07/31/2020 | **SUMMONS - SERVED**   Doc # 5 | |
| | | *07132020* |
| | | Party:  DEUTSCHE BANK NATIONAL TRUST COMPANY |
| 07/15/2020 | **SUMMONS - SERVED**   Doc # 4 | |
| | | *07132020* |
| | | Party:  DEUTSCHE BANK NATIONAL TRUST COMPANY |
| 06/30/2020 | **CIVIL COVER SHEET - E-FILED**   Doc # 1 | |
| 06/30/2020 | **COMPLAINT**   Doc # 2 | |
| 06/30/2020 | **SUMMONS TO BE ISSUED**   Doc # 3 | |
| | | *ISSUED* |
| | | Party:  DEUTSCHE BANK NATIONAL TRUST COMPANY |

---

## FINANCIAL INFORMATION

**PLAINTIFF** HAHN, JEFFREY M



| | | | |
|---|---|---|---|
| Total Financial Assessment | | | 410.00 |
| Total Payments and Credits | | | 410.00 |
| **Balance Due as of 12/23/2020** | | | **0.00** |
| | | | |
| 06/30/2020 | Transaction Assessment | | 410.00 |
| 06/30/2020 | E-FILE PAYMENT   Receipt # EF-2020-21453 | HAHN, JEFFREY M | (410.00) |

# EXHIBIT 23

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT,
IN AND FOR PINELLAS COUNTY, FLORIDA

JEFFREY M. HAHN and CARLA TURNER HAHN,

     Plaintiffs,

                                   Case No.:

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee for GSAA Home Equity Trust 2006-10 Asset
Backed Certificates, Series 2006-10,

     Defendant.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs, JEFFREY M. HAHN and CARLA TURNER HAHN, by and through their

undersigned counsel, sue Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY, as

Trustee for GSAA Home Equity Trust 2006-10 Asset Backed Certificates, Series 2006-10

("Defendant"), and would show:

## BACKGROUND

1.    Plaintiffs are the owners of the following property in Pinellas County, Florida ("the

Property"):

> Lot 1, Block Z, Revision of Revised Map of Golf Course and Subdivision,
> according to the Plat thereof as recorded in Plat Book 6, Page 33, of the Public
> Records of Pinellas County, Florida.
> Parcel ID 13/31/15/31808/026/0010

More commonly known as 1517 Jungle Avenue N, St. Petersburg, FL 33710

2.    On January 19, 2016, Plaintiff, Carla Turner Hahn, entered a promissory note ("the

Note") with American Brokers Conduit ("ABC"), secured by a mortgage ("the Mortgage")

recorded in the Pinellas County Official Records at Book 14897, Page 2207. Instead of operating

1

merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage also read like a contract, requiring Plaintiffs to remit monetary payments, including payments of property taxes and insurance.

3.      Shortly after closing on Plaintiffs' loan, ABC sold the Note to a third-party depositor ("the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

4.      Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust. The Depositor then assigned the cash flows from the Loans to the Trust, which in this case was called WGSAA Home Equity Trust 2006-10 ("the Trust").

5.      Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities. The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments. Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

6.      Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages"). In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default. Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code

2

860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

7.    Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

8.    Deutsche Bank National Trust Company ("Deutsche") never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

9.      Deutsche's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

10.     Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

11.     By 2010, however, the Depositor was no longer in business. As Trustee of the Trust, Deutsche was still responsible for collecting cash flows on behalf of the Certificateholders. Yet it was failing to do so. Plaintiffs, for example, stopped making payments under the Note in October, 2010 – one of many Borrowers who did so. Thereafter, a lawsuit was filed against them, Pinellas County Case No. 2015-5650-CI ("the Lawsuit"), with Defendant named as the plaintiff. The genesis of the Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiffs of ownership of the Property.

12.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

13.     First, Defendant was neither the owner nor the holder of the Note by operation of law. In fact, it was illegal for Defendant to own or hold the Notes. Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and

4

perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs, violating §
517.301 of the Florida Securities Fraudulent Acts Statute.

14.     Second, the Lawsuit was brought in the name of the Certificates, who were
identified in the style of the Lawsuit as the party prosecuting the case ("as Trustee for GSAA Home
Equity Trust 2006-10, Asset Backed Certificates, Series 2006-10"). It is axiomatic, however, that
Certificates (pieces of paper) cannot prosecute a lawsuit. Moreover, the holders of these
Certificates, *i.e.* the Certificateholders, did not authorize the Lawsuit, benefit from it, or even know
it had been filed. Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet it
purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and
perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs. Defendant
undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301
of the Florida Securities Fraudulent Acts Statute.

15.     Third, Defendant was purporting to prosecute the Lawsuit in its capacity as Trustee,
yet it was illegal for it to act as Trustee, as its trust license had been revoked. Quite simply, it was
illegal for Deutsche to conduct trust business. Defendant knew this, yet it continued falsely
representing to the Court that it was prosecuting the Lawsuit as Trustee of the Trust.

16.     Despite the foregoing, the Servicers, including but not limited to PHH Mortgage
Corporation ("PHH"), purporting to act as Defendant's servicer and agent with authority to bind
Defendant – caused the Lawsuit to be prosecuted in Defendant's name and represented, under oath,
that Defendant was the owner and holder of the Note. As Defendant is not the principal of the
Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

17.     To support its position in the Lawsuit, various servicers ("the Servicers") took a
series of actions that can only be described as fraudulent, void, perjurious, and illegal. (At any one

5

time, only one servicer was assigned to the Loan. However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein. As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

18.     First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Certificates (an absurd proposition on its face) or the Certificateholders, as the Certificateholders did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome. Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make them the plaintiff in the Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

19.     Second, the Servicers knew that Defendant was not the owner or holder of the Note by operation of law. Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit, under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs.

20.     Third, the Servicer caused to be recorded in the Official Records of Pinellas County, Florida at Book 17330, Page 827, an Assignment of Mortgage ("the First Assignment"), which purported to assign the Mortgage from Mortgage Electronic Registration Systems, Inc. ("MERS"), as Nominee for ABC, to Defendant.

21.     In truth, MERS had no ability to convey the Assignment, either as Nominee for ABC or otherwise. After all, the Trust was created in 2006 by the sale of the cash flows from the Loans, so by the time of the Assignment, ABC had no interest in the Mortgage, as it had already been sold to the Depositor. The Servicer nonetheless recorded the Assignment on behalf of

6

Defendant, in violation of Fla. § 817.535(2)(a) and constituted a criminal infraction – a felony under Florida law.

22.     Fourth, the Servicer relied on a blank endorsement on the Note, purportedly executed by an employee of ABC ("the Endorsement"), and used it as a basis to claim standing in the Lawsuit. In truth, however, the Endorsement was not put onto the Note by ABC in the ordinary course of business, but by the Servicer in a fraudulent attempt to convey standing where none otherwise existed.

23.     Fifth, the Servicers repeatedly represented, in the Lawsuit, that Deutsche had been damaged as a result of Plaintiffs' non-payment of the installment payments due under the Note. These representations were knowingly false, fraudulent, and perjurious at all times relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether Plaintiffs paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trust. Suffice it to say Servicer's repeated representations in the Lawsuit that Defendant was not damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant's name where no basis to do so existed.

24.     Sixth, the Servicer filed in the Lawsuit a Limited Power of Attorney from Deutsche ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuit as an agent of the Trust. These representations, however, were entirely fraudulent – and known to be so by all involved. In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly

7

prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit. Moreover, the Servicer was never a T-1 license holder, so Deutsche could not delegate its authority to act as trustee to it (any more than an attorney can delegate another to practice law with his/her law license).

25.     Seventh, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendant and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendant in the Lawsuit. In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendant was the holder of the Note and was damaged by Plaintiffs' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendant, the entity for which they were counsel of record in the Lawsuit.

26.     At all times relevant, Deutsche knew that the actions of the Servicers in the Lawsuit were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, Deutsche has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers like PHH on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

27.     For instance, in its capacity as Trustee, Deutsche has executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if

8

one did not actually exist, enabling servicers like PHH to go to court and create the impression they were an agent of PHH and authorized to prosecute a foreclosure in PHH's name and otherwise act on its behalf even if actual authority were lacking.

28.     At the same time, though, Deutsche knew that servicers like PHH were using Deutsche's name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts. If this misconduct ever came to light, Deutsche wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent." That is why: (i) Deutsche insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) Deutsche insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within Deutsche, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of Deutsche, and conceded that Deutsche never owned or held any promissory notes.

29.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like PHH – perpetuated in the name of Deutsche, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment with Deutsche, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiffs, the Certificateholders, and the public at large.

30.     Despite its feigned ignorance, Deutsche knew full well what was happening. In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, Deutsche failed to take remedial measures, continued to

look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name. In fact, Deutsche continues to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

31. Further proof that Deutsche's "ignorance" of the Servicers' illegality was feigned, and that Deutsche knew full well what the Servicers were doing, is seen in the indemnification agreements between it and the Servicers. After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship. Here, conversely, Deutsche, *i.e.* the principal, wanted Servicers like PHH, *i.e.* the agent, to indemnify Deutsche for all actions the servicers took in their name. The obvious reason for such an unusual indemnification is that Deutsche knew that servicers like PHH were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and Deutsche wanted someone else to pay in the event the fraud scheme ever came to light.

32. Deutsche's motive for participating in the foregoing was clear – money. After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to Deutsche for those payments. Facilitating and encouraging the foregoing misconduct hence enabled Deutsche to avoid significant payments out of its own pocket.

33. All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

34. Venue is proper in Pinellas County, as the Property is located here.

## COUNT ONE

35.    This is an action for declaratory relief within the jurisdiction of this Court.

36.    Plaintiffs reallege and incorporate by reference paragraphs 1-34 above.

37.    Plaintiffs contend that exclusive jurisdiction for any claims against them was New York, as a CPL Article 77 derivative lawsuit by shareholders, rendering the Lawsuit, any rulings therein, and any title emanating therefrom void for lack of jurisdiction.  Defendant, ostensibly, contends otherwise.

38.    Plaintiffs contend the Mortgage is being used as a contract for payment and not a lien on the Property because it imparts payment obligations, *e.g.* for taxes and insurance, defeating its ability to operate as a lien.  Defendant, ostensibly, contends otherwise.

39.    Plaintiffs contend that Defendant has never owned or held the Note yet represented otherwise in the Lawsuit in a fraudulent, perjurious, and illegal attempt to create the impression in the Lawsuit that it had standing, convince the court in the Lawsuit to foreclose the Mortgage, and steal the Property from them.  Defendant, ostensibly, contends otherwise.

40.    Plaintiffs contend that Defendant suffered no damages as a result of their non-payment of the Note, and Defendant's representations otherwise in the Lawsuit were false, fraudulent, and perjurious effort to foreclose the Mortgage and steal the Property from them. Defendant, ostensibly, contends otherwise.

41.    Plaintiffs contend that the Servicers committed a series of false, fraudulent, illegal, and perjurious acts in the Lawsuit in an attempt to foreclose the Mortgage in Defendant's name. Defendant, ostensibly, contends otherwise.

42.    Plaintiffs contend the Servicers were the agents of Deutsche at the time of the false, fraudulent, contemptuous and illegal acts described herein, acting with acting with actual and

apparent authority.  Plaintiffs further contend Deutsche ratified all misconduct of the Servicers, adopting it as its own.  Defendant, ostensibly, contends otherwise.

43.   Plaintiffs contend that Deutsche is no longer a Securities Administrator and a Trustee for this Trust and it has been illegal for it to serve as Trustee of the Trust since 2019, so any rulings in the Lawsuit, including any Final Judgment or title emanating therefrom, are a byproduct of illegality and hence void.  Defendant, ostensibly, contends otherwise.

44.   Plaintiffs contend that Deutsche and the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Certificateholders, yet they represented otherwise throughout the Lawsuit to conceal that the Servicers (and, to a lesser extent, Deutsche) were the parties who stood to benefit if the foreclosure was successful and to fraudulently shift adverse tax consequences in the event of a foreclosure from the Servicers (and, to a lesser extent, Deutsche) to the Certificateholders.  Defendant, ostensibly, contends otherwise.

45.   Plaintiffs contend, as a result of the foregoing, that any rulings in the Lawsuit, including any Final Judgment and Certificate of Title, are void.  Defendant, ostensibly, contends otherwise.

46.   There is a present, actual need for a declaration regarding a present, ascertainable set of facts, as set forth above.

47.   The rights of the parties are dependent upon the law applicable to these facts, and the antagonistic and adverse interests are all before this Court.

WHEREFORE Plaintiffs demand that this Court enter an Order declaring:

A.   Defendant has never been the owner or holder of the Note, and its representations otherwise in the Lawsuit were false, fraudulent, and perjurious;

12

B.     The Trust has never been the owner or holder of the Note, and its representations otherwise in the Lawsuit were false, fraudulent, and perjurious;

C.     The Certificateholders have never been the owner or holder of the Note, did not authorize the Lawsuit, and did not stand to gain if the Lawsuit were successful and the Property were foreclosed, and its representations otherwise in the Lawsuit were false, fraudulent, and perjurious;

D.     The Mortgage is not a lien on the Property;

E.     Deutsche, as Trustee, and the Servicers conspired to conceal that they were the parties who stood to gain if the Lawsuit were successful and the Property were foreclosed, with the Servicers using Defendant's name as the plaintiff in the Lawsuit to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders;

F.     Deutsche ceased being a Securities Administrator in 2019, and its continued prosecution of the Lawsuit, as Trustee, was illegal, rendering any subsequent rulings in the Lawsuit, including a final judgment and any certificate of title emanating therefrom, void;

G.     Deutsche ratified the fraud of the Servicers in the Lawsuit, as described herein;

H.     Having been converted into a security, the Note no longer exists;

I.     Exclusive jurisdiction for the claims brought in the Lawsuit lied in New York, so any rulings issued in the Lawsuit, including any final judgment and any title emanating therefrom, are void;

J.     Any rulings in the Lawsuit, including any final judgment and certificate of title emanating therefrom, are void.

Plaintiffs further demand trial by jury, all attorney's fees and costs incurred in prosecuting this lawsuit, and any other relief that this Court deems proper.

This 27th day of June, 2020.

Respectfully submitted,

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)
ashley@segalschuh.com (Legal Assistant)

# EXHIBIT 24

Filing # 11084086 E-Filed 07/31/2020 09:48:43 AM

CIRCUIT COURT OF THE 6TH JUDICIAL COURT STATE OF FLORIDA                    Job #: 200492

Attorney: Segal & Schuh Law Group P.L.  PH: (727) 824-5775
Address: 18167 US Highway 19 North Suite 100 Clearwater , NY 33764

# AFFIDAVIT OF SERVICE

| Jeffrey M. Hahn and Carla Turner Hahn | | |
|---|---|---|
| | | **Index Number:** 20 003116 CI |
| | *Plaintiff* | **Date Filed:** |
| Deutsche Bank National Trust Company, as trustee for GSAA Home Equity Trust 2006-10 Asset Backed Certificates, Series 2006-10 | | **Client's File No.:** |
| | *Defendant* | **Court Date:** |

STATE OF NEW YORK, COUNTY OF SUFFOLK, SS.:
**Michael S. Levey** , being sworn says: Deponent is not a party herein; is over the age of 18 years and resides in the State of .
On **7/13/2020**, at **11:03 AM** at: **CT CORP  28 LIBERTY STREET, NY, NY 10005** Deponent served the within
**Summons Complaint**

upon: **DEUTSCHE BANK NATIONAL TRUST COMPANY** , therein named.

☐ **#1 INDIVIDUAL**
By delivering a true copy of each to said recipient personally; Deponent knew the person so served to be the person described in as said recipient therein.

☐ **#2 SUITABLE AGE PERSON**
By delivering thereat a true copy of each to  (Authorized Agent) a person of suitable age and discretion. Said premises is recipient's:[] actual place of business / employment [] dwelling house (usual place of abode) within the state.

☐ **#3 AFFIXING TO DOOR**
By affixing a true copy of each to the door of said premises which is defendants
[] actual place of business / employment  [] dwelling house (usual place of abode) within the state. Deponent was unable with due diligence to find defendant or person of suitable age and discretion thereat having called there

☒ **#4 Corporation or Partnership or Trust or LLC or Medical Profession**
By delivering thereat a true copy of each to Gina Martinez Messenger Room o/b/o CT Corp personally. Deponent knew said entity so served to be the entity described in said aforementioned document as said defendant and knew said individual to be an Authorized Agent thereof.

☐ **#5 MAILING**
On , deponent enclosed a copy of same in a postpaid envelope properly addressed to defendant at defendant's last known [] Actual Place of Residence [] Actual Place of Business, and deposited the envelope in an official depository, personally or via agency, under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "personal and confidential" and did not indicate on the outside, thereof by return address or otherwise that the communication was from an attorney or concerned an action against the defendant.

☒ **#6 DESCRIPTION**
**Sex:** Female      **Color of skin:** Olive **Color of hair:** Black      **Glasses:**
**Age:** 22 - 35 Yrs.      **Height:** 5ft 4inches - 5ft 8inches      **Weight:** 131-160 Lbs. **Other Features:** Glasses

☐ **#7 MILITARY SERVICE**
I asked the person spoken to whether defendant was in active military service of the United States or the State of New York in any capacity whatever and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated.

☐ **#8 WITNESS FEES** Subpoena Fee Tendered in the amount of

☐ **#9 OTHER**

Sworn to before me on 7/29/2020

Robert J. Monteleone
NOTARY PUBLIC STATE OF NEW YORK
No. 02M06010691
Qualified in Suffolk County
My Commission Expires October 16. 2022

Michael S. Levey

Michael S Levey 450 Route 25A #814 East Setauket NY 11733 877 358 4515

o/b/o Segal & Schuh Law Group P.L.  (727) 824-5775 18167 US Highway 19 North Suite 100 Clearwater , NY 33764

# EXHIBIT 25

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT,
IN AND FOR PINELLAS COUNTY, FLORIDA

JEFFREY M. HAHN and CARLA TURNER HAHN,

      Plaintiffs,

                                    Case No. 2020-3116-CI

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee for GSAA Home Equity Trust 2006-10 Asset
Backed Certificates, Series 2006-10,

      Defendant.

_____/

## MOTION FOR CLERK'S DEFAULT

      Plaintiffs, JEFFREY M. HAHN and CARLA TURNER HAHN, by and through their

undersigned counsel and pursuant to Fla.R.Civ.P. 1.500, move this Court for a default in its favor

and against Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee for

GSAA Home Equity Trust 2006-10 Asset Backed Certificates, Series 2006-10, and would show:

      1.      On July 13, 2020, Defendant was personally served with the Summons and

Complaint. An Affidavit of Service so reflecting is contained in the court file.

      2.      On August 3, 2020, Defendant's deadline to respond to the Complaint came and

went, yet Defendant failed to file/serve any paper or otherwise respond.

      3.      The Clerk of this Court should enter a default against Defendant.

      WHEREFORE Plaintiff requests a default against Defendant.

## DEFAULT

      A default is hereby entered against Defendant, Deutsche Bank National Trust Company,
as Trustee for GSAA Home Equity Trust 2006-10 Asset Backed Certificates, Series 2006-10, as
to all relief sought in the Complaint, for failure to serve any paper as required by law.

AUG 04 2020

KEN BURKE, CLERK CIRCUIT COURT
315 Court Street
Clearwater, Pinellas County, FL 33756-5165

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via regular U.S. Mail to Deutsche Bank National Trust Company, as as Trustee for GSAA Home Equity Trust 2006-10 Asset Backed Certificates, Series 2006-10, 28 Liberty Street, New York City, New York, 10005 on this 4th day of August, 2020.

Respectfully submitted,

*/s/ Lee Segal*

Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)
ashley@segalschuh.com (Legal Assistant)

<div align="right">

**IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA**

</div>

**MICHAEL HAULSEE and
MARCIA HAULSEE,**

      **Plaintiff,**              **CASE NO.: 2020-001663-CA**

**vs.**

**DEUTSCHE BANK NATIONAL TRUST
COMPANY,**

      **Defendant.**

_____/

## REQUEST FOR JUDICIAL NOTICE OF OTHER LEE SEGAL CASES

Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY ("DBNTC"). by and through its undersigned counsel and pursuant to Fla. Stat. §§ 90.202(11), (12), hereby files this Request for Judicial Notice in support of Defendant's Motion to Vacate Default and Motion to Quash Service of Process and for all other purposes applicable in this matter, and states:

1.      Section 90.202(6) of the Florida Evidence Code specifically provides that a court may take judicial notice of the "[r]ecords of any court of this state." § 90.202(6), Fla. Stat. (2017); *see also Hunt v. State*, 613 So. 2d 893, 898 n.5 (Fla. 1992) (recognizing that the Supreme Court took judicial notice of the record in another case on the basis of section 90.202(6) of the Florida Statutes); *Martin v. Garrison*, 658 So. 2d 1019, 1021 (Fla. 4th DCA 1995) (taking judicial notice of court records).  In interpreting this provision, Florida appellate courts have also taken judicial notice of deeds recorded in the Official Records of a Florida County.  *See Gonzalez v. Chase Home Fin. LLC*, 37 So. 3d 955, 958 (Fla. 3d DCA 2010) (taking judicial notice of a deed and mortgage recorded in Miami-Dade County's official records); *see also Beggi v. Ocean Bank*, 91 So. 3d 193, 195 n. 3 (Fla. 3d DCA 2012) (recognizing quitclaim deeds that were recorded in the official records

of Miami-Dade County when the appellee requested taking of judicial notice of same).  Indeed, the Florida Supreme Court has stated that "[c]ourts may take judicial cognizance of all public documents and public records." *Conyers v. State*, 123 So. 817, 818 (Fla. 1929).

2.      Further, Sections 90.202(11) and 90.202(12) of the Florida Statutes also permit the Court to take judicial notice of "[f]acts that are not subject to dispute because they are generally known within the territorial jurisdiction of the court" and/or "[f]acts that are not subject to dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned." *See* Fla. Stat. §§ 90.202(11), (12).

3.      Pursuant to this statute, DBNTC requests that the Court take judicial notice of the Court records filed in the following actions, which fall squarely within the above-referenced sections:

i.      ***Ziferryn Ventures, LLC, as Trustee of the 8172 Via Rose Land Trust*** v. *Deutsche Bank National Trust Company, as Indenture Trustee*; Charlotte County Circuit Court Case No. 20-000747-CA, which includes, but is not limited to:

- Complaint filed on August 20, 2020; **Exhibit "5".**
- Order filed on December 2, 2020; **Exhibit "6".**

ii.      ***8172 Via Rosa Land Trust, by: Ziferryn Ventures, LLC***, *as Trustee* v. *Deutsche Bank National Trust Company, as Indenture Trustee for MortgageIT Trust 2005-2*; Clay County Circuit Court Case No. 2020-CA-000929.

- Complaint filed on December 3, 2020; **Exhibit "7".**

iii.      ***Inland Assets, LLC, as Trustee for the 4417 Rudder Way Land Trust*** v. *Deutsche Bank National Trust Company, as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2*; Pasco County Circuit Court Case No. 2020-CA-001794.

- Complaint filed on August 11, 2020; **Exhibit "8".**
- Order filed on October 20. 2020; **Exhibit "9".**

iv.   ***4417 Rudder Way Land Trust, By: Inland Assets, LLC****, Trustee v. Deutsche Bank National Trust Company, as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2*; Pasco County Circuit Court Case No. 20-245-CA.

- Complaint filed on October 20, 2020; **Exhibit "10".**

v.   ***Anna Lofgren*** *v. Deutsche Bank National Trust Company, et, al.*; Bradford County Circuit Court Case No. 20-CA-340.

- Complaint filed on September 10, 2020; **Exhibit "11".**

vi.   ***Anna Lofgren*** *v. Deutsche Bank National Trust Company, as Trustee*; Okeechobee County Circuit Court Case No. 2020-000212-CA.

- Complaint filed on December 13, 2020; **Exhibit "12"**.

vii.   ***Wallace Cook*** *v. Deutsche Bank National Trust Company, as Trustee, et.al.;* Nassau County Circuit Court Case No. 20CA000270.

- Complaint filed on October 12, 2020; **Exhibit "13".**

viii.   ***Wallace Cook*** *v. Deutsche Bank National Trust Company Americas, as Trustee;* Glades County Circuit Court Case No. 20-000084-CA.

- Complaint filed on August 24, 2020; **Exhibit "14".**

ix.   ***Wallace Cook*** *v. Deutsche Bank Trust Company Americas, as Trustee, et.al.;* Volusia County Circuit Court Case No. 2020 11139 CIDL.

- Complaint filed on August 20, 2020; **Exhibit "15".**

4.   Judicial notice of these documents will allow this Court "to arrive at the best decision[] on the merits."  Dorothy F. Easley, *Judicial Notice on Appeal: A History Lesson in*

3

*Recent Trends*, 84 Fla. B.J. 45, 46 (Dec. 2010) (noting that courts consider additional sources referred to in briefs or conduct their own independent research to arrive at the best decisions on the merits).

**WHEREFORE**, DBNTC respectfully request that the Court take judicial notice of the documents filed in the above- referenced cases, together with such other relief this Court deems just and necessary.

Dated: December 23, 2020

Respectfully submitted,

Patrick G. Broderick (FBN 88568)
broderickp@gtlaw.com
**GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Suite 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222
Secondary email:
Sandra.Famadas@gtlaw.com;

Beth A. Norrow (FBN 061497)
norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Suite 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: */s/ Beth A. Norrow*
Beth A. Norrow

*Counsel for Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY*

### CERTIFICATE OF SERVICE

I CERTIFY that on December 23, 2020, I electronically filed the foregoing with the Clerk of Court via the Florida E-Filing Portal, which shall cause a copy to be served via email to the following:

Carla Turner-Hahn, Esq.
615 Whisper Wood Dr.
Lakeland, FL 33813
carlahahn@gmail.com

/s/ Beth A. Norrow
Beth A. Norrow

# EXHIBIT 5

Case 8:21-cv-00349-SDM-JSS   Document 1-2   Filed 01/12/21   Page 219 of 428 PageID 230

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT,
IN AND FOR CHARLOTTE COUNTY, FLORIDA

ZIFERRYN VENTURES, LLC, as Trustee
of the 8172 Via Rosa Land Trust,

     Plaintiff,

v.

                                         Case No.:   20000747CA

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Indenture Trustee for MortgageIT Trust 2005-2,

     Defendant.

_____/

## COMPLAINT

Plaintiff, ZIFERRYN VENTURES, LLC, as Trustee of the 8172 Via Rosa Land Trust ("Plaintiff" or "the Trust"), by and through its undersigned counsel, sues Defendant, Deutsche Bank National Trust Company, as Indenture Trustee for MortgageIT Trust 2005-2 ("Defendant"), and would show:

1.     All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

2.     Venue is proper in Charlotte County, Florida, as the causes of action alleged herein accrued here.

3.     For many years, Rosana Monteiro-Kamel ("Monteiro") was the owner of the following property in Orlando, Orange County, Florida ("the Property"):

> Lot 50, Mirabella at Vizcaya Phase Three, according to the Plat thereof as recorded in Plat Book 52, Pages 32 through 35, Public Records of Orange County, Florida.
>
> More commonly known as:  8172 Via Rosa, Orlando, FL 32836

4.     On March 21, 2005, Monteiro executed a promissory note ("the Note") and mortgage ("the Mortgage") in favor of MIT Lending ("MIT"), as recorded in the Orange County

1

Official Records at Book 7892, Page 1503.  The Mortgage was intended to act merely as a lien on the Property, as required by Fla. Stat. § 697.01, yet it also read like a contract, requiring payment of property taxes and insurance.

5.      Shortly after closing on the Monteiro loan, MIT sold the Note to the depositor, MortgageIT Holding, Inc. ("MortgageIT" or "the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") and conveyed the Notes to Deutsche Bank National Trust Company ("DBNTC"), as Trustee, to a trust named MortgageIT Trust 2005-2 ("the Trust").

6.      The purpose of the conveyance was to convert the Notes into securities, enabling MortgageIT to sell the cash flows from the Notes in the form of certificates ("the Certificates") to certificateholders ("the Certificateholders").  The Certificateholders had no ownership interest in the Notes, but merely collected cash flows from the Notes when the borrowers on the Loans ("the Borrowers") made their monthly mortgage payments.

7.      The Trust did not own or hold any of the Notes, either.  It was merely a real estate mortgage investment conduit (REMIC, for short) for the payment of cash flows, with the Notes used as collateral.

8.      As Trustee, DBNTC did not own or hold the Notes, either.  Rather, it owed fiduciary duties to the Certificateholders, including:  (i) the obligation to review each loan and verify that it qualified for inclusion in the Trust; and (ii) in the event the Certificateholders stopped collecting the cash flows for which they bargained, *e.g.* because the Warranties were false, the obligation to ask MortgageIT to buy back the Notes.

9.      In 2015, Monteiro stopped making payments under the Note – one of many Borrowers who did so.  Thereafter, a lawsuit was filed against her, Orange County Case No. 2016-CA-4184 ("the First Lawsuit"), purportedly in the name of Defendant.

10.     After succeeding in getting the First Lawsuit involuntarily dismissed, Monteiro transferred title to the Property to Plaintiff via a Deed to Trustee recorded in the Orange County Official Records on July 25, 2017 at Instrument # 20170411414.

11.     With title to the Property in Plaintiff's name, another foreclosure lawsuit was initiated in Defendant's name, Orange County Case No. 2019-CA-5198 ("the Second Lawsuit"). The genesis of the Second Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiff of ownership of the Property.

12.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

13.     First, with the Note having been converted into a security, Defendant was neither the owner nor the holder of the Note by operation of law.  In fact, it was illegal for Defendant to own or hold the Note.  Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

14.     Second, DBNTC was not authorized to be a trustee at the time the Second Lawsuit was initiated or at any point thereafter.  Simply put, DBNTC does not exist as a trustee.  Defendant knew this, yet it intentionally represented otherwise in the Second Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

15.     Third, at no point during the Second Lawsuit did MortgageIT Trust 2005-2 exist, and at no point in the Second Lawsuit was the Note an asset within that trust.  Defendant knew these facts, yet it intentionally represented otherwise, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

16.     In essence, the Second Lawsuit was prosecuted in the name of a non-existent trustee for a non-existent trust – with those key facts concealed both from this Court and Plaintiff – in a fraudulent attempt to divest ownership of the Property from Plaintiff.

17.     At the heart of these fraudulent and illegal acts was Specialized Loan Servicing, LLC ("SLS").  Acting as Defendant's purported agent, SLS engaged in a series of fraudulent and illegal acts separate and apart from those listed above.

18.     First, SLS verified the Complaint in the Second Lawsuit, purportedly as servicer and attorney in fact for Defendant, despite knowing that it was neither.  After all, it was impossible for SLS to be servicer for a non-existent trustee of a non-existent trust.  In this same vein, SLS was neither the attorney in fact for Defendant nor its authorized agent.  In fact, it was illegal for SLS to act as an agent for DBNTC, as Trustee, at all, particularly since SLS lacks trust powers.

19.     Second, SLS caused the Second Lawsuit to be prosecuted in Defendant's name so it could pocket the proceeds from a foreclosure sale for itself and avoid any attendant tax consequences.  Though SLS engaged in these acts under the auspices of being Defendant's agent, SLS knew the very notion of an agency relationship was a farce.  SLS was the only party who stood to gain if the Second Lawsuit were to succeed.  It had no intention of sharing any ill-gotten gains with anyone else.  It represented otherwise throughout the course of the Second Lawsuit in a fraudulent, illegal, and perjurious attempt to divest Plaintiff of ownership of the Property and pocket the proceeds for itself – without paying any taxes on the gains.

20.     Third, SLS caused to be recorded in the Official Records of Orange County, Florida at Book 11002, Page 4239, an Assignment of Mortgage ("the Assignment"), from Mortgage Electronic Registration Systems, Inc. ("MERS"), as Nominee for MIT Lending, to Defendant. This Assignment purported to reflect a conveyance that never happened.  That is why it was prepared not in the ordinary course of business, but by Albertelli Law, the attorneys who prosecuted the First Lawsuit on behalf of SLS.  That's also why the Assignment purports to show a conveyance from MERS to Defendant when, in reality, the Note was sold to MortgageIT before being collateralized.

21.     Despite these false, fictitious, and fraudulent statements and representations, SLS used the Assignment in the Second Lawsuit, purporting to affect Plaintiff's interest in the Property. Indeed, the Assignment was attached to the Complaint and used to support Defendant's standing to foreclose the Mortgage.  Given these facts, SLS's recording of the Assignment violated Fla. Stat. § 817.535(2)(a) and constituted a criminal infraction – a felony under Florida law.

22.     Fourth, SLS – purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Second Lawsuit to be prosecuted in Defendant's name, repeatedly representing, under oath, that Defendant was the owner and holder of the Note.  Yet SLS knew that Defendant could not be the owner or holder of the Note by operation of law.  The purported agency relationship that SLS used to support a holder theory was likewise a farce.  SLS may have possessed the Note, but it did not do so for Defendant – a nonexistent trustee of a nonexistent trust.

23.     While these fraudulent, illegal, and perjurious acts were undertaken by SLS, DBNTC, as Trustee, is liable for all of them.  After all, SLS was acting with actual and apparent authority to bind DBNTC.

5

24.     For many years, DBNTC conspired with SLS to enable, facilitate, and encourage these acts.  Though it simultaneously attempted to feign ignorance of SLS's misconduct to avoid liability, its purported ignorance was a rouse, and DBNTC ratified the misconduct after being specifically apprised of it.

25.     To illustrate, in its capacity as Trustee, DBNTC has executed many limited powers of attorney ("LPOA" in the singular, or "LPOAs" in the plural).  Its purpose in conveying the LPOAs was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like SLS to go to court and create the impression they were an agent of DBNTC and authorized to prosecute a foreclosure in DBNTC's name and otherwise act on its behalf even if actual authority were lacking.

26.     At the same time, though, DBNTC knew that servicers like SLS were using DBNTC's name to perpetuate fraudulent, illegal, and perjurious acts.  If this misconduct ever came to light, DBNTC wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent."  That is why:  (i) DBNTC insisted that the LPOAs include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) DBNTC insisted that the servicers indemnify DBNTC for all actions taken on its behalf; and (iii) when high-ranking officers within DBNTC, *e.g.* Ronaldo Reyes ("Reyes"), its Vice President, and Timothy Patrick ("Patrick"), its CEO, were confronted with the illegal acts described herein by Plaintiff's agent, Cyndee Rae Estrada ("Estrada"), they disclaimed knowledge of the servicers' misconduct, denied that the servicers were their agents, and even went so far as to disclaim knowledge that servicers were prosecuting foreclosure lawsuits in Florida in DBNTC's

name at all.  Those denials, however, were belied by the LPOAs, particularly since many of the LPOAs were signed by Reyes.

27.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like SLS – perpetuated in the name of DBNTC, as Trustee – Reyes and Patrick, within the course and scope of their employment with DBNTC, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with these servicers to conceal these acts from Plaintiff and the public at large.

28.     Despite its feigned ignorance, DBNTC knew full well what was happening.  In fact, even after Estrada addressed the details of the misconduct with Reyes, Patrick, and other, high-ranking officers of DBNTC in detail, DBNTC failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name.

29.     Further proof that DBNTC's "ignorance" of the servicers' illegality was feigned, and that DBNTC knew full well what the servicers were doing, is seen in the indemnification agreements between it and the servicers.  After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship.  Here, conversely, DBNTC, *i.e.* the principal, wanted servicers like SLS, *i.e.* the agent, to indemnify DBNTC for all actions the servicers took in their name.  The obvious reason for such an unusual indemnification is that DBNTC knew that servicers like SLS were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and SLS wanted someone else to pay in the event the fraud scheme ever came to light.

30.     Defendant is subject to the court's personal jurisdiction because Defendant holds a mortgage or other lien on real property within the State.

## COUNT ONE

31.     This is an action for declaratory relief within the jurisdiction of this Court.

32.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

33.     Plaintiff realleges and incorporates by reference paragraphs 1-30 above.

34.     Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4).  To wit, through a pattern of criminal activity, a series of fraudulent misrepresentations, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

35.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of the Property, interest on that amount, and the attorney's fees and costs incurred defending the Lawsuit.

36.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

## COUNT TWO

37.     Plaintiff realleges and incorporates by reference paragraphs 1-30 above.

38.     This is an action for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

39.     Plaintiff realleges and incorporates by reference paragraphs 1-30 above.

40.     Through a series of fraudulent misrepresentations, as set forth above, Defendant slandered Plaintiff's title to the Property and prevented Plaintiff from selling the Property without regard for the Mortgage.

41.     As a result of Defendant's actions, Plaintiff has been damaged.  Those damages include, but are not limited to, the value of the Property, interest on that money, and attorney's fees and costs arising from having to defend the Lawsuit.

WHEREFORE Plaintiff demands judgment against Defendant for damages, general and special, interest, attorney's fees, and costs.  Plaintiff further demands a trial by jury and such other and further relief that this Court deems proper.

This 19th day of August, 2020

Respectfully submitted,

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

# EXHIBIT 6

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR
CHARLOTTE COUNTY, FLORIDA                                        CIVIL ACTION


**ZIFERRYN VENTURES LLC AS TRUSTEE**,
                  **Plaintiff.**                **CASE NO. 20000747CA**

**VS.**

DEUTSCHE BANK NATIONAL TRUST COMPANY,
            **Defendant.**
_____/


## Order

**THIS CAUSE** came before the court on December 2, 2020 on Plaintiff's Motion
for Final Judgment (noticed as summary judgment) and the court having heard
argument and being otherwise fully advised in the premises, finds as follows:

1) The court has reviewed all filings in the case and heard argument of counsel.

2) The court specifically finds that the affidavit of service filed on November 11,
   2020 (prior filings were illegible) does not reflect valid service of process. The
   agent serving process followed the directions of security or messengers in an
   attempt to gain service and this is insufficient under Florida law. There is no proof
   or allegation that the Defendant is attempting to avoid service.

3) In light of the above, the clerk's default filed on October 6, 2020 is of no legal
   effect.

4) The allegations of the Complaint fail to allege any facts that would make
   Charlotte County a proper venue for this case.

5) The allegations of the two counts fail to state a cause of action under the Civil
   Remedy statute or for common law fraud.

6) The affidavit of damages is insufficient under Florida law.

7) This case appears to be an improper collateral attack on two other actions in
   Orange County Florida.

8) The Plaintiff demanded a jury trial and the damages in this case are unliquidated
   so any trial must be noticed as a jury trial.

**<u>Ordered and Adjudged:</u>**

For those reasons the Plaintiff's Motion for Judgment is denied. Plaintiff shall perfect service on the Defendant within 60 days. In light of the rulings above, Plaintiff is hereby authorized, but not ordered, to file an amended complaint within 15 days.

Ordered in Charlotte County, Florida, this 2nd day of December, 2020.

eSigned by GENTILE, GEOFFREY H in 20000747CA
on 12/02/2020 10:19:14 1cX4mZJI

Lee Segal <lee@segalschuh.com>, <marie@segalschuh.com>
Megan Lazenby <lazenbylaw@gmail.com>, <eserve@lazenbylawllc.com>

# EXHIBIT 7

Filing # 117581432 E-Filed 12/03/2020 10:55:10 AM

IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT,
IN AND FOR CLAY COUNTY, FLORIDA

8172 VIA ROSA LAND TRUST,
By:  ZIFERRYN VENTURES, LLC, as Trustee,

      Plaintiff,

v.

                                              Case No.:

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Indenture Trustee for MortgageIT Trust 2005-2,

      Defendant.

_____/

## **COMPLAINT**

     Plaintiff, 8172 VIA ROSA LAND TRUST, By Ziferryn Ventures, LLC, as Trustee ("Plaintiff"), by and through its undersigned counsel, sues Defendant, Deutsche Bank National Trust Company, as Indenture Trustee for MortgageIT Trust 2005-2 ("Defendant"), and would show:

     1.     All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

     2.     Venue is proper in Clay County, Florida, as the cause of action accrued here.

     3.     For many years, Rosana Monteiro-Kamel ("Monteiro") was the owner of the property at 8172 Via Rosa, Orlando, FL 32836 ("the Property").

     4.     On March 21, 2005, Monteiro executed a promissory note ("the Note") and mortgage ("the Mortgage") in favor of MIT Lending ("MIT"), as recorded in the Orange County Official Records at Book 7892, Page 1503.  The Mortgage was intended to act merely as a lien on the Property, as required by Fla. Stat. § 697.01, yet it also read like a contract, requiring payment of property taxes and insurance.

1

5.     Shortly after closing on the Monteiro loan, MIT sold the Note to the depositor, MortgageIT Holding, Inc. ("MortgageIT" or "the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") and conveyed the Notes to Deutsche Bank National Trust Company ("DBNTC"), as Trustee, to a trust named MortgageIT Trust 2005-2 ("the Trust").

6.     The purpose of the conveyance was to convert the Notes into securities, enabling MortgageIT to sell the cash flows from the Notes in the form of certificates ("the Certificates") to certificateholders ("the Certificateholders").  The Certificateholders had no ownership interest in the Notes, but merely collected cash flows from the Notes when the borrowers on the Loans ("the Borrowers") made their monthly mortgage payments.

7.     The Trust did not own or hold any of the Notes, either.  It was merely a real estate mortgage investment conduit (REMIC, for short) for the payment of cash flows, with the Notes used as collateral.

8.     As Trustee, DBNTC did not own or hold the Notes, either.  Rather, it owed fiduciary duties to the Certificateholders, including:  (i) the obligation to review each loan and verify that it qualified for inclusion in the Trust; and (ii) in the event the Certificateholders stopped collecting the cash flows for which they bargained, *e.g.* because the Warranties were false, the obligation to ask MortgageIT to buy back the Notes.

9.     In 2015, Monteiro stopped making payments under the Note – one of many Borrowers who did so.  Thereafter, a lawsuit was filed against her, Orange County Case No. 2016-CA-4184 ("the First Lawsuit"), purportedly in the name of Defendant.

10.     After succeeding in getting the First Lawsuit involuntarily dismissed, Monteiro transferred title to the Property to Plaintiff via a Deed to Trustee recorded in the Orange County Official Records on July 25, 2017 at Instrument # 20170411414.

11.     With title to the Property in Plaintiff's name, another foreclosure lawsuit was initiated in Defendant's name, Orange County Case No. 2019-CA-5198 ("the Second Lawsuit"). The genesis of the Second Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiff of ownership of the Property.

12.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

13.     First, with the Note having been converted into a security, Defendant was neither the owner nor the holder of the Note by operation of law.  In fact, it was illegal for Defendant to own or hold the Note.  Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

14.     Second, DBNTC was not licensed or authorized to be a trustee at the time the Second Lawsuit was initiated or at any point thereafter.  Simply put, DBNTC does not exist as a trustee.  Defendant knew this, yet it intentionally represented otherwise in the Second Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

15.     Third, at no point during the Second Lawsuit did MortgageIT Trust 2005-2 exist, and at no point in the Second Lawsuit was the Note an asset within that trust.  Defendant knew

3

these facts, yet it intentionally represented otherwise, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

16.     In essence, the Second Lawsuit was prosecuted in the name of a non-existent trustee for a non-existent trust – with those key facts concealed both from this Court and Plaintiff – in a fraudulent attempt to divest ownership of the Property from Plaintiff.

17.     At the heart of these fraudulent and illegal acts was Specialized Loan Servicing, LLC ("SLS").  Acting as Defendant's purported agent, SLS engaged in a series of fraudulent and illegal acts separate and apart from those listed above.

18.     First, SLS verified the Complaint in the Second Lawsuit, purportedly as servicer and attorney in fact for Defendant, despite knowing that it was neither.  After all, it was impossible for SLS to be servicer for a non-existent trustee of a non-existent trust.  In this same vein, SLS was neither the attorney in fact for Defendant nor its authorized agent.  In fact, it was illegal for SLS to act as an agent for DBNTC, as Trustee, at all, particularly since SLS lacks trust powers.

19.     Second, SLS caused the Second Lawsuit to be prosecuted in Defendant's name so it could pocket the proceeds from a foreclosure sale for itself and avoid any attendant tax consequences.  Though SLS engaged in these acts under the auspices of being Defendant's agent, SLS knew the very notion of an agency relationship was a farce.  SLS was the only party who stood to gain if the Second Lawsuit were to succeed.  It had no intention of sharing any ill-gotten gains with anyone else.  It represented otherwise throughout the course of the Second Lawsuit in a fraudulent, illegal, and perjurious attempt to divest Plaintiff of ownership of the Property and pocket the proceeds for itself – without paying any taxes on the gains.

20.     Third, SLS caused to be recorded in the Official Records of Orange County, Florida at Book 11002, Page 4239, an Assignment of Mortgage ("the Assignment"), from Mortgage

Electronic Registration Systems, Inc. ("MERS"), as Nominee for MIT Lending, to Defendant. This Assignment purported to reflect a conveyance that never happened. That is why it was prepared not in the ordinary course of business, but by Albertelli Law, the attorneys who prosecuted the First Lawsuit on behalf of SLS. That's also why the Assignment purports to show a conveyance from MERS to Defendant when, in reality, the Note was sold to MortgageIT before being collateralized.

21.   Despite these false, fictitious, and fraudulent statements and representations, SLS used the Assignment in the Second Lawsuit, purporting to affect Plaintiff's interest in the Property. Indeed, the Assignment was attached to the Complaint and used to support Defendant's standing to foreclose the Mortgage. Given these facts, SLS's recording of the Assignment violated Fla. Stat. § 817.535(2)(a) and constituted a criminal infraction – a felony under Florida law.

22.   Fourth, SLS – purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Second Lawsuit to be prosecuted in Defendant's name, repeatedly representing, under oath, that Defendant was the owner and holder of the Note. Yet SLS knew that Defendant could not be the owner or holder of the Note by operation of law. The purported agency relationship that SLS used to support a holder theory was likewise a farce. SLS may have possessed the Note, but it did not do so for Defendant – a nonexistent trustee of a nonexistent trust.

23.   Fifth, SLS – purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused to be recorded a Notice of Lis Pendens in connection with the Second Lawsuit, then made the fraudulent misrepresentations described herein as part and parcel of that action.

24.     While these fraudulent, illegal, and perjurious acts were undertaken by SLS, DBNTC, as Trustee, is liable for all of them.  After all, SLS was acting with actual and apparent authority to bind DBNTC.

25.     For many years, DBNTC conspired with SLS to enable, facilitate, and encourage these acts.  Though it simultaneously attempted to feign ignorance of SLS's misconduct to avoid liability, its purported ignorance was a rouse, and DBNTC ratified the misconduct after being specifically apprised of it.

26.     To illustrate, in its capacity as Trustee, DBNTC has executed many limited powers of attorney ("LPOA" in the singular, or "LPOAs" in the plural).  Its purpose in conveying the LPOAs was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like SLS to go to court and create the impression they were an agent of DBNTC and authorized to prosecute a foreclosure in DBNTC's name and otherwise act on its behalf even if actual authority were lacking.

27.     At the same time, though, DBNTC knew that servicers like SLS were using DBNTC's name to perpetuate fraudulent, illegal, and perjurious acts.  If this misconduct ever came to light, DBNTC wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent."  That is why:  (i) DBNTC insisted that the LPOAs include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) DBNTC insisted that the servicers indemnify DBNTC for all actions taken on its behalf; and (iii) when high-ranking officers within DBNTC, *e.g.* Ronaldo Reyes ("Reyes"), its Vice President, and Timothy Patrick ("Patrick"), its CEO, were confronted with the illegal acts described herein by Plaintiff's agent, Cyndee Rae Estrada ("Estrada"), they disclaimed knowledge

of the servicers' misconduct, denied that the servicers were their agents, and even went so far as to disclaim knowledge that servicers were prosecuting foreclosure lawsuits in Florida in DBNTC's name at all.  Those denials, however, were belied by the LPOAs, particularly since many of the LPOAs were signed by Reyes.

28.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like SLS – perpetuated in the name of DBNTC, as Trustee – Reyes and Patrick, within the course and scope of their employment with DBNTC, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with these servicers to conceal these acts from Plaintiff and the public at large.

29.     Despite its feigned ignorance, DBNTC knew full well what was happening.  In fact, even after Reyes, Patrick, and other, high-ranking officers of DBNTC were apprised of this misconduct, in detail, DBNTC failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name.

30.     Further proof that DBNTC's "ignorance" of the servicers' illegality was feigned, and that DBNTC knew full well what the servicers were doing, is seen in the indemnification agreements between it and the servicers.  After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship.  Here, conversely, DBNTC, *i.e.* the principal, wanted servicers like SLS, *i.e.* the agent, to indemnify DBNTC for all actions the servicers took in their name.  The obvious reason for such an unusual indemnification is that DBNTC knew that servicers like SLS were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and SLS wanted someone else to pay in the event the fraud scheme ever came to light.

31.     Defendant is subject to the court's personal jurisdiction because Defendant holds a mortgage or other lien on real property within the State.

## COUNT ONE

32.     This is an action for damages arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

33.     Plaintiff re-alleges and incorporates by reference paragraphs 1-31 above.

34.     Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535, 817.54, and 773.103(1)-(4).   To wit, through a pattern of criminal activity, a series of fraudulent misrepresentations, the recording of the Assignment, the recording of the Notice of Lis Pendens, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

35.     As a result of these violations, Plaintiff has been damaged.   These damages include, but are not limited to, the value of the Property, interest on that amount, and the attorney's fees and costs incurred in defending the Second Lawsuit.

36.     Under the terms of Fla. Stat. § 772.104, Plaintiff is entitled to treble damages.

WHEREFORE Plaintiff demands judgment for damages, general and special, treble damages, interest, attorney's fees, a jury trial, and such other and further relief that this Court deems proper.

This 3rd day of December, 2020             */s/ MLL*_____
                                           MEGAN LAZENBY, Esquire
                                           Lazenby Law, LLC
                                           4927 Southfork Drive
                                           Lakeland, FL 33813
                                           Telephone: 863.698.6844
                                           Florida Bar No. 0014285
                                           Lazenbylaw@gmail.com

8

# EXHIBIT 8

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT,
IN AND FOR PASCO COUNTY, FLORIDA

INLAND ASSETS, LLC, as Trustee of the
4417 Rudder Way Land Trust,

      Plaintiff,

                                   Case No.

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-
Through Certificates, Series 2006-NC2,

      Defendant.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff, INLAND ASSETS, LLC, as Trustee of the 4417 Way Land Trust, by and through

its undersigned counsel, sues Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY,

as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2

("Defendant"), and would show:

### BACKGROUND

1.      On or about March 27, 2006, Ronald Pownall ("Pownall") acquired title to the

following property ("the Property") in Pasco County, Florida:

> All of Lot 58, Block 1, FLOR-A-MAR SUBDIVISION, Section 17-B, according
> to the map or plat thereof as recorded in Plat Book 10, Page 131 of the Public
> Records of Pasco County, Florida

More commonly known as 4417 Rudder Way, New Port Richey, FL 34652

2.      On that same date, Pownall entered a promissory note ("the Note") with New

Century Mortgage Corporation ("New Century") in the amount of $328,500.00 and a mortgage

("the Mortgage") for which the Note purported to act as security, as recorded in the Pasco County

1

Official Records at Book 6911, Page 542. Instead of operating merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage also read like a contract, requiring Pownall to remit monetary payments, including payments of property taxes and insurance.

3.      Shortly after closing on Pownall's loan, New Century sold the Note to a third-party depositor ("the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

4.      Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust. The Depositor then assigned the cash flows from the Loans to the Trust, which in this case was called GSAMP Trust 2006-NC2 ("the Trust").

5.      Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities. The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments. Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

6.      Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages"). In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default. Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code

2

860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

7. Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

8. Deutsche Bank National Trust Company ("Deutsche") never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

3

9. Deutsche's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

10. Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

11. After falling on hard times financially, Pownall caused the Property to be deeded to Plaintiff. The deed reflecting this transaction is recorded in the Pasco County Official Records at Book 9492, Page 511. Plaintiff has been the owner of the Property since that time.

12. By 2010, the Depositor was no longer in business. As Trustee of the Trust, Deutsche was still responsible for collecting cash flows on behalf of the Certificateholders. Yet it was failing to do so. Pownall, for example, stopped making payments under the Note in 2008, one of many Borrowers who did so. Thereafter, a lawsuit was filed against Pownall and Plaintiff – by that point the Property owner – Pasco County Case No. 2018-CA-1565 ("the Lawsuit"), with Defendant named as the plaintiff. The genesis of the Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiff of ownership of the Property.

13. For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

4

14.     First, Defendant was neither the owner nor the holder of the Note by operation of law. In fact, it was illegal for Defendant to own or hold the Notes. Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

15.     Second, the Lawsuit was purportedly brought on behalf of the Certificateholders, who were identified in the style of the Lawsuit as the party prosecuting the case ("as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2…"). However, the Certificateholders did not authorize the Lawsuit, benefit from it, or even know it had been filed. Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet it purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff. Defendant undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

16.     Third, Defendant was purporting to prosecute the Lawsuit in its capacity as Trustee, yet it was illegal for it to act as Trustee, as its trust license had been revoked. Quite simply, it was illegal for Deutsche to conduct trust business. Defendant knew this, yet it continued falsely representing to the Court that it was prosecuting the Lawsuit as Trustee of the Trust.

17.     Despite the foregoing, Ocwen Loan Servicing, LLC ("Ocwen"), purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Lawsuit to be prosecuted in Defendant's name and represented, under oath, that Defendant was the owner and holder of the Note. As Defendant is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

18.     To support its position in the Lawsuit, various servicers, including Ocwen ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal. (At any one time, only one servicer was assigned to the Loan. However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein. As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

19.     First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Certificateholders, as the Certificateholders did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome. Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make them the plaintiff in the Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

20.     Second, the Servicers knew that Defendant was not the owner or holder of the Note by operation of law. Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit, under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs.

21.     Third, the Servicer caused to be recorded in the Official Records of Pasco County, Florida at Book 7800, Page 846, an Assignment of Mortgage ("the Assignment"), which purported to assign the Mortgage from New Century to Defendant. By the time the Assignment was created, however, New Century ceased to exist. Rather than acknowledging its inability to procure an assignment, the Servicer's attorney (purporting to represent Defendant) drafted the Assignment and caused it to be executed by Ocwen Loan Servicing, LLC, purportedly as attorney in fact for New Century. Yet Ocwen was not actually the attorney in fact for New Century or authorized to

6

sign on its behalf.  The Servicer nonetheless recorded the Assignment on behalf of Defendant, in
violation of Fla. § 817.535(2)(a) and a criminal infraction under Florida law, then used it in the
Lawsuit as a (fraudulent and illegal) basis for standing to foreclose.

22.    Fourth, the Servicers repeatedly represented, in the Lawsuit, that Defendant had
been damaged as a result of Plaintiffs' non-payment of the installment payments due under the
Note.  These representations were knowingly false, fraudulent, and perjurious at all times relevant.
After all, the Servicers knew they were responsible for paying fixed, monthly payments to the
Certificateholders, *i.e.* the cash flows, regardless of whether Plaintiffs paid the payments due under
the Note.  The Servicers did, in fact, make these payments to the Certificateholders, and those
payments "passed through" Deutsche given its role as Trustee under the Trust.  Suffice it to say
Servicer's repeated representations in the Lawsuit that Defendant was not damaged as a result of
Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in
Defendant's name where no basis to do so existed.

23.    Fifth, the Servicer filed in the Lawsuit a Limited Power of Attorney from Deutsche
("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the
Lawsuit as an agent of the Trust.  These representations, however, were entirely fraudulent – and
known to be so by all involved.  In truth, the LPOA gave the Servicer no powers at all, as it did
not authorize the Servicer to take any actions that it was not already authorized to take under the
terms of separate, written agreements identified therein.  In addition, the LPOA expressly
prevented the Servicer from filing any action in the name of Deutsche, a restriction which it
expressly violated by prosecuting the Lawsuit.  Moreover, the Servicer was never a T-1 license
holder, so Deutsche could not delegate its authority to act as trustee to it (any more than an attorney
can delegate another to practice law with his/her law license).

7

24. Sixth, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendant and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendant in the Lawsuit. In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendant was the holder of the Note and was damaged by Plaintiffs' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendant, the entity for which they were counsel of record in the Lawsuit.

25. At all times relevant, Deutsche knew that the actions of the Servicers in the Lawsuit were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, Deutsche has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers like Ocwen on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

26. For instance, in its capacity as Trustee, Deutsche has executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like Ocwen to go to court and create the impression they were an agent of Ocwen and authorized to prosecute a foreclosure in Ocwen's name and otherwise act on its behalf even if actual authority were lacking.

8

27.     At the same time, though, Deutsche knew that servicers like Ocwen were using Deutsche's name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts. If this misconduct ever came to light, Deutsche wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent." That is why: (i) Deutsche insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) Deutsche insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within Deutsche, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of Deutsche, and conceded that Deutsche never owned or held any promissory notes.

28.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like SPS – perpetuated in the name of Deutsche, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment with Deutsche, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

29.     Despite its feigned ignorance, Deutsche knew full well what was happening. In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, Deutsche failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name. In fact, Deutsche continues to execute LPOAs for these Servicers,

9

knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

30.     Further proof that Deutsche's "ignorance" of the Servicers' illegality was feigned, and that Deutsche knew full well what the Servicers were doing, is seen in the indemnification agreements between it and the Servicers. After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship. Here, conversely, Deutsche, *i.e.* the principal, wanted Servicers like Ocwen, *i.e.* the agent, to indemnify Deutsche for all actions the servicers took in their name. The obvious reason for such an unusual indemnification is that Deutsche knew that servicers like Ocwen were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and Deutsche wanted someone else to pay in the event the fraud scheme ever came to light.

31.     Deutsche's motive for participating in the foregoing was clear – money. After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to Deutsche for those payments. Facilitating and encouraging the foregoing misconduct hence enabled Deutsche to avoid significant payments out of its own pocket.

32.     Based on the fraudulent and illegal acts of Defendant, Ocwen, and the Servicers, as described herein, Defendant succeeded in obtaining a Final Judgment of Foreclosure in the Lawsuit and, ultimately divesting Plaintiff of title to the Property.

33.     All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

34.     Venue is proper in Pasco County, as the Property is located here.

## COUNT ONE

35.   This is an action for declaratory relief.

36.   Plaintiff realleges and incorporates by reference paragraphs 1-34 above.

37.   Plaintiff contends the Assignment was fraudulent, void, and illegal and that its recording in the Pasco County Official Records violated Fla. Stat. § 817.535(2)(a). Defendant, ostensibly, contends otherwise.

38.   Plaintiff contends that exclusive jurisdiction for any claims against it was New York, as a CPL Article 77 derivative lawsuit by shareholders, rendering the Lawsuit, any rulings therein, and any title emanating therefrom void for lack of jurisdiction. Defendant, ostensibly, contends otherwise.

39.   Plaintiff contends the Mortgage is being used as a contract for payment and not a lien on the Property because it imparts payment obligations, e.g. for taxes and insurance, defeating its ability to operate as a lien. Defendant, ostensibly, contends otherwise.

40.   Plaintiff contends that Defendant has never owned or held the Note yet represented otherwise in the Lawsuit in a fraudulent, perjurious, and illegal attempt to create the impression in the Lawsuit that it had standing, convince the court in the Lawsuit to foreclose the Mortgage, and steal the Property from them. Defendant, ostensibly, contends otherwise.

41.   Plaintiff contends that Defendant suffered no damages as a result of the non-payment of the Note, and Defendant's representations otherwise in the Lawsuit were false, fraudulent, and perjurious effort to foreclose the Mortgage and steal the Property from it. Defendant, ostensibly, contends otherwise.

11

42.      Plaintiff contends that the Servicers committed a series of false, fraudulent, illegal, and perjurious acts in the Lawsuit in an attempt to foreclose the Mortgage in Defendant's name. Defendant, ostensibly, contends otherwise.

43.      Plaintiff contends the Servicers were the agents of Deutsche at the time of the false, fraudulent, contemptuous and illegal acts described herein, acting with acting with actual and apparent authority.  Plaintiffs further contend Deutsche ratified all misconduct of the Servicers, adopting it as its own.  Defendant, ostensibly, contends otherwise.

44.      Plaintiff contends that Deutsche is no longer a Securities Administrator and a Trustee for this Trust and it has been illegal for it to serve as Trustee of the Trust since 2019, so any rulings in the Lawsuit, including any Final Judgment or title emanating therefrom, are a byproduct of illegality and hence void.  Defendant, ostensibly, contends otherwise.

45.      Plaintiff contends that Deutsche and the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Certificateholders, yet they represented otherwise throughout the Lawsuit to conceal that the Servicers (and, to a lesser extent, Deutsche) were the parties who stood to benefit if the foreclosure was successful and to fraudulently shift adverse tax consequences in the event of a foreclosure from the Servicers (and, to a lesser extent, Deutsche) to the Certificateholders.  Defendant, ostensibly, contends otherwise.

46.      Plaintiff contends, as a result of the foregoing, that any rulings in the Lawsuit, including any Final Judgment, Certificate of Title, and deeds subsequent to the Certificate of Title are void.  Defendant, ostensibly, contends otherwise.

47.      There is a present, actual need for a declaration regarding a present, ascertainable set of facts, as set forth above.

48.   The rights of the parties are dependent upon the law applicable to these facts, and the antagonistic and adverse interests are all before this Court.

WHEREFORE Plaintiffs demand that this Court enter an Order declaring:

A.   Defendant has never been the owner or holder of the Note, and its representations otherwise in the Lawsuit were false, fraudulent, and perjurious;

B.   The Trust has never been the owner or holder of the Note, and its representations otherwise in the Lawsuit were false, fraudulent, and perjurious;

C.   The Certificateholders have never been the owner or holder of the Note, did not authorize the Lawsuit, and did not stand to gain if the Lawsuit were successful and the Property were foreclosed, and its representations otherwise in the Lawsuit were false, fraudulent, and perjurious;

D.   The Mortgage is not a lien on the Property;

E.   Deutsche, as Trustee, and the Servicers conspired to conceal that they were the parties who stood to gain if the Lawsuit were successful and the Property were foreclosed, with the Servicers using Defendant's name as the plaintiff in the Lawsuit to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders;

F.   Deutsche ceased being a Securities Administrator in 2019, and its continued prosecution of the Lawsuit, as Trustee, was illegal, rendering any subsequent rulings in the Lawsuit, including a final judgment and any certificate of title emanating therefrom, void;

G.   Deutsche ratified the fraud of the Servicers in the Lawsuit, as described herein;

H.   Having been converted into a security, the Note no longer exists;

13

I.     Exclusive jurisdiction for the claims brought in the Lawsuit lied in New York, so any rulings issued in the Lawsuit, including any final judgment and any title emanating therefrom, are void;

J.     Any rulings in the Lawsuit, including any final judgment and certificate of title emanating therefrom, are void. Likewise, any deeds subsequent to the certificate of title are void.

Plaintiffs further demand trial by jury, all attorney's fees and costs incurred in prosecuting this lawsuit, and any other relief that this Court deems proper.

## COUNT TWO

49.    This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

50.    Plaintiff realleges and incorporates by reference paragraphs 1-35 above.

51.    Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4). To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

52.    As a result of these violations, Plaintiff has been damaged. These damages include, but are not limited to, the value of the Property and the attorney's fees and costs incurred defending the Lawsuit.

53.    Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper. Plaintiff further demands trial by jury.

14

This 10th day of August, 2020.

Respectfully submitted,

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)



15

# EXHIBIT 9

**IN THE CIRCUIT COURT, SIXTH JUDICIAL CIRCUIT IN AND FOR
PASCO COUNTY, FLORIDA
CASE NO. 2020-CA-1794**

INLAND ASSETS, LLC, as Trustee of the
4417 Rudder Way Land Trust,
    Plaintiff,

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee for GSAMP Trust 2006-NC2, Mortgage
Pass-Through Certificates, Series 2006-NC2,
    Defendant,

**ORDER DENYING PLAINTIFF'S MOTION FOR FINAL SUMMARY JUDGMENT AFTER
DEFAULT  AND ORDER ON COURT'S OWN MOTION TO CONSOLIDATE CASES**

    **THIS MATTER** having come before the Court on October 13, 2020 upon Plaintiff's Motion for Final Summary Judgment after Default. The Court having reviewed the motion and having heard the arguments of counsel, it is hereby:

    **ORDERED AND ADJUDGED** that

1. Plaintiff's Motion for Final Summary Judgment after Default is DENIED. This matter will require a trial as the damages in question are unliquidated.

2. Upon the Court's own Motion, this case shall be consolidated with the related foreclosure case.

3. The Clerk of Court is directed to consolidate Case No. 2020-CA-1794 into Case No. 2018-CA-1565.

    **DONE AND ORDERED** in Chambers, New Port Richey, Pasco County, Florida, this 20 day of October, 2020.

Honorable Kimberly Sharpe Byrd
Circuit Court Judge

## Certificate of Service

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via U.S. Mail or Email (as indicated) on this 20th day of October, 2020.

Amanda Driscole, Esq.
Via Email at
Amanda Driscole @brockandscott.com
Via U.S. Mail at
Brock & Scott, PLLC
2001 NW 64th Street
Suite 130
Fort Lauderdale, FL 33309

Inland Assets, LLC, as Trustee for the
4417 Rudder Way Trust
c/o Lee Segal, Esq.
Via Email at
Lee@segalschuh.com
marie@segalschuh.com
Via U.S. Mail at
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North
Ste 100
Clearwater, FL 33764

Eric D. Jacobs, Esq.
BK Trustee Attorney
Via Email at ejacobs@gjb-law.com
Via U.S. Mail at
100 N Tampa St.
STE. 1645
Tampa, FL 33602

Lisa M. Castellano
BK Trustee Attorney
Via Email at
lcastellano@gjb-law.com
btraina@gjb-law.com
Via U.S. Mail at
100 N Tampa St.
STE. 1645
Tampa, FL 33602

Via U.S. Mail:
Ronald Pownall
8349 Monarch Circle
Seminole, FL 33772

Via U.S. Mail:
Deutsche Bank National Trust Company,
As Trustee for GSAMP Trust 2006-2,
Mortgage Pass-Through Certificates,
Series 2006-2,
28 Liberty Street
New York City, New York, 10005

Via U.S. Mail:
Deutsche Bank National Trust Company,
As Trustee for GSAMP Trust 2006-2,
Mortgage Pass-Through Certificates,
Series 2006-2,
60 Wall Street
New York City, New York 10005

Shannon McGrady, Judicial Assistant

# EXHIBIT 10

Filing # 115305858 E-Filed 10/20/2020 04:23:05 PM

IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT,
IN AND FOR COLUMBIA COUNTY, FLORIDA

4417 RUDDER WAY LAND TRUST,
By: Inland Assets, LLC, Trustee

      Plaintiff,

                                                     Case No. 20-245-CA

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-
Through Certificates, Series 2006-NC2,

      Defendant.
_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

      Plaintiff, 4417 Way Land Trust, by Inland Assets, LLC, Trustee ("Plaintiff"), by and

through its undersigned counsel, sues Defendant, DEUTSCHE BANK NATIONAL TRUST

COMPANY, as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series

2006-NC2 ("Defendant"), and would show:

## BACKGROUND

      1.     All conditions precedent to the filing of this action have been met, waived, or

otherwise satisfied.

      2.     Venue is proper in Columbia County, Florida, as the cause of action accrued here.

      3.     On or about March 27, 2006, Ronald Pownall ("Pownall") acquired title to the

following property ("the Property") in Pasco County, Florida:

      All of Lot 58, Block 1, FLOR-A-MAR SUBDIVISION, Section 17-B, according
      to the map or plat thereof as recorded in Plat Book 10, Page 131 of the Public
      Records of Pasco County, Florida

      More commonly known as 4417 Rudder Way, New Port Richey, FL 34652

1

4.   On that same date, Pownall entered a promissory note ("the Note") with New Century Mortgage Corporation ("New Century") in the amount of $328,500.00 and a mortgage ("the Mortgage") for which the Note purported to act as security, as recorded in the Pasco County Official Records at Book 6911, Page 542.  Instead of operating merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage also read like a contract, requiring Pownall to remit monetary payments, including payments of property taxes and insurance.

5.   Shortly after closing on Pownall's loan, New Century sold the Note to a third-party depositor ("the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

6.   Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust.  The Depositor then assigned the cash flows from the Loans to the Trust, which in this case was called GSAMP Trust 2006-NC2 ("the Trust").

7.   Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities.  The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments.  Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

8.   Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the

2

Mortgages"). In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default. Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

9.      Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

10.     Deutsche Bank National Trust Company ("Deutsche") never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties

3

to the Certificateholders.  The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust.  The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

11.      Deutsche's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders.  Notably, this duty is not contingent upon any other condition.

12.      Notwithstanding the Warranties, the Loans were not high-quality loans.  In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference.  As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

13.      After falling on hard times financially, Pownall caused the Property to be deeded to Plaintiff.  The deed reflecting this transaction is recorded in the Pasco County Official Records at Book 9492, Page 511.  Plaintiff has been the owner of the Property since that time.

14.      By 2010, the Depositor was no longer in business.  As Trustee of the Trust, Deutsche was still responsible for collecting cash flows on behalf of the Certificateholders.  Yet it was failing to do so.  Pownall, for example, stopped making payments under the Note in 2008, one of many Borrowers who did so.  Thereafter, a lawsuit was filed against Pownall and Plaintiff – by that point the Property owner – Pasco County Case No. 2018-CA-1565 ("the Lawsuit"), with Defendant named as the plaintiff.  The genesis of the Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiff of ownership of the Property.

15.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

16.     First, Defendant was neither the owner nor the holder of the Note by operation of law.  In fact, it was illegal for Defendant to own or hold the Notes.  Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.     Second, the Lawsuit was purportedly brought on behalf of the Certificateholders, who were identified in the style of the Lawsuit as the party prosecuting the case ("as Trustee for GSAMP Trust 2006-NC2, Mortgage Pass-Through Certificates, Series 2006-NC2…").  However, the Certificateholders did not authorize the Lawsuit, benefit from it, or even know it had been filed. Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet it purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.  Defendant undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

18.     Third, Defendant was purporting to prosecute the Lawsuit in its capacity as Trustee, yet it was illegal for it to act as Trustee, as its trust license had been revoked.  Quite simply, it was illegal for Deutsche to conduct trust business.  Defendant knew this, yet it continued falsely representing to the Court that it was prosecuting the Lawsuit as Trustee of the Trust.

19.     Despite the foregoing, Ocwen Loan Servicing, LLC ("Ocwen"), purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Lawsuit to be

prosecuted in Defendant's name and represented, under oath, that Defendant was the owner and holder of the Note.  As Defendant is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

20.     To support its position in the Lawsuit, various servicers, including Ocwen ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal.  (At any one time, only one servicer was assigned to the Loan.  However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein.  As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

21.     First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Certificateholders, as the Certificateholders did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome.  Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make them the plaintiff in the Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

22.     Second, the Servicers knew that Defendant was not the owner or holder of the Note by operation of law.  Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit, under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiffs.

23.     Third, the Servicer caused to be recorded in the Official Records of Pasco County, Florida at Book 7800, Page 846, an Assignment of Mortgage ("the Assignment"), which purported to assign the Mortgage from New Century to Defendant.  By the time the Assignment was created, however, New Century ceased to exist.  Rather than acknowledging its inability to procure an

assignment, the Servicer's attorney (purporting to represent Defendant) drafted the Assignment and caused it to be executed by Ocwen Loan Servicing, LLC, purportedly as attorney in fact for New Century.  Yet Ocwen was not actually the attorney in fact for New Century or authorized to sign on its behalf.  The Servicer nonetheless recorded the Assignment on behalf of Defendant, in violation of Fla. § 817.535(2)(a) and a criminal infraction under Florida law, then used it in the Lawsuit as a (fraudulent and illegal) basis for standing to foreclose.

24.     Fourth, the Servicers repeatedly represented, in the Lawsuit, that Defendant had been damaged as a result of Plaintiffs' non-payment of the installment payments due under the Note.  These representations were knowingly false, fraudulent, and perjurious at all times relevant.  After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether Plaintiffs paid the payments due under the Note.  The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trust.  Suffice it to say Servicer's repeated representations in the Lawsuit that Defendant was not damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant's name where no basis to do so existed.

25.     Fifth, the Servicer filed in the Lawsuit a Limited Power of Attorney from Deutsche ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuit as an agent of the Trust.  These representations, however, were entirely fraudulent – and known to be so by all involved.  In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein.  In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it

7

expressly violated by prosecuting the Lawsuit.  Moreover, the Servicer was never a T-1 license holder, so Deutsche could not delegate its authority to act as trustee to it (any more than an attorney can delegate another to practice law with his/her law license).

26.     Sixth, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendant and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendant in the Lawsuit.  In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendant was the holder of the Note and was damaged by Plaintiffs' non-payment, were true – knowing they were not.  This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme.  Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendant, the entity for which they were counsel of record in the Lawsuit.

27.     At all times relevant, Deutsche knew that the actions of the Servicers in the Lawsuit were fraudulent, illegal, contemptuous, and perjurious.  Nonetheless, Deutsche has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers like Ocwen on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

28.     For instance, in its capacity as Trustee, Deutsche has executed many limited powers of attorney.  Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers like Ocwen to go to court and create the impression

they were an agent of Ocwen and authorized to prosecute a foreclosure in Ocwen's name and otherwise act on its behalf even if actual authority were lacking.

29.     At the same time, though, Deutsche knew that servicers like Ocwen were using Deutsche's name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts.   If this misconduct ever came to light, Deutsche wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent."   That is why:  (i) Deutsche insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) Deutsche insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within Deutsche, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of Deutsche, and conceded that Deutsche never owned or held any promissory notes.

30.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like SPS – perpetuated in the name of Deutsche, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment with Deutsche, did nothing.  Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

31.     Despite its feigned ignorance, Deutsche knew full well what was happening.  In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, Deutsche failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting

foreclosures in its name. In fact, Deutsche continues to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

32.     Further proof that Deutsche's "ignorance" of the Servicers' illegality was feigned, and that Deutsche knew full well what the Servicers were doing, is seen in the indemnification agreements between it and the Servicers. After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship. Here, conversely, Deutsche, *i.e.* the principal, wanted Servicers like Ocwen, *i.e.* the agent, to indemnify Deutsche for all actions the servicers took in their name. The obvious reason for such an unusual indemnification is that Deutsche knew that servicers like Ocwen were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and Deutsche wanted someone else to pay in the event the fraud scheme ever came to light.

33.     Deutsche's motive for participating in the foregoing was clear – money. After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to Deutsche for those payments. Facilitating and encouraging the foregoing misconduct hence enabled Deutsche to avoid significant payments out of its own pocket.

34.     Based on the fraudulent and illegal acts of Defendant, Ocwen, and the Servicers, as described herein, Defendant succeeded in obtaining a Final Judgment of Foreclosure in the Lawsuit and, ultimately divesting Plaintiff of title to the Property.

35.     All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

36.     Venue is proper in Pasco County, as the Property is located here.

## **COUNT ONE**

37.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

38.     Plaintiff realleges and incorporates by reference paragraphs 1-35 above.

39.     Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535, 817.54, and 772.103(1)-(4).  To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in the Property.

40.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of the Property and the attorney's fees and costs incurred defending the Lawsuit.

41.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

This 20th day of October, 2020.

/s/ *Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

11

# EXHIBIT 11

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT,
IN AND FOR BRADFORD COUNTY, FLORIDA

ANNA LOFGREN,

    Plaintiff,

                                              Case No.:

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee for WaMu Mortgage Pass-Thru
Certificates, Series 2006-AR1 Trust, and
DEUTSCHE BANK TRUST COMPANY AMERICAS,
*f.k.a.* Bankers Trust Company, as Trustee and Custodian
for IXIS 2005-HE4,

    Defendants.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff, ANNA LOFGREN ("Plaintiff" or "Lofgren"), hereby files this lawsuit against

Defendants, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee for WaMu

Mortgage Pass-Thru Certificates, Series 2006-AR1 Trust ("Defendant One"), and DEUTSCHE

BANK TRUST COMPANY AMERICAS, *f.k.a.* Bankers Trust Company, as Trustee and

Custodian for IXIS 2005-HE4 ("Defendant Two"), would show:

    1.      All conditions precedent to the filing of this action have been met, waived, or

otherwise satisfied.

    2.      Venue is proper in Bradford County, Florida, as the cause of action alleged herein

accrued here.

    3.      On or about November 22, 2005, Plaintiff entered a promissory note ("Note One")

and mortgage ("Mortgage One") with Washington Mutual Bank, FA ("WaMu"), which mortgage

was recorded in the Pinellas County Official Records at Book 14836, Page 2495, in connection

with her purchase of the property at 26-28 Evevrgreen Ave N., Clearwater, FL 33756 ("Property One").

4.    On May 24, 2005, Plaintiff entered a promissory note ("Note Two") and mortgage ("Mortgage Two") with First Bank ("FB"), which Mortgage was recorded in the Pinellas County Official Records at Book 14466, Page 2304, in connection with her purchase of the property at 22-24c N Evergreen Ave., Clearwater, FL 33756 ("Property Two").

5.    Instead of operating merely as a lien on Property One, as required by Florida Statute § 697.01, Mortgage One read like a contract, requiring the remittance of monetary payments, including payments of property taxes and insurance.  Likewise, instead of merely operating as a lien on Property Two, Mortgage Two read like a contract, requiring the remittance of monetary payments, including property taxes and insurance.

6.    Shortly after closing on these Loans, WaMu sold Note One and FB sold Note Two to a third-party depositor ("the Depositor"), which bundled them together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

7.    Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust.  The Depositor then assigned the cash flows from the Loans to the Trust.  For Note One, this trust was called WaMu Mortgage Pass-Thru Certificates, Series 2006-AR1 ("Trust One").  For Note Two, this Trust was called IXIS 2005-HE4 ("Trust Two").

8.    Pursuant to the terms of each prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities.  The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers

2

on the Loans ("the Borrowers") made their monthly Loan payments. Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

9.      Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, Trust One and Trust Two did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages"). In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant One and Defendant Two (collectively "Defendants") to own or hold the Notes, regardless of whether they were in default. Rather, Trust One and Trust Two were merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Deutsche Bank National Trust Company ("DBNTC") and Deutsche Bank Trust Company Americas ("DBTCA") knew of these restrictions, as they were T-1 license holders, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

10.     Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the

3

Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

11.     DBNTC and DBTCA never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

12.     DBNTC and DBTCA's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

13.     Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

14.     By 2008, however, the Depositors were no longer in business. As Trustee of the Trusts, DBNTC and DBTCA were still responsible for collecting cash flows on behalf of the

4

Certificateholders. Yet they was failing to do so. Plaintiff, for example, stopped making payments under Note One and Note Two in 2008 – one of many Borrowers who did so. As a result, multiple different lawsuits were filed against Plaintiff, including Pinellas County Case 09-8237-CI ("Lawsuit One"), 08-12065-CI ("Lawsuit Two"), with Defendant One named as plaintiff in the former, and Defendant Two named as plaintiff in the latter (collectively "the Lawsuits"). The genesis of each lawsuit was DBNTC and DBTCA's attempt to foreclose Mortgage One and Mortgage Two, respectively, and divest Plaintiff of ownership.

15.     For several reasons, DBNTC and DBTCA's prosecution of Lawsuit One and Lawsuit Two, respectively, were fraudulent, illegal, and perjurious, rendering the entire proceedings, and any rulings emanating from them, void.

16.     First, Defendants were neither the owner nor the holder of Note One or Note Two by operation of law. In fact, it was illegal for Defendants to own or hold these Notes. Defendants knew this, yet they intentionally represented otherwise in the Lawsuits, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal Property One and Property Two from Plaintiff, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.     Second, the Lawsuits were brought in the names of Trust One and Trust Two, which were identified in the style of the respective Lawsuits ("WaMu Mortgage Pass-Thru Certificates, Series 2006-AR1 Trust" and "IXIS 2005-HE4"). However, the beneficiaries of Trust One and Trust Two, *i.e.* the Certificateholders, did not authorize the Lawsuits, benefit from them, or even know they had been filed. Defendants knew the Certificateholders had no knowledge of the Lawsuits, yet it purported to prosecute them anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose Mortgage One and Mortgage Two and steal Property One and Property Two from Plaintiff. Defendants undertook these actions in its capacity

5

as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

18.     Third, Defendants were purporting to prosecute the Lawsuits in its capacity as Trustee, yet it was illegal for it to act as Trustee, as its trust license had been revoked.  Quite simply, it was illegal for DBNTC or DBTCA to conduct trust business.  Defendants knew this, yet they continued falsely representing to the Court that it was prosecuting the Lawsuits as Trustee of the Trust.

19.     Despite the foregoing, the Servicers, purporting to act as Defendants' servicer and agent with authority to bind Defendants -- caused the Lawsuits to be prosecuted in the name of DBNTC and DBTCA, respectively, and represented, under oath, that Defendants were the owner and holder of Note One and Note Two, respectively.  As Defendants are not the principals of Trust One or Trust Two, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

20.     To support its position in the Lawsuits, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal.  (At any one time, only one servicer was assigned to the Loan.  However, the servicer changed several times during the duration of the Lawsuits, and each of them contributed to the frauds and illegalities described herein.  As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

21.     First, the Servicers knew the Lawsuits were not being prosecuted for the benefit of the Certificateholders, as the Certificateholders did not consent to the Lawsuits, know they had been filed, or stand to benefit upon a successful outcome.  Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make Trust One and Trust Two the plaintiffs in the

6

respective Lawsuits, to conceal that the Servicers were the parties who stood to benefit from the Lawsuits and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

22.    Second, the Servicers knew that Defendants was not the owner or holder of the Note by operation of law. Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuits, under oath, in a fraudulent and perjurious attempt to foreclose Mortgage One and Mortgage Two and steal Property One and Property Two from Plaintiff.

23.    Third, the Servicer and its attorneys caused to be recorded in the Official Records of Pinellas Florida at Book 3185, Page 2964, an Assignment of Mortgage Two ("the Assignment"), then used the Assignment in the Lawsuits as a basis to foreclose. The Assignment, though, did not depict a transaction in the ordinary course of business, but was a fraudulent and illegal effort to convey standing where none otherwise existed. To illustrate, it was not prepared and executed by FB in the ordinary course of business, but by the Servicer's attorneys. Additionally, the purported assignor, MERS, never had any basis to assign the Note, as its own website depicts that it never owns a note. Also, FB had already sold the Note years earlier to the Depositor under the securitization process described above.

24.    Fourth, the Servicer and its attorneys caused to be recorded in the Official Records a Notice of Lis Pendens, accompanying the filing of each of the Lawsuits. These Notices of Lis Pendens were recorded fraudulently and used to recount the misrepresentations described herein with the intent of divesting Plaintiff of title.

25.    Fourth, the Servicers repeatedly represented, in the Lawsuits, that Defendants had been damaged as a result of Plaintiff's non-payment of the installment payments due under the Notes. These representations were knowingly false, fraudulent, and perjurious at all times

relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trusts. Suffice it to say Servicer's repeated representations in the Lawsuits that Defendants was damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant One and Defendant Two's name where no basis to do so existed.

26.     Fifth, the Servicer filed in the Lawsuits a Limited Power of Attorney from DBNTC and DBTCA, respectively ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuits as an agent of the Trusts. These representations, however, were entirely fraudulent – and known to be so by all involved. In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit. Moreover, the Servicer was never a T-1 license holder, so DBNTC and DBTCA could not delegate its authority to act as trustee to it (any more than an attorney can delegate another to practice law with his/her law license).

27.     Sixth, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendants and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendants in the Lawsuits. In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendants were the holder of the Note and was damaged by the Borrowers' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to

8

facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendants, the entity for which they were counsel of record in the Lawsuits.

28.    At all times relevant, DBNTC and DBTCA knew that the actions of the Servicers in the Lawsuits were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, DBNTC and DBTCA have intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

29.    For instance, in its capacity as Trustee, DBNTC and DBTCA have executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers to go to court and create the impression they were an agent of DBNTC and DBTCA and authorized to prosecute a foreclosure in their name and otherwise act on its behalf even if actual authority were lacking.

30.    At the same time, though, DBNTC and DBTCA knew that servicers were using its name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts. If this misconduct ever came to light, DBNTC and DBTCA wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent." That is why: (i) DBNTC and DBTCA insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) DBNTC and DBTCA insisted that the

9

servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within DBNTC and DBTCA, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of DBNTC/DBTCA, and conceded that it never owned or held any promissory notes.

31.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers – perpetuated in the name of DBNTC and DBTCA, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment, did nothing.  Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

32.     Despite its feigned ignorance, DBNTC and DBTCA knew full well what was happening.  In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, DBNTC and DBTCA failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name.  In fact, DBNTC and DBTCA continue to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

33.     Further proof that DBNTC and DBTCA's "ignorance" of the Servicers' illegality was feigned, and that they knew full well what the Servicers were doing, is seen in the indemnification agreements between them and the Servicers.  After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship.  Here, conversely, DBNTC/DBTCA, *i.e.* the principal, wanted Servicers, *i.e.* the agent, to indemnify it

10

for all actions the servicers took in its name. The obvious reason for such an unusual indemnification is that DBNTC/DBTCA knew that servicers were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and DBNTC/DBTCA wanted someone else to pay in the event the fraud scheme ever came to light.

34.    DBNTC/DBTCA's motive for participating in the foregoing was clear – money. After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to it for those payments. Facilitating and encouraging the foregoing misconduct hence enabled DBNTC/DBTCA to avoid significant payments out of its own pocket.

35.    Based on the fraudulent and illegal acts of Defendants and the Servicers, as described here, Defendants divested Plaintiff of title to Property One and Property Two, depriving Plaintiff of the value thereof.

36.    As a result of the extensive efforts of Defendants and the Servicers to conceal these fraudulent schemes, Plaintiff only learned of these facts in September 2020

COUNT ONE

37.    This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages against Defendant One in excess of $30,000, exclusive of interest, attorney's fees, and costs.

38.    Plaintiff realleges and incorporates by reference paragraphs 1-36 above.

39.    Defendant One's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4). To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the

11

foregoing acts, Defendant One divested Plaintiff of possession and ownership of Property One when it had no lawful basis to do so.

40.     As a result of these violations, Plaintiff has been damaged. These damages include, but are not limited to, the value of Property One, all attorney's fees incurred in defending the Lawsuits, all attorney's fees incurred in prosecuting this case, and interest on all of that money.

41.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant One for damages, general and special, treble damages, costs, interest, attorney's fees, and such other and further relief that this Court deems proper. Plaintiff further demands trial by jury.

## COUNT TWO

42.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.,* for damages against Defendant Two in excess of $30,000, exclusive of interest, attorney's fees, and costs.

43.     Plaintiff realleges and incorporates by reference paragraphs 1-36 above.

44.     Defendant Two's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4). To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant Two divested Plaintiff of ownership of Property Two when it had no lawful basis to do so.

45.     As a result of these violations, Plaintiff has been damaged. These damages include, but are not limited to, the value of Property Two, all attorney's fees incurred in defending the Lawsuits, all attorney's fees incurred in prosecuting this case, and interest on all of that money.

46.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

12

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant Two for damages, general and special, treble damages, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

Dated:  September 9, 2020

/s/ Lee Segal, Esquire
Lee Segal, Esquire (FBN: 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@segalschuh.com – Attorney
marie@segalschuh.com – Florida Registered Paralegal

13

$20.50

Prepared by and return to:
Shapiro & Fishman, LLP/KIMBERLY ANNE HUMPHREY
10004 N. Dale Mabry Highway, Suite 112
Tampa, FL 33618
S&F No.: 08-105700

This area above this line is for the use of recording official

## ASSIGNMENT OF MORTGAGE

**Mortgage Electronic Registration Systems, Inc., as Nominee for First Bank d/b/a First Bank Mortgage,** ("Assignor"), C/O Shapiro & Fishman, LLP, 10004 N. Dale Mabry Highway, Suite 112, Tampa, FL 33618, in consideration from **Deutsche Bank Trust Company Americas** formerly known as Banker's Trust Company, as Trustee and Custodian for IXIS 2005-HE4, ("Assignee"), C/O Shapiro & Fishman, LLP, 10004 N. Dale Mabry Highway, Suite 112, Tampa, FL 33618, has granted, bargained, sold, assigned, transferred and set over, and by these presents does grant, bargain, sell, transfer and set over unto Assignee the following described Mortgage(s) recorded in the Public Records of Pinellas County, State of Florida, together with the note of obligation described in said Mortgage(s), and the money due and to become, due thereon, with interest as therein provided.

Date of Mortgage: May 24, 2005
Mortgage Recording Date: July 20, 2005
Clerk's File Number: 2005-283345
Book Number: 14466
Page Number: 2304ª

Legal Description:

LOT 12, TOGETHER WITH THE SOUTH 16.67 FEET OF LOT 11, BLOCK A, FAIRVIEW ADDITION ACCORDING TO THE MAP OR PLAT THEREOF, AS RECORDED IN PLAT BOOK 5, PAGE 85, PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA, AKA 22 GREENWOOD NORTH, CLEARWATER, FLORIDA.

Original Mortgagors: Anna Lofgren, a Single Woman

This Assignment of Mortgage is made without recourse against Assignor.

IN WITNESS WHEREOF, Assignor has caused these presents to be executed this 28 day of October , 2008.

Mortgage Electronic Registration Systems, Inc., as Nominee for First Bank d/b/a First Bank Mortgage

By: _Topako Love - VP_____ By: _Christina Allen - VP_____

(CORPORATE SEAL)

STATE OF Mn ]
COUNTY OF Dakota ]SS.

I HEREBY CERTIFY, That on this day personally appeared before me, an officer duly authorized to administer oaths and take acknowledgements of the above referenced duly authorized signatories of Topako Love & Christina who are personally known to me and did take an oath and who are to me well known to be the persons described herein and who executed the foregoing Assignment of Mortgage and duly acknowledged before me and executed the same for the purposes therein expressed as the act and deed of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, said County and State, this 28 day of October , 2008

*NOTARY PUBLIC
Name of Notary: _____
Commission NO. _____
My Commission Expires: _____

JAMES C. MORRIS
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2009

(SEAL)

Return To:
First Bank d/b/a First Bank
Mortgage
1 Technology Dr   Bldg A
Irvine, CA
92618

This document was prepared by:
Adriana Weant
1 Technology Dr    Bldg A
Irvine, CA

WHEN RECORDED RETURN TO: Irvine, CA 92618
            RAE BODONYI
28111 COUNTRY CLUB BLVD., STE 275
NORTH OLMSTED, OH 44070
       (440) 777-8288

                                    [Space Above This Line For Recording Data]

# MORTGAGE
                        MIN 100312000002862523

9048
LOW#13778

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated   May 24, 2005
together with all Riders to this document.
(B) "Borrower" is  Anna Lofgren, a single woman

*22-24 C North Evergreen Avenue
Clearwater , Florida  33756*

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under
this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address
and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is First Bank d/b/a First Bank Mortgage

DOC  #:322051                      APPL #:0000465487           LOAN #:0000465487
FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS   Form 3010 1/01

-6A(FL) (0008).01          LMS1 0005.10
Page 1 of 18                            Initials: ___

VMP MORTGAGE FORMS - (800)521-7291

BROKERS TITLE
3644 MADACA LANE
TAMPA, FL 33618
(813) 962-6004

AFTER RECORDING RETURN TO:

Washington Mutual Bank, FA
C/O ACS IMAGE SOLUTIONS
12691 PALA DRIVE MS156DPCA
GARDEN GROVE, CA 92841

PREPARED BY:

CARLA T STEDMAN
8100 SW 10TH ST STE #3000
PLANTATION, FL 33324

———————————— [Space Above This Line For Recording Data] ————————————

BROKERS TITLE OF TAMPA, LLC 01-2929

# MORTGAGE

03-2324-069374315-5

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated November 22, 2005 , together with all Riders to this document.
**(B) "Borrower"** is ANNA LOFGREN A SINGLE WOMAN
CHRISTOPHER G LOFGREN a single man

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is Washington Mutual Bank, FA, a federal association .
Lender is a Bank organized and existing under the laws of
United States of America . Lender's address is:
400 East Main Street Stockton, CA 95290 .
Lender is the mortgagee under this Security Instrument.
**(D) "Note"** means the promissory note signed by Borrower and dated November 22, 2005 .
The Note states that Borrower owes Lender One Hundred Sixty-Four Thousand Five
Hundred & 00/100
Dollars (U.S. $ 164,500.00 ) plus interest. Borrower has promised to pay this debt
in regular Periodic Payments and to pay the debt in full not later than December 1, 2035 .
**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

FLORIDA
73213 (06-03)                    Page 1 of 16

# EXHIBIT 12

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT,
IN AND FOR OKEECHOBEE COUNTY, FLORIDA

ANNA LOFGREN,

     Plaintiff,

                                           Case No.:

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

     Plaintiff, ANNA LOFGREN ("Plaintiff" or "Lofgren"), hereby files this lawsuit against

Defendant, Deutsche Bank National Trust Company, as Trustee, and would show:

     1.     All conditions precedent to the filing of this action have been met, waived, or

otherwise satisfied.

     2.     Venue is proper in Okeechobee County, Florida, as the cause of action alleged

herein accrued here.

     3.     On or about November 22, 2005, Plaintiff entered a promissory note ("Note One")

and mortgage ("Mortgage One") with Washington Mutual Bank, FA ("WaMu"), which mortgage

was recorded in the Pinellas County Official Records at Book 14836, Page 2495, in connection

with her purchase of the property at 26-28 Evevrgreen Ave N., Clearwater, FL 33756 ("Property

One").

     4.     On May 24, 2005, Plaintiff entered a promissory note ("Note Two") and mortgage

("Mortgage Two") with First Bank ("FB"), which Mortgage was recorded in the Pinellas County

Official Records at Book 14466, Page 2304, in connection with her purchase of the property at 22-24c N Evergreen Ave., Clearwater, FL 33756 ("Property Two").

5.     Instead of operating merely as a lien on Property One, as required by Florida Statute § 697.01, Mortgage One read like a contract, requiring the remittance of monetary payments, including payments of property taxes and insurance.  Likewise, instead of merely operating as a lien on Property Two, Mortgage Two read like a contract, requiring the remittance of monetary payments, including property taxes and insurance.

6.     Shortly after closing on these Loans, WaMu sold Note One and FB sold Note Two to a third-party depositor ("the Depositor"), which bundled them together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

7.     Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust.  The Depositor then assigned the cash flows from the Loans to the Trust.  For Note One, this trust was called WaMu Mortgage Pass-Thru Certificates, Series 2006-AR1 ("Trust One").  For Note Two, this Trust was called IXIS 2005-HE4 ("Trust Two").

8.     Pursuant to the terms of each prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities.  The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments.  Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

2

9.      Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, Trust One and Trust Two did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages").  In fact, Section 310(b)(3) 211.01 states that it was illegal for Deutsche Bank National Trust Company, as Trustee for WaMu Mortgage Pass-Thru Certificates, Series 2006-AR1 Trust ("D One"), and Deutsche Bank Trust Company Americas, *f.k.a.* Bankers Trust Company, as Trustee and Custodian for IXIS 2005-HE4 ("D Two") (collectively "Ds") to own or hold the Notes, regardless of whether they were in default.  Rather, Trust One and Trust Two were merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates.  As such, the tax liability "passed through the trust" directly to investors to avoid double taxation.  Of course, Deutsche Bank National Trust Company ("DBNTC") and Deutsche Bank Trust Company Americas ("DBTCA") knew of these restrictions, as they were T-1 license holders, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

10.     Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties").  The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make

3

their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

11.    DBNTC and DBTCA never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

12.    DBNTC and DBTCA's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

13.    Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

14.    By 2008, however, the Depositors were no longer in business. As Trustee of the Trusts, DBNTC and DBTCA were still responsible for collecting cash flows on behalf of the Certificateholders. Yet they was failing to do so. Plaintiff, for example, stopped making payments

4

under Note One and Note Two in 2008 – one of many Borrowers who did so.  As a result, multiple different lawsuits were filed against Plaintiff, including Pinellas County Case 09-8237-CI ("Lawsuit One"), 08-12065-CI ("Lawsuit Two"), with D One named as plaintiff in the former, and D Two named as plaintiff in the latter (collectively "the Lawsuits").  The genesis of each lawsuit was DBNTC and DBTCA's attempt to foreclose Mortgage One and Mortgage Two, respectively, and divest Plaintiff of ownership.

15.    For several reasons, DBNTC and DBTCA's prosecution of Lawsuit One and Lawsuit Two, respectively, were fraudulent, illegal, and perjurious, rendering the entire proceedings, and any rulings emanating from them, void.

16.    First, D One and D Two were neither the owner nor the holder of Note One or Note Two by operation of law.  In fact, it was illegal for D One and D Two to own or hold these Notes. D One and D Two knew this, yet they intentionally represented otherwise in the Lawsuits, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal Property One and Property Two from Plaintiff, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.    Second, the Lawsuits were brought in the names of Trust One and Trust Two, which were identified in the style of the respective Lawsuits ("WaMu Mortgage Pass-Thru Certificates, Series 2006-AR1 Trust" and "IXIS 2005-HE4").  However, the beneficiaries of Trust One and Trust Two, *i.e.* the Certificateholders, did not authorize the Lawsuits, benefit from them, or even know they had been filed.  D One and D Two knew the Certificateholders had no knowledge of the Lawsuits, yet it purported to prosecute them anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose Mortgage One and Mortgage Two and steal Property One and Property Two from Plaintiff.  D One and D Two undertook these actions in its

5

capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

18.     Third, D One and D Two were purporting to prosecute the Lawsuits in its capacity as Trustee, yet it was illegal for it to act as Trustee, as its trust license had been revoked.  Quite simply, it was illegal for DBNTC or DBTCA to conduct trust business.  D One and D Two knew this, yet they continued falsely representing to the Court that it was prosecuting the Lawsuits as Trustee of the Trust.

19.     Despite the foregoing, the Servicers, purporting to act as servicer and agent with authority to bind D One and D Two – caused the Lawsuits to be prosecuted in the name of DBNTC and DBTCA, respectively, and represented, under oath, that D One and D Two were the owner and holder of Note One and Note Two, respectively.  As D One and D Two are not the principals of Trust One or Trust Two, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

20.     To support its position in the Lawsuits, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal.  (At any one time, only one servicer was assigned to the Loan.  However, the servicer changed several times during the duration of the Lawsuits, and each of them contributed to the frauds and illegalities described herein.  As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

21.     First, the Servicers knew the Lawsuits were not being prosecuted for the benefit of the Certificateholders, as the Certificateholders did not consent to the Lawsuits, know they had been filed, or stand to benefit upon a successful outcome.  Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make Trust One and Trust Two the plaintiffs in the

6

respective Lawsuits, to conceal that the Servicers were the parties who stood to benefit from the Lawsuits and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

22.      Second, the Servicers knew that D One and D Two were not the owner or holder of the Notes by operation of law.  Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuits, under oath, in a fraudulent and perjurious attempt to foreclose Mortgage One and Mortgage Two and steal Property One and Property Two from Plaintiff.

23.      Third, the Servicer and its attorneys caused to be recorded in the Official Records of Pinellas Florida at Book 3185, Page 2964, an Assignment of Mortgage Two ("the Assignment"), then used the Assignment in the Lawsuits as a basis to foreclose.  The Assignment, though, did not depict a transaction in the ordinary course of business, but was a fraudulent and illegal effort to convey standing where none otherwise existed.  To illustrate, it was not prepared and executed by FB in the ordinary course of business, but by the Servicer's attorneys.  Additionally, the purported assignor, MERS, never had any basis to assign the Note, as its own website depicts that it never owns a note.  Also, FB had already sold the Note years earlier to the Depositor under the securitization process described above.

24.      Fourth, the Servicer and its attorneys caused to be recorded in the Official Records a Notice of Lis Pendens, accompanying the filing of each of the Lawsuits.  These Notices of Lis Pendens were recorded fraudulently and used to recount the misrepresentations described herein with the intent of divesting Plaintiff of title.

25.      Fourth, the Servicers repeatedly represented, in the Lawsuits, that D One and D Two had been damaged as a result of Plaintiff's non-payment of the installment payments due under the Notes.  These representations were knowingly false, fraudulent, and perjurious at all

7

times relevant.  After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note.  The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trusts.  Suffice it to say Servicer's repeated representations in the Lawsuits that D One and D Two were damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in D One and D Two's name where no basis to do so existed.

26.     Fifth, the Servicer filed in the Lawsuits a Limited Power of Attorney from DBNTC and DBTCA, respectively ("LPOA"), representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuits as an agent of the Trusts.  These representations, however, were entirely fraudulent – and known to be so by all involved.  In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein.  In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit.  Moreover, the Servicer was never a T-1 license holder, so DBNTC and DBTCA could not delegate its authority to act as trustee to it (any more than an attorney can delegate another to practice law with his/her law license).

27.     Sixth, the Servicers fraudulently misrepresented to their attorneys that they were the agent of D One and D Two and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for D One and D Two in the Lawsuits.  In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that D One and D Two were the holder of the Note and was damaged by the Borrowers' non-payment, were true – knowing they were not.  This put the attorneys in the position of either not knowing that the

8

Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme.   Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and D One and D Two, the entity for which they were counsel of record in the Lawsuits.

28.     At all times relevant, DBNTC and DBTCA knew that the actions of the Servicers in the Lawsuits were fraudulent, illegal, contemptuous, and perjurious.   Nonetheless, DBNTC and DBTCA have intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

29.     For instance, in its capacity as Trustee, DBNTC and DBTCA have executed many limited powers of attorney.   Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers to go to court and create the impression they were an agent of DBNTC and DBTCA and authorized to prosecute a foreclosure in their name and otherwise act on its behalf even if actual authority were lacking.

30.     At the same time, though, DBNTC and DBTCA knew that servicers were using its name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts.   If this misconduct ever came to light, DBNTC and DBTCA wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent."   That is why:  (i) DBNTC and DBTCA insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression

9

of an agency relationship, conveyed no power at all; (ii) DBNTC and DBTCA insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within DBNTC and DBTCA, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of DBNTC/DBTCA, and conceded that it never owned or held any promissory notes.

31.    Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers – perpetuated in the name of DBNTC and DBTCA, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment, did nothing.  Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

32.    Despite its feigned ignorance, DBNTC and DBTCA knew full well what was happening.  In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, DBNTC and DBTCA failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name.  In fact, DBNTC and DBTCA continue to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

33.    Further proof that DBNTC and DBTCA's "ignorance" of the Servicers' illegality was feigned, and that they knew full well what the Servicers were doing, is seen in the indemnification agreements between them and the Servicers.  After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship.  Here,

conversely, DBNTC/DBTCA, *i.e.* the principal, wanted Servicers, *i.e.* the agent, to indemnify it for all actions the servicers took in its name. The obvious reason for such an unusual indemnification is that DBNTC/DBTCA knew that servicers were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and DBNTC/DBTCA wanted someone else to pay in the event the fraud scheme ever came to light.

34.    DBNTC/DBTCA's motive for participating in the foregoing was clear – money. After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to it for those payments. Facilitating and encouraging the foregoing misconduct hence enabled DBNTC/DBTCA to avoid significant payments out of its own pocket.

35.    Based on the fraudulent and illegal acts of D One, D Two, and the Servicers, as described here, D One and D Two divested Plaintiff of title to Property One and Property Two, depriving Plaintiff of the value thereof.

36.    As a result of the extensive efforts of D One, D Two and the Servicers to conceal these fraudulent schemes, Plaintiff only learned of these facts in September, 2020.

37.    At all times relevant, Deutsche Bank National Trust Company, as Trustee was the alter ego of D One and D Two. The corporate veil is hence able to be pierced, and Deutsche Bank National Trust Company, as Trustee is liable for the acts described herein to the same extent as Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed, Pass-Through Certificates, Series 2007-QH4.

11

## COUNT ONE

38.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages against Defendant in excess of $30,000, exclusive of interest, attorney's fees, and costs.

39.     Plaintiff realleges and incorporates by reference paragraphs 1-37 above.

40.     D One's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535, 817.54, and 772.103(1)-(4).  To wit, through a pattern of criminal activity, the recording of the Lis Pendens, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, D One divested Plaintiff of possession and ownership of Property One when it had no lawful basis to do so.

41.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of Property One, all attorney's fees incurred in defending the Lawsuits, all attorney's fees incurred in prosecuting this case, and interest on all of that money.

42.     Defendant is liable to the same extent as D One.

43.     Under the terms of Fla. Stat. § 772.104, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, treble damages, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

## COUNT TWO

44.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages against Defendant in excess of $30,000, exclusive of interest, attorney's fees, and costs.

45.     Plaintiff realleges and incorporates by reference paragraphs 1-37 above.

12

46.     D Two's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535, 817.54, and 772.103(1)-(4).  To wit, through a pattern of criminal activity, the recording of the Lis Pendens and the Assignment, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, D Two divested Plaintiff of ownership of Property Two when it had no lawful basis to do so.

47.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of Property Two, all attorney's fees incurred in defending the Lawsuits, all attorney's fees incurred in prosecuting this case, and interest on all of that money.

48.     Defendant is liable to the same extent as D Two.

49.     Under the terms of Fla. Stat. § 772.104, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, treble damages, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

Dated:  December 13, 2020

/s/ MLL
MEGAN LAZENBY, Esquire
Lazenby Law, LLC.
4927 Southfork Drive
Lakeland, FL 33813
Telephone: 863.698.6844
Florida Bar No. 0014285
Lazenbylaw@gmail.com

# EXHIBIT 13

Case 8:21-cv-00349-SDM-JSS   Document 1-3   Filed 01/12/21   Page 304 of 428 PageID 315

IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT,
IN AND FOR NASSAU COUNTY, FLORIDA

WALLACE COOK,

      Plaintiff,

                                      Case No.:

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee of Argent Securities Inc., Mortgage Backed
Pass-Through Certificates Series 2004-W1, under the
Pooling and Servicing Agreement dated February 1, 2004,
and
DEUTSCHE BANK TRUST COMPANY AMERICAS,
*formerly known as* Bankers Trust Company, as Trustee
and Custodian,

      Defendants.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff, WALLACE COOK ("Plaintiff"), hereby files this lawsuit against Defendants,

DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee of Argent Securities, Inc.,

Mortgage Backed Pass-Through Certificates Series 2004-W1, under the Pooling and Servicing

Agreement dated February 1, 2004 ("Defendant One"), and DEUTSCHE BANK TRUST

COMPANY AMERICAS, *formerly known as* Bankers Trust Company, as Trustee and Custodian

("Defendant Two"), would show:

1.      All conditions precedent to the filing of this action have been met, waived, or

otherwise satisfied.

2.      Venue is proper in Nassau County, Florida.

3.      On or about November 26, 2003, Plaintiff entered a promissory note ("Note One")

and mortgage ("Mortgage One") with Argent Mortgage Company ("AMC"), which mortgage was

recorded in the Brevard County Official Records at Book 5135, Page 2567, in connection with his purchase of the property at 6949 Bayfront Road in Cocoa, Florida ("Property One").

4.      On June 6, 2005, Plaintiff entered a promissory note ("Note Two") and mortgage ("Mortgage Two") with Primequity, LLC ("PE"), which Mortgage was recorded in the Brevard County Official Records at Book 5485, Page 8604, in connection with his purchase of the property at 1655 N Banana River Drive in Merritt Island, Florida ("Property Two").

5.      Instead of operating merely as a lien on Property One, as required by Florida Statute § 697.01, Mortgage One read like a contract, requiring the remittance of monetary payments, including payments of property taxes and insurance.  Likewise, instead of merely operating as a lien on Property Two, Mortgage Two read like a contract, requiring the remittance of monetary payments, including property taxes and insurance.

6.      Shortly after closing on these Loans, AMC sold Note One and PE sold Note Two to a third-party depositor ("the Depositor"), which bundled them together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

7.      Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust.  The Depositor then assigned the cash flows from the Loans to a Trust ("the Trusts")

8.      Pursuant to the terms of each prospectus, the cashflows from the Loans were used as collateral, and the Trusts issued securities.  The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments.  Significantly, the amounts

received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

9.      Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trusts did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages").  In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant One and Defendant Two (collectively "Defendants") to own or hold the Notes, regardless of whether they were in default.   Rather, the Trusts were merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral.   This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates.  As such, the tax liability "passed through the trust" directly to investors to avoid double taxation.  Of course, Deutsche Bank National Trust Company ("DBNTC") and Deutsche Bank Trust Company Americas ("DBTCA") knew of these restrictions, as they were T-1 license holders, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

10.      Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties").  The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make

3

their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

11.    DBNTC and DBTCA never owned or held the Notes, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

12.    DBNTC and DBTCA's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

13.    Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

14.    By 2008, however, the Depositors were no longer in business. As Trustee of the Trusts, DBNTC and DBTCA were still responsible for collecting cash flows on behalf of the Certificateholders. Yet they was failing to do so. Plaintiff, for example, stopped making payments

4

under Note One and Note Two in 2008 – one of many Borrowers who did so.  As a result, multiple different lawsuits were filed against Plaintiff, including Brevard County Case 07-CA-15895 ("Lawsuit One"), 07-CA-15606 ("Lawsuit Two"), with Defendant One named as plaintiff in the former, and Defendant Two named as plaintiff in the latter (collectively "the Lawsuits").  The genesis of each lawsuit was DBNTC and DBTCA's attempt to foreclose Mortgage One and Mortgage Two, respectively, and divest Plaintiff of ownership.

15.     For several reasons, DBNTC and DBTCA's prosecution of Lawsuit One and Lawsuit Two, respectively, were fraudulent, illegal, and perjurious, rendering the entire proceedings, and any rulings emanating from them, void.

16.     First, Defendants were neither the owner nor the holder of Note One or Note Two by operation of law.  In fact, it was illegal for Defendants to own or hold these Notes.  Defendants knew this, yet they intentionally represented otherwise in the Lawsuits, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal Property One and Property Two from Plaintiff, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.     Second, the Lawsuits were brought on behalf of the Trusts, but the beneficiaries of the Trusts, *i.e.* the Certificateholders, did not authorize the Lawsuits, benefit from them, or even know they had been filed.  Defendants knew the Certificateholders had no knowledge of the Lawsuits, yet they purported to prosecute them anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose Mortgage One and Mortgage Two and steal Property One and Property Two from Plaintiff.  Defendants undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

18.    Third, Defendants were purporting to prosecute the Lawsuits in its capacity as Trustee, yet it was illegal for it to act as Trustee, as its trust license had been revoked.  Quite simply, it was illegal for DBNTC or DBTCA to conduct trust business.  Defendants knew this, yet they continued falsely representing to the Court that it was prosecuting the Lawsuits as Trustee of the Trust.

19.    Despite the foregoing, the Servicers, purporting to act as Defendants' servicer and agent with authority to bind Defendants – caused the Lawsuits to be prosecuted in the name of DBNTC and DBTCA, respectively, and represented, under oath, that Defendants were the owner and holder of Note One and Note Two, respectively.  As Defendants are not the principals of Trust One or Trust Two, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

20.    To support its position in the Lawsuits, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal.  (At any one time, only one servicer was assigned to the Loan.  However, the servicer changed several times during the duration of the Lawsuits, and each of them contributed to the frauds and illegalities described herein.  As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

21.    First, the Servicers knew the Lawsuits were not being prosecuted for the benefit of the Certificateholders, as the Certificateholders did not consent to the Lawsuits, know they had been filed, or stand to benefit upon a successful outcome.  Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make Trust One and Trust Two the plaintiffs in the respective Lawsuits, to conceal that the Servicers were the parties who stood to benefit from the

Lawsuits and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

22.     Second, the Servicers knew that Defendants was not the owner or holder of the Note by operation of law.   Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuits, under oath, in a fraudulent and perjurious attempt to foreclose Mortgage One and Mortgage Two and steal Property One and Property Two from Plaintiff.

23.     Third, the Servicers and their attorneys caused to be recorded in the Official Records of Brevard County, Florida a Notice of Lis Pendens, one accompanying the filing of each of the Lawsuits.   As the Lawsuits were riddled with fraudulent representations, as described herein, these notices were likewise fraudulent and a violation of Fla. Stat. § 817.535(2)(a) – a criminal act under Florida law.

24.     Fourth, the Servicers repeatedly represented, in the Lawsuits, that Defendants had been damaged as a result of Plaintiff's non-payment of the installment payments due under the Notes.   These representations were knowingly false, fraudulent, and perjurious at all times relevant.   After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note.   The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trusts.   Suffice it to say Servicer's repeated representations in the Lawsuits that Defendants was damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant One and Defendant Two's name where no basis to do so existed.

25.     Fifth, the Servicer caused the Lawsuits to be filed in the name of DBNTC and DBTCA, respectively, based upon a Limited Power of Attorney ("LPOA"), asserting the LPOA

7

gave it the power to act on behalf of Deutsche and prosecute the Lawsuits as an agent of the Trusts. These representations, however, were entirely fraudulent – and known to be so by all involved. In truth, the LPOA gave the Servicer no powers at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit. Moreover, the Servicer was never a T-1 license holder, so DBNTC and DBTCA could not delegate its authority to act as trustee to it (any more than an attorney can delegate another to practice law with his/her law license).

26.     Sixth, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendants and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendants in the Lawsuits. In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendants were the holder of the Note and was damaged by the Borrowers' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendants, the entity for which they were counsel of record in the Lawsuits.

27.     At all times relevant, DBNTC and DBTCA knew that the actions of the Servicers in the Lawsuits were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, DBNTC and

DBTCA have intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

28.     For instance, in its capacity as Trustee, DBNTC and DBTCA have executed many limited powers of attorney.  Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers to go to court and create the impression they were an agent of DBNTC and DBTCA and authorized to prosecute a foreclosure in their name and otherwise act on its behalf even if actual authority were lacking.

29.     At the same time, though, DBNTC and DBTCA knew that servicers were using its name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts.  If this misconduct ever came to light, DBNTC and DBTCA wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent."  That is why:  (i) DBNTC and DBTCA insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) DBNTC and DBTCA insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within DBNTC and DBTCA, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of DBNTC/DBTCA, and conceded that it never owned or held any promissory notes.

30.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers – perpetuated in the name of DBNTC and DBTCA, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment, did

9

nothing.  Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

31.     Despite its feigned ignorance, DBNTC and DBTCA knew full well what was happening.  In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking officers of Deutsche in detail, DBNTC and DBTCA failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name.  In fact, DBNTC and DBTCA continue to execute LPOAs for these Servicers, knowing the Servicers were using them to engage in the fraudulent and illegal misconduct described herein.

32.     Further proof that DBNTC and DBTCA's "ignorance" of the Servicers' illegality was feigned, and that they knew full well what the Servicers were doing, is seen in the indemnification agreements between them and the Servicers.  After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship.  Here, conversely, DBNTC/DBTCA, *i.e.* the principal, wanted Servicers, *i.e.* the agent, to indemnify it for all actions the servicers took in its name.  The obvious reason for such an unusual indemnification is that DBNTC/DBTCA knew that servicers were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and DBNTC/DBTCA wanted someone else to pay in the event the fraud scheme ever came to light.

33.     DBNTC/DBTCA's motive for participating in the foregoing was clear – money.  After all, if the Servicers did not pay the monthly cash flows due to the Certificateholders, then the Certificateholders would have looked to it for those payments.  Facilitating and encouraging

10

the foregoing misconduct hence enabled DBNTC/DBTCA to avoid significant payments out of its own pocket.

34.      Based on the fraudulent and illegal acts of Defendants and the Servicers, as described here, Defendants divested Plaintiff of title to Property One and Property Two, depriving Plaintiff of the value thereof.

35.      As a result of the extensive efforts of Defendants and the Servicers to conceal these fraudulent schemes from Plaintiff, the public at large, and even, to a lesser extent, their own attorneys, Plaintiff only learned of these facts in October, 2020.

## COUNT ONE

36.      This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages against Defendant One in excess of $30,000, exclusive of interest, attorney's fees, and costs.

37.      Plaintiff realleges and incorporates by reference paragraphs 1-35 above.

38.      Defendant One's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4).  To wit, through a pattern of criminal activity, the recording of the Notice of Lis Pendens, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant One divested Plaintiff of possession and ownership of Property One when it had no lawful basis to do so.

39.      As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of Property One, all attorney's fees incurred in defending the Lawsuits, all attorney's fees incurred in prosecuting this case, and interest on all of that money.

40.      Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant One for damages, general and special, treble damages, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

## COUNT TWO

41.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages against Defendant Two in excess of $30,000, exclusive of interest, attorney's fees, and costs.

42.     Plaintiff realleges and incorporates by reference paragraphs 1-36 above.

43.     Defendant Two's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4).  To wit, through a pattern of criminal activity, the collection of an unlawful debt, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant Two divested Plaintiff of ownership of Property Two when it had no lawful basis to do so.

44.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of Property Two, all attorney's fees incurred in defending the Lawsuits, all attorney's fees incurred in prosecuting this case, and interest on all of that money.

45.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant Two for damages, general and special, treble damages, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

Dated:  October 12, 2020

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN: 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@segalschuh.com – Attorney
marie@segalschuh.com – Florida Registered Paralegal



13

# EXHIBIT 14

Case 8:21-cv-00349-SDM-JSS   Document 1-2   Filed 01/12/21   Page 318 of 428 PageID 329

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT,
IN AND FOR GLADES COUNTY, FLORIDA

WALLACE COOK,

     Plaintiff,

                                              Case No.:

v.

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Trustee,

     Defendant.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

     Plaintiff, WALLACE COOK, by and through his undersigned counsel, sues Defendant,

Deutsche Bank Trust Company Americas, as Trustee ("Defendant"), and would show:

## BACKGROUND

     1.     All conditions precedent to the filing of this action have been met, waived, or

otherwise satisfied.

     2.     Venue is proper in Glades County, Florida, as the cause of action accrued here.

     3.     On or about October 6, 2003, Plaintiff entered a promissory note ("the Note") and

mortgage ("the Mortgage") with 1st Florida State Mortgage Corp. ("FSM") in connection with his

ownership of the property at 1715 Saratoga Street, Titusville, FL 32796 ("the Property").

     4.     In 2009, Plaintiff stopped making payments under the Note.  As a result, a lawsuit

was filed against him, Brevard County Case No. 18-CA-50709 ("the Lawsuit"), with MTGLQ

Investors, LP named as the plaintiff ("MTGLQ").  The genesis of the Lawsuit was MTGLQ's

attempt to foreclose the Mortgage and divest Plaintiff of ownership of the Property.

5.     For several reasons, MTGLQ's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious.

6.     First and foremost, notwithstanding its allegations in the Lawsuit, MTGLQ was never the holder of the Note.  On the face of the Note, it appeared MTGLQ was the holder, as there was a series of endorsements ending in a blank endorsement.  However, within this endorsement chain was an endorsement to Defendant, and a subsequent endorsement by Defendant in blank. This chain of endorsements was fraudulent in every way.

7.     The endorsement to Defendant was purported executed by Residential Funding Corp. ("RFC").  Yet RFC did not execute this endorsement to Defendant in the ordinary course of business.  In fact, RFC did not even exist as of the point in time that this endorsement was stamped onto the Note.  Rather, this endorsement was stamped onto the Note by a servicer of Defendant in a fraudulent attempt to convey standing upon Defendant where no such standing existed.

8.     This fraudulent misconduct was exacerbated when Defendant's servicer then executed a second endorsement, from Defendant in blank.  While this servicer purported to execute this endorsement as attorney in fact for Defendant, it was not the attorney in fact and could not have been, particularly without any particular trust being identified on the endorsement.  No matter, Defendant's agent wanted to create the appearance of standing, to facilitate foreclosure, where no such standing existed.

9.     The endorsements to Defendant and by Defendant in blank were both fraudulent. As a result, each such endorsement is anomalous and of no force and effect.  Without those assignments, neither MTGLQ or any other entity had any basis to foreclose.  Indeed, the only party that could have even tried to foreclose at that point was RFC, yet it had gone out of business years

2

earlier and ceased to exist.  As such, without the fraudulent endorsements by Defendant, Plaintiff would have retained ownership of the Property forever, without regard for any mortgage.

10.     Defendant's intent in executing the Endorsement was that it be filed in the public records, which it then was, thereby violating Fla. Stat. § 817.535.  Likewise, a Notice of Lis Pendens was recorded as part and parcel of the Lawsuit, and that filing was predicated entirely on a fraud.

## COUNT ONE

11.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

12.     Plaintiff realleges and incorporates by reference paragraphs 1-10 above.

13.     Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4).  To wit, through a pattern of criminal activity and by endeavoring to commit the foregoing, fraudulent acts, Defendant enabled a foreclosure action on Plaintiff's property when one otherwise would not have been possible.

14.     As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of the Property, lost rents, interest on those amounts, and the attorney's fees and costs incurred defending the Lawsuit.

15.     Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

This 20th day of August, 2020.

Respectfully submitted,

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)



4

# EXHIBIT 15

IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT,
IN AND FOR VOLUSIA COUNTY, FLORIDA

WALLACE COOK,

     Plaintiff,

                                             Case No.:

v.

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Trustee for Residential Accredit Loans, Inc.,
Mortgage Asset-Backed Pass-Through Certificates,
Series 2004-QS4,

     Defendant.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff, WALLACE COOK, by and through his undersigned counsel, sues Defendant, Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS4 ("Defendant"), and would show:

## BACKGROUND

1.      All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

2.      Venue is proper in Volusia County, Florida, as the cause of action accrued here.

3.      On or about October 6, 2003, Plaintiff entered a promissory note ("the Note") and mortgage ("the Mortgage") with National City Mortgage Co. ("NC") in connection with his ownership of the property at 3669 Powder Horn Road, Titusville, FL 32796 ("the Property").

1

4.      Shortly after closing on this loan, NC sold the Note to a third-party depositor ("the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

5.      Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust.   The Depositor then assigned the cash flows from the Loans to the trust, which in this case was called NRZ Pass-Through Trust X ("the Trust").

6.      Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities.   The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments.   Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

7.      Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages").   In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default.   Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral.   This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates.   As such, the tax liability "passed

2

through the trust" directly to investors to avoid double taxation.  Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

8.      Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties").  The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter.  The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

9.      Deutsche Bank Trust Company Americas ("Deutsche") never owned or held the Notes, either as Trustee or in its individual/corporate capacity.  In fact, the Trustee for the Trust was U.S. Bank National Association ("U.S. Bank").  As Trustee, U.S. Bank owed fiduciary duties to the Certificateholders.  The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust.  The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

10.      U.S. Bank's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of

impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders.  Notably, this duty is not contingent upon any other condition.

11.     Notwithstanding the Warranties, the Loans were not high-quality loans.  In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference.  As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

12.     By 2009, however, the Depositor was no longer in business.  As Trustee of the Trust, U.S. Bank was still responsible for collecting cash flows on behalf of the Certificateholders.  Yet it was failing to do so.  Plaintiff, for example, stopped making payments under the Note in 2009 – one of many Borrowers who did so.  As a result, a lawsuit was filed against Plaintiff, Brevard County Case No. 18-CA-32755 ("the Lawsuit"), with U.S. Bank, as Trustee of the Trust named as the plaintiff ("Trust Plaintiff").  The genesis of the Lawsuit was Trust Plaintiff's attempt to foreclose the Mortgage and divest Plaintiff of ownership of the Property.

13.     For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious.

14.     First, Trust Plaintiff was neither the owner nor the holder of the Note by operation of law.  In fact, it was illegal for Trust Plaintiff to own or hold the Notes.  It knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

15.     Second, the Lawsuit was brought in the name of the Trust, which was identified in the style of the Lawsuit as the party prosecuting the case.  However, the beneficiaries of the Trust, *i.e.* the Certificateholders, did not authorize the Lawsuit, benefit from it, or even know it had been filed.  U.S. Bank knew the Certificateholders had no knowledge of the Lawsuit, yet it purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.  U.S. Bank undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

16.     Despite the foregoing, the Servicers, purporting to act as U.S. Bank's servicer and agent with authority to bind it – caused the Lawsuit to be prosecuted in Defendant's name and represented, under oath, that U.S. Bank, as Trustee of the Trust, was the owner and holder of the Note.  As U.S. Bank is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

17.     To support U.S. Bank's position in the Lawsuit, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal.  (At any one time, only one servicer was assigned to the Loan.  However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein.  As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

18.     First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Trust beneficiaries, *i.e.* the Certificateholders, as they did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome.  Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make the Trust the plaintiff in the

Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

19.     Second, the Servicers knew that U.S. Bank, as Trustee of the Trust, was not the owner or holder of the Note by operation of law.  Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit, under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

20.     Third, the Servicer represented in the Lawsuit caused to be recorded in the Official Records of Pinellas County, Florida, an Assignment of Mortgage ("the Assignment"), as recorded in the Brevard County Official Records at Book 8158, Page 2153, which purported to assign the Mortgage to U.S. Bank, as Trustee of the Trust.  In truth, however, the Assignment was a fraud, created by the Servicer to create the appearance of standing where none otherwise existed.  After all, by the time of the Assignment, the Note and Mortgage had long since been sold to the Depositor.  The Servicer nonetheless prepared and caused to be recorded the Assignment – a violation of Fla. § 817.535(2)(a) and a criminal infraction, a felony under Florida law.

21.     Fourth, the Servicers repeatedly represented, in the Lawsuit, that U.S. Bank, as Trustee of the Trust, had been damaged as a result of Plaintiff's non-payment of the installment payments due under the Note.  These representations were knowingly false, fraudulent, and perjurious at all times relevant.  After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note.  The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" U.S. Bank given its role as Trustee under the Trust.  Suffice it to say Servicer's repeated representations in the Lawsuit that U.S. Bank

6

was damaged as a result of Plaintiffs' alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant's name where no basis to do so existed.

22.     Fifth, the Servicers fraudulently misrepresented to their attorneys that they were the agent of U.S. Bank and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for U.S. Bank in the Lawsuit.  In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that U.S. Bank was the holder of the Note and was damaged by Plaintiffs' non-payment, were true – knowing they were not.  This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme.  Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and U.S. Bank, the entity for which they were counsel of record in the Lawsuit.

23.     At all times relevant, U.S. Bank knew the actions of the Servicers in the Lawsuit were fraudulent, illegal, contemptuous, and perjurious.  Nonetheless, U.S. Bank has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

24.     For instance, in its capacity as Trustee, U.S. Bank has executed many limited powers of attorney.  Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers to go to court and create the impression they

were an agent of U.S. Bank and authorized to prosecute a foreclosure in U.S. Bank's name and otherwise act on its behalf even if actual authority were lacking.

25.     At the same time, though, U.S. Bank knew the Servicers were using its name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts.  If this misconduct ever came to light, U.S. Bank wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent."

26.     Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers – perpetuated in the name of U.S. Bank, as Trustee – U.S. Bank did nothing.  Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

27.     While Defendant did not engage in the fraudulent acts described herein in order to facilitate foreclosure on the Note in this case in its own name, it has done so on other properties on many occasions.  Regardless, on this particular Note, Defendant collaborated and conspired with U.S. Bank, as Trustee of the Trust, to commit the fraudulent, illegal, and perjurious acts described herein – and joined and facilitated the misconduct by executing an endorsement on the Note that was wholly fraudulent.

28.     The Note, originally payable to NC, bore an endorsement to Residential Funding Corporation ("RFC").  This endorsement was lawful and legitimate, done in the ordinary course of business.  However, RFC went out of business and ceased to exist without ever endorsing the Note.  Nonetheless, the Servicers caused an endorsement to be put onto the Note, purportedly by RFC, to "Deutsche Bank Trust Company Americas, as Trustee."  This endorsement was wholly fraudulent, as it was stamped on the Note after RFC ceased to exist, without the authority of the purported signer, in an effort to manufacture standing where none otherwise existed.  Then, even

though no trust was identified with that endorsement, Defendant executed an endorsement on the Note, in blank ("the Endorsement"), purporting to do so as trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS4.

29. The Endorsement was wholly fraudulent and known to be so by Defendant at all times. After all, Defendant never had an interest in the Note (in its capacity as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS4 or otherwise) much less an interest at the time of the Endorsement. After all, the Note had been sold to the Depositor years earlier. Defendant executed the Endorsement anyway, purportedly as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2004-QS4, in a fraudulent and illegal attempt to help create the appearance of standing in favor of U.S. Bank, as Trustee of the Trust, in the Lawsuit where none otherwise existed.

30. Defendant's intent in executing the Endorsement was that it be filed in the public records, which it then was, thereby violating Fla. Stat. § 817.535.

**COUNT ONE**

31. This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

32. Plaintiff realleges and incorporates by reference paragraphs 1-31 above.

33. Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535 and 772.013(1)-(4). To wit, through a pattern of criminal activity and by endeavoring to commit and conspiring with the Servicers and U.S. Bank to commit the foregoing acts, Defendant caused a foreclosure on Defendant's home when one otherwise would not have been possible.

9

34.    As a result of these violations, Plaintiff has been damaged.  These damages include, but are not limited to, the value of the Property (which Plaintiff would have continued to enjoy if not for Defendant's illegal actions, as described herein), interest on that amount, and the attorney's fees and costs incurred defending the Lawsuit.

35.    Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in its favor and against Defendant for damages, general and special, costs, interest, attorney's fees, and such other and further relief that this Court deems proper.  Plaintiff further demands trial by jury.

This 19th day of August, 2020.

Respectfully submitted,

*/s/ Lee Segal, Esquire*
Lee Segal, Esquire (FBN 37837)
**Segal & Schuh Law Group, P.L.**
18167 U.S. Highway 19 North, Suite 100
Clearwater, Florida 33764
Tel: (727) 824-5775 Fax: (877) 636-7408
lee@Segalschuh.com (Attorney)
marie@segalschuh.com (Florida Registered Paralegal)

Case 8:21-cv-00349-SDM-JSS   Document 1-3   Filed 01/12/21   Page 333 of 428 PageID 344

**IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA**

**MICHAEL HAULSEE and
MARCIA HAULSEE,**                                    **Case No. 20-001663-CA**

      **Plaintiff,**

**vs.**

**DEUTSCHE BANK NATIONAL TRUST
COMPANY,**

      **Defendant.**

_____/

## REQUEST FOR JUDICIAL NOTICE
## OF PINELLAS COUNTY FORECLOSURE CASE

Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY ("DBNTC") by and through its undersigned counsel and pursuant to Fla. Stat. §§ 90.202(11), (12), hereby files this Request for Judicial Notice in support of Defendant's Motion to Vacate Default and Motion to Quash Service of Process and for all other purposes applicable in this matter, and states:

1.      Section 90.202(6) of the Florida Evidence Code specifically provides that a court may take judicial notice of the "[r]ecords of any court of this state." § 90.202(6), Fla. Stat. (2017); *see also Hunt v. State*, 613 So. 2d 893, 898 n.5 (Fla. 1992) (recognizing that the Supreme Court took judicial notice of the record in another case on the basis of section 90.202(6) of the Florida Statutes); *Martin v. Garrison*, 658 So. 2d 1019, 1021 (Fla. 4th DCA 1995) (taking judicial notice of court records). In interpreting this provision, Florida appellate courts have also taken judicial notice of deeds recorded in the Official Records of a Florida County. *See Gonzalez v. Chase Home Fin. LLC*, 37 So. 3d 955, 958 (Fla. 3d DCA 2010) (taking judicial notice of a deed and mortgage recorded in Miami-Dade County's official records); *see also Beggi v. Ocean Bank*, 91 So. 3d 193, 195 n. 3 (Fla. 3d DCA 2012) (recognizing quitclaim deeds that were recorded in the official records

of Miami-Dade County when the appellee requested taking of judicial notice of same).  Indeed, the Florida Supreme Court has stated that "[c]ourts may take judicial cognizance of all public documents and public records."  *Conyers v. State*, 123 So. 817, 818 (Fla. 1929).

2.      Further, Sections 90.202(11) and 90.202(12) of the Florida Statutes also permit the Court to take judicial notice of "[f]acts that are not subject to dispute because they are generally known within the territorial jurisdiction of the court" and/or "[f]acts that are not subject to dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned."  *See* Fla. Stat. §§ 90.202(11), (12).

3.      Pursuant to this statute, DBNTC requests that the Court take judicial notice of the court filings in the following case, which fall squarely within the above-referenced sections:

i.      *Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass Through Certificates, Series 2007-QS4 v. Michael S. Haulsee, et al.*; Pinellas County Circuit Court Case No. 15-002225-CI, which includes, but is not limited to:

- Pinellas County Court Docket; **Exhibit 16;**
- Complaint filed on April 6, 2015; **Exhibit 17;**
- Lis Pendens filed on April 6, 2015, **Exhibit 18;**
- Final Judgment of Foreclosure entered on October 5, 2018 **Exhibit 19;**
- Per Curium Opinion 2DCA dated August 14, 2020, **Exhibit 20;**
- Mandate entered on September 1, 2020, **Exhibit 21**.

4.      Judicial notice of these documents will allow this Court "to arrive at the best decision[] on the merits."  Dorothy F. Easley, *Judicial Notice on Appeal: A History Lesson in Recent Trends*, 84 Fla. B.J. 45, 46 (Dec. 2010) (noting that courts consider additional sources referred to in briefs or conduct their own independent research to arrive at the best decisions on the merits).

2

**WHEREFORE**, DBNTC respectfully request that the Court take judicial notice of the documents filed in the above-referenced foreclosure case, together with such other relief this Court deems just and necessary.

Dated: December 23, 2020

Respectfully submitted,

Patrick G. Broderick (FBN 88568)
broderickp@gtlaw.com
**GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Suite 300 East
West Palm Beach, FL 33401
Telephone: (561) 650-7915
Facsimile: (561) 655-6222
Secondary email:
Sandra.Famadas@gtlaw.com;

Beth A. Norrow (FBN 061497)
norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**
450 S. Orange Ave., Suite 650
Orlando, FL 32801
Telephone: (407) 420-1000
Facsimile: (407) 420-5909
Secondary email: dunnla@gtlaw.com;
FLService@gtlaw.com

By: /s/ *Beth A. Norrow*
         Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company*

## CERTIFICATE OF SERVICE

I CERTIFY that on December 23, 2020, I electronically filed the foregoing with the Clerk of Court via the Florida E-Filing Portal, which shall cause a copy to be served via email to the following:

Carla Turner-Hahn
615 Whisper Woods Dr.
Lakeland, FL 33813
carlathahn@gmail.com

/s/ Beth A. Norrow
Beth A. Norrow

3

# EXHIBIT 16

Skip to Main Content    Logout    My Account    Search Menu    New Civil Search    Refine
Search    Back                                                    Location : Pinellas County    Help

# REGISTER OF ACTIONS
## CASE NO. 15-002225-CI



**Order Documents!** *Click Here!*
*Request Now!* **Including Certified!**

| | | |
|---|---|---|
| DEUTSCHE BANK TRUST COMPANY AMERICAS Vs. MICHAEL S HAULSEE, et al | § § § § § § § § | |

| | |
|---|---|
| Case Type: | **REAL PROP - HOMESTEAD RES FORECLOSURE3 $250,000 OR MORE** |
| Date Filed: | **04/06/2015** |
| Location: | **Section 20** |
| Judicial Officer: | **MEYER, KEITH** |
| UNIFORM CASE NUMBER: | **522015CA002225XXCICI** |

## PARTY INFORMATION

**Attorneys**

| | | |
|---|---|---|
| CLOSED DEFENDANT - AMENDED | ANY AND ALL UNKNOWN PARTIES 2900 PELHAM ROAD NORTH ST PETERSBURG, FL 33710 | |
| CLOSED DEFENDANT - DISMISSED/DR | UNKNOWN TENANT 1 2900 PELHAM ROAD NORTH SAINT PETERSBURG, FL 33710 | |
| CLOSED DEFENDANT - DISMISSED/DR | UNKNOWN TENANT 2 2900 PELHAM ROAD NORTH SAINT PETERSBURG, FL 33710 | |
| CLOSED DEFENDANT - DISMISSED/DR | UNKNOWN TENANT 3 2900 PELHAM ROAD NORTH SAINT PETERSBURG, FL 33710 | |
| CLOSED DEFENDANT - DISMISSED/DR | UNKNOWN TENANT 4 2900 PELHAM ROAD NORTH SAINT PETERSBURG, FL 33710 | |
| DEFENDANT | CITIBANK NA *AS SUCCESSOR TO* CITIBANK FEDERAL SAVINGS BANK 2900 PELHAM ROAD NORTH SAINT PETERSBURG, FL 33710 | |
| DEFENDANT | HAULSEE, MARCIA S  2900 PELHAM ROAD NORTH SAINT PETERSBURG, FL 33710 | **MARK P STOPA** STOPA LAW FIRM PA P O BOX 1371 ST PETERSBURG, FL 33731  727-851-9551(W) |
| DEFENDANT | HAULSEE, MICHAEL S *ALSO KNOWN AS* HAULSEE, MICHAEL        2900 PELHAM ROAD NORTH SAINT PETERSBURG, FL 33710 | **MARK P STOPA** STOPA LAW FIRM PA P O BOX 1371 ST PETERSBURG, FL 33731  727-851-9551(W)   LEE SEGAL, ESQ  FL FORECLOSURE & CREDIT DEFENSE FIRM PL |

18167 US HWY 19 N STE 100
CLEARWATER, FL 33764

813-920-5775(W)

**PLAINTIFF**  **DEUTSCHE BANK TRUST COMPANY**
**AMERICAS** *AS TRUSTEE*
*FOR* RESIDENTIAL ACCREDIT LOANS, INC.
   1615 S CONGRESS AVENUE, AVE
   STE 200
   DELRAY BEACH, FL 33445

**TARA NATASHA CASTILLO**

ALDRIDGE PITE LLP
1615 S CONGRESS AVE STE
200
DELRAY BEACH, FL 33445

561-392-6391(W)

JENNIFER LANE

ALDRIDGE PITE LLP
1615 S CONGRESS AVE STE
200
DELRAY BEACH, FL 33445

561-392-6391(W)

JONATHAN JACOBSON, ESQ

ALDRIDGE PITE LLP
1615 S CONGRESS AVE STE
200
DELRAY BCH, FL 33445

561-392-6391(W)

---

## EVENTS & ORDERS OF THE COURT

### OTHER EVENTS AND HEARINGS

| | | |
|---|---|---|
| 09/04/2020 | **NEW SECTION ASSIGNMENT PER AO** | Doc # 88 |
| | *THIS CASE IS ASSIGNED TO SECTION 21, BUT WILL BE REASSIGNED TO SECTION 20 EFFECTIVE JANUARY 1, 2021 PER AO 2020-022. MATTERS WILL CONTINUE TO BE HEARD BY THE SECTION 21 JUDGE UNTIL DECEMBER 31, 2020.* | |
| 09/01/2020 | **MANDATE PER CURIAM AFFIRMED** | |
| | *2D19-137* | |
| 09/01/2020 | **APPEAL CLERK'S WORKSHEET WITH ATTACHMENT** | Doc # 87 |
| 08/14/2020 | **DCA ORDER**    Doc # 85 | |
| | *GRANTING APPELLEE'S MOTION FOR APPELLATE ATTORNEY'S FEES AND REMANDING TO TRIAL COURT TO DETERMINE AMOUNT* | |
| 03/12/2020 | **DCA ORDER**    Doc # 84 | |
| | *CANCELLING THE ORAL ARGUMENT SCHEDULED FOR APRIL 28, 2020 TO MITIGATE THE IMPACT OF THE COVID-19 OUTBREAK* | |
| 09/11/2019 | **DCA ORDER ANSWER BRIEF DUE**    Doc # 83 | |
| | *BY NOVEMBER 22, 2019* | |
| 06/05/2019 | **Receipt Apl Record $**    Doc # 81 | |
| | *17.50* | |
| 06/05/2019 | **PREPARED RECORD TO DISTRICT COURT OF APPEAL**    Doc # 82 | |
| | *ELECTRONICALLY TRANSMITTED 2D19-137 SUPPLEMENT* | |
| 05/31/2019 | **ORIGINAL SUPPLEMENTAL RECORD ON APPEAL PREP**    Doc # 79 | |
| | *2D19-137* | |
| 05/31/2019 | **COPY**    Doc # 80 | |
| | *SUPPLEMENTAL APPELLATE RECORD BILLING STATEMENT* | |
| 05/28/2019 | **DIRECTIONS TO CLERK**    Doc # 78 | |
| 05/24/2019 | **DCA ORDER GRANTING MOTION TO SUPPLEMENT**    Doc # 77 | |
| 04/23/2019 | **RETURNED FROM POST OFFICE**    Doc # 76 | |
| | *COPY ORDER GRANTING DEFTS EMERGECY MOTION TO WITHDRAW COUNSEL --- COURT RECEIVED 042219* | |
| 04/13/2019 | **NOTICE OF UNAVAILABILITY**    Doc # 75 | |
| | *OF LEAD COUNSEL* | |
| 03/26/2019 | **PREPARED RECORD TO DISTRICT COURT OF APPEAL**    Doc # 74 | |
| | *ELECTRONICALLY TRANSMITTED 2D19-137* | |
| 03/21/2019 | **DCA ORDER**    Doc # 72 | |
| | *ACKNOWLEDGING THE END OF THE RELINQUISHMENT PERIOD* | |
| 03/12/2019 | **RECORDED AT**    Doc # 71 | |
| | *CC AGREED ORDER ON JOINT MOTION TO VACATE FORCLOSURE SALE* | |
| | Vol./Book 20459, Page 502,  2 pages | |
| 03/08/2019 | **Receipt Apl Record $**    Doc # 73 | |
| | *199.50* | |
| 02/21/2019 | **ORIGINAL RECORD ON APPEAL PREPARED**    Doc # 69 | |
| | *2D19-137* | |
| 02/21/2019 | **COPY**    Doc # 70 | |
| | *APPELLATE RECORD BILLING STATEMENT* | |
| 02/18/2019 | **ATTORNEY COVER LETTER**    Doc # 66 | |
| | *--- COURT RECEIVED 021519* | |
| 02/18/2019 | **CORRESPONDENCE BETWEEN ATTYS RE**    Doc # 67 | |
| | *PROPOSED AGREED ORDER* | |

| Date | Document |
|---|---|
| 02/18/2019 | **AGREED ORDER**    Doc # 68 |
| | *GRANTING JOINT MTN TO VACATE SALE/CERTIFICATE OF SALE AND STAY PROCEEDING PENDING APPEAL* |
| 02/05/2019 | **DCA ORDER**    Doc # 65 |
| | *APPELLANT'S MOTION TO EXTEND THE TIME FOR FILING A MOTION IN THE TRIAL COURT PURSUANT TO THIS COURT'S JANUARY 15, 2019 ORDER IS GRANTED UNTIL 3/7/19* |
| 01/30/2019 | **CERTIFICATE OF TITLE**    Doc # 63 |
| | Vol./Book 20419, Page 1200,   1 pages |
| 01/30/2019 | **CERTIFICATE OF NO DISBURSEMENT**    Doc # 64 |
| 01/29/2019 | **ORDER DENYING**    Doc # 61 |
| | *PLTF'S AND DEF'S MOTN TO CANCEL SALE AS MOOT* |
| 01/28/2019 | **COPY CERTIFICATE OF SALE RETURNED BY POST OFFICE**    Doc # 60 |
| | Party:   CITIBANK NA |
| 01/28/2019 | **CASE REOPENED** |
| 01/28/2019 | **JOINT MOTION**    Doc # 62 |
| | *TO VACATE FORECLOSURE SALE, CERTIFICATE OF SALE AND STAY PROCEEDING PENDING APPEAL* |
| 01/16/2019 | **JUDICIAL ONLINE SALE**   (10:00 AM) (Judicial Officer ONLINE SALE, JUDICIAL) |
| | *REC VER* |
| 01/16/2019 | **CERTIFICATE OF SALE**    Doc # 58 |
| | *DEUTSCHE BANK TRUST COMPANY AMERICAS* |
| 01/15/2019 | **PLAINTIFF'S MOTION TO CANCEL FORECLOSURE SALE**    Doc # 57 |
| | *JANUARY 16, 2019 SALE AND RESCHEDULE FORECLOSURE SALE* |
| 01/15/2019 | **DCA ORDER**    Doc # 59 |
| | *RELINQUISHING JURISDICTION TO TRIAL COURT ON APPELLANT'S MOTION TO STAY PROCEEDINGS UNTIL 3/18/19* |
| 01/14/2019 | **DCA ORDER**    Doc # 56 |
| | *APPELLEE IS DIRECTED TO RESPOND TO THE EMERGENCY MOTION TO STOP OR POSTPONE A JANUARY 16, 2019, ILLEGAL FORECLOSURE SALE BY 9:00AM ON 1/15/19* |
| 01/10/2019 | **LETTER FROM CLERK RE APPEAL NOTICE TO DCA**    Doc # 53 |
| 01/10/2019 | **LETTER FROM 2ND DCA RE ASSIGN APPEAL NO.**    Doc # 54 |
| | *2D19-137* |
| 01/10/2019 | **DCA ORDER FILING FEES DUE**    Doc # 55 |
| | *BY 1/30/19* |
| 01/09/2019 | **ORDER DENYING**    Doc # 49 |
| | *DEFENDANTS MOTION FOR RE-HEARING AND/OR RECONSIDERATION* |
| 01/09/2019 | **ATTORNEY COVER LETTER**    Doc # 50 |
| | *- 103018* |
| 01/09/2019 | **NOTICE OF APPEAL**    Doc # 51 |
| | Party:   HAULSEE, MARCIA S |
| | Party:   HAULSEE, MICHAEL S |
| 01/09/2019 | **NOTICE OF APPEAL RECORDED**    Doc # 52 |
| | Vol./Book 20398, Page 1912,   15 pages |
| 12/21/2018 | **PUBLISHER'S AFFIDAVIT NOTICE OF SALE**    Doc # 48 |
| 12/13/2018 | **NOTICE OF SALE**    Doc # 47 |
| | *\*\*ESF PAID\*\** |
| 11/01/2018 | **NOTICE OF FILING**    Doc # 46 |
| | *ATTACHED CONSENT TO EXCEPTION FROM STAY EXTENSION* |
| 10/31/2018 | **NOTICE OF HEARING**    Doc # 45 |
| | *010819 3:00* |
| 10/29/2018 | **RESPONSE**    Doc # 44 |
| | *TO MOTION FOR REHEARING AND/OR RECONSIDERATION OF THIS COURT'S UNIFORM FINAL JUDGMENT OF FORECLOSURE DATED OCTOBER 5, 2018* |
| 10/18/2018 | **NOTICE OF APPEARANCE**    Doc # 38 |
| | Party:   HAULSEE, MICHAEL S |
| 10/18/2018 | **NOTICE OF FILING**    Doc # 39 |
| | *TRIAL TRANSCRIPT* |
| 10/18/2018 | **TRANSCRIPTION OF PROCEEDINGS**    Doc # 40 |
| | *100518* |
| 10/18/2018 | **NOTICE OF FILING**    Doc # 41 |
| | *COPY OF ORDER GRANTING TEMPORARY EXTENSION OF AUTOMATIC STAY* |
| 10/18/2018 | **ATTACHMENT**    Doc # 42 |
| | *COPY ORDER GRANTING TEMPORARY EXTENSION* |
| 10/18/2018 | **DEF-RESP'S MOTION FOR REHEARING**    Doc # 43 |
| 10/09/2018 | **AFFIDAVIT OF ATTORNEY FEES**    Doc # 36 |
| | *AND COSTS* |
| 10/09/2018 | **AFFIDAVIT**    Doc # 37 |
| | *(SUPPORTING) AS TO ATTYS FEES* |
| 10/05/2018 | **CERTIFICATE OF COMPLIANCE WITH FORECLOSURE PROCEDURES**    Doc # 20 |
| 10/05/2018 | **AFFIDAVIT**    Doc # 21 |
| | *OF ATTORNEY FEES AND COSTS* |
| 10/05/2018 | **EXHIBIT**    Doc # 22 |
| | *#3* |
| 10/05/2018 | **EXHIBIT**    Doc # 23 |
| | *#4* |
| 10/05/2018 | **EXHIBIT**    Doc # 24 |
| | *#6* |
| 10/05/2018 | **EXHIBIT**    Doc # 25 |
| | *#7* |
| 10/05/2018 | **EXHIBIT**    Doc # 26 |
| | *#8* |
| 10/05/2018 | **EXHIBIT**    Doc # 27 |
| | *#9* |
| 10/05/2018 | **EXHIBIT**    Doc # 28 |
| | *#10* |
| 10/05/2018 | **EXHIBIT**    Doc # 29 |
| | *#11* |

| | | |
|---|---|---|
| 10/05/2018 | NOTICE OF FILING | Doc # 30 |
| | *ORIGINAL NOTE AND MORTGAGE* | |
| 10/05/2018 | FINAL DISPOSITION FORM | Doc # 31 |
| 10/05/2018 | DISPOSED BY JUDGE (SRS DISPO) | |
| 10/05/2018 | FINAL JUDGMENT OF FORECLOSURE | Doc # 33 |
| | *Vol./Book 20300, Page 619, 7 pages* | |
| 10/05/2018 | FEES DUE LETTER FROM CLERK | Doc # 34 |
| | *$49 SERVICE CHARGE FEE-RCVD 111218* | |
| 10/05/2018 | ORDER GRANTING | Doc # 35 |
| | *WITHDRAWAL OF DEFTS COUNSEL / DENYING MOTION TO STAY* | |
| 09/21/2018 | WITNESS LIST | Doc # 19 |
| | *(SUPPLEMENTAL)* | |
| 09/19/2018 | DEF-RESP'S EMERGENCY MOTION | Doc # 18 |
| | *TO WITHDRAW AS COUNSEL, EX PARTE RULING, AND FOR 45-DAY STAY* | |
| 09/14/2018 | DEF-RESP'S MOTION FOR CONTINUANCE | Doc # 16 |
| | *OF TRIAL, AND MOTION FOR MEDIATION* | |
| 09/14/2018 | STIPULATION FOR SUBSTITUTION OF COUNSEL | Doc # 17 |
| | *W/ATTACHED PROPOSED ORDER* | |
| 08/16/2018 | LIST OF EXHIBITS | Doc # 13 |
| 08/16/2018 | WITNESS LIST | Doc # 14 |
| 08/16/2018 | NOTICE OF SERVICE OF | Doc # 15 |
| | *COPY OF ORDER SCHEDULING NON-JURY TRIAL FOR OCTOBER 5, 2018* | |
| 07/16/2018 | NOTICE OF SUBSTITUTION OF COUNSEL | Doc # 12 |
| 06/26/2018 | ORDER SCHEDULING NON-JURY TRIAL | Doc # 11 |
| | *100518 9:00* | |
| 05/18/2018 | CERTIFICATE OF COMPLIANCE WITH FORECLOSURE PROCEDURES | Doc # 9 |
| 05/18/2018 | NOTICE CAUSE IS AT ISSUE READY FOR TRIAL | Doc # 10 |
| | *NON-JURY* | |
| 05/01/2018 | NOTICE OF CANCELLATION | Doc # 6 |
| | *OF HEARING 050718* | |
| 04/30/2018 | CORRESPONDENCE TO COURT RE | Doc # 7 |
| | *PROPOSED AGREED ORDER* | |
| 04/30/2018 | AGREED ORDER | Doc # 8 |
| | *GRANTING PLTF MOTN STRIKE DEMAND FOR JURY TRIAL* | |
| 02/14/2018 | NOTICE OF HEARING | Doc # 5 |
| | *050718 2:00 (TELEPHONIC)* | |
| 01/16/2018 | NOTICE OF CANCELLATION | Doc # 4 |
| | *OF HEARING 011918 9:00* | |
| 10/24/2017 | NOTICE OF SERVICE ANSWERS INTERROGATORIES | Doc # 3 |
| | *(AND OBJECTIONS)* | |
| 10/20/2017 | NOTICE OF SERVICE OF | Doc # 2 |
| | *RESPONSES AND OBJECTIONS TO DEFTS REQUEST FOR PRODUCTION* | |
| 09/20/2017 | NOTICE OF HEARING | Doc # 1 |
| | *011718 9:00 BY DEFTS* | |
| 03/01/2017 | DEF-RESP'S MOTION TO STRIKE | |
| | *REPLY* | |
| 02/24/2017 | DEF-RESP'S MOTION TO COMPEL DISCOVERY | |
| | *RESPONSES* | |
| 02/13/2017 | PLTF-PET'S MOTION TO STRIKE | |
| | *DEMAND FOR JURY TRIAL* | |
| 02/13/2017 | PLTF-PET'S MOTION FOR EXTENSION OF TIME | |
| | *TO RESPOND TO DEFENDANT'S REQUEST FOR PRODUCTION, AND INTERROGATORIES* | |
| 02/13/2017 | REPLY TO AFFIRMATIVE DEFENSES | |
| 01/18/2017 | DEFAULT ENTERED | |
| | *Party: CITIBANK NA* | |
| 01/13/2017 | NOTICE OF SERVICE OF INTERROGATORIES | |
| 01/13/2017 | REQUEST FOR PRODUCTION | |
| 01/12/2017 | DEMAND FOR JURY TRIAL | |
| 01/12/2017 | ANSWER-AFFIRMATIVE DEFENSES OF | |
| | */DEMAND FOR JURY TRIAL* | |
| | *Party: HAULSEE, MARCIA S* | |
| | *Party: HAULSEE, MICHAEL S* | |
| 01/11/2017 | PLTF-PET'S MOTION FOR COURT DEFAULT | |
| | *W/ATTACHED COPY EXHIBITS* | |
| 01/11/2017 | MOTION FOR DEFAULT | |
| | *W/ATTACHED COPY//DEFAULT ENTERED* | |
| | *Party: CITIBANK NA* | |
| 10/06/2016 | CORRESPONDENCE TO COURT RE | |
| | *PROPOSED ORDER - RETURNED BY COURT 100516* | |
| 10/06/2016 | ORDER DENYING | |
| | *DEFTS MTN DISMISS AMENDED COMPLAINT* | |
| 09/29/2016 | RESPONSE | |
| | *TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT* | |
| 07/01/2016 | DEF-RESP'S MOTION | |
| | *TO DISMISS AMENDED COMPLAINT* | |
| 06/28/2016 | NOTICE OF CANCELLATION | |
| | *OF HEARING 062916 9:15* | |
| 03/23/2016 | NOTICE OF HEARING | |
| | *062916 9:15 (TELEPHONIC)* | |
| 03/18/2016 | AMENDED COMPLAINT | |
| 02/24/2016 | PLTF-PET'S MOTION FOR EXTENSION OF TIME | |
| | *TO COMPLY WITH COURT ORDER DATED 012716* | |
| 01/27/2016 | ORDER GRANTING | |
| | *DEFTS MOTION TO DISMISS* | |

|  |  |
|---|---|
|  | Vol./Book 19074, Page 566, 1 pages |
| 10/02/2015 | **PLTF-PET'S MOTION FOR COURT DEFAULT** |
| 10/02/2015 | **NOTICE OF DROPPING** |
|  | *PARTY* |
|  | Party: UNKNOWN TENANT 1 |
|  | Party: UNKNOWN TENANT 2 |
|  | Party: UNKNOWN TENANT 3 |
|  | Party: UNKNOWN TENANT 4 |
| 09/30/2015 | **NOTICE OF HEARING** |
|  | *012716 11:30* |
| 09/17/2015 | **NOTICE OF FIRM NAME CHANGE** |
| 07/30/2015 | **NOTICE OF FILING** |
|  | *NON RESIDENT COST BOND* |
| 07/30/2015 | **NON-RESIDENT COST BOND** |
|  | *APPROVED 07/31/15 / $100.00 DEPOSITED* |
| 07/29/2015 | **NOTICE OF FIRM NAME CHANGE** |
| 07/29/2015 | **NOTICE** |
|  | *CHANGE OF ATTY* |
| 06/29/2015 | **DEF-RESP'S MOTION TO DISMISS** |
| 06/02/2015 | **AFFIDAVIT AS TO MILITARY SERVICE** |
| 05/06/2015 | **DEF-RESP'S MOTION FOR EXTENSION OF TIME** |
|  | *TO RESPOND TO COMPLAINT* |
| 05/06/2015 | **NOTICE OF APPEARANCE** |
|  | */EMAIL DESIGNATION* |
| 04/22/2015 | **SUMMONS - SERVED** |
|  | *041515 MICHAEL S HAULSEE* |
| 04/22/2015 | **SUMMONS - SERVED** |
|  | *041515 MARCIA S HAULSEE* |
| 04/22/2015 | **SUMMONS - SERVED** |
|  | *041415 CITIBANK, N.A* |
| 04/22/2015 | **SUMMONS - NOT SERVED** |
|  | *UNKNOWN TENANT 1* |
| 04/22/2015 | **SUMMONS - NOT SERVED** |
|  | *UNKNOWN TENANT 2* |
| 04/08/2015 | **SUMMONS TO BE ISSUED** |
|  | *ISSUED 04/08/15* |
| 04/08/2015 | **PLAINTIFF-LENDER CONTACT INFORMATION SHEET** |
|  | *FORM D* |
| 04/06/2015 | **CIVIL COVER SHEET - E-FILED** |
| 04/06/2015 | **COMPLAINT** |
| 04/06/2015 | **DESIGNATION OF E-MAIL ADDRESS(ES)** |
| 04/06/2015 | **NOTICE** |
|  | *OF AO 2015-015* |
| 04/06/2015 | **NOTICE** |
|  | *TO HOMEOWNERS / FORM C* |
| 04/06/2015 | **VALUE OF REAL PROP-MORTGAGE FORECLOSURE CLAIM** |
| 04/06/2015 | **LIS PENDENS** |
|  | Vol./Book 18742, Page 841, 1 pages |
| 04/06/2015 | **ATTACHMENT TO COMPLAINT** |
|  | *CERTIFICATION OF POSSESSION OF ORIGINAL NOTE* |
| 04/06/2015 | **ATTACHMENT TO COMPLAINT** |
|  | *NOTE* |
| 04/06/2015 | **ATTACHMENT TO COMPLAINT** |
|  | *MORTGAGE* |
| 04/06/2015 | **SUMMONS TO BE ISSUED** |
|  | *ISSUED 04/08/15* |
| 04/06/2015 | **SUMMONS TO BE ISSUED** |
|  | *ISSUED 04/08/15* |
| 04/06/2015 | **SUMMONS TO BE ISSUED** |
|  | *ISSUED 04/08/15* |
| 04/06/2015 | **SUMMONS TO BE ISSUED** |
|  | *ISSUED 04/08/15* |

---

## FINANCIAL INFORMATION

**ATTORNEY** SEGAL, LEE, ESQ

Court Ordered   Click Here!
Pay Now!   Fines, Fees, Costs?

| | | | |
|---|---|---|---|
| Total Financial Assessment | | | 22.50 |
| Total Payments and Credits | | | 22.50 |
| **Balance Due as of 12/23/2020** | | | **0.00** |

| | | | |
|---|---|---|---|
| 03/12/2019 | Transaction Assessment | | 22.50 |
| 03/12/2019 | Counter Payment | Receipt # SB-2019-04022     CARLA TURNER HAHN PA | (22.50) |

**DEFENDANT** HAULSEE, MICHAEL S



| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | 334.00 |
| | Total Payments and Credits | | | 334.00 |
| | **Balance Due as of 12/23/2020** | | | **0.00** |

| | | | | |
|---|---|---|---|---|
| 01/10/2019 | Transaction Assessment | | | 117.00 |
| 01/10/2019 | Mail Payment | Receipt # CV-2019-00949 | HAULSEE, MICHAEL S | (117.00) |
| 02/21/2019 | Transaction Assessment | | | 199.50 |
| 03/08/2019 | Counter Payment | Receipt # SB-2019-03854 | STOPA, MARK P | (199.50) |
| 05/31/2019 | Transaction Assessment | | | 17.50 |
| 06/05/2019 | Mail Payment | Receipt # CV-2019-14591 | BIASOTTI & ASSOC | (17.50) |

**PLAINTIFF** DEUTSCHE BANK TRUST COMPANY AMERICAS



| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | 2,361.20 |
| | Total Payments and Credits | | | 2,361.20 |
| | **Balance Due as of 12/23/2020** | | | **0.00** |

| | | | | |
|---|---|---|---|---|
| 04/08/2015 | Transaction Assessment | | | 1,970.50 |
| 04/08/2015 | E-FILE PAYMENT | Receipt # EF-2015-13079 | DEUTSCHE BANK TRUST COMPANY AMERICAS | (1,970.50) |
| 04/14/2015 | Transaction Assessment | | | 10.00 |
| 04/14/2015 | Counter Payment | Receipt # SB-2015-05027 | provest | (10.00) |
| 04/20/2015 | Transaction Assessment | | | 1.50 |
| 03/01/2016 | Transaction Assessment | | | 2.00 |
| 03/01/2016 | Counter Payment | Receipt # SB-2016-02550 | JOE DALY | (2.00) |
| 10/05/2018 | Transaction Assessment | | | 49.00 |
| 10/15/2018 | Mail Payment | Receipt # CV-2018-28384 | ALDRIDGE PITE LLP | (49.00) |
| 12/14/2018 | Transaction Assessment | | | 49.00 |
| 12/14/2018 | Counter Payment | Receipt # CV-2018-33735 | DEUTSCHE BANK TRUST COMPANY AMERICAS | (49.00) |
| 01/15/2019 | Transaction Assessment | | | 70.00 |
| 01/15/2019 | REALAUCTION PAYMENT | Receipt # RA-2019-00084 | Aldridge Connors | (70.00) |
| 01/25/2019 | Transaction Assessment | | | 210.70 |
| 01/25/2019 | Mail Payment | Receipt # CV-2019-02279 | PERFECT ATTENDANCE | (210.70) |

# EXHIBIT 17

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

DEUTSCHE BANK TRUST COMPANY      CASE NO.
AMERICAS, AS TRUSTEE FOR RESIDENTIAL
ACCREDIT LOANS, INC., MORTGAGE ASSET-      DIVISION
BACKED PASS-THROUGH CERTIFICATES,
SERIES 2007-QS4,

         Plaintiff(s),

vs.

MICHAEL S. HAULSEE A/K/A MICHAEL
HAULSEE; MARCIA S. HAULSEE; CITIBANK,
N.A., SUCCESSOR BY MERGER TO CITIBANK,
FEDERAL SAVINGS BANK; UNKNOWN
TENANT 1; UNKNOWN TENANT 2; UNKNOWN
TENANT 3; UNKNOWN TENANT 4;
         Defendant(s).
_____/

## VERIFIED COMPLAINT FOR FORECLOSURE OF MORTGAGE

Plaintiff, Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4, sues the Defendants and alleges:

## COUNT I – MORTGAGE FORECLOSURE

1.     This is an action to foreclose a mortgage on real property in Pinellas County, Florida.

2.     The Court has jurisdiction over the subject matter.

3.     On or about November 30, 2006, MICHAEL S. HAULSEE A/K/A MICHAEL HAULSEE executed and delivered a promissory note. A copy of the note is attached hereto as Exhibit "A".

4.     On or about November 30, 2006, MICHAEL S. HAULSEE A/K/A MICHAEL HAULSEE AND MARCIA S. HAULSEE executed and delivered a mortgage securing payment of the note to LOANCITY, A CALIFORNIA CORPORATION. The mortgage was recorded on December 18, 2006, in Official Record Book 15535, at Page 1598, of the Public Records of Pinellas County, Florida, and encumbered the property described in the mortgage then owned by and in possession of the mortgagor, a copy of the mortgage being attached hereto as Exhibit "B".

5.     The mortgage of the Plaintiff is a lien superior in dignity to any prior or subsequent right, title, claim, lien or interest arising out of mortgagor(s) or the mortgagor(s)' predecessor(s) in interest.

1221-11188B                                                 v1.1

6.    Plaintiff is the holder of the original note secured by the mortgage and is entitled to foreclose pursuant to Florida Statute 673.3011(1).

7.    Ocwen Loan Servicing, LLC ("Ocwen") is the loan servicer for this particular loan. Plaintiff has delegated Ocwen the authority to service the loan on its behalf pursuant to a Limited Power of Attorney.

8.    Defendant(s) have defaulted under the note and mortgage by failing to pay the payment due as of July 1, 2013, and all subsequent payments.

9.    Plaintiff declares the full amount payable under the note and mortgage to be due, except to the extent any part of that amount is or would be subject to a statute of limitations defense.

10.    Defendant(s) owe Plaintiff $999,999.00, that is due and owing on principal on the note and mortgage, plus interest from and after June 1, 2013, and title search expenses for ascertaining necessary parties to this action, pursuant to the documents attached, except for those defendants who have been discharged in bankruptcy.

11.    In order to protect its security, the Plaintiff may have advanced and paid Ad Valorem Taxes, premiums on insurance required by the mortgage and other necessary costs, or may be required to make such advances during the pendency of this action.  Any such sum so paid will be due and owing to the Plaintiff.

12.    The property is now owned by Defendant(s) Marcia S. Haulsee and MICHAEL S. HAULSEE A/K/A MICHAEL HAULSEE, and the record legal title to said mortgaged property is now vested in Defendants(s), MARCIA S. HAULSEE and MICHAEL S. HAULSEE A/K/A MICHAEL HAULSEE.

13.    All conditions precedent to the acceleration of this mortgage note and to foreclosure of the mortgage have occurred.

14.    Plaintiff is obligated to pay Plaintiff's attorneys a reasonable fee for their services.  Plaintiff is entitled to recover its attorneys' fees pursuant to the express terms of the note and mortgage.

15.    Plaintiff alleges that the claims of the remaining Defendants are secondary, junior, inferior and subject to the prior claim of Plaintiff.

16.    Defendant, UNKNOWN TENANT 1, UNKNOWN TENANT 2, UNKNOWN TENANT 3, UNKNOWN TENANT 4, may claim some right, title, or interest in the property herein sought to be foreclosed

1221-11188B

v1.1

by virtue of homestead rights, possession or some other unknown interest, the exact nature of which is unknown to Plaintiff and not a matter of public record. However, said interest, if any, is subordinate, junior, and inferior to the lien of Plaintiff's mortgage.

17.     Any interest in the property inuring to the Defendant, CITIBANK, N.A., SUCCESSOR BY MERGER TO CITIBANK, FEDERAL SAVINGS BANK, is subordinate and inferior to the lien of Plaintiff's mortgage, including, but not limited to, the Mortgage recorded August 12, 2005, in Official Record Book 14527 at Page 1653 of the Public Records of Pinellas County, Florida; but not limited to, the Subordination Agreement recorded December 18, 2006, in Official Record Book 15535 at Page 1594 of the Public Records of Pinellas County, Florida.

18.     Any and all unknown parties claiming by, through, under, and against the herein named individual defendant(s) who are not known to be dead or alive, whether said unknown parties may claim an interest as spouses, heirs, devisees, grantees, or other claimants are joined as defendants herein. The claims of said defendants are subordinate, junior, and inferior to the interest of the Plaintiff.

WHEREFORE, Plaintiff demands judgment foreclosing the mortgage, for costs (and, when applicable, for attorneys' fees) and, if the proceeds of the sale are insufficient to pay plaintiff's claim, a deficiency judgment. Request that subject to any applicable statute of limitations, that the Court ascertain the amount due to Plaintiff for principal and interest on the Mortgage and Note and for late charges, abstracting, taxes, expenses and costs, including attorney's fees, plus interest thereon; that if the sums due Plaintiff under the Mortgage and Note are not paid immediately, the Court foreclose the Mortgage and the Clerk of the Court sell the Property securing the indebtedness to satisfy the Plaintiff's mortgage lien in accordance with the provisions of Florida Statutes §45.031 (2011); that the rights, title and interest of any Defendant, or any party claiming by, through, under or against any Defendant named herein or hereinafter made a Defendant be forever barred and foreclosed; that the Court appoint a receiver of the Property and of the rents, issues, income and profits thereof, or in the alternative, order sequestration of rents, issues, income and profits pursuant to Florida Statutes §697.07 (2006); and that the Court retain jurisdiction of this action to make any and all further orders and judgments as may be necessary and proper, including the issuance of a writ of possession and the

1221-11188B                                                                                    v1.1

entry of a deficiency judgment decree, when and if such deficiency decree shall appear proper, if borrower(s) has not been discharged in bankruptcy.

## **VERIFICATION**

Under penalty of perjury, I declare that I have read the foregoing, and the facts alleged therein are true and correct to the best of my knowledge and belief.

Executed on this _26th_ day of _March_____, 20_15_

Ocwen Loan Servicing LLC as attorney-in-fact for
Deutsche Bank Trust Company Americas, as Trustee for
Residential Accredit Loans, Inc., Mortgage Asset-Backed
Pass-Through Certificates, Series 2007-QS4

By: _____   Rosemarie LaRosa

Its: _____**Contract Management Coordinator**_____

RE:    Borrower: MICHAEL S. HAULSEE A/K/A MICHAEL HAULSEE and MARCIA S. HAULSEE
       Address: 2900 PELHAM ROAD NORTH
       SAINT PETERSBURG, FL 33710
       File #:   1221-11188B

**Aldridge Connors, LLP**
Attorney for Ocwen
1615 South Congress Avenue
Suite 200
Delray Beach, FL 33445

Telephone: 561.392.6391
Facsimile: 561.392.6965
Service Email: servicemail@aclawllp.com

By: _____   Tara Natasha Castillo
    Attorney                              Bar #722901
    Florida Bar No.
    Communication Email:

1221-11188B                                                    v1.1

Page 19

Case Number: 15-002225-CI

Filing # 25729865 E-Filed 04/06/2015 02:32:48 PM    Case 8:21-cv-00349-SDM-JSS    Document 1-2    Filed 01/12/21    Page 348 of 428 PageID 359

## CERTIFICATION OF POSSESSION PURSUANT TO FLA. STAT. 702.015(4)

STATE OF FLORIDA)
COUNTY OF PALM BEACH)

      BEFORE me, personally appeared Tucker Perry who, being of lawful age and after being first duly sworn, deposes and says, under penalty of perjury:

1. I am a Servicing Operations Specialist of Ocwen Loan Servicing, LLC ("Ocwen"), servicer for Plaintiff in this action. In this capacity I have personal knowledge of the facts and matters stated herein, and I am authorized to execute this Certification on behalf of Ocwen. The information contained in this Certification is based on my personal knowledge.

2. The promissory note at issue in this action was executed by Michael S. Haulsee on November 30, 2006 in the amount of $999,999.00 ("Note"). A true and correct copy of the Note is attached to this Certification as Exhibit "A."

3. On December 17, 2014 at 12:33 PM, I obtained the original Note at 5720 Premier Park Drive, West Palm Beach, FL 33407 and personally verified that Ocwen is in possession of the Note on behalf of Plaintiff.

Prepared Date: December 17, 2014

                Signature: _____
                Print Name: Tucker Perry
                    Date: December 17, 2014
                    Title: Servicing Operations Specialist
                    Ocwen Loan Servicing, LLC, servicer for
                    Deutsche Bank Trust Company Americas, as
                    Trustee for Residential Accredit Loans, Inc.,
                    Mortgage Asset-Backed Pass-Through
                    Certificates, Series 2007-QS4

The foregoing instrument was acknowledged and sworn before me on December 17, 2014, by Tucker Perry as a Servicing Operations Specialist of Ocwen Loan Servicing, LLC, who is personally known to me (or who has produced the following identification: n/a).

_____
Notary Public - State of Florida

Donealia Wilson

Notary Public State of Florida
Donealia Wilson
My Commission FF 106479
Expires 03/25/2018

## InterestFirst^SM NOTE

HAULSEE

| NOVEMBER 30, 2006 | ST. PETERSBURG | FLORIDA |
|---|---|---|
| [Date] | [City] | [State] |

2900 PELHAM ROAD N, SAINT PETERSBURG, FL 33710
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $999,999.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is LOANCITY , A CALIFORNIA CORPORATION. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.875%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3. PAYMENTS

(A) Time and Place of Payments

I will make a payment every month. This payment will be for interest only for the first 120 months, and then will consist of principal and interest.

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on JANUARY 1, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 5671 SANTA TERESA BOULEVARD, SUITE 100, SAN JOSE, CA 95123 or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $5,729.16 for the first 120 months of this Note, and thereafter will be in the amount of U.S. $7,678.13. The Note Holder will notify me prior to the date of change in monthly payment.

### 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. However, if the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest as well as during the time that my payments consist of principal and interest. If the partial Prepayment is made during the

FLORIDA InterestFirst FIXED RATE NOTE--Single Family--Fannie Mae UNIFORM INSTRUMENT

    299.50              Page 1 of 3           Form 3271.10 1/01

period when my payments consist of principal and interest, the amount of my monthly payment will not decrease; however, the principal and the interest required under this Note will be paid prior to the Maturity Date.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of

FLORIDA InterestFirst FIXED RATE NOTE--Single Family--Fannie Mae UNIFORM INSTRUMENT
299.50                          Page 2 of 3                          Form 3271.10 1/01

Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**11. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Michael S Haulsee_ / 11/30/06

- BORROWER - MICHAEL S HAULSEE - DATE -

[Sign Original Only]

FLORIDA InterestFirst FIXED RATE NOTE--Single Family--Fannie Mae UNIFORM INSTRUMENT

299.50                              Page 3 of 3                              Form 3271.10 1/01

PAY TO THE ORDER OF

RESIDENTIAL FUNDING COMPANY, LLC

WITHOUT RECOURSE

This __4__ day of __December__, __2006__

LoanCity
**A CALIFORNIA CORPORATION**

X _____

Erika Hutton
Jr. Underwriter

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Company, LLC

BY _____
Judy Faber, Vice President

Loan# ████████

## ALLONGE TO NOTE

This endorsement is a permanent part of the Note, in the amount of $999,999.00

NOTE DATE:          **11/30/2006**

BORROWER NAME:   **MICHAEL S HAULSEE**

PROPERTY:          **2900 PELHAM ROAD N**
                   **SAINT PETERSBURG, FL 33710**

PAY TO THE ORDER OF:

Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc., Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS4

WITHOUT RECOURSE

**DEUTSCHE BANK TRUST COMPANY AMERICAS, AS TRUSTEE BY ITS ATTORNEY IN FACT OCWEN LOAN SERVICING, LLC**

Signer: Joshua Swinton
Title: Authorized Signer

KEN BURKE, CLERK OF COURT
PINELLAS COUNTY FLORIDA
INST# 2006457100 12/18/2006 at 08:56 AM
OFF REC BK: 15535 PG: 1698-1610
DocType:MTG RECORDING: $112.00

M DOC STAMP: $3500.00 INT TAX: $2000.00

After Recording Return To:
LOANCITY
5671 SANTA TERESA BOULEVARD,
SUITE 100
SAN JOSE, CA 95123
Attn: POST CLOSING DEPT.

This Document Prepared By:
CINDA ROOKER
LOANCITY
600 N. WESTSHORE BLVD. #204
TAMPA, FL 33609
(813) 286-7870

*RFC*

[Space Above This Line For Recording Data]

# MORTGAGE

*scanned*

HAULSEE
Loan #
Parcel                          #:
12-31-15-44874-000-0400
MIN:

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated NOVEMBER 30, 2006, together with all Riders to this document.
**(B) "Borrower"** is MICHAEL S. HAULSEE AND MARCIA S. HAULSEE, HUSBAND AND WIFE. Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D) "Lender"** is LOANCITY , A CALIFORNIA CORPORATION. Lender is a CORPORATION organized and existing under the laws of CALIFORNIA. Lender's address is 5671 SANTA TERESA BOULEVARD, SUITE 100 ,SAN JOSE ,CA 95123.
**(E) "Note"** means the promissory note signed by Borrower and dated NOVEMBER 30, 2006. The Note states that Borrower owes Lender NINE HUNDRED NINETY-NINE THOUSAND NINE HUNDRED NINETY-NINE AND 00/100 Dollars (U.S. $999,999.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JANUARY 1, 2037.
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:
☐ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ Biweekly Payment Rider
☐ 1-4 Family Rider    ☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
317    *(Page 1 of 12 pages)*    Form 3010 1/01

opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the COUNTY (Type of Recording Jurisdiction) of PINELLAS (Name of Recording Jurisdiction):
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF
which currently has the address of 2900 PELHAM ROAD N, SAINT PETERSBURG, Florida 33710 ("Property Address").

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
317                                         *(Page 2 of 12 pages)*                          Form 3010 1/01

covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which

FLORIDA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
317          *(Page 3 of 12 pages)*                              Form 3010 1/01

payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice,

**FLORIDA**-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
    317             *(Page 4 of 12 pages)*                    Form 3010 1/01

which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not

FLORIDA-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**

317                                        *(Page 5 of 12 pages)*                          Form 3010 1/01



Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the

FLORIDA-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
   317                  *(Page 6 of 12 pages)*                       Form 3010 1/01

premises for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of

the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and evaluation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a

**FLORIDA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**.
⬚   317                                      *(Page 8 of 12 pages)*                                    Form 3010 1/01

direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall

**FLORIDA**-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
317                          *(Page 9 of 12 pages)*                          Form 3010 1/01

continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 a the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**FLORIDA**-Single Family-Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**
    317         *(Page 10 of 12 pages)*         Form 3010 1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_Michael S Haulsee_      11/30/06
- BORROWER - MICHAEL S HAULSEE - DATE -

_Marcia S Haulsee_      11/30/06
MARCIA S. HAULSEE - DATE -

Witness  Megan S. Pena

Witness  Jennifer Minafo

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
317                    *(Page 11 of 12 pages)*                    Form 3010 1/01

<div align="center">(Space Below This Line for Acknowledgment)</div>

STATE OF Florida

COUNTY OF Pinellas

The foregoing instrument was acknowledged before me on 11/30/00 , by
Michael S Hauisee & Marda S. Hauisee

who is personally known to me or who has produced _____ as
identification.

MEGAN S. PENA
MY COMMISSION # DD 474078
EXPIRES: September 21, 2009
Bonded Thru Notary Public Underwriters

Notary Public

My Commission Expires:

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
317                    *(Page 12 of 12 pages)*                    Form 3010 1/01

# Exhibit A

**Parcel 1:**

Lot 40, Jungle Shores Subdivision No. 6, according to the Plat thereof, recorded in Plat Book 12, Page 27, of the Public Records of Pinellas County, Florida.

**AND**

**Parcel 2:**

Begin at the Southwest corner of Lot Forty (40) of Jungle Shores No. 6, run thence West into the waters of Boca Ciega Bay, in extension of the South line of Lot Forty (40), 330 feet more or less to the quarter section line of Section 12, Township 31 South, Range 15 East; thence North along the quarter section line to a point of intersection of the South boundary line of Lot Forty-one (41) to said subdivision extended West; thence East along the said South boundary line of Lot Forty-one (41) extended to the intersection of the water of Boca Ciega Bay and the Upland; thence Southeasterly meandering the shore line of Boca Ciega Bay to the Point of Beginning.

Parcel Identification Number: 12/31/15/44874/000/0400

File Number ▮▮▮▮▮

DoubleTime®

# EXHIBIT 18

CLKPR06
Case Number:15-002225-CI

Filing # 25729865 E-Filed 04/06/2015 02:32:48 PM

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

DEUTSCHE BANK TRUST COMPANY AMERICAS,
AS TRUSTEE FOR RESIDENTIAL ACCREDIT LOANS,
INC., MORTGAGE ASSET-BACKED PASS-THROUGH
CERTIFICATES, SERIES 2007-QS4,

        Plaintiff(s),

vs.

                                         CASE NO.

MICHAEL S. HAULSEE A/K/A MICHAEL HAULSEE;
MARCIA S. HAULSEE;  CITIBANK, N.A.,           DIVISION
SUCCESSOR BY MERGER TO CITIBANK, FEDERAL
SAVINGS BANK; UNKNOWN TENANT 1; UNKNOWN
TENANT 2; UNKNOWN TENANT 3; UNKNOWN
TENANT 4;

               Defendant(s).

_____/

### NOTICE OF LIS PENDENS

    NOTICE IS HEREBY GIVEN that a suit has been instituted in the above Court by the above named Plaintiff(s) and against the above-named Defendant(s) seeking to foreclose a mortgage on the following real property in the County indicated in the description:

PARCEL 1:

LOT 40, JUNGLE SHORES SUBDIVISION NO. 6, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 12, PAGE 27, OF THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA.

AND

PARCEL 2:

BEGIN AT THE SOUTHWEST CORNER OF LOT FORTY (40) OF JUNGLE SHORES NO. 6, RUN THENCE WEST INTO THE WATERS OF BOCA CIEGA BAY, IN EXTENSION OF THE SOUTH LINE OF LOT FORTY (40), 330 FEET MORE OR LESS TO THE QUARTER SECTION LINE OF SECTION 12, TOWNSHIP 31 SOUTH, RANGE 15 EAST; THENCE NORTH ALONG THE QUARTER SECTION LINE TO A POINT OF INTERSECTION OF THE SOUTH BOUNDARY LINE OF LOT FORTY-ONE (41) TO SAID SUBDIVISION EXTENDED WEST; THENCE EAST ALONG THE SAID SOUTH BOUNDARY LINE OF LOT FORTY-ONE (41) EXTENDED TO THE INTERSECTION OF THE WATER OF BOCA CIEGA BAY AND THE UPLAND; THENCE SOUTHEASTERLY MEANDERING THE SHORE LINE OF BOCA CIEGA BAY TO THE POINT OF BEGINNING.

Dated this ___1___ day of _April_, 2015.

                                       **Aldridge Connors, LLP**
                                       Attorney for Plaintiff(s)
                                       1615 South Congress Avenue
                                       Suite 200
                                       Delray Beach, FL 33445
                                       Phone: 561.392.6391 Fax: 561.392.6965

                                       BY: _____
                                       Fla. Bar#

                                             Tara Notoshka Casalino
                                             Bar#722901

# EXHIBIT 19



IN THE CIRCUIT COURT FOR THE
SIXTH JUDICIAL CIRCUIT IN AND FOR
PINELLAS COUNTY, FLORIDA
CIVIL DIVISION

CASE NO.: 15-002225-CI
REF #:

DEUTSCHE  BANK  TRUST  COMPANY
AMERICAS,  AS  TRUSTEE  FOR
RESIDENTIAL  ACCREDIT  LOANS,  INC.,
MORTGAGE  ASSET-BACKED  PASS-
THROUGH  CERTIFICATES,  SERIES  2007-
QS4,

Plaintiff,

V.

MICHAEL S. HAULSEE A/K/A MICHAEL
HAULSEE;  MARCIA  S.  HAULSEE;
CITIBANK, N.A., SUCCESSOR BY MERGER
TO CITIBANK, FEDERAL SAVINGS BANK,

Defendant(s).

_____/

### UNIFORM FINAL JUDGMENT OF FORECLOSURE

**THIS MATTER** was heard before the Court on the Trial of Plaintiff, DEUTSCHE BANK
TRUST COMPANY AMERICAS, AS TRUSTEE FOR RESIDENTIAL ACCREDIT LOANS,
INC., MORTGAGE ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-
QS4, on October 5, 2018. After consideration of all evidence presented, this Court rules as follows:

**IT IS ADJUDGED** that:

1.   Plaintiff has submitted a Certificate of Compliance with Foreclosure Procedures in
compliance with Administrative Order 2015-043 or any subsequent Administrative Order.

2.   VALUE OF CLAIM: At the initiation of this action, in accordance with section
28.241(1)(a)2.b., Florida Statutes, Plaintiff estimated the amount in controversy of the claim
to be **$999,999.00.** In accordance with section 28.241(1)(a)2.c., Florida Statutes, the Court
identifies the actual value of the claim to be **$1,667,704.07,** as set forth below. For any
difference between the estimated amount in controversy and the actual value of the claim

that requires the filing fee to be adjusted, the Clerk shall adjust the filing fee. In determining whether the filing fee needs to be adjusted, the following graduated filing fee scale in section 28.241(1)(a)2.d., Florida Statutes, controls:

3.

| $400 | Value of claim less than or equal to $50,000 with 5 defendants or less |
|---|---|
| $905 | Value of claim greater than $50,000 but less than $250,000 with 5 defendants or less |
| $1,905 | Value of claim $250,000 or greater with 5 defendants or less |

If an excess filing fee was paid, the Clerk shall provide a refund of the excess fee. If an additional filing fee is owed, the Plaintiff shall pay the additional fee at least 24 hours prior to the judicial sale. If any additional filing fee owed is not paid prior to the judicial sale, the Clerk shall cancel the judicial sale without further order of the Court.

3.     The following amounts are due and owed to the Plaintiff:

| | |
|---|---|
| Principal due on the note secured by the mortgage foreclosed: | $999,999.00 |
| Interest on the note and mortgage from 6/01/2013 to 10/05/2018 | $367,419.66 |
| Late charges | $2,291.66 |
| Taxes | $67,637.58 |
| Insurance | $247,518.89 |
| Title Report | $400.00 |
| Property Inspections | $589.00 |
| Property Preservations | $835.00 |
| BPO/Valuations | $527.00 |
| Court Costs:<br>    Additional Lis Pendens - Over 4 Defendants - $3.00<br>    Complaint Filing - $1,905.00<br>    Florida E-Filing Service Fee - $3.00<br>    Lis Pendens - $5.00<br>    Complaint – Additional Cost per Defendant - $7.50<br>    Complaint - Issue Summons - $50.00<br>    Service of Process - $382.00<br>    First Class Mail - $8.88 | $2,364.38 |
| **SUBTOTAL** | $1,689,582.17 |
| Attorney's Fees Total:<br>    Trial Attorney's fees (10 hr/$215.00) - $2,150.00<br>    Additional Attorney's fees - $5,897.50<br>    Foreclosure Attorney's fees – 2,800.00 | $10,847.50 |
| **LESS:** Escrow Balance | ($32,725.60) |
| **TOTAL SUM** | $1,667,704.07 |

4.     The total sum in paragraph 3 will bear interest at the prevailing statutory interest rate of 6.09 percent per year from this date through December 31 of this current year. Thereafter, on January 1 of each succeeding year until the judgment is paid, the interest rate will adjust annually in accordance with section 55.03(3), Florida Statutes.

5.     Plaintiff, whose address is Attention: Vault Department, 5720 Premier Park Drive, West Palm Beach, FL- 33407, holds a lien for the total sum specified in paragraph 3 herein. The lien of the Plaintiff is superior in dignity to all rights, titles, interests, or claims of the Defendant(s) MICHAEL S. HAULSEE A/K/A MICHAEL HAULSEE; MARCIA S. HAULSEE; CITIBANK, N.A., SUCCESSOR BY MERGER TO CITIBANK, FEDERAL SAVINGS BANK and all persons, corporations, or other entities claiming by, through, or under the Defendant(s), or any of them and the property will be sold free and clear of all claims of the Defendant(s), with the exception of any assessments that are superior pursuant to sections 718.116 and 720.3085, Florida Statutes. The Plaintiff lien encumbers the subject property located in Pinellas County, Florida, and described as:

**PARCEL 1:**

**LOT 40, JUNGLE SHORES SUBDIVISION NO. 6, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 12, PAGE 27, OF THE PUBLIC RECORDS OF PINELLAS COUNTY, FLORIDA.**

**PARCEL 2:**

**BEGIN AT THE SOUTHWEST CORNER OF LOT FORTY (40) OF JUNGLE SHORES NO. 6, RUN THENCE WEST INTO THE WATERS OF BOCA CIEGA BAY, IN EXTENSION OF THE SOUTH LINE OF LOT FORTY (40), 330 FEET MORE OR LESS TO THE QUARTER SECTION LINE OF SECTION 12, TOWNSHIP 31 SOUTH, RANGE 15 EAST; THENCE NORTH ALONG THE QUARTER SECTION LINE TO A POINT OF INTERSECTION OF THE SOUTH BOUNDARY LINE OF LOT FORTY-ONE (41) TO SAID SUBDIVISION EXTENDED WEST; THENCE EAST ALONG THE SAID SOUTH BOUNDARY LINE OF LOT FORTY-ONE (41) EXTENDED TO THE INTERSECTION OF THE WATER OF BOCA CIEGA BAY AND THE UPLAND; THENCE SOUTHEASTERLY MEANDERING THE SHORE LINE OF BOCA CIEGA BAY TO THE POINT OF BEGINNING.**

Property Address: 2900 PELHAM ROAD NORTH, SAINT PETERSBURG, FL 33710.

6. If the total sum with interest at the rate described in paragraph 4 and all costs accrued subsequent to this judgment are not paid, the Clerk of Circuit Court shall sell the subject property at public sale on __/6 Jan 2019__ _(date)_ to the highest bidder for cash, except as prescribed in Paragraph 7, in the following location *(mark applicable location)*:

☑ In an online sale at www.pinellas .realforeclose.com, beginning at 10 a.m. on the prescribed date (mark this box for all sales in Pinellas County)

☐ In an online sale at www.pasco.realforeclose.com, beginning at 11 a.m. on the prescribed date (mark this box for all sales in Pasco County)

after having first given notice as required by section 45.031, Florida Statutes. Plaintiff must arrange for publication of notice of sale in accordance with chapters 45 and 702, Florida Statutes. The Plaintiff must file the original Notice of Sale and Affidavit of Proof of Publication with the Clerk no later than 24 hours prior to the sale.

The sale date set by the judgment can only be canceled and rescheduled by court order. Any motion or request to cancel this sale must be served on all parties in conformity with Florida Rule of Civil Procedure 1.080(a) and must be set for hearing with proper notice. Claiming this matter is an "emergency" does not avoid this requirement. A violation of any party's due process rights will subject the movant and/or counsel to sanctions. *See Jade Winds v. Citibank,* 63 So. 3d 819 (3d DCA 2011).

If a Plaintiff wishes to cancel a sale, a written motion must be filed with the Court in substantial compliance with Florida Rules of Civil Procedure Form 1.996(c). The motion also must state the number of times the Plaintiff has previously requested the cancelation of a sale and must include an affidavit with supporting grounds for the motion. Any proposed order prepared to cancel the sale must also include a date to reschedule the sale.

7.    Plaintiff shall advance all subsequent required costs of this action. Except for the fee to the Clerk as provided in section 45.035, Florida Statutes, and publishing costs supported by an affidavit, reimbursement or credit for such costs shall be by court order based upon a written motion and adjudication at a hearing with notice. If a third party bidder is the purchaser, the third party bidder must pay the documentary stamps attached to the certificate of title in addition to the bid.

8.    If the Plaintiff incurs additional expenses subsequent to the entry of this final judgment but prior to the sale date specified in paragraph 6, Plaintiff may, by written motion served on all parties and adjudication at a hearing with notice, seek to amend this final judgment to include said additional expenses.

9.    Only the judgment owner will be allowed to credit bid. An assignment of the final judgment of foreclosure filed with the Clerk of the Circuit Court prior to the public sale will effectively transfer with it the right to credit bid at the sale. Court approval of the assignment of the final judgment is not required.

The filing of a Certificate of Sale by the Clerk gives certain property rights to the highest bidder. In order to assign those rights and have the Certificate of Title issued to a third party, the highest bidder must file a written conveyance made in accordance with section 689.01 or section 692.01, Florida Statutes, governing real estate transfers. Such conveyance must be filed with the Clerk prior to the issuance of the Certificate of Title. Neither the Court nor the Clerk will change a Certificate of Title based upon a conveyance filed after the Certificate of Title has been issued.

10.     On the filing of the Certificate of Title, the Clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of the Plaintiff's costs; second, documentary stamps affixed to the Certificate, unless the property is purchased by a third party bidder; third, Plaintiff's attorneys' fees; fourth, the total sum due to the Plaintiff, less the items paid, plus interest at the rate prescribed in paragraph 4 from this date to the date of the sale; and by retaining any remaining amount pending further Order of this Court.

11.     On filing of the Certificate of Sale, Defendant(s) and all persons claiming under or against Defendant(s) since the filing of the Notice of Lis Pendens shall be foreclosed of all estate or claim in the property except as to claims or rights under chapter 718 or chapter 720, Florida Statutes, if any. On filing of the Certificate of Sale, Defendant's right of redemption as provided by section 45.0315, Florida Statutes shall be terminated.

12.     The Court finds, based upon the affidavits presented and upon inquiry of counsel for the Plaintiff, that 20.90 hours at an hourly rate of $175.00, 18.50 hours at an hourly rate of $215.00 and 0.50 hours at an hourly rate of $125.00, were reasonably expended by Plaintiff's counsel and that it is appropriate. PLAINTIFF'S COUNSEL CERTIFIES THAT THE ATTORNEY FEE AWARDED DOES NOT EXCEED ITS CONTRACT FEE WITH PLAINTIFF. The Court finds that there are no reduction or enhancement factors for consideration by the Court pursuant to *Florida Patient's Compensation v. Rowe*, 427 So. 2d 1145 (Fla. 1985).

*And Flat Fees:*

The Court finds, based upon the affidavits presented and upon inquiry of counsel for the Plaintiff, that the flat fee of $3,150.00 is reasonable and appropriate for the Plaintiff's counsel's attorney's fees. The Court finds that there are no reasons for either reduction or enhancement pursuant to *Florida Patient's Compensation Funds v. Rowe*, 472 So. 2d 1145 (Fla. 1985), and the Court therefore has awarded reasonable attorney's fees in the amount indicated in paragraph 3 of this Judgment.

13. IMPORTANT INFORMATION PROVIDED pursuant to section 45.031, Florida Statutes:

IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THIS FINAL JUDGMENT.

IF YOU ARE A SUBORDINATE LIEN HOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN 60 DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.

IF YOU ARE THE PROPERTY OWNER, YOU MAY CLAIM THESE FUNDS YOURSELF. YOU ARE NOT REQUIRED TO HAVE A LAWYER OR ANY OTHER REPRESENTATION AND YOU DO NOT HAVE TO ASSIGN YOUR RIGHTS TO ANYONE ELSE IN ORDER FOR YOU TO CLAIM ANY MONEY TO WHICH YOU ARE ENTITLED.

PLEASE CHECK WITH EITHER THE PINELLAS CLERK OF CIRCUIT COURT AT 315 COURT STREET, CLEARWATER, FL 33756, (727) 464-7000, OR THE PASCO CLERK OF CIRCUIT COURT AT 38053 LIVE OAK AVENUE, DADE CITY, FL 33523, (352) 521-4517 OR 7530 LITTLE ROAD, NEW PORT RICHEY, FL 34654, (727) 847-8176 WITHIN TEN (10) DAYS AFTER THE SALE TO SEE IF THERE IS ADDITIONAL MONEY FROM THE FORECLOSURE SALE THAT THE CLERK HAS IN THE REGISTRY OF THE COURT.

IF YOU DECIDE TO SELL YOUR HOME OR HIRE SOMEONE TO HELP YOU CLAIM THE ADDITIONAL MONEY, YOU SHOULD READ VERY CAREFULLY ALL PAPERS YOU ARE REQUIRED TO SIGN, ASK SOMEONE ELSE, PREFERABLY AN ATTORNEY WHO IS NOT RELATED TO THE PERSON OFFERING TO HELP YOU, TO MAKE SURE THAT YOU UNDERSTAND WHAT YOU ARE SIGNING AND THAT YOU ARE NOT TRANSFERRING YOUR PROPERTY OR THE EQUITY IN YOUR PROPERTY WITHOUT THE PROPER INFORMATION.

IF YOU CANNOT AFFORD TO PAY AN ATTORNEY, YOU MAY CONTACT A LEGAL SERVICES OFFICE, SUCH AS: GULFCOAST LEGAL SERVICES, INC., 314 S. MISSOURI AVE., SUITE 109, CLEARWATER, FL 33756, (727) 443-0657 / COMMUNITY LAW PROGRAM, 501 FIRST AVE N., ROOM 519, ST. PETERSBURG, FL 33701, (727) 582-7480 / BAY AREA LEGAL SERVICE, INC., 4948 CENTRAL AVE., ST. PETERSBURG, FL 33707, (800) 625-2257 / BAY AREA LEGAL SERVICE, INC., 37718 MERIDIAN AVENUE, DADE CITY, FL 33532 (800) 625-2257 / BAY AREA LEGAL SERVICE, INC., 8406 MASSACHUSETTS AVE, STE B-2, NEW PORT RICHEY, FL 34653, (800) 625-2257 TO SEE IF YOU QUALIFY FINANCIALLY FOR THEIR SERVICES. IF THEY CANNOT ASSIST YOU, THEY MAY BE ABLE TO REFER YOU TO A LOCAL BAR REFERRAL AGENCY OR SUGGEST ANOTHER OPTION. IF YOU CHOOSE TO CONTACT ONE OF THESE SERVICES FOR ASSISTANCE, YOU SHOULD DO SO AS SOON AS POSSIBLE AFTER RECEIPT OF THIS NOTICE.

14.    Upon issuance of the Certificate of Title the new owner/titleholder shall be let into possession of the property. Because of the provisions of section 83.561, Florida Statutes, the Clerk shall decline issuance of a Writ of Possession without a Court order. By using the procedures and forms found in Administrative Order 2015-043 the new owner/titleholder may obtain such an order.

15.    If the tenant fails to vacate the premises in accordance with the Notice of Termination, the titleholder may apply to the Court for a writ of possession by filing and serving an application in the form of a sworn affidavit pursuant to section 83.561(2), Florida Statutes.

16.    Alternatively, if the titleholder takes title to a residential property occupied by a tenant meeting an exception in section 83.561(3), Florida Statutes, the titleholder may immediately apply to the Court for a writ of possession by filing and serving a sworn affidavit demonstrating the tenant meets one of the exceptions listed in the statute.

17.    Upon review of an application for writ of possession under section 83.561(2) or section 83.561(3), Florida Statutes, the Court may enter an order directing the Clerk to issue a writ of possession pursuant to section 83.62, Florida Statutes.

18.     The Court retains jurisdiction of this action to enter further Orders that are proper, including without limitation, Orders authorizing writs of possession and an award of attorney's fees, and to enter a deficiency judgment if the Defendant has not been discharged in bankruptcy.

19.     **Jurisdiction of this action is retained to enter further orders that are proper including, without limitation, orders relating to supplemental proceedings to address any omitted parties who may possess an interest in the property. Jurisdiction of this action is further retained to allow Plaintiff to file post-judgment motions seeking a determination on the amounts of assessments due to any Associations under sections 718.116 and 720.3085, Florida Statutes.**

**DONE AND ORDERED** in Pinellas County, Florida, on this 5th day of October, 2018.

_____
CIRCUIT JUDGE

**Copies Furnished to:**
**ALDRIDGE | PITE, LLP**
Attorney for Plaintiff
1615 South Congress Avenue
Suite 200
Delray Beach, FL 33445
Primary E-Mail: ServiceMail@aldridgepite.com

Richard J. Mockler, Esq.
**STAY IN MY HOME, P.A.**
*Attorney for Defendants, Michael S. Haulsee A/K/A Michael Haulsee and Marcia S. Haulsee*
Post Office Box 1371
St. Petersburg, FL 33731
Email: serviceonly@stayinmyhome.com

Michael S. Haulsee A/K/A Michael Haulsee
2900 Pelham Road, North
St. Petersburg, FL 33710
Email: limaroma@tampabay.rr.com

Marcia S. Haulsee
2900 Pelham Road, North
St. Petersburg, FL 33710
Email: limaroma@tampabay.rr.com

Citibank, N.A., Successor by Merger to Citibank, Federal Savings Bank
1000 Technology Drive
O'Fallon, MO 63368

# EXHIBIT 20

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

MARCIA S. HAULSEE and           )
MICHAEL S. HAULSEE,             )
                                )
          Appellants,           )
                                )
v.                              )          Case No. 2D19-137
                                )
DEUTSCHE BANK TRUST             )
COMPANY AMERICAS,               )
as Trustee for RESIDENTIAL      )
ACCREDIT LOANS, INC.,           )
MORTGAGE ASSET-BACKED           )
PASS-THROUGH                    )
CERTIFICATES, SERIES            )
2007-Q34,                       )
                                )
          Appellee.             )
_____ )

Opinion filed August 14, 2020.

Appeal from the Circuit Court for
Pinellas County; Jack R. St. Arnold,
Judge.

Robert E. Biasotti of Biasotti Law
Saint Petersburg, for Appellant.

Kimberly S. Mello and Vitaliy
Kats of Greenberg Traurig, P.A.
Orlando and Tampa, for Appellee.


PER CURIAM.

Affirmed.

SILBERMAN, SLEET, and ATKINSON, JJ., Concur.

# EXHIBIT 21

# M A N D A T E

### from

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

## SECOND DISTRICT

THIS CAUSE HAVING BEEN BROUGHT TO THIS COURT BY APPEAL, AND AFTER DUE CONSIDERATION THE COURT HAVING ISSUED ITS OPINION;

YOU ARE HEREBY COMMANDED THAT SUCH FURTHER PROCEEDINGS BE HAD IN SAID CAUSE, IF REQUIRED, IN ACCORDANCE WITH THE OPINION OF THIS COURT ATTACHED HERETO AND INCORPORATED AS PART OF THIS ORDER, AND WITH THE RULES OF PROCEDURE AND LAWS OF THE STATE OF FLORIDA.

WITNESS THE HONORABLE NELLY N. KHOUZAM CHIEF JUDGE OF THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA, SECOND DISTRICT, AND THE SEAL OF THE SAID COURT AT LAKELAND, FLORIDA ON THIS DAY.

DATE:  September 01, 2020

SECOND DCA CASE NO.  19-0137

COUNTY OF ORIGIN:   Pinellas

LOWER TRIBUNAL CASE NO.  2015-CA-2225

CASE STYLE:   MARCIA S. HAULSEE AND         v.   DEUTSCHE BANK TRUST
                    MICHAEL S. HAULSEE                  COMPANY AMERICAS, AS
                                         TRUSTEE, ET AL.



Mary Elizabeth Kuenzel
**Mary Elizabeth Kuenzel**
**Clerk**

**cc:** (without attached opinion)
ARDA GOKER, ESQ.                              JONATHAN I. JACOBSON, ESQ.
KIMBERLY S. MELLO, ESQ.                  LEE SEGAL, ESQ.
ROBERT E. BIASOTTI, ESQ.                  VITALIY KATS, ESQ.

mep

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

MARCIA S. HAULSEE and  )
MICHAEL S. HAULSEE,     )
                        )
        Appellants,      )
                        )
v.                      )        Case No. 2D19-137
                        )
DEUTSCHE BANK TRUST      )
COMPANY AMERICAS,        )
as Trustee for RESIDENTIAL )
ACCREDIT LOANS, INC.,    )
MORTGAGE ASSET-BACKED    )
PASS-THROUGH             )
CERTIFICATES, SERIES     )
2007-Q34,                )
                        )
        Appellee.        )
_____ )

Opinion filed August 14, 2020.

Appeal from the Circuit Court for
Pinellas County; Jack R. St. Arnold,
Judge.

Robert E. Biasotti of Biasotti Law
Saint Petersburg, for Appellant.

Kimberly S. Mello and Vitaliy
Kats of Greenberg Traurig, P.A.
Orlando and Tampa, for Appellee.


PER CURIAM.

Affirmed.

SILBERMAN, SLEET, and ATKINSON, JJ., Concur.

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and MARCIA HAULSEE,

        Plaintiffs,

                                      Case No. 20-CA-1663

    v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

        Defendant.

_____/

## **MOTION TO WITHDRAW**
## **WITH INCORPORATED SIGNED CLIENT CONSENT**

      CARLA TURNER-HAHN shows that she is attorney for Plaintiffs, MICHAEL HAULSEE
and MARCIA HAULSEE in this action.  Pursuant to Rule 2.505(f)(1), Florida Rules of Judicial
Administration, CARLA TURNER-HAHN moves this Honorable Court for entry of an *ex parte*
Order allowing her to withdraw as counsel for Plaintiffs, and as grounds therefore would state:

      1.     Under Rule 4-1.16(b)(1) of the Rules Regulating the Florida Bar, a lawyer
may withdraw from representation of a client if it will not have a material adverse effect on the
interests of the client.

      2.     Under Rule 4-1.16(b)(5) of the Rules Regulating the Florida Bar, a lawyer
may withdraw from representation of a client if other good cause for withdrawal exists.

      3.     In the case at bar, the withdrawal of the undersigned can be accomplished without
any material adverse effect on the interests of Plaintiffs because Plaintiffs have retained substitute
legal counsel who has already or will imminently be filing his Notice of Appearance.

4.     Plaintiffs not only have been given notice of the undersigned attorney's intention to withdraw informally and in writing on or before the date of this motion, but have also signed the Client Consent, which is attached hereto and incorporated herein by reference, demonstrating their consent to the withdrawal of the undersigned.

5.     In accordance with Rule 2.505(f)(1), Florida Rules of Judicial Administration, the last known address, telephone number with area code and email address of Plaintiffs are, respectively, 2900 Pelham Road North, St. Petersburg, FL 33710, 727-224-9696, mhaulsee@tcspharma.com.

WHEREFORE the undersigned respectfully requests that his Honorable Court enter Order, *ex parte*, discharging her of any further obligation in this matter.

Respectfully Submitted,

*/s/ Carla Turner-Hahn, Esquire*
Carla Turner-Hahn, Esquire
Carla Turner-Hahn, P.A.
Attorney for Plaintiff
615 Whisper Woods Drive
Lakeland, Florida 33813
Ph: 727-433-1624
FBN: 0390658
Email: carlathahn@gmail.com

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and MARCIA HAULSEE,

        Plaintiffs,

                                           Case No. 20-CA-1663

    v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

        Defendant.

_____/

## CLIENT CONSENT FOR WITHDRAWAL

I hereby consent to the withdrawal of Carla Turner Hahn, Esq. from the above captioned matter.

_____       _____
Michael Haulsee                               Marcia Haulsee

Dated January 6, 2021                    Dated January 6, 2021

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 6, 2021, a true and correct copy of the foregoing was filed with the Clerk of the Court using the State of Florida E-filing system, which will send a notice of electronic service to:

Beth Norrow, Esq.
Florida Bar No. 061497
norrowb@gtlaw.com
Greenberg Taurig, P.A.
450 S. Orange Ave., Ste 650
Orlando, FL 32801

I also HEREBY CERTIFY that on January 6, 2021, a true and correct copy of the foregoing was provided to the following via electronic service and via regular mail:

Michael & Marcia Haulsee
2900 Pelham Road North
St. Petersburg, FL 33710
mhaulsee@tcspharma.com

*/s/ Carla TurnerHahn, Esquire*
Carla Turner-Hahn, Esquire
Carla Turner-Hahn, P.A.

Case 8:21-cv-00349-SDM-JSS   Document 1-2   Filed 01/12/21   Page 389 of 428 PageID 400

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

     Plaintiffs,

                                        Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

## NOTICE OF APPEARANCE

Matthew D. Wolf, Esquire and the law firm of Ivanov & Wolf, PLLC hereby make an appearance as counsel for Plaintiffs, MICHALE HAULSEE and MARCHIA HAULSEE, and request that copies of all pleadings, notices, and correspondence be served upon them at the address listed below.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via regular the EPortal to Beth Norrow, Esquire and Carla Turner Hahn, Esquire on this 7th day of January, 2021.

IVANOV & WOLF, PLLC
Attorney for Defendant
3310 W. Cypress St, Suite 206
Tampa, FL 33607
Telephone: 813-870-6396
Matt@IWFirm.com

By:   /s/ Matthew D. Wolf         
    MATTHEW D. WOLF, FBN: 92611

1

Case 8:21-cv-00349-SDM-JSS   Document 1-3   Filed 01/12/21   Page 390 of 428 PageID 401

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

     Plaintiffs,

                                         Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

### NOTICE OF SERVICE OF
### PLAINTIFF'S FIRST SET OF INTERROGATORIES

Please take notice of the service of the First Set of Interrogatories served by Plaintiffs,

MICHAEL HAULSEE and MARCIA HAULSEE, upon Defendant, Deutsche Bank National

Trust Company, as Trustee, to be answered in writing and under oath pursuant to Fla.R.Civ.P.

1.340.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

via the EPortal to Beth Norrow, Esquire on this 7th day of January, 2021.


IVANOV & WOLF, PLLC
Attorney for Defendant
3310 W. Cypress St, Suite 206
Tampa, FL 33607
Telephone: 813-870-6396
Matt@IWFirm.com


By: __/s/ Matthew D. Wolf_____
MATTHEW D. WOLF, FBN: 92611

1

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

     Plaintiffs,

                                                 Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

     Defendant.

_____/

## PLAINTIFF'S FIRST SET OF INTERROGATORIES

<u>Interrogatory no. 1:</u>    Please identify all persons who contributed to the answers to these interrogatories.  For each such person, please provide his/her name, employer, job title, and his/her relationship with Defendant.

    <u>Answer:</u>


<u>Interrogatory no. 2:</u>  Please identify the name of the person that retained Beth Norrow, Esq. as counsel in this proceeding.  In your answer, please include that person's job title and the name of the company with whom that person is employed.  (Instruction:  Plaintiff is not asking for the substance of any communications between this person and counsel, merely the person's name, job title, and the name of the company with whom he/she is employed.)

    <u>Answer:</u>


<u>Interrogatory no. 3:</u>    Please identify the date and time in which Beth Norrow, Esquire was retained as counsel in this proceeding.  (Instruction:  Plaintiff is not asking for the substance of any communications between this person and counsel, merely the date and time in which counsel was retained.)

    <u>Answer:</u>


<u>Interrogatory no. 4:</u>    Please describe in detail the manner in which Defendant first became aware of the existence of this lawsuit.

<u>Answer:</u>

<u>Interrogatory no. 5:</u>    Please identify all witnesses with knowledge of the facts set forth in the Motion to Vacate filed in this action.  For each such witness, please identify his/her name, address, job title, job description, and the facts about which he/she has knowledge.

<u>Answer:</u>

<u>Interrogatory no. 6:</u>   Please identify all documents that support or pertain to the allegations in the Motion to Vacate filed in this action.

<u>Answer:</u>

<u>Interrogatory no. 7:</u>   Please identify all documents that you intend to introduce into evidence at the hearing on the Motion to Vacate in this action.

<u>Answer:</u>

<u>Interrogatory no. 8:</u>    Do you allege that a servicer/subservicer has been authorized to act as an agent for Defendant at any point in the instant case?  If so, please describe the source of that authority, including the identity (name, job title, job position) of all persons who provided it and the identity of all servicers/subservicers which received it.  If that authority was conveyed by a document, *e.g.* a power of attorney, please attach those documents to your answer to this interrogatory or identify them with sufficient specificity that they can be identified in a request for production.

<u>Answer:</u>

<u>Interrogatory no. 9:</u>  Do you allege that a servicer/subservicer was authorized to act as an agent for Deutsche Bank Trust Company Americas at any point in Pinellas County Case No. 15-2225-CI?  If so, please describe the source of that authority, including the identity (name, job title, job position) of all persons who provided it and the identity of all servicers/subservicers which received it.  If that authority was conveyed by a document, *e.g.* a power of attorney, please attach

3

those documents to your answer to this interrogatory or identify them with sufficient specificity that they can be identified in a request for production.

    <u>Answer:</u>



_____
Deutsche Bank National Trust Company,
As Trustee
By: _____ (Print Name)
Its: _____ (Print Title)


    Before me, the undersigned authority, personally appeared _____, as _____ of _____, who is personally known to me and who produced _____ as identification, and who, having been duly sworn, deposes and says the foregoing facts are true and correct.

                                           _____
                                         Notary

Case 8:21-cv-00349-SDM-JSS   Document 1-3   Filed 01/12/21   Page 394 of 428 PageID 405

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

      Plaintiffs,

Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

      Defendant.

_____/

### **PLAINTIFFS' FIRST REQUEST FOR PRODUCTION**

Plaintiffs, MICHAEL HAULSEE and MARCIA HAULSEE, by and through their undersigned counsel and pursuant to Fla.R.Civ.P. 1.350, hereby request that Defendant produce the following documents:

1. All documents identified in your answers to Plaintiff's First Set of Interrogatories.

2. All powers of attorney that purport to authorize any servicer or subservicer to take actions on behalf of Defendant (or in the name of Defendant) in this case.

3. All powers of attorney that purported to authorize any servicer or subservicer to take any actions on behalf of Deutsche Bank Trust Company Americas in Pinellas Case No. 15-2225-CI

4. The retainer agreement between Defendant and its counsel in this action.

5. Documents reflecting payment towards counsel's retainer in this action.

6. All documents reviewed in the process of drafting the Motion to Vacate in this action.

7.      All documents reviewed in the process of drafting the Affidavit in support of the Motion to Vacate in this action.

8.      All documents referenced in the Affidavit in support of the Motion to Vacate in this action.

9.      All correspondence, including letters and emails, exchanged between Deutsche Bank National Trust Company, either individually or as trustee of a trust, and CT Corporation within the past two years.

10.      All correspondence, including letters and emails, exchanged between Deutsche Bank Trust Company Americas, either individually or as trustee of a trust, and CT Corporation within the past two years.

11.      All correspondence, including letters and emails, between any servicer for Deutsche Bank National Trust Company, either individually or as Trustee of a trust, and CT Corporation within the past two years.

12.      All correspondence, including letters and emails, between any service for Deutsche Bank Trust Company Americas, either individually or as Trustee of a trust, and CT Corporation within the past two years.

13.      All documents that you intend to introduce into evidence at the hearing on the Motion to Vacate.

14.      All limited powers of attorney between PHH Mortgage Corp. and Deutsche Bank National Trust Company that purport to give PHH power to act in any lawsuits in Florida in the past five years.

15.     All limited powers of attorney between PHH Mortgage Corp. and Deutsche Bank

Trust Company Americas that purport to give PHH power to act in any lawsuits in Florida in the

past five years.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished

via EPortal to Beth Norrow, Esquire on this 7th day of January, 2021.

IVANOV & WOLF, PLLC
Attorney for Defendant
3310 W. Cypress St, Suite 206
Tampa, FL 33607
Telephone: 813-870-6396
Matt@IWFirm.com

By:   /s/ Matthew D. Wolf                         
        MATTHEW D. WOLF, FBN: 92611

Case 8:21-cv-00349-SDM-JSS Document 1-2 Filed 01/12/21 Page 397 of 428 PageID 408

## DECLARATION OF RONALDO REYES

I, Ronaldo Reyes, being of sound mind and of my own volition, hereby attest to the following facts:

1.　I am over the age of eighteen and am competent to give the following Declaration.

2.　I am a Vice President of Deutsche Bank National Trust Company ("DBNTC"), where I have been employed since 1998. I have personal knowledge of the facts set forth herein.

3.　I am aware that DBNTC is the plaintiff in mortgage foreclosure lawsuits in Florida, not in its individual capacity, but as trustee for various residential mortgage-backed securitization ("RMBS") trusts comprised of pooled mortgage loans. These lawsuits have not been filed at the specific direction of DBNTC, but by the various servicers who make loan-level decisions regarding the loans in question in accordance with the rights and obligations conferred upon them under the relevant trust governing agreements.

4.　Generally, servicers, not the trustee, manage all aspects of loan servicing, including foreclosures, and the decisions to file foreclosure lawsuits, the allegations made in them, whether to settle, the type/terms of any settlement (be it loan modification, short payoff, short sale, or other alternatives to foreclosure), and which attorneys to retain to

1

represent the trustee, are made by the servicers, not the trustee.  DBNTC as trustee typically does not control the servicer's decisions on these issues; the servicer makes these decisions without direction from DBNTC.

5.      As trustee, DBNTC does not personally retain the proceeds from any settlement and or judgment obtained by the servicer's attorney. Money received by the servicer passes through a payment waterfall and, net of trust and servicing expenses, is distributed to certificateholders of the trust.

6.      As a Vice President of DBNTC, upon request from servicers and in accordance with trust governing agreements, I sign limited powers of attorney on behalf of DBNTC in its capacity as trustee. I understand that these limited powers of attorney may aid the servicer in performing its duties set forth in the applicable trust governing agreements, such as trusts' pooling and servicing agreements.

I hereby certify under penalty of perjury that I have read the foregoing, and the facts set forth herein are true and correct.

Ronaldo Reyes,
Vice President, Deutsche Bank National
Trust Company

2

Case 8:21-cv-00349-SDM-JSS   Document 1-3   Filed 01/12/21   Page 399 of 428 PageID 410

IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT,
IN AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

       Plaintiffs,

                                                 Case No. 20-CA-1663

v.

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee,

       Defendant.

_____/

## MOTION TO DISQUALIFY COUNSEL
## AND FOR SANCTIONS FOR FRAUD ON THE COURT

Plaintiffs, MICHAEL HAULSEE and MARCIA HAULSEE, by and through their undersigned counsel, move this Court for entry of an Order disqualifying Beth Norrow, Esq. and any other attorneys with Greenberg Traurig, P.A. (collectively "Counsel") from proceeding as Counsel for Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY, ("Deutsche" or "Defendant"), and would show:

### BACKGROUND, OVERVIEW

1.      The instant motion is unique, but it is justified by a compilation of facts that is equal parts bizarre and disturbing.

2.      Counsel has filed a Notice of Appearance in this action, purporting to act as counsel of record for Deutsche.  Yet Counsel has no attorney-client relationship with Deutsche.

3.      Despite being personally served with the Summons and Complaint, Deutsche did not retain Counsel in this action.  In fact, Counsel filed its Notice of Appearance without Deutsche's knowledge or consent.

4.      That bears repeating:  ***Counsel filed its Notice of Appearance in this case without Deutsche's knowledge or consent.***

5.      In fact, the oddity goes beyond that.  Counsel has admitted that its appearances in cases such as this did not result from being retained by Deutsche, but from Counsel doing docket searches on her own accord.

6.      These facts beg some troubling questions.   Why would Counsel make an appearance in a lawsuit on behalf of Deutsche, without its knowledge or consent, where Deutsche chose to default and has no stake in the outcome?  And why would Counsel take it upon herself to search dockets for existing cases against Deutsche where Deutsche had not retained her?

7.      For reasons that will become clear as the instant motion is adjudicated, Deutsche does not stand to gain (or lose) no matter the outcome of this litigation.

8.      Unlike Deutsche, Ocwen Loan Servicing, LLC ("Ocwen") and PHH Mortgage Corp. ("PHH") do have a stake in the outcome.  Specifically, PHH is the party that stood to benefit from the underlying foreclosure, not Deutsche.

9.      Counsel, meanwhile, has no attorney-client relationship with Deutsche, but it has one with PHH.

10.     PHH pays Counsel's invoices, not Deutsche.

11.     PHH retained Counsel in the Lawsuit, not Deutsche.

12.     PHH directs Counsel's actions, not Deutsche.

13.     PHH, however, is not a party, either in this action or the Lawsuit.  Attempting to reap the benefits from this litigation even though it is not a party, PHH has been using Deutsche's name to litigate.  To accomplish this nefarious end, PHH has been lying to its own attorneys, telling Counsel that it is the agent of Deutsche and authorized to act on its behalf, when it is not.  In fact,

this fraudulent scheme is part and parcel of Defendant's proposed counterclaim in the instant action.

14.     PHH's primary tool in its ongoing efforts to carry out this fraudulent, illegal, and perjurious scheme is a Limited Power of Attorney from Deutsche ("the LPOA").  As Plaintiffs explained in their Complaint in this action – allegations to which Deutsche chose to default after personal service – the LPOA does not actually create an agency relationship between Deutsche and PHH.  Rather, the LPOA is only made to appear that way to facilitate the fraudulent, illegal, and perjurious efforts of PHH to litigate in the name of Deutsche and reap the rewards of this litigation for itself.

15.     Prior to filing the instant motion, Plaintiffs and their previous counsel apprised Counsel of the fraudulent, illegal, and perjurious acts identified herein.  First, the undersigned presented Counsel with an affidavit from Ronaldo Reyes ("Reyes"), the Vice President of Deutsche Bank National Trust Company, so reflecting.  Additionally, Defendant apprised Counsel of these facts by telephone.  Then, Plaintiffs and their prior counsel explained this fraudulent scheme in various pleadings.  Unfortunately, rather than acknowledge their own, ethical duties, PHH merely doubled down on the misconduct, retaining Beth Norrow, Esq. and Greenberg Traurig, P.A. as escalation counsel.  Counsel is now facilitating the fraudulent, illegal, and perjurious misconduct of PHH by appearing as Counsel for Deutsche at the behest of PHH despite knowing that PHH is not actually Deutsche's agent.

16.     In light hereof, this Court should strike Counsel's Notice of Appearance, disqualify them as counsel, and impose sanctions for fraud on the Court.  These sanctions should include, but not be limited to, an order denying any motion to vacate the default against Deutsche, entry of final judgment on the default, and all attorney's fees incurred in prosecuting this case.

## ANALYSIS

17.    Most of the pertinent facts are not in dispute:

- Counsel has no attorney-client relationship with Deutsche

- Counsel has no fee agreement with Deutsche

- Counsel's invoices are paid by PHH, not Deutsche

- Counsel's client is PHH, not Deutsche

- Deutsche has no stake in the outcome of this litigation

This latter point is indisputably true yet merits clarification.

18.    In collateral litigation between these parties, Deutsche has repeatedly asserted, under oath, that it was damaged as a result of Plaintiffs' non-payment of a promissory note.  This allegation is critical to the parties' underlying dispute, as it purports to give Deutsche a stake in the outcome.  Yet it is plainly and demonstrably untrue.  Deutsche has no damages.  Regardless of the outcome of the Lawsuit or the instant case, Deutsche has nothing to gain (or lose).

19.    In his affidavit, Reyes conceded as much, acknowledging, in a materially indistinguishable case, that Soundview Home Loan Trust 2004-1 ("the Trust") is a pass-through trust and Deutsche collects the same, fixed, monthly payments, and distributes them to the Certificateholders of the Trust, regardless of whether the borrowers on the underlying loans are in default.  See Exhibit "A."  This is precisely what Plaintiffs alleged in the Complaint in this action.

20.    The bone of contention, and what will prompt Counsel to stand on the table in opposition to this motion, is the existence of the LPOA.  As Counsel would have it, the LPOA makes PHH the agent and attorney in fact for Deutsche, allowing PHH to control this case and the Lawsuit in the name of Deutsche.  Put differently, Counsel would have this Court believe PHH is the agent for Deutsche and is authorized to proceed on its behalf.

21.     Counsel is mistaken.  Worse yet, they know it.

22.     Under long-standing Florida law, a principal-agent relationship requires that the principal maintain control of the actions of the agent.  See Goldschmidt v. Holman, 571 So. 2d 422 (Fla. 1990).  In the words of the Florida Supreme Court:

> Essential to the existence of an actual agency relationship is (1) acknowledgement by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent.  Restatement (Second) of Agency § 1 (1957).  The record is devoid of any evidence to support a finding of the third element.
>
> Although Goldschmidt may have known that the Holmans wanted to hold him liable for Soud's actions, see Holman ex rel. Holman v. Goldschmidt, 550 So. 2d 499, 504 n.4 (Fla. 1st DCA 1989), this cannot excuse the Holmans' failure to appropriately plead or present the evidence necessary to support actual agency.

Id. at 424, n.5.

23.     Here, the purported agency relationship between Deutsche and PHH is predicated upon the LPOA, executed by Reyes.  Yet Reyes is already on record, under oath, explaining the dynamic between PHH and Deutsche.  His testimony shows, notwithstanding the LPOA, that PHH is not the agent of Deutsche.  See Exhibit "A" hereto.  After all, all loan-level decisions are made by PHH without input from Deutsche.  To borrow the vernacular from the Florida Supreme Court, Deutsche does not maintain "control over the actions" of PHH, so an agency relationship does not exist.  Id.

24.     This is not merely a situation where a technical element of agency is missing.  If an actual agency relationship existed, PHH would be acting at the behest of Deutsche and collecting proceeds on its behalf.  That is the essence of an agency, i.e. someone purporting to act on behalf of another.  Yet that is not what is happening.  PHH is not acting on behalf of Deutsche or for its benefit.  Instead, PHH is using Deutsche's name to act for the benefit of itself.  Indeed, PHH is the only party that stands to benefit from the Lawsuit and the instant case, not Deutsche, and PHH has

*been lying about it for years*.  Now, by appearing in this case after Deutsche chose to default, despite knowing about Reyes' affidavit, Counsel has joined PHH in these misrepresentations.

25.     That might sound harsh.  Yet the fraudulent, illegal, and perjurious representations of PHH permeate both this proceeding.  Counsel's knowledge of this fraud is seen in its conduct in a related case between Counsel and Plaintiffs' prior lawyers.  See Hahn v. Deutsche Bank, Pinellas County Case No. 20-3116-CI ("the Hahn Case").

26.     In the Hahn Case, Plaintiffs' previous counsel made essentially these same allegations, seeking to disqualify Counsel.  Instead of acknowledging the impropriety of its actions, Counsel doubled down, filing an Affidavit of Ronaldo Reyes.  See Exhibit "B."  That Affidavit was obviously inadequate, as it did not attach the documents upon which it relied.  As such, as part of a hearing on the Motion to Disqualify Counsel, the undersigned subpoenaed Deutsche to produce the documents referenced in this affidavit, *i.e.* those upon which it relied to support an agency relationship between PHH and Deutsche, and bring them to the hearing. Counsel refused.  Despite the Subpoena, Deutsche did not attend, nor did it produce the documents. Even after the judge in the Hahn Case directed an evidentiary hearing to be scheduled, Counsel still refused.

27.     Defendant's point is simple.  Counsel knows that there are no documents that support the existence of an agency relationship between PHH and Deutsche.  Counsel knows its representation is unauthorized.  Yet it is continuing to act as counsel for Deutsche – without an attorney-client relationship with Deutsche and at the direction of PHH – in furtherance of the fraud scheme.

28.     Where Deutsche has no stake in the outcome of the litigation, it is not the "real party in interest" and lacks standing to litigate.  See Nedeau v. Gallagher, 851 So. 2d 214 (Fla. 1st

DCA 2003) ("Standing depends on whether a party has a sufficient stake in a justiciable controversy, with a legally cognizable interest which would be affected by the outcome of the litigation.  The interest cannot be conjectural or merely hypothetical.  Furthermore, the claim should be brought by, or on behalf of, the real party in interest.") (internal citations omitted). Similarly, where an agency relationship with PHH and Deutsche is lacking, PHH does not possess the note as an agent for Deutsche, but in its own stead, defeating the concept of "constructive possession."  See Rosa v. Deutsche Bank Nat'l Trust Co., 191 So. 3d 987 (Fla. 2d DCA 2016) (reversing foreclosure judgment where evidence showed the servicer possessed the note itself, not as an agent for the plaintiff trust).

29.     Some of that is a discussion on the merits.  For purposes of the instant motion, the analysis is a bit simpler.

30.     PHH is not the agent of Deutsche.  As a result, Counsel is not authorized to make an appearance as counsel of record for Deutsche merely because PHH tells it to do so.  For that reason alone, the Notice of Appearance is unauthorized and should be stricken.

31.     The lack of an agency relationship aside, the facts at bar reveal a myriad of conflicts of interest that prohibit Counsel's representation of Deutsche in this case at the behest of PHH.

32.     As R.Reg.Fla.Bar 4-1.7(a) provides, a lawyer shall not represent a client if:

(1) the representation of 1 client will be directly adverse to another client; or
(2) there is a substantial risk that the representation of 1 or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

33.     Here, there can be no doubt that Counsel cannot be counsel of record for Deutsche in this case while simultaneously acting as counsel for PHH (both in this proceeding and other, pending cases).  After all, there are several reasons why Counsel's representation of Deutsche will

be directly adverse to that of PHH and why that representation will be materially limited by Counsel's responsibilities to each client.

34.     First, conflict-free counsel for Deutsche would deny knowledge of, and disavow, the actions of PHH precipitating this lawsuit.  PHH, conversely, would be better served by claiming that Deutsche knew about, and signed off on, all of its conduct.  Counsel cannot simultaneously assert the same position for both.  The conflict from it representing Deutsche in this case while representing PHH and taking direction from PHH precludes representation.  See Young v. Achenbauch, 136 So. 3d 575, 581-583 (Fla. 2014) (citing R.Reg.Fla.Bar 4-1.7 and 4-1.9).

35.     By way of example,[1] Plaintiffs claim, and the evidence shows, that Deutsche committed perjury by filing a verified pleading alleging it was damaged by Plaintiffs' non-payment.  It would behoove Deutsche to assert PHH filed this pleading without its knowledge or consent and to seek indemnification for all losses incurred as a result of this misconduct, as authorized under the LPOA.  In fact, anyone representing the best interests of Deutsche would acknowledge that its best approach would be to throw PHH under the bus and resolve these claims as quickly, inexpensively, and quietly as possible (particularly since Deutsche has nothing to gain from the litigation).

36.     PHH, conversely, would be better-served asserting Deutsche consented to, knew about, and/or ratified its misconduct, allowing it to prosecute fraudulent claims in its name.  PHH may also want to contend that the indemnification language in the LPOA is not triggered because Deutsche participated in the fraud scheme, as illegal conduct cannot be indemnified.  See Claire's Boutiques, Inc. v. Locastro, 85 So. 3d 1192 (Fla. 4th DCA 2012).

---

[1]     Of course, many more conflicts of interest, as between PHH and Deutsche, are evident from the face of the counterclaim in this action.

37.     These positions are clearly inconsistent and cannot be simultaneously asserted by the same counsel.

38.     Second, conflict-free counsel would realize that it does not help Deutsche to continue litigating in its capacity as trustee where it is no longer licensed to act as a securities administrator, particularly where it has no stake in the outcome of the litigation.  Conversely, PHH wants to continue litigating, notwithstanding the illegality of Deutsche holding itself out as a trustee, so it can reap the rewards of the litigation.  Counsel cannot simultaneously assert the same position for both.  The conflict from it representing Deutsche in this case while taking direction from PHH is evident and precludes representation.  See Young, 136 So. 3d at 581-583.

39.     The point is clear.  PHH is not the agent of Deutsche as a matter of law, so Counsel cannot represent Deutsche in this action merely because PHH tells it to.   Additionally or alternatively, even if an agency relationship exists between Deutsche and PHH, Counsel is ethically prohibited from representing the two simultaneously under R.Reg.Fla.Bar 4-1.7.   As such, this Court should strike Counsel's Notice of Appearance in this action and/or enter an order disqualifying them from proceeding as counsel for Deutsche.

40.     In the Complaint, Plaintiffs gave Counsel the benefit of the doubt as to its knowledge of the fraudulent, illegal, and perjurious misconduct described herein.  At this point, though, there is no doubt that Counsel is aware of the true facts and is trying to proceed anyway.  As such, this Court should impose a monetary sanction against Counsel, to include all attorney's fees incurred litigating this case.

WHEREFORE Plaintiffs respectfully request relief in accordance with the foregoing and any other and further relief that this Court deems proper.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been furnished via the

EPortal to Beth Norrow, Esquire on this 7th day of January, 2021.


IVANOV & WOLF, PLLC
Attorney for Defendant
3310 W. Cypress St, Suite 206
Tampa, FL 33607
Telephone: 813-870-6396
Matt@IWFirm.com

By:   /s/ Matthew D. Wolf
      MATTHEW D. WOLF, FBN: 92611

Case 8:21-cv-00349-SDM-JSS   Document 1-3   Filed 01/12/21   Page 409 of 428 PageID 420

IN THE CIRCUIT COURT OF THE
FOURTEENTH JUDICIAL CIRCUIT IN
AND FOR BAY COUNTY, FLORIDA

MICHAEL HAULSEE and
MARCIA HAULSEE,

      **Plaintiff,**               **CASE NO.: 2020-001663-CA**

vs.

DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Trustee

      **Defendant.**

_____/

## <u>MOTION TO QUASH SERVICE OF PROCESS</u>

    Defendant, **DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE**

**("DBNTC")**, by and through undersigned counsel, moves quash service of process, and as grounds

therefore states:

    1.     Plaintiffs, MICHAEL and MARCIA HAULSEE (collectively "Haulsees") initiated

this action on September 23, 2020, naming DBNTC as the "alter ego" of the entity that foreclosed

on Haulsees' property in Pinellas County, Florida. (Complt. ¶14).[1]

    2.     Haulsees purportedly served the Summons and Complaint in this matter on CT

Corporation System ("CT Corp"), which is not the registered agent for DBNTC. *See* Affidavit of

Service filed October 7, 2020, attached hereto as **<u>Exhibit "A"</u>**; *see also* Rejection Letter, attached

hereto as **<u>Exhibit "B"</u>**.

---

[1] An identical cause of action was filed by Haulsees against the foreclosing lender in Okaloosa County, Florida. That matter was removed to Federal Court on September 15, 2020 and transferred sua sponte to the Middle District of Florida, Tampa Division, where is remains pending under case #8:20-cv-2410-T-60SPF.

**Lack of Service of Process**

3.      Haulsees are seeking entry of judgment by default in this matter without disclosing to this Court that they KNOW they did not effectuate service of process on DBNTC.

4.      Haulsees purportedly attempted to serve the Summons and Complaint on DBNTC, via CT Corp in New York.  *See again* Exhibit "A".

5.      However, CT Corporation is not the registered agent for DBNTC and thus was not authorized to accept service on its behalf.  *See again* CT Corp rejection letter, **Exhibit "B"**.

6.      Defendant DBNTC is a national banking association organized under the laws of the United States to carry on the business of a limited purpose trust company.  *See* Certificate of Corporate Existence, attached hereto as **Exhibit "C"**.  DBNTC's main office is in Los Angeles, California and its principal office of trust administration is in Santa Ana, California*.  Id.*

7.      Haulsee and their counsel, Lee Segal, Esq., have been informed by CT Corp on numerous occasions that CT Corp (a) is NOT the registered agent for DBNTC, and (b) cannot forward the Summons and Complaint to DBNTC.  *See* Other CT Corp Rejection Letters, attached hereto as **Exhibit "D"**.

8.      Indeed, CT Corp has repeatedly rejected Mr. Segal's efforts to serve process on DBNTC, yet Mr. Segal continues to improperly deliver documents to CT Corp to create the false appearance of 'valid service of process' knowing full well that DBNTC will not receive the pleadings and DBNTC will remain unaware of the pending litigation so that Mr. Segal can obtain Judgment by default.

9.      Pursuant to §607.0501, Fla. Stat., corporations in the state of Florida must designate a registered agent to accept service of process of lawsuits filed in Florida.

10.     However, §607.0501, Fla. Stat., does not apply to banks and Trust Companies. Pursuant to §607.0501(2), Fla. Stat., "**This section does not apply to** … **banks and trust companies** subject to the provisions of the financial institutions codes." (Emphasis added).

11.     DBNTC has not designated CT Corp as its registered agent and DBNTC is not required to designate a registered agent in the state of Florida. *Id.*

12.     Accordingly, Haulsees' delivery of the Summons and Complaint to CT Corp was improper and failed to constitute valid service of process on DBNTC.

13.     Pursuant to the foregoing, there is an error on the face of the return of service in that it indicates the Summons and Complaint were delivered to a third-party that is not named in this action and is not the registered agent for DBNTC.  As such, service of process is defective on its face and must be quashed.

14.     Until proper service is made, the Court is without jurisdiction to hear Plaintiff's claims.  *See MAC Org., Inc. v. Harry Rich Corp.*, 374 So. 2d 81, 83 (Fla. 3d DCA 1979) (court lacks in personam jurisdiction without service upon the registered agent).

15.     Further, under Florida law, "[i]f service of process is so defective that it amounts to no notice of the proceedings, the judgment is void" and may be collaterally attacked at any time pursuant to Rule 1.540(b)(4).  *Floyd v. Fed. Nat'l Mortg. Ass'n*, 704 So. 2d 1110, 1112 (Fla. 5th DCA 1998).

16.     "The burden of proving proper service of process falls upon the party invoking the court's jurisdiction."  *Re-Employment Servs., Ltd. v. Nat'l Loan Acquisitions Co.*, 969 So. 2d 467, 471 (Fla. 2d DCA 2007) (when there is an error or omission in the return of service of process, personal jurisdiction is suspended, and it lies dormant until proper proof of valid service is submitted).

17.     Due to improper service of process, this Court lacks jurisdiction over DBNTC until such time as proper service is perfected.

WHEREFORE, DBNTC respectfully requests this Court enter and order quashing service of process on DBNTC together with such other relief the Court deems just and appropriate in this matter.

Dated: January 11, 2021                          Respectfully submitted,

Jason H. Okleshen, Esq.                          Beth A. Norrow, Esq.
Florida Bar No. 496170                           Florida Bar No. 061497
Okleshenj@gtlaw.com                              norrowb@gtlaw.com
**GREENBERG TRAURIG, P.A.**                      **GREENBERG TRAURIG, P.A.**
777 S. Flagler Dr., Ste. 300 East                450 S. Orange Ave., Ste. 650
West Palm Beach, FL 33401                         Orlando, FL 32801
Telephone: (561) 650-7915                         Telephone: (407) 420-1000
Facsimile: (561) 655-6222                         Facsimile: (407) 420-5909
                                                  Secondary email: dunnla@gtlaw.com
                                                  FLService@gtlaw.com

                                                  By: /s/ *Beth A. Norrow*
                                                       Beth A. Norrow

*Counsel for Defendant, Deutsche Bank National Trust Company, As Trustee*

### **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 11, 2021, a true and correct copy of the foregoing was filed with the Clerk of the Court using the State of Florida e-filing system which will send a notice of electronic service to:

Carla Turner-Hahn, Esq.                          Matthew D. Wolf
615 Whisper Woods Dr.                            3310 W. Cypress St., Ste. 206
Lakeland, FL 33813                               Tampa, FL 33607
carlathahn@gmail.com                             matt@iwfirm.com

                                                  /s/ Beth A. Norrow
                                                  Beth A. Norrow

4

Filing # 114614270 E-Filed 10/07/2020 04:57:04 PM

**EXHIBIT A**

IN THE CIRCUIT FOURTEENTH JUDICIAL CIRCUIT
IN AND FOR BAY COUNTY FLORIDA
Attorney: Segal & Schuh Law Group P.L.  PH: (727) 824-5775
Address: 18167 US Highway 19 North Suite 100 Clearwater , NY 33764

Job #: 200664
Client's File.:

**AFFIDAVIT OF SERVICE**

Michael Haulsee and Marcia Haulsee

*Plaintiff*

Deutsche Bank National Trust Company

*Defendant*

Index Number: 200001663CA

Date Filed: 9/23/2020

Date Received  9/23/2020 at 12:22 PM

Court Date:

STATE OF NEW YORK, COUNTY OF SUFFOLK, SS.:
Michael S. Levey , being sworn says: Deponent is not a party herein; is over the age of 18 years and resides in the State of .
On 9/24/2020, at **1:04 PM** at: **CT CORP  28 LIBERTY STREET, NY, NY 10005** Deponent served the within **Summons and Complaint**

upon: DEUTSCHE BANK NATIONAL TRUST COMPANY,  therein named.

☐ **#1 INDIVIDUAL**
By delivering a true copy of each to said recipient personally; Deponent knew the person so served to be the person described in as said recipient therein.

☐ **#2 SUITABLE AGE PERSON**
By delivering thereat a true copy of each to  (Authorized Agent) a person of suitable age and discretion. Said premises is recipient's:☐ actual place of business / employment ☐ dwelling house (usual place of abode) within the state.

☐ **#3 AFFIXING TO DOOR**
By affixing a true copy of each to the door of said premises which is defendants
☐ actual place of business / employment  ☐ dwelling house (usual place of abode) within the state. Deponent was unable with due diligence to find defendant or person of suitable age and discretion thereat having called there

☒ **#4 Corporation or Partnership or Trust or LLC or Medical Profession**
By delivering thereat a true copy of each to Gabriel Perez Messenger Room o/b/o CT Corp personally. Deponent knew said entity so served to be the entity described in said aforementioned document as said defendant and knew said individual to be an Authorized Agent thereof.

☐ **#5 MAILING**
On , deponent enclosed a copy of same in a postpaid envelope properly addressed to defendant at defendant's last known ☐ Actual Place of Residence ☐ Actual Place of Business, and deposited the envelope in an official depository, personally or via agency, under the exclusive care and custody of the U.S. Postal Service within New York State. The envelope bore the legend "personal and confidential" and did not indicate on the outside, thereof by return address or otherwise that the communication was from an attorney or concerned an action against the defendant.

☒ **#6 DESCRIPTION**
Sex: Male          Color of skin: White          Color of hair: Black     Glasses: No
Age: 22 - 35 Yrs.     Height: 5ft 4inches - 5ft 8inches          Weight: 161-200 Lbs. Other Features: Mask

☐ **#7 MILITARY SERVICE**
I asked the person spoken to whether defendant was in active military service of the United States or the State of New York in any capacity whatever and received a negative reply. The source of my information and the grounds of my belief are the conversations and observations above narrated.

☐ **#8 WITNESS FEES**  Subpoena Fee Tendered in the amount of

☒ **#9 OTHER**
Per Jacquelin Walton at the security desk,  the respondent Deutsche Bank of 60 Wall Street NY NY has directions to continue to serve process at CT Corp 28 Liberty Street NY NY 10005 as no one currently is present in the building who is authorized to accept legal papers.  As of 9/24/20 she does not know when this method will revert to the original service address.

Sworn to before me on 9/30/2020

_Robert Monteleone_

Robert J. Monteleone
NOTARY PUBLIC STATE OF NEW YORK
No. 02MO6010691
Qualified in Suffolk County
My Commission Expires October 16, 2022

_Michael S. Levey_

Michael S. Levey
1209939

Michael S.Levey 450 Route 25 A East Setauket NY 11733 631 786 8021 received by Attorney (Firm) and or Pro Se Litigant

o/b/o Segal & Schuh Law Group P.L.  (727) 824-5775 18167 US Highway 19 North Suite 100 Clearwater , NY 33764

# EXHIBIT B



September 25, 2020


Carla Turner-Hahn
Carla Turner-Hahn, P.A.
615 Whisper Woods Drive,
Lakeland, FL  33813

Re:  MICHAEL HAULSEE AND MARCIA HAULSEE, PLTFS. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, ETC., DFT.

Case No.  20001663CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538305571

Sent By Regular Mail

cc:  --

**(Returned To)**

Carla Turner-Hahn
Carla Turner-Hahn, P.A.
615 Whisper Woods Drive,
Lakeland, FL  33813

EXHIBIT C

## AFFIDAVIT OF ALEXANDRE C. HALOW FOR CT CORPORATION SYSTEM

STATE OF GEORGIA            )
                            )
COUNTY OF CLARKE            )

Alexandre C. Halow, being first duly sworn on oath, deposes and states as follows:

1.      I am over the age of 18 and competent to testify as to the matters contained herein.

2.      C T Corporation System ("CT") is a commercial registered agent, and in that capacity exists to receive and forward service of process on behalf of its customers.

3.      I am a Representation Services Advisor for CT. As such, I am familiar with the records maintained by CT in the ordinary course of business for the purpose of handling and processing the service of process CT receives on behalf of its customers. All statements made in this affidavit regarding service of process received by CT are made based on my review of those records.

4.      Based on my review of CT's records, CT is not the designated registered agent for an entity named "Deutsche Bank National Trust Company" in the state of New York.

5.      On July 13, 2020, CT Corporation received a Summons and Complaint in the matter entitled: *Carla Turner-Hahn and Jeffrey M. Hahn vs. Deutsche Bank National Trust Company, As Trustee For GSAA Home Equity Trust 2006-10, Asset-Backed Certificates, Series 2006-10*, Pinellas County Circuit Court Case # 2020-3116-CI (the "Matter"). Based on CT's records, the Matter was served on CT in New York.

6.      By letter dated July 15, 2020 (the "Rejection Letter") to Lee Segal, Esquire of Segal and Schuh Law Group, P.L., 18167 US Highway 19 North, Suite 100, Clearwater, FL

33764, CT Corporation rejected service of the Summons and Complaint received in the matter on July 13, 2020. A true and correct copy of the Rejection Letter is attached as **Exhibit A**.

7.      CT did not forward the Summons and Complaint received in the Matter to Deutsche Bank National Trust Company.

8.      CT's records do not reflect receipt of any other service related to the Matter.

**FURTHER AFFIANT SAYETH NAUGHT.**

DATED: December _8_, 2020

_Alexandre C. Halow_
Alexandre C. Halow
Representation Services Advisor for CT
Personally Known _____  OR
Produced Identification  _X_

Type of Identification Produced: GA Driver's License

Subscribed and sworn to before me
this _8th_ day of December, 2020, by
Alexandre C. Halow.

_Tracie E Burns_ Notary Public

State of Georgia
My Commission expires: 08/26/2024





July 15, 2020

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 N., Ste 100,
Clearwater, FL 33764

Re: JEFFREY M. HAHN and CARLA TURNER HAHN, Pltfs. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, etc., Dft.

Case No. 20003116CI

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation
System is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST
COMPANY.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 537939543

Sent By Regular Mail

cc: --
**(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 N., Ste 100,
Clearwater, FL 33764

## AFFIDAVIT OF ALEXANDRE C. HALOW

STATE OF GEORGIA      )
                           )
COUNTY OF CLARKE     )

Alexandre C. Halow, being first duly sworn and on oath, deposes and states as follows:

1.      I am over the age of 18 and competent to testify as to the matters contained herein.

2.      C T Corporation System ("CT") is a commercial registered agent, and in that capacity exists to receive and forward service of process on behalf of its customers.

3.      I am a Representation Services Advisor for CT. As such, I am familiar with the records maintained by CT in the ordinary course of business for the purpose of handling and processing the service of process CT receives on behalf of its customers. All statements made in this affidavit regarding service of process received by CT are made based on my review of those records.

4.      Based on my review of CT's records, CT is not the designated registered agent for an entity named "Deutsche Bank National Trust Company" in the state of New York.

5.      On July 24, 2020, CT received a Summons and Complaint in the matter entitled: *Jacaranda, LLC, as Trustee for the Certificateholders of the Brev 1144 Land Trust v. Deutsche Bank National Trust Company, as Trustee for Soundview Home Loan Trust 2004-1, Asset-Backed Certificates, Series 2004-1*, Brevard County Circuit Court Case # 05-2020-CA-035223 (the "Matter"). Based on CT's records, the Matter was served on CT in New York.

6.      By letter dated July 27, 2020 (the "Rejection Letter) to Lee Segal, Esquire of Segal and Schuh Law Group, P.L., 18167 US Highway 19 North, Suite 100, Clearwater, FL

33764, CT Corporation rejected service of the Summons and Complaint received in the Matter on July 24, 2020. A true and correct copy of the Rejection Letter is attached as **Exhibit A**.

7.      CT did not forward a copy of the Summons and Complaint received in the Matter to Deutsche Bank National Trust Company.

8.      CT's records do not reflect receipt of any other service related to the Matter.

**FURTHER AFFIANT SAYETH NAUGHT**.

DATED: November 5, 2020

Alexandre C. Halow
Representation Services Advisor for CT
Personally Known _____ OR
Produced Identification _____.

Subscribed and sworn to before me
this 25 day of November, 2020, by
Alexandre C. Hallow .

_____, Notary Public

Type of Identification Produced: GA Driver's License

State of Georgia
My Commission expires: 05/26/2024



Exhibit A



July 27, 2020

Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL 33764

Re: Jacaranda, LLC, etc., Pltf. vs. Deutsche Bank National Trust Company, etc., Dft.

Case No. 052020CA035223XXXXXX

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 537994646

Sent By Regular Mail

cc: --

**(Returned To)**

Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL 33764

# EXHIBIT D



August 18, 2020

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL  33764

Re:  INLAND ASSETS, LLC, ETC., PLTF. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, ETC.,
DFT.

Case No.  2020CA001794CAAXWS

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation
System is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST
COMPANY.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 538115335

Sent By Regular Mail

cc:  --
 **(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North,
Suite 100,
Clearwater, FL  33764



October 27, 2020


Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 1.00,
Clearwater, FL  33764

Re:  4417 RUDDER WAY LAND TRUST, ETC., PLTF. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, ETC., DFT.

Case No.  20245CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538459207

Sent By Regular Mail

 cc:  --


**(Returned To)**

Lee Segal, Esquire
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 1.00,
Clearwater, FL  33764



November 09, 2020

MEGAN LAZENBY
Lazenby Law, LLC
4927 Southfork Drive,
Lakeland, FL  33813

Re:  ABUNDANT LIFE HOMES, LLC, Pltf. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, etc.,
Dft.

Case No.  20194CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation
System is not the registered agent for an entity by the name of Deutsche Bank National Trust Company.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 538556685

Sent By Regular Mail

cc:  --
  **(Returned To)**

MEGAN LAZENBY
Lazenby Law, LLC
4927 Southfork Drive,
Lakeland, FL  33813



October 20, 2020


Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764

Re:  WALLACE COOK, Pltf. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, etc. and DEUTSCHE
BANK TRUST COMPANY AMERICAS, etc., Dfts.

Case No.  20CA270

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST CO.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538419381

Sent By Regular Mail

 cc:  --


**(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764



October 09, 2020


Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764

Re:  RICHARD DECOURSY, PLTF. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, ETC., DFT.

Case No.  20001724CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538379908

Sent By Regular Mail

cc:  --


**(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL  33764



August 19, 2020

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL 33764

Re: JEFFREY M. HAHN and CARLA TURNER HAHN, Pltfs. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, etc., Dft.

Case No. 2020CA002487000000

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System is not the registered agent for an entity by the name of Deutsche Bank National Trust Company.

CT was unable to forward.

Very truly yours,

C T Corporation System

Log# 538124660

Sent By Regular Mail

cc: --
 **(Returned To)**

Lee Segal
Segal & Schuh Law Group, P.L.
18167 U.S. Highway 19 North, Suite 100,
Clearwater, FL 33764



September 25, 2020


Carla Turner-Hahn
Carla Turner-Hahn, P.A.
615 Whisper Woods Drive,
Lakeland, FL  33813

Re:  MICHAEL HAULSEE AND MARCIA HAULSEE, PLTFS. vs. DEUTSCHE BANK NATIONAL TRUST
COMPANY, ETC., DFT.

Case No.  20001663CA

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538305571

Sent By Regular Mail

 cc:  --


**(Returned To)**

Carla Turner-Hahn
Carla Turner-Hahn, P.A.
615 Whisper Woods Drive,
Lakeland, FL  33813

# CT

November 30, 2020


LAUREN L. BRODIE
COLLIER COUNTY - 20th JUDICIAL CIRCUIT COURT
3315 TAMIAMI TRAIL EAST,
SUITE 203,
NAPLES, FL  34112

Re:  TAMMY KENNY, Pltf. vs. DEUTSCHE BANK NATIONAL TRUST COMPANY, etc., Dft.

Case No.  112020CA0033090001XX

Dear Sir/Madam:

After checking our records and the records of the State of NY, it has been determined that C T Corporation System
is not the registered agent for an entity by the name of DEUTSCHE BANK NATIONAL TRUST COMPANY.

CT was unable to forward.

Very truly yours,


C T Corporation System

Log# 538662072

Sent By Regular Mail

cc: --


**(Returned To)**

LAUREN L. BRODIE
COLLIER COUNTY - 20th JUDICIAL CIRCUIT COURT
3315 TAMIAMI TRAIL EAST,
SUITE 203,
NAPLES, FL  34112

FILED 12/ 9 /20 14:51 Collier Co

RECEIVED

DEC  8 2020

LAUREN L. BRODIE
CIRCUIT JUDGE